UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,            )
                    Plaintiff,       )
                                     )
                                     )
vs.                                  )  No. 08-10385-RGS
                                     )
                                     )
PRUDENCE KANTENGWA,                  )
a/k/a PRUDENTIENNE KANTENGWA,        )
                    Defendant.

BEFORE:  THE HONORABLE RICHARD G. STEARNS

JURY TRIAL DAY 3

John Joseph Moakley United States Courthouse
Courtroom No. 21
One Courthouse Way
Boston, MA 02210

APRIL 25, 2012

9:10 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by ALOKE CHAKRAVARTY, ASSISTANT UNITED STATES ATTORNEY, and JOHN A. CAPIN, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Boston, Massachusetts 02210;

For the Defendant:

    Federal Public Defender Office, by CHARLES P. McGINTY, ESQ., 51 Sleeper Street, Boston, Massachusetts  02210;
        and
    Federal Public Defender Office, by BJORN LANGE, ESQ., 18 North Main Street, Concord, New Hampshire 03301.

I N D E X

Testimony of:                Direct   Cross   Redirect   Recross

ERIC BENN
   by Mr. Capin          2-8              2-52, 2-55
   by Mr. McGinty                 2-37              2-53, 2-56

RICHARD WALLEN
   by Mr. Capin          2-57             2-111
   by Mr. McGinty                 2-87              2-117


DOROTHY MICHAUD
   by Mr. Chakravarty    2-118


E X H I B I T S

No.       Description                          In Evd.

21E, 21F,      Photographs                     2-14
21G and 21H

21B            Aerial photograph               2-49

21C            Aerial photograph               2-49

21D            Aerial photograph               2-49

2              Non-immigrant visa applications  2-77

3              Refugee application             2-77

23             Dept. Of State cable            2-111

PROCEEDINGS

THE CLERK:  All rise.

THE COURT:  Counsel, if you're going to file motions at the last minute, you have to at least show up in court and not hold up the jury before we begin the trial.  I think it's unreasonable to file motions at three minutes of nine and then hold up the jury while we try to decide them, so in the future I expect a little more forepromise.

MR. McGINTY:  I apologize for yesterday, your Honor.  I was here timely today.  There were motions filed at the last minute, and some were occasioned by what the government had noticed yesterday, but I do apologize yesterday for not having been here on time.

THE COURT:  All right.  I have a motion to admit Exhibit 20.  I've already ruled on that from the government.  I was given a motion for a review of documents last night, but it's never been put on the docket, so it's technically not before the Court.

THE CLERK:  It was put on this morning, Judge.

THE COURT:  It was?

THE CLERK:  Yes, Mr. McGinty put it on this morning.

THE COURT:  I'm assuming that's something I can get to.

MR. McGINTY:  I filed that, your Honor, in anticipation of the government possibly putting those documents

in today.  I don't know whether they plan on doing that or not, but that's the possibility.

THE COURT:  Well, I don't think I need to hear argument on that now.  That's a paper exhibit that can always be supplemented at the appropriate period of time, if necessary.  That then leaves, I only then have one other motion the best I can tell to exclude the RTLM shareholder list.

MR. McGINTY:  That is correct.

THE COURT:  Does the government have any intention of offering it?

MR. CHAKRAVARTY:  We do, your Honor, but in light of yesterday's testimony of Dr. Longman, this was a document that came in the A file, that the second witness this morning is expected to talk about the documents that are in the A file. She's not going to talk substantively about the list, but these authenticate that this is one of the documents that was found in the file.

The exhibit itself is probative of the fact that after Dr. Longman testified to the nature of the RTLM radio station that in fact the defendant was a shareholder of that radio station.  There's also testimony in the immigration court proceedings in which she acknowledges that she was such a shareholder.

THE COURT:  Why is that relevant to anything we're doing?

MR. CHAKRAVARTY:  It's relevant to suggesting that in fact she acted in conformity with what the MRND position was. As Dr. Longman testified to, RTLM was essentially an MRND mouthpiece during the lead-up to the genocide, the fact that she was --

THE COURT:  I thought we were not trying her for genocide, that she lied on her application for a Visa?

MR. CHAKRAVARTY:  Fair enough.  Your Honor, we don't have a membership list of the MRND.  The way we're going to have to prove that is by witness testimony evidencing what she said, what she did, what she wore and other manifestations of her affiliation with the MRND.  This is one of those manifestations, the fact that she subscribed to at least in terms of support of the radio station, that was a mouthpiece of evidence.

THE COURT:  That may be relevant.  I'll admit it.

MR. McGINTY:  Your Honor, I differ.  The RTLM list does not equal the MRND list.  That's the inference that's admissible.  The testimony yesterday from Dr. Longman, he acknowledged that the initial document that created the RTLM had provided that it was intended to contribute to the strengthening of pure democracy and not to broadcast any information that would cause divisions in the community or provoke aid or dissent.

Whatever it is that RTLM then morphed into later is a

separate issue, so whether it was at its inception what the government claims or later on that became that is highly significant, and the government has offered no proof. In fact, Dr. Longman's testimony suggests the opposite.

THE COURT: I think the government is saying it doesn't really matter what the purpose of the radio station was, that it was in fact the party's station and that one who is a shareholder in it, the jury might well infer was in fact a member of the MRND despite the defendant's denial of having been so affiliated.

MR. McGINTY: Your Honor, I didn't cross on that, and I didn't cross on that because the government had not noticed that it was putting in the RTLM shareholder list and didn't open on this. There were Tutsis who were shareholders in RTLM. There were several prominent members of the RPF who were shareholders in RTLM.

THE COURT: I think the jury is ready.

THE CLERK: All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE CLERK: The case before this Court carries Case No. 08-CR-10385, United States of America vs. Prudence Kantengwa.

THE COURT: Good morning again, counsel; good morning, jurors. I'm sorry we're starting a little late. We've got to plan ahead for traffic, that's the price of living around

Boston, I think.  Let's see if we can make up some time here.

Next witness.

        MR. CAPIN:  Your Honor, the government calls Eric Benn.

        ERIC BENN, having been duly sworn by the Clerk, testified as follows:

        THE CLERK:  Please state your name and spell your last name for the record.

        THE WITNESS:  My name is Eric Benn, B-e-n-n.

                    DIRECT EXAMINATION

BY MR. CAPIN:

Q.    Good morning, Mr. Benn.  Would you please tell this jury what you do for a living.

A.    Good morning, I am the senior GEOINT advisor for an element of the U.S. government.  I work for the Department of Defense, and the agency I work for is a member of the intelligence community.

Q.    Would you please tell the jury what you mean by the term "GEOINT"?

A.    GEOINT is a classic government kind of parlance for a discipline in the intelligence community.  We have intelligence disciplines.  You're probably familiar with the more traditional, well-known HUMINT, which is the spying that CIA and others do to try to recruit agents.  There's also SIGINT, where we try to intercept signals, be they communications of

terrorists or military communications.

GEOINT is the Geospatial intelligence.  It consists of imagery, imagery intelligence and mapping, charting and geodesy kinds of data.  Imagery is taken from various platforms or sensors, be they aircraft, be they satellites.  Imagery intelligence is the analysis that's derived from that imagery, and then M, C and G, mapping, charting and geodesy are the kinds of features that are recorded onto maps or charts or other kinds of systems related to navigation or the operations of military systems or other things like that.

Q.   How long have you been engaged in the field of analysis of images?  Am I correct in understanding that's essentially what you do, you analyze images collected from various platforms from satellites?

A.   That is the case, from satellites and many other imagery sources.  I joined the Army in 1976.  The Army had recently converted the field that I went into from photo interpretation to imagery interpretation.  It used to be it was routine, just photos, black and white or color pictures, but as the imagery systems became more complex and capable to include radar and infrared and spectral sensors and other what we call phenomenology, we changed the term to imagery.

I've been involved in imagery intelligence since I started my training in the Army in 1976 and essentially have been involved in imagery exploitation and analysis since that

time.

Q.    Are you currently with the Army or with the military?

A.    I am not.  I am a defense civilian, so I am an employee of the Department of Defense.  I did a single tour with the Army and then completed my assignment there.

Q.    Very briefly, if you would, would you please just review for the jury your chronology of your career with the Department of Defense?

A.    I did three-year tour with the Army.  I was assigned in Germany working a indications and warning mission looking for the movement or mobilization of the Soviet divisions across the Fulda Gap and the border, completed that and came home.  I got out of the service, I still had a reserve obligation but was never called up.  I went to graduate school and received an advanced degree in what's called remote sensing, the civil side of the imagery exploitation business.  I worked with NASA, landsat data and learned the processing for kind of the civil applications of using imagery.

        Having completed that master's degree in '83, I joined the Defense Intelligence Agency as an imagery analyst and worked initially as a routine analyst for awhile in Korea, then Afghanistan, got promoted to a branch senior analyst, then a division senior analyst and the office senior analyst.

        The agency I'm now employed with was formed in 1996, and I've been the senior analyst or initially the analytic

research director, the person who compiled our analytic research program for all of our analysts and then am now the senior advisor for our agency doing the analytic missions that we're involved in.

Q.   Are you in fact the most senior analyst at the Department of Defense with regard to image analysis?

A.   The Department of Defense and the intelligence community, yes, I do have that title and position.

Q.   Now, does the civilian personnel corps., the civilian employees of the Department of Defense, does your title have an equivalent of what we might recognize as a military title?

A.   Yes, there is.  There are senior executive service or managers in the civil service, and then there are what are called specialists.  I'm a DISL, Defense Intelligence Senior Level, and that rank kind of in the priority and protocols are the equivalent of about a two-star general or a vice admiral, the admiral equivalent, two star.

Q.   Two star general or admiral depending on the branch of the service?

A.   Correct.

Q.   Approximately how many images have you analyzed in your 30 or so years as an analyst?

A.   I would be completely unable to describe a precise number, but it would be many tens of thousands.

Q.   Have you always reviewed the work of other less senior

analysts in your field?

A.    Yes, absolutely.  When I was initially asked to serve as the branch senior analyst, I was reviewing the analysis, both the analytical product but also the analytical substance that went into the finished product of 15 or 20.  Now there are several thousands analysts in our organization, and I am routinely asked to review the analytic trade craft, the soundness of the methods that they use and the quality and the thoroughness of the analytical product that they furnish to our military customers, to the policy customers and the others that we support in the U.S. government.

Q.    Can you tell the jury in a nutshell what's involved in analyzing a particular image?

A.    An analysis of an image, you'll have routinely the requirements, the intelligence problem or the analytic issue that the image was collected in accordance to, so you will understand what the information needs were that drove the collection of that image, so, for instance, if we're looking to look for evidence that the North Korean military forces are massing to potentially invade the south, we would be looking at military garrisons, be they submarine bases or airfields and ground garrisons, and the analysts hopefully will have had some understanding of what that target is about, and they'll be looking for significant activities, mobilization, weapons loading, unusual kinds of activities.

Conversely, if we're looking for evidence that terrorists are using a safe house, we might be looking for evidence that there are vehicles present or there might be unusual security, or we might even be looking for other indications from the heat of a facility or other kinds of evidence, so we're looking for we call them EEIs, essential elements of information that would be in the image or in the topic or target or thing that's collected and acquired on the image and looking to describe or understand what that is.

Q.   Did you analyze a number of images in connection with this case?

A.   I have done that, yes.

Q.   On the table in front of you, sir, is an exhibit that's marked Exhibit 21.  Do you see that?

A.   I do.

Q.   Would you pull that out of its sleeve.  They are in a particular order.  Flip through those and tell me are those among the images you analyzed?

A.   These look very familiar, and I will relay, yes, these are images that I have analyzed.

Q.   I'd like you to explain to the jury with regard to each image what your analysis involved and what observations you were able to make based on those images.

         MR. CAPIN:  Your Honor, with the Court's permission, may Mr. Benn approach the podium and do this from the computer?

THE COURT:  I think it would be easier for the jury if he does.

MR. CAPIN:  Thank you.  May I be seated so I can continue to watch the screen?

THE COURT:  Yes.

THE CLERK:  Is that in evidence?

THE COURT:  I think we agreed that the photographs would all be admitted.

MR. McGINTY:  All the photographs.  These are portions of photographs.  There are other photographs.

(Photographs were marked Government Exhibit Nos. 21E, 21F, 21G and 21H and admitted into evidence.)

Q.  This is for the record a seven-page document identified as Exhibit 21, which is now evidence, Mr. Benn.  I see, so we'll refer to them to make the record clear, Mr. Benn, we'll refer to them by page number, and also I note that on this first image, which bears the caption "Overview, Butare, Rwanda," in the lower right-hand corner, there is a number.  Is that number unique to each of the images?

A.  That is a unique number.  Each image will have a number.  In a single number, those numbers are never repeated on our image.

Q.  Just so the record is perfectly clear then, page 1, could you please read to us the number in the lower right-hand corner?

A.    The number in the lower right corner is UY226531.

Q.    And tell the jury what we're looking at, please.

A.    This is a black and white, we call it a panchromatic image.  It happens to have been taken by a spacecraft.  The date that is annotated in the upper left is the date at which that image was collected.  This was the 1st of June back in 1994.  This is a black and white image looking from several hundred miles up in space of a portion of the ground, and this happens to be of a section of a town called Butare in Rwanda.

These satellites are very flexible and agile and very sophisticated engineering devices.  They have the ability to slew or turn or look not just straight down.  The simplest operation for a satellite is to aim the camera straight down and look at the ground straight underneath the satellite.

In fact, you have more agility, more flexibility to see targets or areas that you care about.  If you can look off to the side, we call it off track, the track the satellite is flying on, so in fact when we orient the image, we don't always have it with a map.  You're used to having the map oriented, so north is up.

What you'll see in this, there's a north arrow in the upper right corner of the image, and, in fact, north is to the left so we are looking kind of off to the side, and the way we orient images when we present them or prepare them is with the logical geometry so buildings aren't leaning sideways or

something, buildings are standing up and down to make them the most interpretable.

This is what we call an overview because you're seeing a relatively large area.  These are very high quality, very precise instruments, and you can zoom in further.  We have zoomed in from the overall image to show a portion of Butare, and, in fact, subsequent exhibits I believe will have zoomed in further onto sections of the area that we're looking at.

Q.    Now, before we move onto the second page, what factors affect your ability to discern on the ground objects or elements?

A.    Sure.  I'll at some risk describe a part of our basic training.  This is stuff that I learned back in the '70s when I was going to imagery school.  We call it the seven Ss.  I probably won't recall all seven, but size, shape, surroundings, settings, the kind of things, that objects that you're looking at, shadow, features that are visually or visibly recognizable that allow you to discern things without all the levels of content that you have in, first of all, making a call.

If I'm looking at an Army depot and I see objects, if the size and width of them are of a certain ratio, I can tell whether they're track wheels versus wheel vehicles, a truck versus a tank, the size, the shape, the setting.

The resolution, the precision, the accuracy of the image very much will affect the analyst's ability to recognize

features.  We train our officers, our analysts to learn about the topic that they're working, so analysts who are nuclear specialists know what nuclear test facilities look like, and they look for components that might indicate nuclear activity or missile specialists where you're watching the North Korean preparations to launch the missile the week before last in North Korea.

Those experts look for very kind of specialized features, and they have expertise in that.  The quality of the image, the viewing geometry, even the conditions of the weather and the haze or atmospheric conditions through which the light was being reflected will very much affect the interpretability of the image.

Q.   So an image might be more or less easily interpretable depending, for example, whether the cloud covering was there?

A.   Cloud cover, the weather conditions, the kind of illumination.  You get instances in Northern Russia in the winter where the sun never gets very high above the horizon, and it's just perennially pretty darn dark, things can be hidden in the shadow and are hard to interpret, so there are many circumstances that can affect the interpretability of the image.

Q.   Can you please turn to page 2, Mr. Benn.

A.   Yes.

Q.   Now, page 2 in the lower right hand, am I correct in

noting that it bears the unique identifier VN471313?

A.    Yes, that is correct.

Q.    What are we looking at now?

A.    This is an essentially zoomed in portion of the same image we were looking at previously.  The satellite had collected a large area.  What we looked at in the prior page was a portion of that, and here we have zoomed in even further, and essentially what we have bisecting the image, and I'll use the mouse as a pointer from the lower right going up to the upper left is a road, and as I understand from maps and other sources, that road is described as the road Kigali, that's the Kigali Highway or Road, and you can see, I believe, you can see features on either side of the road.  There are more dense features on the west or lower side of the road.  There are fewer but a number of features on the upper or east side of the road.

Q.    Do you know where that road leads if you go down to the right which would be south?

A.    The road leads if you stay trafficking it or traveling on it to the right, which is to the south, it leads all the way to the border, which is the Burundi border, as I recall.

Q.    Can you describe what you see on the road as depicted in this image?

A.    The road, the easiest thing to see is a series of vehicles.  If you look at the monitor, I'm circling in the

lower right adjacent to a building, there is a vehicle there. The black blotch or spot, that is a vehicle that is traversing. Well, I can't tell that it is moving, but it is on the traffic lanes of the road. Here are two other vehicles that are also on the road that are dark. One of them is probably a truck that has a white hood, but the bed of the truck is dark.

There is another vehicle further from the north to there that is another vehicle. It is light in color. I can't discern from a black and white image whether it's yellow, but it is very much a light tone vehicle as opposed to a dark red or a black or a dark blue green vehicle.

I don't think I see other vehicles directly on the road. There are other vehicles parked back in and amongst some of these buildings or in courtyards. There are vehicles adjacent to some of the other structures.

I do on the highway in particular in the center portion of the image see a marbled or speckled kind of a disturbance. Highways tend to be very uniform. Asphalt or concrete or even a gravel highway will have a very consistent reflectance because it's made up of common similar material. Here you're seeing all kinds of specular kinds of returns that are light and dark and very much variable. They aren't in regular rows or patterns, and then clearly there is something, a great deal of something on the road, and it stretches over many dozens of yards on the road at this level of

magnification.

Q.   Does page 3 of this exhibit zoom in further on the same image?

A.   It does.

Q.   Page 3 for the record, am I reading correctly, Mr. Benn, it's identified in the lower right-hand corner as HW4002999?

A.   That is correct.

Q.   I see that it bears a date stamp on the upper left-hand corner of 1 June, 1994; is that correct?

A.   It does, yes.

Q.   I see that there's other annotations of the name, words, people, vehicles and obstructions.  Do you know how those were placed there?

A.   Those were placed when this image graphic was rendered back at my agency, back at my center.  Those are analytic annotations that analysts insert into the image data set to render this image.

Q.   Could you explain what those terms "people", "vehicles" and "obstructions" refer to and what additional you can see on this --

A.   Sure.

Q.   -- as opposed to the earlier page?

A.   The vehicles are probably the easiest.  I already referenced those.  As I described before, track vehicles tend to be shorter and stockier so they have what we call a two to

one like the width ratio.  These are classic vehicles.  Wheel vehicles have a three to one length to width ratio.  The wheelbase is longer than a track vehicle, and these are pretty easily identifiable to the trained observer.

It makes sense for vehicles to be on a main highway. They tend to be kind of on one side of the road or the other, although some of these vehicles, the two in the center are in fact apparently not staying on the side of the road that they appear to be driving on.  Unlike Japan or England, they in Rwanda also drive on the right side of the road, but those particular vehicles, two of them are annotated.

There are other vehicles, the one that the mouse is pointing to now that I describe as a probable truck.  There's another one I believe over here adjacent to this set of trees, there's another larger truck that's in front of a complex or a building over here.

The people was the feature that I was describing before, the modelled appearance that's out on the road, large essentially areas of the road that are covered up and you see this variable pattern on.  I can't absolutely guarantee that those are people.  The resolution, the circumstances of the image is not such that I could positively say that those are people, but all indications are my professional judgment, my experience would be that's what would belong on a road.  It's not a herd of sheep of goats.  They wouldn't behave like that.

They wouldn't have that kind of a modelled pattern that people wearing different clothing, perhaps head garb would have that would render this.

The heights of people means they cast shadows, and so you're seeing both the light of probably the garb that people are wearing, the shadows adjacent to them that they are encasting, and the spacing and the numbering suggests -- and just the pattern and kind of formation of them suggests that they are people out on that thoroughfare out on that road.

The final feature that is annotated is obstructions. These are objects or things that are rendering a change in the reflectance. You can see a difference in the image that's perpendicular to the course of the road that's running out into the highway surface that when things are out on the road, they look like they're purposeful because they're perpendicular to the road. We would interpret them to be obstructions, and on this and I think the subsequent image we have called them obstructions. That certainly would be my professional judgment that they are obstructions to the free course of movement on the road.

Q.   Before we move onto the next image, I'm going to draw your attention to the intersection that is indicated by the second of the two arrows, the one you're pointing at right now, the second of the two arrows below obstructions --

A.   Yes.

Q.   -- and specifically right in front of the building above the cursor, that building.

A.   Yes.

Q.   In that vicinity, what, if anything, do you make of the fact that there are no people observable in that portion of the image as opposed to the cluster that one sees in traveling south of the road or southbound of the road?

A.   I would infer that as there are several obstructions here, there appears to be obstructed traffic and people to the left or the north of those features in front of the building, and that is on contrast to the right or the south.  I don't see on this or the prior image activity or apparently stalled or impeded on the highway surface to the right of the image or to the south of that particular point.  The suggestion would be that the obstruction is essentially centered or concentrated roughly in the center of the images we're looking at in this particular graph.

Q.   So what we're looking at then is in essence you're saying, am I correct, there's something, traffic, a vehicular traffic jam that begins in the upper left of the image and ends where you indicate there are obstructions?

A.   That is the case, yes.

Q.   Could you just turn to the next page.  Page 4 of Exhibit 21, Mr. Benn, am I correct in noting that it's identified in the lower right-hand corner with the numbers and

letters DX489227?

A.    That is also correct.

Q.    And is this a further zoomed in image of what we just looked at a moment ago?

A.    That is exactly what it is, yes.

Q.    It's also a June 1, 1994 image?

A.    It is.

Q.    Can you tell the jury what analytically you can see on this as distinguished from the earlier one?

A.    As I described before, these are very sophisticated cameras from a great distance.  They can continue to capture a detail that as we zoom in further you can see more detail which allows you to interpret smaller and smaller features or more fully attribute the features that you're seeing and recognizing, so the vehicles that I was describing before, the white one, I very much would call that a sedan.  You can see the roof of the sedan up higher and then the hood and the trunk behind it.

       The center of the vehicles, that's almost certainly a truck-like vehicle with the light cab and hood and then a bed in the back of it.  It appears, it and the vehicle behind it, which, again, I would call a sedan, those two vehicles appear to be pulling out of their lane.

       Let me comment and pause.  The first of those that I described, the one with the white hood is traveling south or

from left to right, but it is pulled out of the lane that it was in, which is the lane the white car is in and the vehicle behind it, and it is pulled out and it is in fact going in the opposite direction in the opposite lane of traffic, so he has -- he has pulled out of their lane and is moving.

The vehicle behind them, you get the impression that it has also started to make that kind of a turn, and it's very much my sense that they are turning to avoid the obstruction that is back right by the beginning of that curve or turn off to the adjacent road, a road which runs to an adjacent highway or a road through the middle of the community.

There is the second obstruction, which is probably even perhaps the clearest of those evident on this image that's out kind of away from the traffic, the features, the other objects in the image out in that intersection, and clearly you can see that there is a dark line of some feature.  I can't precisely tell you or characterize what that obstruction, we've labeled it an obstruction, I can't tell you exactly what it's made of, but clearly it is riding across the center of the road across the southbound traffic lanes and is very much in a position to impede the free flow of traffic.

I also get the impression that there are probably obstructions on the northbound lanes at other positions back in other portions of the image as I'm kind of moving the mouse. You see that there are similar features also in the northbound

lanes adjacent to these are trees by the edge of the road here, and I would suggest that there may well be other obstructions on the image, again, impeding or obstructing the free flow of movement on the road.

Q. Two questions before we move onto the next image. So, based on your testimony, am I correct in understanding that if one were traveling south, that is from left to right on this road, one would have to follow some serpentine, zigzagging pattern to avoid the series of obstructions?

A. That is absolutely the case. That's a routine kind of an obstruction or a security measure at the building that I work at in Northern Virginia. There is exactly that kind of a serpentine barricade that's established through the jersey barriers so that somebody with a truck-borne explosive has to slow down, has to go through the security posts at a very low grade speed and can't just barrel through at full speed.

Q. And the last question on this image. I want to draw your attention to the large structure that's on the southeast corner of that intersection, that one there. Do you see the compound surrounding that?

A. I do, yes.

Q. Tell us what you observe in that compound.

A. This is a walled compound. The mouse is describing the north face of it. It turns and stops here. Here is the front of the building or front of the structure. That's actually an

overhang that's leaning out from probably the top of the first story of that building.  This is probably at least a two-story building with this roof here.

The other side of the building, the wall picks up again.  This is actually the gate to the compound that would be opened to admit vehicles in and out.  There are several vehicles that are parked inside of the compound, and out in the back, this is towards the down slope, the downhill, there's a tree in the corner.

I'm very confident the wall is contiguous and contends to a corner and then runs along the back side.  This could well be a small personnel gate, the gate that a person could get through but not a vehicle.  You can see some evidence of traffic lanes in the courtyard or the open space adjacent to that building.  This is probably a parking garage or a shed or not a large people structure but rather a storage building or that kind of thing.  It may well have a tin roof.  The lightness of the reflection off of it suggests it may be a metallic or a tin roof.

Q.    One follow-up.  Immediately outside of what you described as the gate to that compound, I see a large element to the left of the cursor there.  What is that?

A.    This is a pretty good size cargo truck.  You can almost make out the cab, then the windshield is a slight dark band there, and then the hood of the truck is the rightward or south

end of it, and then the back is the bed, the black area or very dark area is the bed of that larger truck, and that's probably a good half ton, one-ton utility cargo truck.  It doesn't appear to have a cab on the back or a van or any kind of a structure so I believe it to just be an open bed dump truck or a utility kind of a truck.

Q.   Would you please turn to page 5 of Exhibit 21.  In the lower right, it bears the indicator PX225585, correct?

A.   It does, yes.

Q.   And is this a yet further zoomed in image on June 1st of -- I'm sorry, this is on June 5th, correct?

A.   Correct.

Q.   Is it a further zoomed in image of the same area in Butare we've been looking at?

A.   So whereas before we were looking at an image acquired on the 1st of June, this is the same area on the 5th of June, and it is very much zoomed in.  This is a different kind of a -- well, it is a very similar image but taken on a different day from a satellite looking from a different position in space, and so we call it the viewing geometry is different.

Things are slightly rearranged, north instead of being to the slightly left and lower left appears to the left and slightly upper left, so the satellite was looking at a kind of different angle.

Some of what you're seeing again is not straight down

onto the roofs of buildings, you're seeing the roofs and also the sides of buildings, so it's more of a literal view, you're not looking straight down on the top of things, you're more a human view that you get from the top of a tall building or the top of a ladder or a helicopter or that kind of a view, and I would observe that right under the annotation for obstructions is that large cargo truck that we were just describing.

It's partially obstructed, but, again, you can see the black wheels, the bed of the back of that truck.  This is routine kind of analytic strategy to work with multiple images, infer something from another  -- go to another image and see what you can see from that one.  Look, there's the same object in exactly the same position.  I'm far more confident now that that's a cargo truck than I would have been from just the prior page.

Q.   Turning next to page 6 of this exhibit which bears in the bottom right FJ380340, correct?

A.   Yes, that is correct.

Q.   Tell us what we're looking at now.

A.   This is yet another image, so this is the third of the images, different satellite image collections.  This one occurred back on the 23d of May in 1994.  In this case the viewing geometry is such that north is almost due up slightly to the left and up so the satellite is to the south of the area and is looking back, and so north is up.  The road -- and so

everything is turned around.  It's 90 degrees from what we were looking at before.

The road is starting in the center of the image, and to the bottom is the road that goes to the Rwandan border, and the road that we were looking at proceeds kind of up to the middle and off to the upper right of the image, so whereas before the buildings, the series of buildings that were on the lower side, here they're on the upper side.

The structure that we were just looking at is here in the center.  There is that large truck that was outside the fence or outside the wall, and the barricades or obstructions were roughly the portion of the image that I'm sliding the mouse over now.

Q.   Toggling back a moment to the preceding page, page 5, can you tell based on your experience and analysis of this image how big those elements are, the elements indicated by the red arrows, approximately?

A.   The features that we're describing, that I've described here as obstructions, are clearly big enough that somebody driving down the road would see them, would note them and would try not to traverse them with a vehicle.  They are clearly not the size of a vehicle or even half the size of a vehicle, so they might be as small as four or six inches, they might be as big as a foot or thereabouts.  They clearly are not three feet in size, but they are substantial structures.

I've carried 4 by 4 timbers that are 10 feet long, and that's a substantial feature, especially if it was up off the ground.  That's certainly something that you wouldn't want to roll over or hit with speed, and these are at least that size.  The fact that we're seeing very clearly the black feature, and, in fact, the one that I'm pointing to right now, I get the impression of a lighter feature, and that would be the obstruction itself, the object.

It could be a large piece of lumber or it could be a large piece of metal pipe or something like that, and then what you see just below and to the right of that is the shadow suggesting that it's a couple of feet of two or three or four feet off the ground, so it's extending out again perpendicular to the flow of traffic, it's right angles to the flow of traffic, it's up off the ground and is casting a shadow, and several of them are very distinct.

Here's one on the northbound side, another one on the northbound.  That also has an up and down appearance as though there must be something standing on end or a different kind of feature sticking up in the air.  Here's a clear shadow cast off a feature that is obstructing the road here.  There may be one here which is a location which is an obstruction observed on the earlier dates, and then this is probably one of the clearest of the obstructions here and indications back here of yet another.

Q.   Going back to page 6, the following page, the May 23d image, do you see anything in this image that indicates whether the elements we just looked at were present on May 23d?

A.   This image on May 23d taken several weeks prior to the last one, the 5, June, it's not the kind of images, image that analysts prefer to receive.  You can see in the upper left the bright area that's a cloud, so we're looking kind of down through holes in the clouds, and, in fact, if you look way down in the lower left, that's brightly illuminated, that's sunlight.

Most of the feature we're looking at is in fact not illuminated by sunlight.  You're getting the reflected glare of skylight that is casting light, but it's not as clean, not as well illuminated.  We're looking down in the shadows.  There may be a feature here which is a position where one of the obstructions was but I'm nowhere as near confident, but this is not good viewing conditions, not good viewing orientation.

There may be a feature over here right in front of those trees there.  There is almost certainly something here adjacent to the trees.  On the 5th of June, we did have features in front of those trees, but I'm not as confident as I was on the prior images.  There are -- apparently something is there.  I can't tell if it's an obstruction.

Similarly, here I'm not seeing as much on the southbound side of the road as I saw before, so I'm not as

confident that I can say with any probability that there are obstructions on the southbound side.

Aside from the one that is perhaps out here again right next to the cloud, you can't predict where the clouds are going to be. You can never time it as you would prefer, so that's a possible obstruction. I say that as much because I know from the other images that obstructions were in that location. I can't dismiss that it's not an obstruction by any means.

Q. Are you able to further zoom in on this image?

A. I can. Any particular area?

Q. The same area. Tell us what, if anything you can observe from zooming in about the presence of any elements consistent with the elements of the roadblock that we saw in the early -- the June 1 images?

A. Sure. So this was the feature that's essentially in the center of that intersection, the road that goes off to I think it's called the Chub Road, which is the road that's kind of running parallel, and you do very much see the suggestion of a feature there.

This is the location of another of those obstructions, and I'm not seeing anything specifically here. You kind of get the impression of the curb, or, no, that may be the center lane. Here were the other two features that I was just describing that were adjacent to the trees, and they're very

much is the suggestion, I'm going to slide it up just a little bit, a suggestion of features out on the road surface in front of the trees.

There may be something here, but I can't with any certainty know that there is, could, would be obstructing traffic there, so I'm not as confident absolutely saying that the same kind of or number of obstructions were present on this image.

Q.   What, if anything, do you make of the fact the elements you just pointed to are in the location that we saw more visible elements of the clearer images of June 1st?

A.   In all likelihood, these are the kind of obstructions that aren't constructed onto the road, they haven't come out and laid asphalt, they haven't dug pilings, so they may well be the kind of things that a crew could move onto and then off of, but at some level the indications are the materials could well still be present.

I'm quite confident that these are in all likelihood the same features as were present.  They may not be in exactly the same configuration here a couple weeks different, but, in all likelihood, these are materials that were related to those same features that were present on the other dates, if that answers your question.

Q.   I think it does.  Can you tell the jury whether you see human beings in this image?

A.    I am not seeing explicitly people, individuals.  Again, this is not a high quality image, so this isn't the kind of image that I would hope to be using to be looking for people, individuals.  I certainly am not seeing any people or individuals out on the road itself.  Adjacent to the couple of vehicles that are present, I'm not seeing people present, but, again, this isn't the kind of quality image that I'd expect to be seeing people.

That's a car.  That may be someone adjacent to the car, but I'm purely speculating.  I'm saying it is possible, but I'm not ruling it out.  Kind of looking up northward on the road, I'm not seeing people present here, a couple more vehicles or perhaps a trailer.  I'm not seeing people up there, so, no, I'm not necessarily seeing numbers of people present.  I can't exclude that they aren't present.

Q.    Would you expect to see a large numbers of people if they were congregated in the way they were on page 2 of this exhibit?

A.    One would certainly see evidence of people if they were present on the road even on this quality, yes.

Q.    As part of your analysis, did you have available, do you know if there are available images for dates continuously from the middle of April through July, through the beginning of July, 1994?

A.    I'm not familiar.

Q.    So these are the images that you were aware are available?

A.    These are the images that I've exploited and they are available, yes.

Q.    Can you look at the last page, please, which is page 7 of this Exhibit 21 which bears in the lower right-hand corner the letters and numbers XY136688; is that correct?

A.    Yes, that is correct.

Q.    And, finally, this is the 18th of July?

A.    18th of July, 1994.

Q.    And what are we looking at now?

A.    This is a much nicer image.  The sun is back shining.  We are again looking from the west, so north is to the left, and we're looking back at that same intersection.  Here's the Kigali Road is from the upper left and runs down to the lower right.  Again, the road to the border is to the lower left.  This is that intersection that we have been looking at consistently, and here's that road that goes off to the adjacent road back here is called the Chug Road.

        This was the intersection.  The location of the obstructions is generally in the center left of the image.  The complex that we were looking at was over in the center right and as annotated, as noted by the feature, that large relatively larger structure that we were observing before several stories structure is no longer present.

        It has apparently been destroyed or demolished.  Very

clearly on this sideways looking oblique view, you would see the side of that building, you would see the multiple stories. There was a high central feature in kind of the center eastern side. All of that is no longer present, and, in fact, what you get the appearance of is an undulating, very irregular surface as though it was rubble which leaves the evidence of the annotation of a destroyed building.

MR. CAPIN: I have nothing further, your Honor.

MR. McGINTY: May I?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. McGINTY:

Q. Would you kindly state where you are if the Court permits that? I notice that there were annotations that you brought to our attention in connection with the photographs on June 1 --

A. Uh-hum.

Q. -- am I right? Now, you hadn't personally prepared those annotations, correct?

A. I wasn't the technician that actually made, that did the photo processing, but I'm the analyst who's involved in the analysis, so we have people who actually do one of the graphic products.

Q. The workup of the graphic product included the preparation of those annotations; do I understand it correctly?

A. At my direction.

Q.    At your direction?

A.    Yes.

Q.    Let's just back up a bit.  You had provided a disk of photographs to the government in connection with these proceedings; am I right?

A.    That is correct.

Q.    Those were photographs that were part of intelligence photographs taken by the United States during the course of the Rwanda genocide; do I understand that right?

A.    These were images that were acquired by the U.S. government in that time frame, yes.

Q.    And if I understand this right, the purpose of getting those images was for the United States to learn information about what was happening in Rwanda during that time period; am I right?

A.    I don't know in detail the reason, the specific tasking that drove the operation of the satellites, but inasmuch as there was advance of interest in national security policymakers going on, I would have to infer that, yes, there is -- that was the primary reason why this body of images was being collected.

Q.    So you know of images that were collected -- you know of images that were collected by United States intelligence back in '94, this at least included the images and in May and June and July that you have here, correct?

A.    I am familiar with the images that have been presented,

yes, some of which we looked at today, others which were brought forward.

Q.   Now, in fact, you understand that there's a greater collection of such images; do I understand that right from your testimony?

A.   There are other images that have been introduced, yes.

Q.   But apart from the images that were introduced, there was a greater population of images collected by United States intelligence during this time period?

A.   I don't know that for a fact.

Q.   Did you ever inquire to find out what the range was or what the extent was of United States satellite imagery during the Rwanda genocide?

A.   I did not.  I would have to go back to the officers who were either doing the exploitation at the time or who are working in that part of the world now and happened to do that research.  I have not.

Q.   Now, these images are parts of larger images that were captured by United States intelligence satellites?

A.   That's correct.

Q.   So there would be a larger -- I'm not inquiring to learn nor would I understand the intelligence aspect of this, but if I understand it, there's a larger image, and these are smaller parts of that larger image; do I understand that right?

A.   That is normally the case.  I can't guarantee whether the

overview image wasn't the entirety of the image.  At some level these are sophisticated devices that collect what we need.

Q.    Right.  Now, you provided two overview images.  One of them was for June 1 and the other one was for May 28th; do I have that right?

A.    I believe that to be the case.

Q.    Now, there were other overviews from which those were derived for the other dates of the images that you provided; am I right?

A.    That would be the case.

Q.    But we don't have those, correct?

A.    Correct.

Q.    And you didn't ask for those?

A.    I didn't ask for those.

Q.    Now, the United States collects these images for purposes of learning information on the ground, correct?

A.    In order to respond to our national security interests, sometimes that's targeting, sometimes that's warning, sometimes that's to inform policymakers of developments that they care about.

Q.    And can help provide meaningful information for policymakers to make judgments about what's happening on the ground; am I right?

A.    That's correct.

Q.    Now, in connection with the page 1, the image of June 1,

you had shown the overview of the entire area.  Are you able
from that image to zoom in and show the image of not only in
the area that you focused on but also the larger image as it
trails out towards the center of Butare?

A.    We can do that.

Q.    Would you kindly do that?

A.    I can do that, yes, to the extent of the quality of the
data and our ability to do so.  This is the image you're
speaking of?

Q.    Yes.

A.    So this is the 1st of June, this one.  I have to jump out
of that viewer, work my way back.  Okay.  So I will zoom in,
and this is cumbersome, I apologize.  Here's the area we were
looking at on the subsequent images.  This would be the
compound.  Here's that intersection, so you're interested in
areas further up the road?

Q.    Right.  If you could help us watch as we proceed from the
area of the EER.  Let me just, if I might, try to make this a
bit more -- if we can move the image at the risk of now -- if
we move this image up a ways.  Now you had focused in on the
activity that was in front of the EER building which is now
toward the lower right, fair to say?

A.    I understand this to be secondary school.

Q.    Right.  So if we can just pull this down just a tiny bit
here.  This area where I have moved the cursor is the area we

were focused on where you talked about those obstructions.  Am I right?

A.   Correct, and the vehicles traveling in that serpentine fashion.

Q.   Right.  Then you talked about people that were masked behind that, and this was the model defect you were describing?

A.   That is correct.

Q.   Now, if we chase this back a bit and follow the cursor, do you continue to see people lined up along that road?

A.   There are people lined up along that road.  I wouldn't necessarily use the term "lined up."  They are in loose numbers, but, yes, there are some numbers of people.  As I move further to the north on that road, they are less in number, less in concentration, but there are numbers of people that continue to be present.

Q.   Now, is that the case as we go, and if I could at the risk of drawing a little bit more on this, as we watch this road then proceed, and this is the road now that's leading up to the center of Butare and ultimately toward Kigali.  Do you continue to see people, these modelled collections of people in various degrees of order and disorder all the way up here, all the way up beneath the trees, all the way up to this area here?

A.   There are people present, for instance, where the mouse is now, I see a break of 30 or 40 feet, and then there's a tree, then there's another area where I don't see any people.  So in

this area where the mouse is currently circling, there are probably a dozen or two or three people, and then there's a distance of 30 or 40 or maybe 60, 80 feet where I don't see any and then numbers of people trailing off.

This is actually a very small concentration, maybe a dozen or thereabouts.  It looks like a break before, then you'd get to the tail of the large concentration I was describing. To go back to where you were looking as we proceed up to the trees, I do see a number of, probably several dozen here.  I'm not sure I see any in that break in the trees.  Unfortunately the viewing geometry gets kind of crummy as we go up to looking underneath the trees.  Here's a large shadow.  There are people present up here and then this is an intersection.

Q.   Then if you look to the left, if you draw the cursor over to the left, there's the model defect as we get over here?

A.   There is a large concentration of people up on this side of the road, again, many, many dozens of people up in that area.

Q.   Now, this is again part of a larger image, if I understand this right?

A.   This overview could be the entire image.  I haven't directly established that.

Q.   But we don't know whether this is part of an image which would have continued further north in the direction of --

A.   We do not know that.

Q.    Among the things that is captured by these images would be, among other things, Army movements, for example?

A.    Correct.  Pardon me, Army movements, we are real good at looking, these satellites were developed to detect the Soviet Armies.  The Soviet Armies traveled in large formations, individuals, special forces, platoons or squad of Army personnel.  They tried to not be hidden.  So, in this, imaging conditions, small light infantry or crew serve kinds of weapons, equipped military forces, I might not be able to detect at all.

Q.    But one of the things you might be able to try to detect would be the advance of the RPF as it's heading in the direction of Kigali?

A.    The RPF?

Q.    The RPF would be  -- let's just hypothesize.  It's the Rwandan Patriotic Front, and it is the Army advancing down in the direction of Kigali.  Might you be capable if you had a larger image of detecting or trying to detect what the movement would be of an Army advancing in this direction?

A.    Detecting the front lines of military forces is difficult.  It can be done, especially out in open barren regions, open barren regions.  Small forces and foot soldiers are very difficult to detect now, even the kind of military force that might have been operating here if they have logistics, their supply trail, be traveling with trucks, resupply for their

food, their ammunition, probably have gear for quartering in the field or tents.  We would see that support equipment.  It's entirely possible unless the forces were on their vehicles that we wouldn't see them, so the front line of forces is an extremely difficult challenge for us.

Q.    Now, you've seen in photographs that you've analyzed over your career of instances of civilian populations on the move on roads to vacate a war zone?

A.    This evidence here, principal.

Q.    Now --

A.    I mean the only evidence that we have is the actual relief camps that are established for people who have been pushed out of war zones, displaced persons.

Q.    Now, back to the images then that are the focused images here, I believe it was image No. 3 where you had shown the annotations about obstructions and about people, and these were marked annotations on the screen.  Those marked annotations were not done by you, but they were done by staff at your direction?

A.    That's correct.  I did the analysis.

Q.    Right.

A.    Described where those annotations should go and then they burned them into the image.

Q.    And you instructed them what it was they were to look for when they made those annotations?

A.   No, I instructed where the annotations needed to be on the image.

Q.   I see.  So you told them I see this, please note it?

A.   I essentially marked up the images with rough graphics, and they did the finished production of what these look like with the colors and the size of the arrows.

Q.   So with respect to the June 1 image, the annotations there reflect your judgment of what you saw when you examined that photograph, correct?

A.   Yes, that's correct.

Q.   And you then had people memorialize what you saw with those annotations?

A.   Correct.

Q.   Am I right?  Now, the government -- if I may have a moment.  When the government was showing you the photographs, did it include all the photographs that you had provided from the disk that you gave the government back some time ago?

A.   Am I aware that all the photos exist?

Q.   Yes.

A.   Yes, I am.

Q.   And are there not photographs that the government did not put in as part of this exhibit?  You were aware that there were some photographs that you had provided which are not part of that exhibit?

A.   I understood -- I guess I'm not exactly clear on the term

of the exhibit.  I know there are other photos that were introduced to the Court.  I don't know whether or not they have been formulated as part of this exhibit.

Q.   Okay.  Now, one of the images that the government showed you a few moments ago, I believe it was characterized as Exhibit No. 5 is the May 23d image, if you could pull that up.

A.   Do you have a number for it in the lower right?

Q.   Yes, it is 0430.

A.   That was one of those that we actually have been looking at.

Q.   Now, this is one of the photographs that you had reviewed in preparation for surveying this to the government, correct?

A.   Yes.

Q.   And when you reviewed it just as with the June 1 photographs, you had the possibility of instructing your staff to make notations about things that you saw, correct?

A.   Yes.

Q.   On this photograph that's submitted, are there any notations reflecting any features that you now say you noticed in reviewing the photograph?

A.   Yes.  In fact, this was one of the photographs that we've discussed this morning, and I did observe that I could with far less confidence discern features that may be the same in the same locations as one of those other days.

Q.   When was it that you instructed your subordinates to add

the annotations to the June 1 photograph?

A.   I don't know the precise date.  It was quite a number of months ago actually.

Q.   And at the time did you instruct your subordinates to put annotations on the photograph of May 23d indicating that you detected possible obstructions on that road?

A.   I did not direct my colleagues, my subordinates, my colleagues to do any such annotations.

Q.   One of the images that I believe the government admitted is an image relating to Mukoni; am I right?

A.   Correct.

Q.   Did you look at that image from Mukoni?

A.   I have looked at all the images in this package, yes.

Q.   Can you tell the jury where Mukoni is?

A.   I'm not exactly sure where Mukoni is.  It is on the Kigali Road.  It's down to the south.  Yes, I can tell you, I can't tell you what the name Mukoni describes, but it is on this Kigali Road, and it is proximal to this central portion.  It's a little south of the area that we've been focused on.

Q.   In fact, if I understand right, it's a different place?

A.   Yes.

Q.   Now, apart from the May 23d image, which is also an image that is blown up as Defendant's Exhibit 21B --

          MR. MCGINTY:  And I would move to admit that.

          MR. CAPIN:  No objection.

THE COURT:  So admitted.

(Aerial photograph was marked Defendant's Exhibit No. 21B and admitted into evidence.)

MR. MCGINTY:  The May 28th blow-up as 21C, may I move to have that admitted?

MR. CAPIN:  Very well.  No objection to any of these exhibits, your Honor.

(Aerial photograph was marked Defendant's Exhibit No. 21C and admitted into evidence.)

MR. McGINTY:  And 21D, a blow-up of May 30, 1994, if I may move to have that admitted.

THE COURT:  21D.

(Aerial photograph was marked Defendant's Exhibit No. 21D and admitted into evidence.)

MR. McGINTY:  Additionally, I would move to admit the photographs not earlier submitted by the government which would be May 28th, compound photograph VC139739, photograph overview of Butare, 5H420288 and image compound Butare 0D833160.

Q.  Now, I would ask you if you recognize that image?

A.  I do.

Q.  And that is an image of the -- that is an image of the compound on May 30th, 1994, is it not?

A.  It is.

Q.  Now, is this part of the disk that you had provided to the government back some time ago?

A.    It is, yes.

Q.    Is it part of the images that are submitted as part of this exhibit here?

A.    I believe they are in the computer.  That's the question.

Q.    But are they part of the exhibit?

          MR. CAPIN:  They are not, but I have no objection to making them part.

          MR. McGINTY:  Now, also two other photographs, one on May 28th.  Actually I should if I could --

A.    It may well be in the disk here.

          MR. McGINTY:  I want to make sure they're admitted. The May 28th photo rather than try to blow them up, if we just did them this way.

Q.    Mr. Benn, if you kindly step over here.  Do you recognize the image in this photograph?

A.    I do.

Q.    Is this also one of the intelligence photographs that were prepared by -- that were part of the submission the government had made?

A.    Yes.

Q.    That you had made to the government of the surveillance photographs?

A.    They are.

Q.    And, additionally, there is an image on May 28th, 1994, compound Butare, if you kindly look at this and tell me

additionally if this is an image that --

A.   Yes, it is.

Q.   Okay.  Finally, there is the overview of Butare which is 1H40288, and do you recognize that to be the overview of Butare?

A.   I do.

Q.   Now, if you provided a disk of these images, would the jury have the capability of magnifying the image and sort of recreating the exercise we just did with respect to the image on June 1?

A.   They can.  Magnifying an image such as I did before or such as the image which is up on the screen now, as you zoom in, things get pixely, whereas in the original data sets as we zoom in, they get far less pixely as we then present them, and that's why we zoom them in and created them as separate JPEGs or disks or whatever the format they're in.

Yes, absolutely in the same way that I was able to just double click on the file and open up the Windows picture viewer, and you can go down to the zoom-in feature and do this. Any of us can working with this data do exactly that function.

MR. McGINTY:  Thank you.  No further questions.

THE COURT:  Mr. Capin.

MR. CAPIN:  Just a couple, your Honor.

REDIRECT EXAMINATION

BY MR. CAPIN:

Q.    Mr. Benn, Mr. McGinty made reference to the fact that the Exhibit 21 does not contain all of the images that you exploited in connection with your analysis of events added around that what you called the secondary school and the adjacent hotel; do you remember those questions?

A.    Yes.

Q.    Did you without telling us the details, did you prepare those original images, the larger set in connection with another case involving that hotel?

A.    Yes, they were prepared for another case.

Q.    And so in preparing for your testimony today, did you focus on those images that best depict, most clearly depict what can be seen in and around the intersection in front of the that hotel?

A.    That was essentially my exclusive focus for today, yes.

Q.    And, so, for example, I think I can end with this.  One moment, your Honor.  With regard to just by way of example the one that the jury can see right here, I think it's Defense Exhibit 21C, does that -- that's the same date as page 6 of Government Exhibit 21, correct?

A.    That is the case.

Q.    Can you put page 6 on the screen, please.  So what differences do you note between what's on the screen now,

page 6 of Exhibit 21 and the blow-up Mr. McGinty just put in front of the jurors in terms of quality of image or ability to see what's happening on the ground?

A.    Do I have the right page?  This is the 23d of May?

Q.    Okay, I'm sorry.  Maybe the 28th.  Well, comparing the 23d of May then to the 28th of May, are there any elements or features or characteristics of the two images that make one preferable to the other with regard to what you can see on the ground?

A.    I think I tell no one anything they don't already know that the image that's before us has clouds in exactly the wrong place.  We can't control the circumstances of the geometry of the clouds and the ground and the images, and so, yes, there are features you can see through those clouds and try to tease out a little bit of useful information, but, in fact, the clouds are kind of pretty much obstructing exactly the intersection that we most care about.  That's an artifact of trying to get an image and you see what you get.

        MR. CAPIN:  Your Honor, I have no further questions of Mr. Benn.

        MR. McGINTY:  May I, your Honor?

        THE COURT:  You may.

                RECROSS-EXAMINATION

BY MR. McGINTY:

Q.    Mr. Benn, when you talked to your subordinates and made

observations about this photograph on June 1, you detected something that you call an obstruction, correct?

A.    I characterized it as an obstruction, yes.

Q.    And you thought something that you saw that appeared to be an obstruction was significant enough to tell them to mark it, correct?

A.    That is the case, yes.

Q.    With respect to another image that you had at precisely the same time, the image on May 23d, did you instruct your subordinates to make a notation that you had observed an obstruction on that photograph?

A.    I elected to have them not do those kinds of annotations on them.

Q.    And, in fact, the words you use to describe the things that you say you saw on this image were words like suggestion of features, correct?

A.    Uh-hum.

Q.    And they may be features, those were your words, were they not?

A.    For this image, correct.

Q.    For this image.  And in no respect did you testify that with respect to the May 30 image that you had instructed your subordinates to make a note to them that there were any obstructions on this image by them, true?

            MR. CAPIN:  Beyond the scope, your Honor.

THE COURT:  I don't think so.

A.  Our routine practice --

Q.  Yes or no.  Did you instruct your subordinates to make a note of an obstruction with respect to the photograph on May 30th?

A.  I did not instruct my colleagues to make such a note.

MR. McGINTY:  I have no further questions.

MR. CAPIN:  The last question, may I have one follow-up, your Honor?

THE COURT:  All right, just one.

MR. CAPIN:  Mr. McGinty, could you put the same image on the screen, please.

REDIRECT EXAMINATION

BY MR. CAPIN:

Q.  Do you see on the image on the screen anything that in your expert assessment is consistent with the obstructions you saw clearly on June 1st or June 5th?

A.  Sure.  I had pointed before to the feature over in front of the trees.  That would probably be the same feature there. There is probably the same feature here.  I get an indication that in the center of the intersection, there is both a light area and falling to the south of it where shadows would lie a darker kind of a stripe or a feature so it could well be present.

I'm getting less confidence of a feature here, but I

can't rule that such a feature doesn't exist, and I'm not going to make a call here, but, again, were I to see it on a screen, I might be able to feel more comfortable or confident.

Q.   With regard to the one that you pointed to closest to the hotel --

A.   Yes.

Q.   -- is that in precisely the same location as to what you saw more clearly on other images?

A.   To answer that it is yes, precisely in the same location, I would get out multiple images from those different dates and do side-by-side comparisons.  It is close enough that I'm very confident it is within the identical location or within a couple feet of it.

        MR. CAPIN:  Nothing further.

        MR. McGINTY:  Just one question.

                    RECROSS-EXAMINATION

BY MR. McGINTY:

Q.   In no respect did you tell your subordinates to make a note of that feature when you reviewed these photographs some time ago, correct?

A.   Correct.

        MR. McGINTY:  No further questions.

        THE COURT:  Thank you very much, Mr. Benn.  That concludes your testimony.  Next witness, please.

        MR. CHAKRAVARTY:  One moment to see who is outside.

MR. CAPIN:  One moment, your Honor.  We're just making sure our next witness is available.

RICHARD WALLEN, having been duly sworn by the Clerk, testified as follows:

DIRECT EXAMINATION

BY MR. CAPIN:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  My name is Richard Wallen, W-a-l-l-e-n.

Q.   Good morning, Mr. Wallen.

A.   Good morning.

Q.   Could you please tell the jury whether you're employed?

A.   I'm sorry.

Q.   Are you employed, sir?

A.   I'm retired now.

Q.   Before you retired, what did you do for a living?

A.   I was working for the U.S. Department of State, Foreign Service.

Q.   How long did you work for the state department?

A.   Full time, 22 years, an additional 10 years after retirement.

Q.   When did you -- what period of time did that cover?

A.   I joined the foreign service in January of 1974, retired in September of 1996 and then came on as a WAE in 1998 until

2008.

Q.   And what does WAE mean?

A.   It means when actually employed.  It's a part time employment of retired consulate officers.

Q.   And as a consulate officer, what kind of work did you do for the state department?

A.   Adjudicated Visas, determined nationalities, visited the ship, documented birth and death overseas, visited incarcerated Americans in jail, any consulate services required.

Q.   Was all of the work that you conducted as a state department employee overseas?

A.   I worked in Washington for three years as a deputy coordinator of Concert Trading and Foreign Service Institute, then an additional two years at the Visa office.

Q.   And except for those periods as a trainer and the second job you describe, you were abroad the entire time?

A.   Yes.

Q.   You said that your job was adjudicating Visas.  What do you mean by adjudicating Visas?

A.   Well, every person who wishes to visit the United States must apply for a Visa to the United States.  They do that through a consulate or embassy of the United States in foreign capitals, in major cities.

Q.   Did these things happen abroad at the U.S. embassy or U.S. consulate?

A.    Yes.

Q.    And you mentioned immigrant and nonimmigrant Visas.
What's the difference between immigrant and nonimmigrant Visas?

A.    Immigrant Visas are for those people who wish to remain
permanently in the United States basically because of family
ties or job skills, and there's a roster around the world, a
waiting list to get on the immigrant visa list.

Q.    How many countries did you work in during your 32 or so
years as a state department employee?

A.    At least 20.

Q.    And were you adjudicating visas in each of those
countries?

A.    Yes.

Q.    And when you were -- what did you say FSI stands for?

A.    Foreign Service Institute.  It's now the foreign affairs
and training center, but at the time it was FSI.

Q.    And when you were at FSI, what were you doing?

A.    As I said, deputy coordinator of consular training.  I
trained incoming foreign service officers in immigration law
and regulation.

Q.    So you trained other people things such as how to
adjudicate a visa?

A.    Exactly.

Q.    And among the 20 countries that you were stationed in
during your career, did those include countries in Europe?

A.    Europe, Asia, Africa.

Q.    Where were you working in 2001, sir?

A.    In Nairobi, Kenya.

Q.    Were you stationed at the embassy?

A.    Yes.

Q.    What was your position there?

A.    I was the supervisory consulate officer in the Visa section.

Q.    Does that mean that you supervised other consular officers working in the visa section?

A.    Yes.

Q.    And were you yourself engaged in adjudicating visas?

A.    Yes.

Q.    Could you give the jury an overview of what the process is adjudicating a Visa from the time the applicant comes into the U.S. embassy abroad to the time it's allowed or denied?

A.    Every applicant must fill out a uniform application, which is the same around the world in applying for a nonimmigrant or visitor Visa, various categories.  The process is they are prescreened by a local employee, someone who is a native of the country where they're applying usually, to see if the application is complete, if the supporting documents are available and that they also will run a computer check before they reach the consulate office for the interview.

Q.    What's the purpose of the computer check?

A.    That's to see if there are any previous or prior refutables or if there is any adverse information available at posts.

Q.    After this prescreening process assembling documents and determining if there are earlier applications, what happens next?

A.    Then it comes to the consular officer for an interview.

Q.    Does that interview happen at the consulate or the embassy?

A.    Yes.

Q.    Does the consular officer conducting the interview look at the documentation, review it before commencing the interview?

A.    Ordinarily you would at least briefly look over all of the documents again to see if they are complete, see what type of visa the person is applying for before calling them up for interview.

Q.    You say ordinarily.  Was that your common practice during your time?

A.    Yes.

Q.    So after reviewing -- in your practice after reviewing an application and the accompanying documents, how would you proceed with the interview process?

A.    Then you call the applicant up to the interview booth or window.  There were privacy panels on both sides so only the applicant and the consular officer could reasonably hear each

other.

Q.   And describe the conduct of a normal interview.

A.   Normally you greet the applicant, and then you ask them what kind of visa they're applying for, what the purpose of the visit is, how long they wish to stay in the United States.

          MR. CAPIN:  May I approach, your Honor?

          THE COURT:  You may.

          MR. CAPIN:  Could I have a moment, your Honor.

Q.   Approaching, sir, with Exhibit No. 2, I ask you if you would take a look at it, see if you recognize it.  Do you recognize that, sir?

A.   Yes.

          MR. CAPIN:  May I approach, your Honor?

          THE COURT:  You may.

Q.   I'm also going to show you Exhibit No. 23 and tell me if it has a certificate on the cover, if the contents of that are also contained in Exhibit 2 once you get past the certification.

A.   All right.  Okay.

Q.   Are the contents of the last -- the substance of the last pages numbered 1 through 4 included in some form of Exhibit 2?

A.   Yes, they are.

          MR. CAPIN:  I offer Exhibit 2, your Honor.

          MR. LANGE:  Your Honor, the exhibit is incomplete.  We raised this issue, and we object to the exhibit coming in in

this form.

THE COURT:  I think I can rule on that after the close of business today when I have a chance to hear the parties.

MR. CAPIN:  May I approach, your Honor?

THE COURT:  You may.

Q.  Tell us what is this document, this Exhibit 2, the set of documents you just looked at?

A.  Basically they're the applications for nonimmigrant visitor visa.  The first three were refused.

Q.  I'm sorry, sir.

A.  The first three were refusals under Section 214B of the Immigration Nationality Act.

MR. LANGE:  We have objected because the jury is now seeing the exhibit, and we object.

THE COURT:  No, I'm allowing the exhibit.

MR. LANGE:  I'm sorry, I didn't hear you.

THE COURT:  I will rule on whether it should be supplemented with additional evidence.

MR. LANGE:  Thank you, your Honor.

Q.  This is a packet relating to an application for a non -- several applications for a nonimmigrant visa?

A.  Yes.

Q.  Tell us again what a nonimmigrant visa is.

A.  The nonimmigrant Visa is for someone traveling to the U.S. for a specific purpose for a short period of time.

Q.   And who is the applicant for this particular visa?

A.   Prudence Kantengwa.

Q.   Can you tell by looking at the first page -- that's indicated, of course, on the very top of the first page, correct?

A.   Yes.

Q.   And can you tell me when this particular application was adjudicated?

A.   It appears to be September 14th, 2000.

Q.   And that's the date indicated here, correct?

A.   Yes.

Q.   And the letters next to it?

A.   Those are the initials of the adjudicating consular officer.

Q.   Can you tell from this first page whether on September 14th, 2000 an application for a nonimmigrant Visa by Prudence Kantengwa was issued?

A.   No, it was refused.

Q.   And what do you see on this that tells you it was refused?

A.   Well, 214B, which is the Section of the law in the INA that assumes everyone is an intending immigrant and overcomes that assumption to qualify as a nonimmigrant.

Q.   So this visa was denied on that date then?

A.   Yes.

Q.   And I see on the second page there's a photograph.  Do you

know whose photograph that is based on your experience adjudicating visas?

A.    It's the photograph of the applicant.

Q.    And I note that on top of the second page, it asks the question:  "Are any of the following in the U.S.," and it has a number of categories of people including husband, father, fiancee', son, brother, sister.  Did I read those correctly?

A.    Correct.

Q.    And they all indicate no, correct?

A.    Yes.

Q.    The next document in the package, what is this?

A.    It's for the same applicant, another refusal on the 21st of September, 2000.

Q.    So the second refusal is one week later?

A.    Uh-hum.

Q.    Did you review the entirety of Exhibit 2 before you testified today?

A.    Yes, I did look over these documents.

Q.    Based on that review, can you tell where these first two applications were submitted?

A.    I cannot tell, no.

Q.    And I see that -- am I correct in noting that again the second page indicates no family members in the U.S.?

A.    Correct.

Q.    This is the next application, the set.  Can you tell the

jury what this is?

A.   Again, the same applicant refused on September 28th.

Q.   So, again, one week later?

A.   Yes.

Q.   And, again, does this indicate no family members in the U.S.?

A.   Yes.

Q.   And under comments, it says, "Please note countries where you've lived."  Do I read correctly that Kenya for studies and work, Nairobi, 1995 to 2000?

A.   Correct.

Q.   And this bears a different photo of the same applicant, correct?

A.   It appears to, yes.

Q.   The document on the screen now, can you tell us what that is, please.

A.   It appears to be an e-mail from the Canadian consulate to the American embassy in Kigali.

Q.   It reads, "This person is applying for a CVV to attend missionary conference in Canada."  Did I read that correctly?

A.   Yes.

Q.   What is CVV?

A.   A Canadian visitor visa.

Q.   She indicates that she is widowed and has three kids and gives her occupation as director of women's ministries at the

African Leadership and Reconciliation Ministries in Nairobi. Did I read that correctly?

A.   That's what it says, yes.

Q.   "She was refused work and NIVs."  Is that U.S. nonimmigrant Visa?

A.   Yes.

Q.   "On 14 September, 21 September and 28 September this year," can you provide me with reasons; did I read that correctly?

A.   Yes.

Q.   Was it uncommon in your experience to have a Canadian and U.S. consular official sharing this type of information?

A.   Not uncommon.  We had close ties with Canada and Britain, other consular officers in the same city.

Q.   I'm looking at another application.  Again, at the bottom am I correct in noting it is captioned nonimmigrant Visa application?

A.   Correct.

Q.   And this is again for the same applicant --

A.   Yes.

Q.   -- Prudence Kantengwa.  Was this visa granted or refused?

A.   Refused.

Q.   And can you tell where it was refused?

A.   From the fee paid stamp, it appears to be Nairobi.

Q.   You're pointing to this stamp here?

A.   Yes.

Q.   So that was your section, correct?

A.   Yes.

Q.   And it was refused on --

A.   17 October, 2000.

Q.   Let me look at the next page.  Am I correct in noting that the case was submitted on 17 October, 2000?

A.   Yes.

Q.   So it was refused the same day.  Does this bear the same photograph we saw a moment ago?

A.   It looks like the same, yes.

Q.   On 17 October, 2000, where were you stationed?

A.   I was not in Nairobi.  I don't remember exactly where I was.

Q.   Okay.  The last application in this set, do you recognize that?

A.   Yes.

Q.   What is that?

A.   The same applicant is applying for 6 September, 2001 in Nairobi with my notes requesting a security advisory opinion and visa donkey.

Q.   I think if you circle what you say are your notes, the jury can see what you're talking about.  Just touch it with your finger.  Am I wrong?

THE CLERK:  You have to tap it hard.

Q.   There you go.  Is that your writing it says, "Rwanda donkey"?

A.   Yes.

Q.   What does Rwanda donkey refer to?

A.   Well, a donkey is one of any number of security advisory opinion requests that are sent to the Department of State for an applicant for whom you want to check if there are any ineligibility not known in post.

Q.   Was a security advisory request made in connection with the other, the four denied visas we saw?

A.   Not as far as I know.  They wouldn't normally be made.  If you're refused a visa, you wouldn't go any further.

Q.   So, is the request for a security advisory opinion the second step in the visa process in essence?

A.   If you decided that you would like to issue, yes.

Q.   Okay.  So, who is the  -- are you the adjudicator on this particular visa?

A.   That one, yes.

Q.   Can you tell us whether you granted or denied this visa?

A.   I'm sorry.

Q.   Can you tell us what action you took on this visa?

A.   Well, I sent a request, a security advisory opinion request, a visa donkey cable to Washington.

Q.   And what did that mean in terms of what next step you took during this application process?

A.    Well, it stops any processing at post until you receive a reply from the department, either positive or negative.

Q.    So you received the application at post.  By that you mean the office or the consulate of embassy in Nairobi, correct?

A.    Yes.

Q.    And you take no further action until you request information via, through the advisory opinion process?

A.    Correct.

Q.    And putting on the screen a document that has at the top of it captioned "Rwanda Questionnaire," what is that?

A.    That was a questionnaire that was authorized by the department for any applicant who had indicated either Rwanda nationality or residence.

Q.    And was a Rwanda questionnaire prepared by Prudence Kantengwa in connection with the previous four applications which had been denied?

A.    That I don't know.

Q.    In the normal course, would it have been prepared based on --

A.    I don't know when the Rwanda questionnaire was required, but once it was required, then presumably, yes, it would have been prepared.

Q.    Based on the review of these documents, the first four times that Ms. Kantengwa applied, did she get to the step of the process where she overcame what you called presumption of

immigration?

A.   She never got passed that, no.

Q.   She never got passed that.  Explain to the jury what that means.

A.   Well, if a person is unable to demonstrate what they used to call a bonafide nonimgrant, in other words, someone that is going to the United States for a specific purpose for a short period of time, then they would be refused under Section 214B as an intending immigrant.

Q.   So, and if a person was refused under that section, would he or she ever be presented with a questionnaire?

A.   If it was required, yes.  Like I said, I don't know, we did require when she applied in Nairobi.

Q.   You did require it?

A.   Yes.

Q.   Was it unusual to require specific questionnaires for specific countries during your tenure at the Department of State?

A.   No, it wasn't unusual depending on the area.  It could have been there were PLO in the communist era, there were special questionnaires for communist party membership, any number of special circumstances where the department would approve an additional questionnaire for the application.

Q.   So, for an applicant to reach this stage of the process in 2001, for a Rwandan applicant in Nairobi, was it common

practice, was it required to send, to request a security advisory opinion?

A.   It was common practice if you were thinking of issuing, yes.

Q.   So, in this instance, based on the application, you were thinking of issuing, correct?

A.   Yes.

Q.   And did you then present the applicant with this particular questionnaire?

A.   Yes.

Q.   And who fills out the questionnaire in the normal course?

A.   The applicant herself or himself.

Q.   And this applicant states as the full name Prudence Kantengwa, correct?

A.   Correct.

Q.   It states that her place of birth as Rwanda, Byumba, et cetera, correct?

A.   Yes.

Q.   And asks a series of questions about activities in Rwanda, correct?

A.   Yes.

Q.   I direct your attention to No. 6, it indicates under ethnicity, mixed, correct?

A.   Correct.

Q.   The second page of this, I direct your attention to

question 16, 17 and 18.

A.    Yes.

Q.    Question 16 reads, "Were you or any of your immediate family members (spouse, parents, siblings, children) employees of the government of Rwanda prior to July 15, 1994?"  Did I read that correctly?

A.    Yes.

Q.    Am I correct in noting that the answer to that was yes?

A.    Correct.

Q.    Do you remember this particular applicant?

A.    No, I did not.

Q.    Because how many -- is it fair to say that you adjudicated thousands of applications during your 30 years at state?

A.    Yes.

Q.    Based on your normal practice in response to that question yes, would you have asked a follow-up question?

A.    I would assume so, yes.

Q.    And under what circumstances would you have made a note of the answer to that follow-up question?

A.    Well, this would be probably what would have generated visa donkey that I would have decided that there was some reason or other that it needed to be a security advisory opinion.

Q.    Although am I correct in understanding that the visa donkey, you mean the information that you passed onto the state

department concerning the questionnaire?

A.   Uh-hum, yes.

Q.   And am I correct in understanding that document, that donkey, was sent to the state department for every Rwandan applicant applying to Nairobi during this time period?

A.   Every Rwandan applicant to whom we were expecting to issue a visa, yes.

Q.   By that you mean if based on your initial review of the application you had determined that this person was not going to get a visa, you wouldn't get this far in the process?

A.   Correct.

Q.   So once you got this far in the process, if you got in light of a yes answer, what type of follow-up question might you have asked?

A.   I probably would have asked what relationship, where did they work, who did they work for.

Q.   Under some circumstances would you have made a note of the answer?

A.   I presume I would have, yes.

Q.   And, for example, if the person had said, "I was related to a general in the military," might you have ignored that answer?

A.   Certainly.

Q.   So do you know why there's no follow-up?  Is there any follow-up in this exhibit that you conceded the "yes" provided

by Ms. Kantengwa to question 16?

A.   Only the following two questions where presumably the applicant answered no to all of those.

Q.   Well, let's turn to the next two.  Question 17, "Were you or any of your immediate family members, (spouse, parents, siblings, children, ever a member of the Armed Forces of Rwanda, any military or militia force, the Gendarmerie, Police Communal, Service de Renseignment, Presidential Guard, the Interahamwe, PALIR, or ALIR.  If so, explain."  Did I read that correctly?

A.   Correct.

Q.   If the answer to that had been yes, what would you have further done?

A.   I would have delved further into, find out specifically who worked for whom.

Q.   And what would you have done with that information?

A.   That would have been included in the visa donkey.

Q.   Would you have done anything at the local level at the embassy in Nairobi with that information?

A.   If there were a yes answer or there was something there, I probably would have referred it to other agencies at post.

Q.   When you say other agencies at post, what do you mean?

A.   Their DEA, FBI, CIA, any number of security.

Q.   Am I correct in understanding in response to question No. 17, if the answer would have been yes, you would have first

found out the details, correct?

A.    Yes.

Q.    And shared that information with other law enforcement agencies at the embassy, correct?

A.    Yes.

Q.    And, in addition, you would have generated this thing which we're calling the legal donkey which we're going to turn to in a moment; is that correct?

A.    Yes.

MR. CAPIN:  This would be a good time for a break, your Honor.

THE COURT:  I was thinking the same thing myself. Jury, let's take a 25-minute recess.

THE CLERK:  All rise.

(A recess was taken.)

THE CLERK:  All rise.

THE COURT:  I reviewed Exhibit 2 which I know what is at issue now.  I don't see any reason not to include the letters.  They're mildly exculpatory in the sense that they explain or at least the jury might understand or perhaps believe that she wasn't just fishing for a consular officer who was naive enough to essentially grant the Visa, there was actually a reason that motivated her at that particular point in time.  She would be fairly persistent in trying to obtain a visa, and I realize it doesn't go to the issue of whether she

made false statements or not in the application.  I don't see any reason not to include them.

(Non-immigrant visa applications were marked and admitted into evidence as Government Exhibit No. 2.)

MR. CAPIN:  We'll withdraw our objection, your Honor.

THE COURT:  That resolves at least with respect to Exhibit 2.

MR. LANGE:  Could we put the documents right here with the exhibit, your Honor?

MR. CAPIN:  Yes, shall we?

MR. CHAKRAVARTY:  We also withdraw it as to Exhibit 3.

THE COURT:  Exhibit 3.

(Refugee application was marked Government Exhibit No. 3 and admitted into evidence.)

THE COURT:  All right.  I think it's the easiest solution.  Okay.  We should have the jury.

THE CLERK:  All rise.

(JURORS ENTERED THE COURTROOM.)

THE CLERK:  Please be seated.  Court is in session.

THE COURT:  You can resume.

Q.   Mr. Wallen, when we left off, we were talking about this question indicated with a red sticker on Exhibit 2, question 17, and the one that asked on the long questionnaire whether the applicant had any family members in any number of entities including the Service de Renseignment; do you remember those

questions?

A.    Yes.

Q.    You testified that if there had been a yes answer, first you would have asked follow-up questions, correct?

A.    Correct.

Q.    Why were follow-up questions important in doing your job as a consular officer?

A.    Well, first of all, in a questionnaire like this, you need to know which family member there could be more detail that could be included in the advisory opinion.

Q.    And the advisory opinion, is that the document that you've also called a donkey?

A.    Yes.

Q.    Now, would that be also -- would the further questions you asked also be information you would pass onto people at post, people at other law enforcement agencies?

A.    Presumably, yes.

Q.    And I'm going to turn away from the questionnaire for a moment and ask you to look at the next couple of pages in this exhibit.  The page on the screen now, what are we looking at?

A.    This is a cable that went from Nairobi to the Department of State, the visa donkey at the SAO request.

Q.    That's a request for a security advisory opinion, correct?

A.    Correct.

Q.    It's colloquially known, commonly known in your business

as a donkey?

A.   A donkey was one of any number of pages that went out with animal names requesting specific information about certain cases, yes.

Q.   So donkey had a specific meaning within the state department?

A.   Yes.

Q.   And am I correct -- strike that.  Tell me based on this document if you could tell the jury where the cable was sent. By cable you basically mean like telegram, right?

A.   Telegram, yes.

Q.   This went from where to where?

A.   This went from Nairobi, the embassy, to the Department of State with an information copy to the embassy in Kigali.

Q.   So it says, "From embassy --"

A.   Nairobi.

Q.   "From A. Embassy, Nairobi to Sec. State, Washington D.C.," that's Secretary of State?

A.   Yes.

Q.   Also going to A. Embassy, that's American Embassy?

A.   Right.

Q.   That's in Kigali, correct?

A.   Correct.

Q.   And I see that there's a number of items numbered here starting with "1, Visa donkey, 2, Kantengwa, Prudence."  What

does that refer to?

A.    Basically that's the biographical information of the applicant, name, date, place of birth.

Q.    Okay.  Then I see there appears a Q and A, starting with Q, full name including any aliases or nicknames, it says "Prudence Kantengwa;" is that correct?

A.    Correct.

Q.    Does the rest of that page basically track the questions and answers given by Prudence Kantengwa on the Rwanda questionnaire?

A.    It does.

Q.    So am I correct in understanding that all of the information including the questions and the answers that you received from the applicant were then sent from Nairobi to the Secretary of State in D.C.; is that correct?

A.    Correct.

Q.    And also sent to the American embassy in Kigali, Rwanda?

A.    Correct.

        MR. LANGE:  Your Honor, the questions are leading.

        THE COURT:  They are a bit, but it does kind of move things along.

        MR. CAPIN:  I'll lead less, but I was trying to move on, your Honor.

Q.    So, turning to the second page of the donkey, I'll put a red sticker by this so you can draw the jury's attention to it,

do you see the question next to the red flag I put on the screen?

A.    Yes.

Q.    Is that verbatim the same question that we saw on the Rwanda questionnaire?

A.    It should be, yes.

Q.    And the answer transmitted to Washington is the same answer on the questionnaire, which is no; am I correct?

A.    Correct.

MR. LANGE:  Your Honor, he's leading.

THE COURT:  Well, again, it's one of these things that speaks for themselves by calling a witness' attention to it, it moves things a little more efficiently.

Q.    Is the answer transmitted to Washington the same answer as Prudence Kantengwa gave to that question, question 17 on the questionnaire, is the question transmitted to Washington -- is the answer -- I'm sorry, I'll start the question again.  My apology, is the answer provided by Prudence Kantengwa to question 17 the exact same answer she provided on the Rwanda questionnaire?

A.    Yes.

Q.    That's the answer that was transmitted to Washington D.C.?

A.    Yes.

Q.    With a copy to Kigali, correct?

A.   Correct.

Q.   I'll go back to the questionnaire and move the red sticky to question 18.  Now the last question on the questionnaire reads as follows, is that correct, it reads, "Were you or any of your immediate family members, spouse, parents, siblings, children ever a member of a political party, particularly CDR, Coalition pour la Défense de la République, or MRND, which then in parentheses has the French name, (Mouvement Revolutionaire pour le Developpement) organization, civil society or association in Rwanda.  If so, explain."  Did I read that correctly?

A.   Correct.

Q.   Did Prudence Kantengwa's answer read no?

A.   Correct.

Q.   If the answer had read yes, would you have asked any follow-up questions?

A.   Certainly.

Q.   Why?

A.   Because these were the areas that the department was specifically interested in relating to Rwanda visa applicants.

Q.   And would you have passed -- if the answer had been yes, would you have passed that answer along with answers to follow-up questions along to other people at the American embassy in Nairobi?

A.   I probably would have referred this to other agencies at

the embassy, yes.

Q.    Would it also have gone into what we're now calling the donkey?

A.    Yes.

Q.    And, in fact, did the answer as it reads on the Rwanda questionnaire go into the donkey word for word?

A.    Yes.

Q.    So I put the red flag by the last question on the donkey which asks about family or immediate family members being members of certain entities including the MRND, correct?

A.    Correct.

Q.    And the answer went into the cable, the donkey, to Washington D.C. and to Kigali the same answer that Prudence Kantengwa put on her Rwanda questionnaire?

A.    Yes.

Q.    And if she had given a different answer, would that different answer have gone onto the cable?

A.    Yes.

Q.    And if you had asked follow-up questions which yielded more detail, would that detail have been included on the questionnaire?

A.    Yes.

Q.    I'm sorry, on the donkey?

A.    Yes.

Q.    Finally, and as part of any package, well, would you have

seen letters of support in support of the applicant as part of your review process?

A.    If they were included with the application, yes.

Q.    And I'm going to show you -- well, first of all, before I turn to that, I'm going to show you the page in the document immediately after the donkey, immediately after the cable from Nairobi to Washington.  What is this we're looking at?

A.    This is the reply to the donkey from the Department of State.

Q.    Okay.  Can you point to us where is the reply to the donkey?

A.    Well, it refers to the reference cable for reference Nairobi 000136.  That's Nairobi's outgoing donkey cable.

Q.    And that's the same number, to be clear, that appears on the cable itself, 000136?

A.    Yes.

Q.    So you know that this response from Washington corresponds to the information sent from Nairobi to Washington, correct?

A.    Yes.

Q.    And what is the bottom line of this response from Washington to Nairobi?

A.    Basically the department has no objection to the issuance of the visa.  The Visa 6 is the coded message saying no derogatory information in Washington.

Q.    Okay.  So the response is what I'm pointing to here, the

department has no objection to the issuance of the visa, correct?

A.    Correct.

Q.    And the remainder of Exhibit 2 contains things like what I'm showing you here, which is the adjudication history, correct?

A.    Correct.

Q.    And also things like this screen shot.  What does a screen shot show, for example?

A.    That shows the Kigali refusals.

Q.    So this is a refusal in Kigali.  This is the next page, 21 September?

A.    Different date, yes.

Q.    You can tell by the R in refusal that's the status of the application, right, refused?

A.    Refused.

Q.    And there's one more refusal, correct?

A.    Correct.

Q.    Referring to the 28 September refusal?

A.    Correct.

Q.    And then there's a number of letters in the file.  This particular one addressed to the American Embassy in Kigali, would you have seen this in the normal course?

A.    Not in Nairobi, no.

Q.    Would you have seen anything -- this is also addressed to

Kigali.  Would you have seen that?

A.   No.

Q.   So, none of these letters here would have been part of your process, correct?

A.   No.

Q.   Just flipping through them, Kigali, addressed to Kigali?

A.   We would not have seen those.

Q.   Addressed to Kigali?

A.   To Nairobi, yes, we would have seen that.

Q.   Would you have seen this?

A.   Presumably, yes.

Q.   Okay.  Would the contents of such a letter, of any letter in support of a visa application, would that have affected one way or the other what information you put into the donkey?

A.   Letters of support would not necessarily go into a donkey, no, they would help us to adjudicate the visa application itself, but they have nothing to do with the security aspect of it.

Q.   So the donkey was going to go out no matter whether there were letters of support or not, correct?

A.   Right.

        MR. CAPIN:  One moment, your Honor.  No further questions, your Honor.

        MR. LANGE:  May I proceed, your Honor?

        THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. LANGE:

Q.   Good morning, sir.

A.   Good morning.

Q.   You are a full-time foreign services officer with our state department from was it 1976?

A.   1974.

Q.   1974 to 1998, 22 years?

A.   1996.

Q.   And so you served for 22 years from '74 to '96?

A.   Correct.

Q.   And then they brought you back in 1998 as essentially a temporary employee?

A.   Correct.

Q.   Temporary ended up being about 10 years?

A.   Well, temporary, it was in a sense, it was only three or four months in the summer during the busy visa season.

Q.   So it wasn't continuous?

A.   No.

Q.   And you went back to full-time retirement back in 2008?

A.   Yes.

Q.   How has that been for you?

A.   Quiet.

Q.   They sent you to the United States Embassy in Nairobi, Kenya in the middle of June, 2001; is that right?

A.   Yes.

Q.   And you were gone by mid-September of the same year, right?

A.   Actually it was late September because of 9-11.

Q.   You couldn't fly around 9-11?

A.   Correct.

Q.   So a little around three months you were the chief of a consular section in that embassy?

A.   Correct.

Q.   And, in fact, you were the senior person in that department, in that section?

A.   Correct.

Q.   And you were sent there because your predecessor had been dismissed?

A.   I didn't know the details.  Somebody needed somebody in Nairobi.

Q.   They grabbed you from quasi retirement and put you there?

A.   Right, we were on a list of available officers.

Q.   And a primary concern of your office at that time was Somalia; is that right?

A.   Yes.

Q.   How many people did you supervise in your three plus months in the embassy?

A.   If I recall, there were five or six what we call junior officers.  The first two are also WAE officers.

Q.   Was Margaret Hartley one of those people?

A.   I don't recall.

Q.   You don't recall the names of the people who were there?

A.   No.

Q.   Now, had you ever actually served in Nairobi before 2001?

A.   I had attended a two-week conference there in 1986; otherwise, no.

Q.   Had you ever been posted to Rwanda?

A.   No.

Q.   How much knowledge did you have about the situation in Rwanda as of 2001?

A.   Presumably whatever was in the newspapers and periodicals.

Q.   Now you've already testified that you do not remember Prudence Kantengwa; is that right?

A.   No, I do not.

Q.   And that's not surprising because you had to process many applicants?

A.   Correct.

Q.   I want to talk about the application process there in Nairobi back in that summer.  Before someone, an applicant saw someone like yourself face to face, they went through a prescreening process; is that right?

A.   Correct.

Q.   And that took place somewhere outside your office?

A.   Well, no, it was in the office.  It was done by local

staff.

Q.   And the local staff were -- they were government employees?

A.   Government employees but Kenya nationals for the most part.

Q.   Now, could an applicant make an appointment, could someone who wanted to get a visa through the embassy there say I want to be in front of someone like yourself at a particular time or a particular day?

A.   What happens, they were quasi appointments, they would apply, and then we would fit them in as soon as we could, usually within a day or so.

Q.   So they did actually have an appointment they could arrive at?

A.   Yes.

Q.   What were the hours that the office was open for these applicants?

A.   If I recall, we were open in the mornings only from say 9 to 12, 9 to 1.

Q.   Five days a week?

A.   Yes.

Q.   And on a given -- any given day how many people would be in that office looking for some sort of immigration documentation?

A.   Several hundred.

Q.    Several hundred?

A.    Yes.

Q.    And they were yourself and, what, five other people to process?

A.    Right.

Q.    Now, you were not the person who handed out the actual application or the questionnaire that the prosecutor has been asking about?

A.    No, it was done by a foreign service national.

Q.    That was done by someone who was maybe a citizen of Kenya?

A.    Yes, could be.

Q.    How about a citizen of Rwanda, or were they mostly --

A.    As far as I knew, there were no Rwandan employees at the embassy in Nairobi.

Q.    They were either all American --

A.    Either Kenyan, or there could have been a British X Pat or something, but they were not American citizens.

Q.    And the interviews were done in English?

A.    I'm sorry.

Q.    The interviews were done in English?

A.    Yes.

Q.    What happened if the applicant did not speak English?

A.    We would look for an interpreter and use an interpreter. Most of the staff spoke many of the tribal languages throughout East Africa so there was no dearth of interpreters there.

Q.    I'm sorry, the applicants filled out the form the day they arrived?

A.    Usually, yes.

Q.    And then there was someone that prescreened basically to make sure the form contained the information that all the boxes were filled out?

A.    All the information, yes.

Q.    Does the something C-L-A-S-S name check, what is that?

A.    Class, that's the Consular Lookout And Support System. It's a computer base, database that we check all nonimmigrant and immigrant visa applicants names against.

Q.    When was that computer check done?  Was it done before the interview with you?

A.    It's usually done before, yes.

Q.    So it's essential for that to be accurate that the person give their correct name, their correct date of birth?

A.    Yes.

Q.    That's how the system works?

A.    Right.  It's only name retrievable, yes.

Q.    And the prosecutor has reviewed with you the applications that the record indicates Prudence Kantengwa made in 2000, and they were refusals --

A.    Correct.

Q.    -- from the record?  I just want to on this particular application from 2000, the name is indicated, the date of birth

is indicated, correct?

A.    Correct.

Q.    And I believe there's a passport number?

A.    Yes.

Q.    And that would be an indication for a Rwandan passport?

A.    According to the application, yes.

Q.    And that's essential information because that's how you identify the applicant?

A.    Correct.

Q.    And that was done in the request, the first request here it looks like September 10th of 2000, and there's some comments in red.  Obviously you didn't write those comments?

A.    Correct.

Q.    Because you weren't there, and it indicates refused under 214B; is that right?

A.    Yes.

Q.    And 214B means insufficient documentation?

A.    No, 214B means that they failed to overcome the assumption of immigrant status.

Q.    And the way if someone overcomes the presumption of immigrant status is to show that they have sufficient information to indicate they're not coming to the United States to stay, they're coming for a legitimate purpose, business or pleasure and they're returning?

A.    What we call in the vernacular, ties and funds, in other

words, ties to the country where they're applying to and sufficient funds to offset their expenses, yes.

Q.    Does it matter in the adjudication process that you were involved in whether or not there are sponsors?

A.    Of course it matters, depending on the part of the world, the purpose of the visit, the sort of thing going on. Obviously someone in Kenya or East Africa would probably not have private funds, their own funds to pay for airfare and that sort of thing, so, yes, sponsors are important.

Q.    And are sponsors listed here on the screen in front of you?

A.    Yes.

Q.    As a practical matter, was it often the case that the first time someone came in to seek a nonimmigrant visa that they were refused?

A.    Often that was the case, yes.

Q.    And part of the reason for that was because you wanted to be more certain that the person was in fact making a real request, this wasn't some spur of the moment?

A.    Usually the first application was deficient in supporting documentation, so they were refused, yes.

Q.    Now, supporting documentation would include things like letters from either people in the United States or institutions in the United States or elsewhere indicating that they were providing either financial or other support for the would-be

traveler?

A.   Yes.

Q.   This is a copy of the second application in September of 2000, and, again, those red notes are not yours.  You don't know who wrote those, presumably it was a consular officer?

A.   Yes.

Q.   Again though we see it's the same name, same date of birth, passport number and so forth?

A.   Correct.

Q.   The third application at the end of September of 2000 simply indicates no change, presumably that's because the consular official felt that there was no new information beyond what he or she had already had earlier?

A.   Correct, the consular officer on all three applications is the same.

Q.   Because you recognize the handwriting?

A.   No, I don't recognize the handwriting, just the initials are the same.

Q.   Oh, okay.  I want to review with you some of the supporting documents that are included in the file.  These were a series of letters.  Now, these are from the file.  These are part of the Exhibit No. 2, and the prosecutor went through them with you quickly.  The first few are the ones for 2000, as you already indicated, were sent to the American Embassy in Kigali, Rwanda.  I take it, at least I infer that if supporting

documents are not sent to the consular officer in Nairobi, they're not going to be considered?

A.    Correct.

Q.    Just because the would-be sponsor sends documents to another embassy, they're not going to forward it, they're not going to know what it's about?

A.    No, the only thing we have is the computer notation.

Q.    These documents here 2000 presumably ended up in a file somewhere and had no impact on whatever decision was made in 2000?

A.    Correct.

Q.    Did you know somebody named Betty Payne, U.S. Embassy, Kigali?

A.    No.

Q.    The application in September of 2000 indicates who the various sponsors might be, and we have a letter, do we not, that was sent to Betty Payne, Mrs. Betty Payne in Kigali and that the letterhead on that is Bent Tree Bible Fellowship.  Is that right?

A.    That's what the letter says, yes.

Q.    Now, this letter is to your embassy there in Nairobi, and it's at a time when you were there, right, it's before 9-11, September 4th of 2001, and this letter is from -- make sure I can read this, Bent Tree Bible Fellowship.  Do you see where my finger is?

A.   Yes.

Q.   And it's in support of Prudence Kantengwa getting a visa to come to the United States?

A.   Correct.

Q.   And they indicate that they will purchase round trip airline tickets and that she is to be involved in a conference in Houston, Texas in September.  Do you have any reason to believe that that letter was not in the file when you interviewed our client?

A.   I presume it was in there at the time she applied for a visa.

Q.   And would that be something you would have given weight to in deciding whether to exercise your discretion to grant the visa?

A.   Yes.

Q.   The letter here, the 5th of July of 2001, and that's from the African Reconciliation Ministries, correct?

A.   Correct.

Q.   And it indicates they're supporting a visa for Prudence Kantengwa because she's the director of Women's Ministries at the African Leadership and Reconciliation Ministries, ALARM?

A.   Correct.

Q.   Another letter from the same group dated September 3rd, 2001, no reason to believe that that wasn't something part of

your decision, correct?

A.   All of that would be taken into consideration, yes.

Q.   So how long do you suppose the interview in this case might have lasted, five minutes, ten minutes?

A.   Probably between ten and fifteen minutes, yes.

Q.   And during the interview, the forms were already completed?

A.   The forms are completed.

Q.   She's not writing the answers as you're asking the questions?

A.   No.

Q.   Do you read the questions to her aloud?

A.   I usually can read them aloud to her or I would go over them individually and explain did you understand this, did you understand that, that sort of thing.

Q.   One of the things that -- it's as judgment call, you're really the one that's going to make the decision?

A.   It's always subjective, yes.

Q.   And part of it is deciding whether or not the person appears to be believable?

A.   Yes.

Q.   So I want to go over the application for the visa that was finally granted.  Again, the name, the date of birth, passport number, that's all there in the proper boxes, correct?

A.   Correct.

Q.   What's the stamp there?

A.   That's the date the application was received at the embassy in Nairobi.

Q.   Who puts that stamp on?

A.   It's done by a local national employee.

Q.   That stamp was already there.  It makes it hard to read what's underneath, but the question is have you ever applied for a U.S. nonimmigrant visa, right?

A.   Correct.

Q.   And she answers it yes?

A.   Yes.

Q.   And that was true?

A.   Yes.

Q.   She had applied and she had been denied in 2000, and that's what she says, she says Rwanda, Kigali, Nairobi, and she gives September, 2000; is that right?

A.   Correct.

Q.   The visa application has a form number, correct?

A.   It's an 0159, whatever, the bottom of the form.

Q.   And that's an official government form put out by the Department of State?

A.   It's the same form worldwide.

Q.   The Rwanda questionnaire is not such a form, is it?

A.   It's specific to Rwandan applicants, yes.

Q.   It's a two pages, is it not?

A.   Yes.

Q.   There's nothing on the top that says it's from the state department?

A.   No.

Q.   And there's nothing at the bottom for the person to sign where they say they've read it or they understand the consequences of what they put in there?

A.   Correct.

Q.   As you went through the questionnaire, did you in that five or ten-minute interview, the face-to-face interview that you had with our client, did you make sure that the information on this form, this Rwanda questionnaire was consistent with what was in the formal application?

A.   Well, the only consistency would be whether her name and passport numbers would be the same.  I don't understand what you mean consistent with the application.

Q.   Question No. 6 asks a question about are you Hutu, Tutsi, TWA or mixed?

A.   Right.

Q.   Did you know anything about the identity card system in Rwanda?

A.   Not specifically, no.

Q.   You don't know whether there was a category in the Rwandan -- in the Republic of Rwanda for people who fell in the mixed category?

A.   No, I don't know what the distinction was.

Q.   The question here about personally being affected by events during the genocide, question 9, there's an answer.  Did you follow up in that answer in any way?

A.   I don't remember the specifics.  I would assume I asked what happened or asked for details.

Q.   Question 10 is:  "Have you participated in the genocide?" And do you know if there was any follow-up to that question?

A.   No, except the answer is no.

Q.   A better way or one way to determine whether someone has participated in the genocide is to contact the state department or other people in the state department who have information about who participated; is that right?

A.   Presumably, yes.

Q.   And that's the point of what you've been questioned about the donkey visa, the request for a security advisory opinion?

A.   Correct.

Q.   They have a checklist that they go through?

A.   Presumably there are resources available in Washington that we didn't have at post, yes.

Q.   That cable didn't just go to Washington though, it also went to --

A.   Kigali.

Q.   -- Kigali, the capital of Rwanda, and they presumably have resources as well to figure out what kind of investigative

information was out there about the applicant being involved in those awful events?

A.    Correct.

Q.    What sort of formal training did you receive on this Rwanda questionnaire?

A.    None whatsoever.  There was just a requirement by the Department of State that they simply said all Rwandan applicants must fill out this questionnaire in addition to their application.

Q.    Was there anybody in the summer of 2001 in the embassy there where you were working in Nairobi that could have given you clarification about what to do with this Rwandan questionnaire beyond making sure that each question was answered?

A.    Not routinely, no.

Q.    Question 13 asks what Ms. Kantengwa's occupation was prior to April 6 of 1994 in Rwanda.  She answers obviously that she was working with an insurance company.  Did you follow up on that?

A.    There appeared no need to.

Q.    Why?

A.    Because it didn't elicit further information or requests for further information, it's a straightforward answer once again.

Q.    Question 14 indicates that -- the question is:  "Have any

of your immediate family members been in Rwanda since April of 1994?"  The answer is yes.  Did you follow up on that?

A.    I again asked perhaps which ones, who.

Q.    But you didn't note any response?

A.    No.

Q.    And you don't remember now what the response might have been?

A.    No, I don't.

Q.    The prosecutor asked you about question 16.  The jury has heard about question 16 in this trial.  It asks whether any of your immediate family members, spouse, parents, siblings, children were employees of the government of Rwanda prior to July 15th of 1994.  Now, did you know what happened around July of 1994 in Rwanda?

A.    No.

Q.    You were unaware that there was a regime change?

A.    I was unaware of the details.

Q.    And I take it that you don't know what RPF stood for at that time?

A.    At that time, no.

Q.    Do you know now?

A.    I may have read subsequent.

Q.    In any case, there is a yes, the response says yes. You've told the prosecutor that you've followed up with that, you apparently tried to get some additional information or you

say I tried to get additional information about whether it was a brother or a father or indeed Ms. Kantengwa herself who was employed by the government of Rwanda prior to that date. You did follow it up, that's what you testified to?

A.    Yes.

Q.    Why don't you tell the jury just what she told you about who it was in her family that had been working for the government?

A.    I don't remember the details.

Q.    Are you sure you asked?

A.    I'm sure of that, I don't remember the details.

Q.    If she told you that her husband was involved in the government of Rwanda prior to April of 1994 or July of 1994, that would have been significant?

A.    If she told me that, yes.

Q.    She said yes?

A.    Yes, I'm sure I followed up, but I don't remember the specifics.

Q.    Did you read each of these questions aloud to Ms. Kantengwa, or did you simply ask her to the effect of did you see the question?

A.    I don't remember if I read them aloud or not. I presume if I had any idea that she didn't understand English or something, I might have gone through each one specifically by reading it allowed. I did not have that indication.

3-105

Q.   Do I correctly understand that these different organizations named in question 17, a lot of those names don't mean anything to you?

A.   Not specifically, no.

Q.   And they didn't at the time?

A.   No.

Q.   You didn't know what the initials FAR stood for?

A.   No, I did not.

Q.   Didn't know exactly what the Service de Renseignment was?

A.   No.

Q.   Did you know what the Interahamwe was?

A.   No.

Q.   And you have no recollection -- did you have any particular conversations with Prudence Kantengwa about any of those entities listed on question 17?

A.   I don't remember the specifics, no.

Q.   Question 18, the CDR did not mean anything to you, did it?

A.   Other than the French.

Q.   And as to the MRND, all you knew about the MRND was what's there in parenthesis, "Mouvement Revolutionaire pour le Developpement"?

A.   Yes.

Q.   You don't know anything on the history of the naming of the MRND?

A.   No, I do not.

Q.   You don't know about multi parties coming in, you don't know about changes in the name?

A.   No.

Q.   You don't know how people understood MRND back in Rwanda?

A.   No, I do not.

Q.   Do you have any idea why they called these visas donkey visas?

A.   I have a feeling years ago it may have been someone who probably thought that the government needed a sense of humor. I have no idea who came up with we have donkey chipmunk, we have donkey raccoon, we have eagles.

Q.   Do you think it might have been because a donkey is slow?

A.   Who knows.

Q.   Well, I want to talk about the cable.  You decided basically that Ms. Kantengwa's application deserved further consideration?

A.   Yes.

Q.   And you didn't issue it in September of 2001?

A.   No.

Q.   After September of 2001, you were gone?

A.   Correct.

Q.   Do you actually know who issued the subpoena, I'm sorry, do you know who actually issued the visa and when?

A.   No, I do not.  I understand the record showed it was

issued in February of 2002, but other than that I don't know who issued it.

Q.   But it would have been issued by somebody in your office, in the consular office back in Nairobi?

A.   Yes.

Q.   All right.  I've got the donkey cable, the visa donkey here on the screen in front of the jury.  I'm going to give this a shot here, 081251 Zulu, right?

A.   Right, correct.

Q.   Do I correctly understand that to mean the 8th day at 12:51 Zulu, a particular time in January of 2002?

A.   Correct.

Q.   So what's 12:51 Zulu, is that the time in London or Washington?

A.   In London, London time.

Q.   That's London time.  That's used because the state department works all around the world?

A.   Correct.

Q.   So we know when the cable was sent, and this is requesting a follow-up really to determine whether there are any genocide concerns regarding Ms. Kantengwa?

A.   Any grounds for ineligibility.

Q.   Any concerns, any reason why she shouldn't be allowed to come here and participate in what she described as religious meetings?

A.    Correct.

Q.    So you see her in September, and the cable doesn't go out until January.  That donkey seems kind of slow?

A.    I have no idea why it took so long.  Normally they would go out within a couple of days of the...

Q.    So it was left to one of your subordinates to follow up?

A.    Well, successors, I wouldn't say subordinates necessarily.

Q.    You don't know who that is at this point?

A.    No, I do not.

Q.    And it goes to the Secretary of State in Washington?

A.    Correct.

Q.    And it was Colin Powell back then, he was your boss?

A.    I'm sure he did not receive the cable personally.

Q.    Well, gosh.  I thought he signed off on it, it says here?

A.    Well, it does.

Q.    Later on it says Powell?

A.    It's true, but the visa went directly to the visa office.

Q.    So somebody acted on his behalf?

A.    Right.

Q.    And I've already asked you this, and I could go over it in detail again.  Basically there is a security check that's done using the name, identification information, anything else that's been provided to you goes to Washington and to Kigali to make sure that the applicant is appropriate to come to the United States on a nonimmigrant visa?

A.    Correct.

Q.    You had no reason to think about this particular visa application for a long time, right?

A.    Correct.

Q.    And then investigators came out to see you where you're living now and started asking you about it, they sent you the file?

A.    They didn't come out and visit me, they called me on the phone.

Q.    Telephone interview?

A.    Yes.

Q.    And they asked you some of the same questions that he's asked you and that I've asked you?

A.    Correct.

Q.    Now, you told them as I see here from this report that if the answer to the question about membership in these various groups had been yes, you would have referred the case to other agencies at the embassy, right?

A.    I would have tried to or at least discussed it with other agencies, yes.

Q.    But you still would have denied, you wouldn't have issued the visa immediately regardless?

A.    Regardless, right.

Q.    Because there was going to be this security advisory SAO donkey to make sure that everything checked out?

A.    Yes.

Q.    Do you remember telling them when they spoke to you on the telephone, and this would have been May 22d of 2009, you're speaking on the telephone to several different people, I guess they're on speaker phone?

A.    Presumably.  I don't remember the dates.

Q.    Okay.  Forgetting about the dates, when they spoke to you after sending you the documents and they asked you these questions about the Rwanda questionnaire, was there more than one person on the line asking questions?

A.    I really don't recall.

Q.    You don't remember, all right.  Do you remember telling the investigator or investigators that you were speaking to on the telephone about this case that when they asked you about the yes answer to employment whether Prudence Kantengwa or any of her family members had been employed by the government and she answered yes, do you remember telling them that you did not ask her to clarify that answer at that time?

A.    I don't recall my response, no.

Q.    If the report indicates that you stated to the investigators you probably should have asked Kantengwa to clarify her answer but did not do so at the time, you're not going to contradict that?

A.    No.

      MR. LANGE:  Thank you, sir.

3-111

THE COURT:  Anything further?

MR. CAPIN:  A little bit.

THE COURT:  Yes.

                    REDIRECT EXAMINATION

BY MR. CAPIN:

Q.   When you first started testifying, I showed you Exhibit 23.  Is that a certified copy of the donkey provided by the state department?

A.   Yes, it is.

MR. CAPIN:  I offer 23, your Honor.

THE COURT:  23.

MR. LANGE:  Without objection.

(Department of State cable was marked Government Exhibit No. 23 and admitted into evidence.)

Q.   Just a few more questions.  Now, on the exhibit Mr. Lange just reviewed with you that indicates that she was traveling to Texas, the purpose of the visit was to travel from Nairobi to Texas for a conference, correct?

A.   Correct.

Q.   And what is the national language in Nairobi, Kenya?

A.   The what?

Q.   The language, what language is spoken?

A.   English, Swahili and other tribal languages.

Q.   And you conducted the interviews in English?

A.   Correct.

Q.    During your course of 30 years as a consular officer, did you have occasion to deal with people who didn't speak English?

A.    Yes.

Q.    And you spoke to them how?

A.    If they spoke one of the languages I did, then I spoke to them in that language.

Q.    How many languages do you speak?

A.    Seven.

Q.    You don't speak Swahili?

A.    No.

Q.    Or Kinyarwandan?

A.    No.

Q.    If the person didn't speak one of the languages you speak, how would you --

A.    We have an interpreter available in most posts.

Q.    Was it common in Nairobi to have people come in who were perfectly proficient in English?

A.    Oh, yes.

Q.    In fact, on this document looking for the one you -- the visa you approved, the writing, I'm pointing to the right margin here, Rwanda donkey, that's your writing?

A.    Correct.

Q.    And down below, what does say?

A.    "Otherwise okay to issue."

Q.    What does this say?

A.    Five years in Kenya.  That is not my writing, that is someone else's.  That was probably the FSA.

Q.    That was the person who wrote it before?

A.    Prescreened the application.

Q.    Now, you said in response to Mr. Lange's questions the things you looked at with regard to whether a person -- he was asking you about whether the person was believable in saying she wasn't coming to immigrate; do you remember those questions?

A.    Uh-hum.

Q.    And I think you said something like you looked at things like resources and residence; is that correct?

A.    Yes, ties and funds.

Q.    So, was it relevant to you that Ms. Kantengwa had been in Kenya for five years at that point?

A.    Yes, she presumably had become established there and had a residence there.

Q.    Does it indicate to you that she indicates on here a business telephone?

A.    That would be part of it, a business phone.  Everybody had cell phones in Kenya, nobody had land lines.

Q.    That indicates, of course, that she was employed?

A.    That would indicate that, yes.

Q.    Now, Mr. Lange also pointed out that it would appear that Ms. Kantengwa provided her correct name and passport number and

the fact that she had previously applied for visas, correct?

A.    Correct.

Q.    Well, of course, her name and passport number would be in the database from her first application in Kigali, right?

A.    Yes.

Q.    Because she would have had to present the passport to apply for the Visa?

A.    Correct.

Q.    So that was information she was providing that was truthful was information already in the U.S. database, correct?

A.    Correct.

Q.    Now, Mr. Lange asked you about a question about the best ways of finding out whether people had done some -- participated in any way during the Rwanda genocide.  Do you remember those questions?

A.    Yes.

Q.    To your knowledge, does the U.S. government have a list of participants in the Rwanda genocide?

A.    They may have somewhere.  I don't know where.  I presume Washington would have that information, that's why we sent the donkey.

Q.    Do you know one way or the other though whether anybody in the U.S. or elsewhere has a list of the participants in the Rwandan genocide?

A.    I do not know personally, no.

Q.    With regard to question 16, this is the question on the Rwanda questionnaire asking whether the applicant had a family member who had been employed by the government, if a person had indicated, for example, that she had a family member who worked as the secretary for the rural development district in some province, would that have been something you would have deemed necessary to probe further on?

A.    No.

Q.    If the person had said that her husband was functionary in the secret police, would that be something you would focus on?

A.    Certainly.

Q.    Why?  What's the difference?

A.    Well, low level of employees of any government are probably not what we're interested in from a security standpoint, not to say there may not be, but I ordinarily wouldn't think they would be.

Q.    And Mr. Lange asked you questions about question 13 about the insurance company, and I think you said that the answer was satisfactory because the questionnaire which is on the screen right now doesn't call for any follow-up information, correct?

A.    Right, it seemed to be an ordinary occupation.

Q.    Am I correct that on this particular page, two of the questions that do call for follow-up information are questions 17 and 18, they basically ask you if the answer is yes to explain, correct?

A.   Correct.

Q.   And, finally, Mr. Lange asked you questions about he suggested that maybe this was a credibility judgment call whether or not to issue the visa, do you remember those questions?

A.   Yes.

Q.   But, sir, was it within your authority to issue a visa before you got this document back from D.C.?

A.   In this case, no.  In any case where I needed to have a security advisory opinion, I had to stop, I no longer had the authority to issue, I had to wait for the department's response.

Q.   So Mr. Lange pointed out that this particular visa didn't get acted on until 2002.  If it had taken another year to be acted on, would that make a difference to whether the visa would have been issued?

A.   Probably not, but I would have wondered.

Q.   Until you got back this information saying the department has no objection to the issuance, no visa was going to be issued, correct?

A.   Correct.

          MR. CAPIN:  Nothing further, your Honor.

          THE COURT:  Mr. Lange, anything?

RECROSS-EXAMINATION

BY MR. LANGE:

Q.    The applicants in general, including Prudence Kantengwa, they would learn nothing from you about the database or how any of their information was going to be used, right?

A.    Correct.

Q.    In some sense, it was like a black box, they came in, presented the documents, went through the process and awaited a response?

A.    Basically, yes.

Q.    With regard to the question about has any member of your family been employed by the government, with regard to the yes answer the prosecutor just asked you about, you did tell the investigators several years ago that you should have followed up or you probably should have followed up but you didn't?

A.    If that's what the record shows.  I don't recall that conversation.

Q.    And the record shows that that conversation happened on May 22d of 2009.  Does that sound right?

A.    It sounds right, yes.

Q.    So that would have been after the indictment in this case, which was December of 2008?

A.    I didn't know the details of that.

Q.    Thank you.

        THE COURT:  Thank you very much, Mr. Wallen.  You're

free to go back to your retirement.  Next witness, please.

MR. CHAKRAVARTY:  Thank you, your Honor.  The government calls Dorothy Michaud.  Ms. Michaud.

DOROTHY MICHAUD, having been duly sworn by the Clerk, testified as follows:

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  First name is Dorothy Loretta, last name Michaud, M-i-c-h-a-u-d.

DIRECT EXAMINATION

BY MR. CHAKRAVARTY:

Q.   Good afternoon, Ms. Michaud.

A.   Good afternoon.

Q.   Could you please tell the jury where you work.

A.   I currently work at the U.S. Services Citizenship and Immigration Services Office in Boston.  I'm the field office director for that office.

Q.   And does field office director mean you're a boss?

A.   Yes, I oversee the operations, day-to-day operations of the field office, correct.

Q.   And what does citizenship and immigration services do?

A.   The citizenship and immigration services informally called U.S. CIS, we process applications and petitions for people seeking benefits under the immigration act.  We do administrative processing.

Q.   And are you familiar with the agency called Immigration

Acquisition Service commonly known as INS?

A.   Yes, I am.

Q.   What's your current position's relationship with the INS?

A.   I began with the Immigration and Naturalization Service in

February of 1976, and I've worked for the agency since that

time.  In 2002, the Homeland Security Act disbanded the

Immigration Naturalization Service and created three agencies,

and the U.S. Citizenship and Immigration Services are one of

those agencies, and we became an agency on March 1st, 2003, so

I've been employed with the Immigration Naturalization Service

and now U.S. CIS since 1976.

Q.   And are there other agencies which are now part of the

Department of Homeland Security that handle other aspects of

the immigration but not necessarily the benefits side?

A.   Yes.

Q.   What are those?

A.   Customs and border protection, they handle the admissions,

and they work at the airport and the land border and

Immigration and Customs Enforcement working internally.

Q.   And those agencies have a different function than CIS?

A.   Yes, they do.  We do work together, and we collaborate on

various issues, but we have separate functions.

Q.   And you describe that there are applications for benefits

that CIS adjudicates; is that fair?

A.    Correct.

Q.    Describe what kinds of benefits U.S. CIS can give?

A.    Well, the United States Citizenship and Immigration Services is located all over the world.  We have 250 offices all over the world, so the offices that are located overseas are generally processing applications from people that are residing overseas.

Those would be refugee applications, they may be immigrant Visa application, excuse me, not immigrant Visa applications but petitions for people seeking immigrant visa applications, and in the United States, we process applications for people wishing to become a permanent resident of the United States, for people applying to become a citizen of the United States and various other petitions and applications.

Q.    So all of these are types of benefits that people can use to immigrate to the United States?

A.    That's correct.

Q.    In your 30 years, can you describe to the jury very briefly where you've worked?

A.    I started my career in Portland, Maine in a clerical administrative position, and I moved to San Francisco where I worked in the San Francisco office for a while, moved back to Portland as an immigration inspector, worked as an inspector for about 20 years moving to an immigration examiner.

An immigration examiner is now referred to as an

immigration services officer, and in that position you're actually adjudicating and processing the various applications that we administer, and I became a supervisor after that, became the field office director in Providence in 2009 and moved to the Boston office in 2011.

Q.    And is it fair to say that you're familiar with most aspects of the immigration process?

A.    Yes, I am.

Q.    Now, do the various means of getting some kind of immigration to the United States to be able to come to and stay in the United States, do they all require different applications?

A.    Yes.

Q.    And what type of information is sought in these various applications?

A.    We're always seeking information about identity of the individual applying for the benefit, we're seeking information as to whether the applicant is entitled to the benefit, and we're also in most of the applications, in many of the applications seeking information to ensure that the applicant is admissible to the United States and also information relating to dependents that may be entitled to benefits received through the primary applicant or the applicant seeking admission to the United States.

Q.    When you say, just to break those down a little bit, when

you say you're looking for identity type of information --

A.    Correct.

Q.    -- what kind of information are you looking for?

A.    There are questions on the application that ask name, other names used, dates of birth, place of birth, parents, addresses, places of work, things that could identify that individual.

Q.    Generally speaking, why is that type of information important to the CIS?

A.    CIS needs to confirm the identity of a person that's applying for benefit to the United States, and also we ask that information, residents for jurisdiction issues to make sure that we have jurisdiction over an application.

Q.    During the immigration process, are there any security reviews done?

A.    There are security reviews done before any application is granted.

Q.    And is that identity information used for that purpose?

A.    Yes, it is.

Q.    You also said that the applications are designed to determine whether someone is entitled to a benefit.  What do you mean by that?

A.    Well, when someone fills out an application, they need to advise us of what they're applying for and under what basis they're applying for that.  Can I use an example like someone

applying for a citizenship?  There are certain requirements that have to be met in order to find that the applicant is eligible for that benefit, so if someone is applying for a benefit as a permanent resident, there are certain questions that are asked to determine that that person is eligible for that benefit.  I'm trying to find words to describe it a little more clearly.

Q.   When you say eligible for that benefit, are you talking about whether they meet the legal requirements?

A.   Whether they meet the legal requirements, correct, and regulations under the law that they're entitled to apply for that benefit.

Q.   You also said that one of the things that the applications look for are to determine whether somebody is admissible to the United States?

A.   Correct.

Q.   What does that mean?

A.   That means that the person meets all of the requirements to be admitted, that they're not under any inadmissibility grounds under the Immigration Nationality Act which range from not having a valid late certification, being a criminal, criminal grounds for not being admissible, could be someone coming in without a valid visa, someone coming in not admissible based on national security grounds, so there's various grounds of inadmissibility.

Q.   Are you familiar with something called the persecutor bar, the genocide bar?

A.   I am familiar with that bar, yes.

Q.   What's that?

A.   That's under the foreign policy, and any person that has been found to be involved in the persecution of another individual is not eligible to be admitted to the United States, and there's no waiver, there's no grounds or application that that person can file to overcome that ground of inadmissibility.

Q.   Are you familiar with something called the terrorist bar?

A.   I am familiar with the terrorist bar, and that is also under the security ground of inadmissibility, that is someone that is coming to the United States either to commit acts of terrorism or has committed acts of terrorism or has assisted in organization in acts of terrorism whether it's a support or active involvement is also inadmissible.

Q.   The fourth element that you identified earlier was you look at dependents that might be listed on an application form?

A.   Correct, because many applications when someone comes to the United States under certain -- on a certain basis, whether it be a permanent resident, a refugee, a student, any form they could coming in they could have dependents or derivative residents to accompany or follow or join them to the United States.

Q.   So in the immigration process understanding that depending on how someone intends to immigrate might be slightly different, once a person submits a form, application form, what are the different options for what CIS would do?

A.   Well, in all cases where someone is seeking to immigrate to the United States and the U.S. CIS has an application before them, that person is called in for an interview, and we would review the application with the applicant.  That would be the first step.  We would also require that the applicant appear for fingerprints, for biometrics again to help establish identity.

Q.   And in some cases do people apply for immigration benefits while they're here in the United States?

A.   Yes, they do, very frequently.

Q.   What's the distinction in terms of the process for when somebody is applying for benefits outside the United States vs. when they're instead the United States?

A.   It really depends on what benefit they're seeking.  If someone is seeking permanent residence and they're in the United States, then they would make that application to the United States Citizenship and Immigration Service.  If someone were to go outside the United States and was eligible to immigrate, they would go to the Department of State.

If someone was in the United States and seeking asylum, they would file with the United States Citizenship and

Immigration Services where if an applicant was a refugee and was outside the United States, they would still file with the U.S. CIS but within overseas office.

Q.   You just mentioned that many of these applications, particularly those for someone intending to immigrate to the United States require interviews?

A.   Yes, they do.

Q.   Describe generally what CIS is looking for when they conduct interviews.

A.   Well, the U.S. CIS is seeking to identify the identity of that person in establishing that the person before them is the applicant for the benefit, and we're seeking to review the information with the applicant, to take testimony from that person to establish that all the information in the application is truthful and accurate, and we're looking to establish that the person would be eligible, as I stated earlier, for the benefit that they're seeking and is admissible to the United States.

Q.   Is assessment of credibility part of that interview process?

A.   Yes, it is.

Q.   If there's communication difficulties during an interview process, what does CIS do?

A.   If there's communication difficulties of an applicant just not understanding some of the questions are complex, if they

just don't understand the question as it was presented, then U.S. CIS officer can rephrase the word and make the question clearer to the applicant.  If it's a matter of a person not understanding the language, then we would require an interpreter to be used.

Q.    Does CIS accept applications when they knowingly recognize that the applicant wasn't able to effectively communicate with CIS?

A.    Well, U.S. CIS will entertain and process any application that is submitted to us, so if we receive an application, the person is eligible, appears to be eligible for the benefit, we would process that application.

Q.    Right.  But in terms of the interview, if CIS knew that the person did not understand what was being asked of them in terms of they knew there was a communication gap, would CIS allow an application to be processed if they knew that the person didn't understand?

A.    We would, yes, we would, but we would require that the applicant come before us with an interpreter.  There could be an instance where a person filed an application and immediately upon receipt, U.S. CIS determines that that person is not even entitled to that benefit.  We may deny that application without an interview, but if an applicant files an application, they're entitled to an interview.  We do conduct the interview.

Q.    Right.  That's what I'm trying to ask.  If there's a

communication gap during an interview, you would require an interpreter?

A.    Correct.  If there's a language barrier during the interview, we would stop the interview at that time, we would inform the applicant that you need to come to the next interview with an interpreter, and we would give them a notice for a new interview to come in with an interpreter, yes.

Q.    Because the accuracy of the information that CIS has is important?

A.    Absolutely.

Q.    I'm going to focus now instead of asking about broad generalities, three particular types of ways people can come to the United States.  The first is something called refugee.  Can you describe that process?

A.    A refugee is a person that's applying to come to the United States claiming to be a refugee because they can't return to their country.  They fear persecution in their country.  They may have been subject to persecution in the past.  They may have feared persecution in the future, but they're unable or unwilling to return to their country, and they're seeking to leave because of a fear of going back because of their race, religion, nationality, political opinion or membership in a social group, so they will apply to the U.S. CIS office overseas for refugee status to come into the United States.

Q.   And describe generally what that process entails.

A.   Generally the process for refugee status is the refugee program, the U.S. refugee admissions program is administered by the Department of State, and the Department of State is the lead agency in that process, and the Department of State generally will contract out with various overseas processing entities to receive eligible refugees to start the process, so the overseas entities are starting the process, helping the applicant fill out the application, providing interpreter services to them, and once they've completed the application process, they forward the application to U.S. CIS, and a refugee officer will call that person in and interview them.

Q.   And when they're interviewing an applicant for refugee status, what legal elements are they looking for generally speaking?

A.   Legal elements they're looking for is that the person does in fact meet the definition of refugee, which is basically, like I said, fleeing for persecution, one of the five grounds. They're looking to establish that the applicant did not firmly resettle in another country, that they're admissible to the United States, that they're not barred on any of the grounds such as criminal grounds or terrorism grounds or things like that and that they have a basis to come in, that they have a sponsorship or a relative or something in the United States.

Q.   And what type of information does CIS look at in order to

make those determinations?

A.   Well, we look at the information that the applicant's provided on the application, we look at various reports on country conditions, we look at other information that we may have depending on what the applicant has provided in the application, work, where they worked, what organizations they may have been a member of, relatives that they may have in the United States.  We look at all of the information and expand on it from there.

Q.   Is that information support in order to frame what type of questions to ask at the interview?

A.   Yes.

Q.   Are you familiar with the immigrant visa process?

A.   Yes.

Q.   As opposed to an emigrant visa process where presumably the persons tend to emigrate, what is a nonimmigrant visa?

A.   A nonimmigrant visa is issued by the Department of State to an applicant who wishes to come to the United States for a temporary period.  A nonimmigrant is someone who's not intending to stay permanently in the United States.

Q.   So are nonimmigrant visas submitted to CIS?

A.   No, they're submitted to the Department of State.

Q.   That's because they're not immigrated?

A.   Correct, a nonimmigrant should be applying for a nonimmigrant Visa outside of the United States.  We don't issue

nonimmigrant Visas in the United States, in very rare circumstances, they may, but not...

Q.    When someone is applying for a nonimmigrant visa, does U.S. CIS let state department know about what, if any, applications for benefits from CIS that applicant has sought?

A.    We would only do that if the state department requested from us any information that we may have because they probably, unless there is a question on the application for the nonimmigrant visa, have you ever applied to remain in the United States, do you have any relatives, it would depend, I think, if an applicant responded to that having a consular officer believe that they may have tried to immigrate or someone had filed a petition for them to immigrate, they may reach out to us, but as a rule they don't reach out to us.

Q.    And are you familiar with the asylum process?

A.    I'm familiar with the asylum process, yes.

Q.    Describe what asylum is to the jury.

A.    Asylum is another avenue that Congress created to allow someone who's in the United States or at the border of the United States applying to come in who fails to return to their country for the same reason that a refugee outside of the country does because of fear of persecution, based on one of the five grounds that they don't have another -- they're not firmly resettled in another country that they can return to, and the asylum avenue allows that person to apply to remain in

the United States as an asylumee.

Q.   So asylum is from within the United States?

A.   Within the United States or at the border.

Q.   And with the other information that CIS gathers that you've described earlier is candor and credibility important to both the refugee process as well as the asylum process?

A.   Yes, it is.

Q.   Are you familiar with what's called an alien file?

A.   I am.

Q.   What's that?

A.   An alien file is a record that the U.S. Citizenship and Immigration Service maintains that includes all of the applications and all of the documents that have been submitted with that application, interview notes, testimony of every proceeding that has taken place for an applicant.

An alien coming to the United States has -- when we create an A file, it is designated with one unique identifier, known as the A number, much like a social security number, and we maintain all the records, all the filings that are related to that person in that file.

Q.   And if someone applies for a benefit, an immigration benefit from overseas and is denied that benefit, are they given an A number?

A.   If they're filing with U.S. CIS, yes, if they're filing through state department, no.

Q.    I'm sorry, go ahead.

A.    I was going to say, I mean, generally it's in the context of a refugee application because when someone files a refugee application, we do create an alien file for that person regardless if the application was approved or denied.

Q.    If someone later applies for benefits from within the United States and CIS isn't aware that they had previously sought refugee status, is another A file created?

A.    Yes, but I would like to state that the service seeks to only have one alien file for each person, but there are times when there may be another application, someone may have entered or been processed under another name, another identity, or we may have overlooked it, and we may not have discovered that there was a prior record, but all records when they're discovered are consolidated so we have one main file on each applicant.

Q.    And what types of materials go into the A file?

A.    All the applications that are submitted before the service and not just the service, if an application is filed before an immigration judge, it also is maintained in the alien file.  If an applicant is ordered to be removed from the United States and it's with another enforcement section, all of the papers that deal with the removal of that person are housed in the alien file, so everything in every process along the way, all of the proceeding documents are maintained in that alien file.

Q.   Does that include communications from within or memorandum from within the CIS or other government agencies?

A.   Yes, it does.

Q.   Now, with regards to this case, did you have the opportunity to review the alien file corresponding to Prudence Kantengwa?

A.   Yes, I did.

Q.   And did your office certify that fair and accurate records were made, copies had been made of the records that you maintained?

A.   Yes, we did.

Q.   In addition to the certification for the accuracy of the records, are there several exhibits which I'll show you in a minute which you have looked at before coming into court today to determine whether those are all in fact in the A file?

A.   That's correct.

Q.   Those are official government records kept in the ordinary course of the business?

A.   That's correct.

Q.   In addition to CIS records, things generated from the department or from an applicant for benefits, do you receive records from other agencies?

A.   Well, we do, and if we use that information to rely on any decision or it's important to any proceeding, it would be maintained in the file.

Q.   And on occasion do you receive certifications of the accuracy and authenticity from other agencies as well?

A.   We do.

Q.   Now, in determining whether the A file relevant in this case was in fact that of Prudence Kantengwa, how did you determine whether it was the same individual who is the subject of these proceedings?

A.   Well, we received the indictment on the person, and we ran a check for the A number.  Can you clarify that, how we knew, we would have had the A number provided to us for that individual.

Q.   So you run it by the A number?

A.   We would have run it by the A number, or we would have run the name and date of birth or the name to pull up that record.  In this case, we were provided the A number and we got the record.

Q.   And when -- based on your review of the A file at the time of the indictment, Prudence Kantengwa had already applied for a university grade step?

A.   Correct.

Q.   Now, particularly the A file for Ms. Kantengwa, can you approximate how big it was?

A.   It was very large.  It was close to, if not at least 6,000 or more pages.

Q.   Is that typical?

A.   No, that's not typical.  That's an extremely large file.

Q.   And can you describe in general terms the different categories of types of information, I'm not asking with precision, but, you know, 6,000 pages is a lot.  What did it consist of?

A.   It included an application for asylum filed before the immigration service, it included an application for asylum filed before the immigration judge, and it included all of the transcripts and all of the notes that were taken through the immigration judge proceedings.  It included a record of the appeal that was taken in the immigration judge's grant of the application.

Q.   And were there -- did you at some point discover that there was a refugee application?

A.   There was a refugee application in another A file.

Q.   And was that located and was that consolidated, or is that being consolidated?

A.   That was located.  It has not been consolidated as we speak right now, but it will be, but it has not been.

Q.   But that's amongst the records you reviewed?

A.   Yes, it is.

Q.   For purposes of the immigration court proceedings, were there numerous exhibits submitted by both the applicant for benefits as well as?

A.   Yes, there were.

Case 1:08-cr-10385-RGS    Document 174    Filed 05/17/12    Page 137 of 140

3-137

Q.   I'm going to show you a pack of documents and ask if you recognize them.

MR. CHAKRAVARTY:  I'm sorry, your Honor, may I approach?

THE COURT:  You may.

Q.   Were you familiar with those?

A.   Yes, I am.

Q.   Can you just read off the exhibit numbers on each of those?

A.   I have Government Exhibit 1B, 2, 3, 4A, 6, 5, 4, 1G, 1A, 7, 8, 10, 11, 11A, 26.

Q.   Ms. Michaud, you've confirmed that each of those exhibits are contained in the A file?

A.   Each, yes.  That's correct.

MR. CHAKRAVARTY:  Your Honor, at this point I would move all those exhibits into evidence.  My understanding is there may be issues that Mr. Lange may be raising with regard to some of those, so instead of wasting time now, although I recognize it might be a good place to break anyway.

THE COURT:  I think being one o'clock, I'll stay behind.  I may want you to put any objections in writing depending on how extensive they are.  All right, jurors, I think we made pretty good ground.  I think we're pretty much on schedule.  We'll start tomorrow at 9 a.m.  I look forward to seeing you then.

THE CLERK:  All rise.

(JURORS EXITED THE COURTROOM.)

MR. LANGE:  I want to make sure we know what's going in.

THE COURT:  Well, maybe the best thing to do would be to go through the exhibits, and who knows, you may not have any objections, but you could then just indicate in writing later today what specifically is objected to.

I had one other thought actually this morning.  I don't know if this is something you could agree to, but I think at least I'm struggling, and I think the jurors are, too, in transcribing African names.  Some of the names are quite -- they're unfamiliar, and I think some of them are not versed in any African language.  I wondered if counsel could just agree on a list or a glossary of spellings of names we're going to be hearing over the next couple of days.  It would make it easier for the jury to keep track of the references.

MR. LANGE:  Also the court reporter.

THE COURT:  It only works for me because I can go back and look, I can recognize a lot from prior submissions which the jurors of course don't have in front of them, but I was just thinking for ease of the jurors it would not be a bad idea.  Anyway, I leave it to counsel.

MR. CHAKRAVARTY:  Your Honor, we do have copies, and we've provided them to counsel of all our proposed exhibits.

We're happy to make another book for your Honor if you find that convenient.

THE COURT:  I don't think I need a separate book, I'm more concerned that there's agreement or not agreement and then I'll rule on what needs to be ruled on.

MR. McGINTY:  Your Honor, we're going to try to iron out the issues relating to the exhibits.

THE COURT:  Good.

MR. McGINTY:  It seems to me the issues with 2 and 3 have been resolved satisfactorily, so we'll see with respect to the others.  There are differences, there are going to be differences with respect to the transcripts in terms of the degree of completeness.  Some of the difficulty that I think is presented is trying to figure out what was going to be in or out in terms of the exhibits themselves, and, therefore, what parts of the hearing relating to those things might be included or excluded by virtue of that ruling, so the issue of the hearing transcripts is a little complicated explaining why it's rolling along in its way, but we're going to try to resolve those.

THE COURT:  Good.  I will look forward to seeing you tomorrow morning then, 9:00.

THE CLERK:  All rise.

(Whereupon, the hearing was adjourned at 1:06 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/ Valerie A. O'Hara

Valerie A. O'Hara, RPR          Dated May 15, 2012

Official Court Reporter