UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   ) Criminal Docket
vs.                                ) No. 1:08-cr-10385-RGS-1
                                   ) @9:00 a.m.
PRUDENCE KANTENGWA,                ) April 26, 2012
                                   )
                Defendant.         )


JURY TRIAL

DAY 4


BEFORE:   THE HONORABLE RICHARD G. STEARNS
          UNITED STATES DISTRICT JUDGE


John Joseph Moakley United States Courthouse
1 Courthouse Way, Courtroom No. 21
Boston, MA  02210


Helana E. Kline, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 5209
Boston, MA  02210

APPEARANCES:


For the Government:


United States Attorney's Office
(By:  Aloke Chakravarty, AUSA &
      John A. Capin, AUSA)
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210


For the Defendant:


Federal Public Defender Office
(By:  Charles P. McGinty, Attorney at Law &
      Bjorn Lange, Attorney at Law)
51 Sleeper Street, 5th Floor
Boston, Massachusetts  02210

I N D E X

Witnesses called on behalf of the Government:

Continued Testimony of:

DOROTHY MICHAUD

|                        | Direct | Cross | Redirect | Recross |
|------------------------|--------|-------|----------|---------|
| By Mr. Chakravarty     | 7      |       | 67       |         |
| By Mr. Lange           |        | 47    |          | 70      |

BETH ANN PAYNE

| By Mr. Chakravarty     | 74     |       |          |         |
| By Mr. Lange           |        | 105   |          |         |

AUGUSTIN IYAMUREMYE

| By Mr. Capin           | 119    |       |          |         |

E X H I B I T S

In Evidence:

| No. | Description                         | Page |
|-----|-------------------------------------|------|
| 17  | Asylum Officer Memo dated 10/19/04. | 71   |

Admitted In Evidence De Bene:

| No. | Description | Page |
|-----|-------------|------|
| 1A | Authenticity Certificate for A-file. | 9 |
| 1B | Authenticity Certificate for Visa file. | 9 |
| 1G | Authenticity Certificate for audio tapes. | 9 |
| 2 | Non-Immigrant Visa Application. | 9 |
| 3 | I-590 Refugee Application. | 9 |
| 4 | I-589 Asylum Application. | 9 |
| 4A | Asylum Application. | 9 |
| 5 | Excerpts 8/24/06. | 9 |
| 6 | Excerpts 2/2/07. | 9 |
| 7 | Excerpts of Immigration Court 6/20/07. | 9 |
| 8 | Excerpts of Immigration Court 5/16/08. | 9 |
| 10 | Documents in A-file - English proficiency. | 9 |
| 11 | Presidential Order. | 9 |
| 11A | 1992 Presidential Order - Republic of Rwanda. | 9 |
| 22 | Record of Border Crossing in the U.S. by Defendant. | 9 |
| 23 | Department of State Cable. | 9 |
| 26 | RTLM List. | 9 |

P R O C E E D I N G S

THE CLERK:  All rise.  Please be seated.  Court is in session.

THE COURT:  Hopefully, we'll start at 9.  I've got one juror who thinks he's a lawyer on the case and seems to be coming in, you know, at the very last minute and is, in fact, a little bit late, but we'll have a talk with him and get him to abide by the schedule a little more faithfully.

From what Marsha tells me, the idea would be to basically handle the defendant's objections as we move along.  That kind of makes sense to me, Mr. McGinty.  I was going to this morning, like somebody once asked me to put the Patriot Act together, and it's kind of hard to reach out when you're being told this and that and not really understanding the content.  So I think it might make more sense if I just watch as things develop and then rule.  It sounds to me like what we're talking about is putting things in and taking things out as we assemble the record ultimately for the jury to have.

MR. LANGE:  Your Honor, I don't practice down here regularly so I'm still learning.  My concern is that the record be clear as to why we're objecting to certain portions of the hearing before the immigration judge and why we think portions should be supplemented.

I'm not asking the Court to address it now.  We spoke with the government last night.  I'm very concerned that this not be resolved on the cuff in front of the jury.

At some point I would urge that we be allowed to stand before you and make our arguments.  It's very important. It deals with some of the issues that we've already raised in the motion in limine, but it deals with some other additional issues like questions like --

THE COURT:  No, just signal that point when it's arising and then we'll stay behind on a break or after --

MR. LANGE:  Yeah, I just --

THE COURT:  -- or we'll take it up at that point.

MR. CHAKRAVARTY:  I just wanted a chance to make a record.

THE COURT:  It's hard for me to understand the total context along with the objections and suggestions that are being made.  Okay.  Well, hopefully, we'll be underway --

MS. ZIERK:  The juror's here.

THE COURT:  Oh, he's here?

MS. ZIERK:  Yes, Judge, the juror's here.

THE COURT:  Okay.  It works.  Sometimes if you're a mean-starting judge, sometimes people will actually listen to you.  Okay.  Then let me go.

THE CLERK:  All rise.

(The Honorable Court exited the courtroom.)

THE CLERK:  All rise for the jurors.

(The jury entered the courtroom.)

THE CLERK:  The case before this court carries Case No. 08-cr-10385, the United States of America versus Prudence Kantengwa.

THE COURT:  Good morning, again, counsel.  Good morning, jurors.  It's good to see everybody here ready to go on time, and I believe we have a witness on the stand?

MR. CHAKRAVARTY:  Right, we do, your Honor.  She's right outside, Dorothy Michaud.  If I may approach with the exhibits?

THE COURT:  You may.

(Dorothy Michaud previously duly sworn.)

CONTINUED DIRECT EXAMINATION BY MR. CHAKRAVARTY:

Q.   Good morning, Ms. Michaud.

A.   Good morning.

Q.   I've placed in front of you Exhibits 1A, 1B, 1G, 2 through 8, 10 and 11, 23; and then I didn't mention this yesterday, but I've also placed Exhibit 22.

A.   Okay.

Q.   Is that a certified record -- is Exhibit 22 a certified record of some Customs and Border Protection records?

A.   Yes, it is.

Q.   And the balance of those records were all in the A-file, correct?

A.   I'm not certain 1G is in the A-file.

Q.   What is 1G?

A.   1G is from the U.S. Immigration Court in Boston.

Q.   All right, and so that two-page exhibit, the second page of which is in the A-file, and the first page is not?

A.   The second page is in the A-file.  I'm not certain that the certification by the court is in the A-file.

Q.   Okay.  So the first page, is that a certification by the immigration court of the accuracy of the record of immigration proceedings?

A.   Yes, they actually are the tapes of the immigration proceedings.

Q.   And that has a certification?

A.   Yes.

MR. CHAKRAVARTY:  All right.  So with that, your Honor, I would move in 1B -- 1A, 1B, 1G, 2 through 8 including 4A, 10, 11, 11A, 22, and 23.

THE COURT:  All right.  Now, I assume to the extent that these are implicated in the motion that we were discussing earlier this morning that you're asking for a de bene admission?

MR. CHAKRAVARTY:  Right.

MR. LANGE:  On that basis no objection.

MR. CHAKRAVARTY:  Sorry, I neglected to add one, Exhibit 26.

MR. LANGE:  No objection.

THE COURT:  All right.

(Exhibit Nos. 1A, 1B, 1G, 2, 3, 4, 4A, 5, 6, 7, 8, 10, 11, 11A, 22, 23 & 26 admitted in evidence de bene.)

Q.   Now, Miss Michaud, based on your review of the A-file, were there some portions of the A-file that you looked at more closely because they're exhibits in the case?

A.   Yes, that's correct.

Q.   And so did you have a general review, enough to know how the defendant's first interaction with the U.S., then Immigration and Naturalization Service, what was that?

A.   Yes, that was through the refugee application that was filed.

Q.   And does the refugee application have a particular form number?

A.   I-590.

Q.   I would draw your attention to Exhibit 3.

A.   Are these in order or can I move them?

Q.   No, please feel free to move them around.  They were once upon a time.

You can take Exhibit 3 out of the sleeve.  What is that?

A.   Exhibit 3 is the certification of the documents which was the contents of A-file containing the refugee

application.

Q.    And now there are supporting documents submitted along with that?

A.    Yes, there are.

Q.    And is there also correspondence from the immigration service to Ms. Kantengwa?

A.    Yes, there is.

Q.    And what was the -- what time frame was this refugee application filed?

A.    The application was filed on January 18, 1995.

Q.    And can you remind the jury what the basis of relief is when someone files a refugee application?

A.    The basis for relief is the applicant is applying to enter the United States as a refugee establishing that they have a fear of returning to their country of nationality because of a fear of persecution or past persecution on account of race, religion, nationality, a member of a social group or political opinion.

Q.    And who is the burden on to prove that they have such a fear?

A.    The burden is on the applicant in these proceedings.

Q.    And what tools does the immigration service use in order to assess whether they have carried that burden?

A.    We use the application, the information that's been provided in the application, and any supporting documents

that are submitted with the application, and we also interview every applicant that applies for refugee classification as a refugee.  We interview every applicant under oath.

Q.   All right.  I'm going to retrieve that from you; and with the assistance of the electronic monitor, walk through this application.

MR. CHAKRAVARTY:  If I may approach, your Honor?

THE COURT:  You may.

Q.   And is this the certification -- these are the certifications that you were talking about earlier?

A.   That's correct.

Q.   And describe what this form is?

A.   This form, G-325, is a biographic information sheet that contains information, identifying information about the applicant:  name, prior names, residences, and employment history.

Q.   And did I just underline the name of the applicant?

A.   Yes, you did.

Q.   And is that the name of the spouse?

A.   That's correct.

Q.   And is the name of the applicant, Prudentienne Kantengwa?

A.   That's correct.

Q.   And the name of the spouse, Athanase Munyemana?

A.   That's correct.

Q.   Does it list that the applicant was in Congo, Kigali, in Rwanda from August 1998 until April 1994 (sic)?

A.   Yes, it does.

Q.   And does it list that the applicant's occupation was that she was a lawyer from the Societe' Nationale D'Assurances Du Rwanda Sonarwa?

A.   Yes.

Q.   And is this signed?

A.   Yes, it is signed.

Q.   And is it dated January 18, 1995?

A.   Yes.

Q.   And is there a particular proviso saying that severe penalties are provided by law for knowingly and willfully falsifying or concealing material facts?

A.   Yes, there is.

Q.   What is this form?

A.   That is an application for registration for classification of a refugee.  It's the Form I-90.

Q.   And this is the application necessary for all refugees?

A.   That's correct.

Q.   And, again, all of these documents in this file pertain to the applicant Prudentienne Kantengwa?

A.   Yes, they do.

Q.   If I may, there's a portion here that says "reasons,"

what kind of reasons is the service looking for in that portion?

A.   Looking for reasons that the applicant is seeking refugee status, what has happened in their past that shows that they have a fear of returning to their country, what persecution they've offered or the reasons they fear if they are returned to their country.

Q.   And does this applicant say:  "In July 1994 there was a violent change of government in Rwanda.  Given the extent of the killings that took place before and after the takeover, many people fled the county and are up-to-date unwilling to go back so long as the security situation does not improve. I happen to be among those people"?

A.   Yes, that's a correct statement.

Q.   And does it again ask in this form for schooling and education, and does she list that she has a post-graduate diploma in law?

A.   Yes.

Q.   Turning now to the next page, like the last document is this signed by the applicant?

A.   Yes, it is.

Q.   And is it actually sworn as well before an employee of the immigration service?

A.   Yes, it is.

Q.   Now, Question No. 14, it reads:  "Political,

professional, and social associations of which I am now or have been a member or with which I am now or have been affiliated since my 16th birthday. If you have never been a member of any organization, state none."

Did I read that correctly?

A. Yes, you did.

Q. Is that a common question on immigration forms?

A. Yes, it is.

Q. Why does the service ask that question?

A. The service is looking to see if an applicant is a member of any political, professional, or social organizations that may possibly render them inadmissible to the United States depending on the activities of that organization and the level of the applicant's engagement in the, in the organization.

Q. And so in this application Miss Kantengwa indicated she had none, is that correct?

A. Correct.

Q. If she had, in fact, listed that she was a member of just MRND, what actions, if any, would the immigration service take?

A. Well, the service looks into any noted organization an applicant is a member of. They look into the activities of that organization. Is it involved in human rights violations? Is it involved in terrorist activities? So

we always look into any organization that's noted on the application, and we need to determine, again, what the applicant's responsibility or activities was in that organization.

Q. And how do you obtain that additional information?

A. We can seek guidance from the Department of State, overseas research, scholars and universities. We can reach out and do an overseas investigation or an internal investigation if it's internal, so we use different methods to determine --

Q. Do you seek additional information from an applicant?

A. We would. We would ask the applicant regarding the activities in that organization.

Q. The next page appears to be another biographical information. Does this column list family members, brothers, sisters, husbands, wives, and children?

A. Yes.

Q. I'm just going to highlight these two, 8 and 9. Does 8 read: "Munyenyezi, Beatrice," it says: "Relationship: sister," and No. 9: "Athanase Munyemana. Relationship: husband"?

A. That's correct.

Q. The next page, is that also another personal history page?

A. That's correct.

Q. And, again, she lists that she's a lawyer with the Rwandese Nationale D'Assurances from 1990 until 1994?

A. Correct.

Q. And is there a portion that asks about language proficiency?

A. Yes, there is.

Q. And under English she indicates she has fair --

A. That's correct.

Q. -- language abilities? And she also lists: French, Swahili, and Kinyarwanda, correct?

A. Correct.

Q. Does she list her ethnicity as Hutu?

A. Yes, she does.

Q. The next page, are you familiar with this form?

A. Yes, I am.

Q. And what is that?

A. This is a form that asks the applicant various questions that relate to the eligibility for admission to the United States.

Q. Are there certain categories of people that are not eligible to be admitted to the United States?

A. Yes, there are many. Someone could be inadmissible based on criminal grounds, based on having been involved in terrorist activities or advocating terrorist activities, anybody that's a security risk to overthrow the government

of the United States, someone that may not have a labor certification that's coming in under those rules, so there are many, many grounds of inadmissibility, and this is basically detailing those grounds.

Q. Okay. There's about 16 specific grounds. One of those actually is: "Aliens who have procured or attempted to procure a visa by fraud or misrepresentation"?

A. That's correct.

Q. And does this also have a proviso above the signature line that says: "Further, I have never ordered, assisted, or otherwise participated in the persecution of any person because of race, religion, or political affiliation"?

A. Yes, it does.

Q. And was this signed by the applicant?

A. Yes.

Q. Now, there is a box over here. What is that?

A. The box on the left is designated for an interpreter. If an interpreter is used during the interview, that would be completed to show the name of the interpreter and the signature of the interpreter.

Q. And does the line just above the signature line read: "I understand all the foregoing statements, having asked for and obtained the translation or explanation of every point which was not understood or clear to me"?

A. Yes.

Q.   Is this document dated March 9th of 1995?

A.   Yes, it is.

Q.   And what is it?

A.   That document is the decision that the U.S. CI -- U.S. INS issued for her application for refugee status, for the applicant's refugee application.

Q.   And does it state what the legal standard is here?

A.   Yes, it does.

Q.   It says:  "Only if the applicant establishes credible claim of persecution or a well-founded fear of persecution on account of," and there are certain categories?

A.   Correct.

Q.   Here's another submission by Miss Kantengwa in support of her application?

A.   Yes.

Q.   And does she list under No. 4 her perception of the circumstances in the event that she returns to her country of origin?

A.   Yes.

Q.   And does she say:  "My security would be at risk"?

A.   Yes, she does.

Q.   Again, the date of this is 1995; is that correct?

A.   That's correct.

Q.   Is this another correspondence from the INS, then INS, to Miss Kantengwa related to a second motion to reconsider?

A.   Yes, it is.

Q.   And is this one dated November of 1999?

A.   Yes, it is.

Q.   And was this request denied?

A.   Yes, the request was denied.

Q.   Now, was this one of the submissions which Miss Kantengwa made in support of her application?

A.   Yes.

Q.   And, again, it's signed by her?

A.   Yes, it is.

Q.   It lists her brother:  "Higiro, Jean-Marie Vianney," and her sister:  "Munyenyezi, Beatrice"?

A.   Yes.

Q.   And does it say:  "It was not safe for us because of the fact that my late husband was working in the Office of the late Prime Minister," and then it lists the prime minister's name that had been murdered?

A.   Yes, it states that.

Q.   And this was submitted or received by the immigration service on April 1st of 1999?

A.   Correct.

Q.   So the service had this before they denied --

A.   Absolutely.

Q.   -- immigration?  Before that was there also this handwritten note dated May 24, 1996?

A.   Yes.

Q.   And, again, does she list:  "Besides my late husband was working in the Office of the late Prime Minister" of the same name, "who had also been murdered"?

A.   That's correct.

Q.   To you knowledge was that the basis that she was offering for why she feared persecution?

A.   Correct.

Q.   And, finally, is there -- there's other supporting materials including a letter submitted by Catholic Charities -- I'm sorry, this is a letter submitted by her brother --

A.   That's correct.

Q.   -- to Catholic Charities --

A.   Correct.

Q.   -- seeking assistance?

A.   Correct.

Q.   And, finally, a typewritten letter on an old dot matrix printer?

A.   That's correct.

Q.   And in this one does Ms. Kantengwa complain that because she was asked whether she was Hutu she did not get a fair interview?

A.   Yes.

Q.   I was asking essentially to summarize the letter, I'm sorry.  Let's go to the last page.  And after talking about

her interview and being asked whether she was Hutu, she says:  "In view of the above statement, I hope sincerely that my case will be reconsidered and hopefully given a chance to join my brother"?

A.   That's correct.

Q.   Now, she was denied her motion to consider in 1999; is that correct?

A.   That's correct.

Q.   And I would ask you to pick up Exhibit 2, please, and is that -- what is that?

A.   Exhibit 2 is several copies of an applications for non-immigrant visas.

Q.   And if I could retrieve that from you?

A.   Sure.

        MR. CHAKRAVARTY:  May I approach, your Honor?

        THE COURT:  You may.

Q.   The first non-immigrant visa application, does that appear to have been refused on September 14th of 2000?

A.   Yes.

Q.   That's a little less than a year after her denial by the immigration service?

A.   Correct.

Q.   And she submitted it on September 13th of 2000, correct?

A.   Yes.

Q.   And was there another application, the next page, that was submitted on September 21st of 2000?

A.   Yes.

Q.   And, again, I'm sorry.  That was submitted on September 19, 2000, and refused on September 21st, 2000?

A.   Correct.

Q.   And on this one does it state that:  "Have you ever applied for a visa before?"  And it lists that the earlier visa application was done in Kigali?

A.   That's correct.

Q.   And you know that Kigali's in Rwanda?

A.   Yes.

Q.   And in her refugee application did she indicate whether it was safe for her to go back to Rwanda?

A.   She had indicated it was not safe to go back to Rwanda.

Q.   Now, the non-immigrant visa applications, do they ask whether someone has previously applied for immigration benefits?

A.   Yes, they do.

Q.   And I would direct you to Question No. 31, does that read:  "Have you or anyone acting for you, have you ever indicated to a U.S. consular or immigration employee a --

A.   Desire?

Q.   -- "desire," thank you, "to immigrate to the United States," and "B:  Has anyone ever filed an immigrant visa

petition on your behalf and has a waiver certification for employment in the U.S. ever been requested by you or on your behalf"?

A. That's correct.

Q. And she indicates no to each of those?

A. That's correct.

Q. And does the next question ask: "Are any of the following in the U.S.," and it includes a brother and sister?

A. Yes, it does.

Q. And she puts a dash there, is that correct?

A. Correct.

Q. I'm not going to belabor this exhibit. In your review of the exhibit did you see additional non-immigrant visa applications?

A. Yes, there was, I believe, four non-immigrant visa applications.

Q. And the last one was --

A. The last one was granted, correct.

Q. Now, in that last one that was granted, did you see a Rwanda questionnaire?

A. Yes.

Q. Are you familiar with a Rwanda questionnaire?

A. Yes. I've seen it before, yes.

Q. Can you explain how you're familiar with it?

A.    I have seen the Rwanda questionnaire in reviewing other applications for refugee status.

Q.    And is that an important form in the refugee process?

A.    It is.  It's part of the security clearance that the service seeks through the Department of State, yes.

Q.    So is that important both to the immigration service as well as to the State Department?

A.    That's correct.

Q.    Do you know what the rules were in terms of under what circumstances that Rwanda questionnaire needed to be used?

A.    It was used in all applicants applying, well, for refugee status that were nationals of -- that had been or were nationals of Rwanda.

Q.    And what was your understanding of what the purpose was of that form?

A.    The purpose, to my understanding, the purpose of that form was to determine based on the situation that had gone on whether the applicant was involved in any of the activities that had gone on.

Q.    If an applicant had answered a question in the negative that should have been in the affirmative, would that have made a difference to the immigration service in that form?

A.    Yes.

Q.    How would it make a difference?

A.    Well, we would have had to look into the reasons that

the answer was wrong, was not answered correctly, and did the correct answer result in misrepresentation or result in the applicant being a member of an organization that they may not have been admissible to the United States.

Q.   And how would you do that further investigation?

A.   Well, we would have interviewed the applicant.  We would have -- during the interview we would have gone to the facts of the case, the facts, the question that wasn't answered correctly and tried to resolve what the correct answer was.

And if it was that someone was a member of an organization or someone had participated in activities we would have reached out, probably the Department of State, or other organizations that could assist you in determining whether that person was, in fact, a member of the African -- a member of the Habyarimana government or members of the organization that was participating in those activities.

Q.   And those are the two questions, 18 and 19, on the Rwanda questionnaire?

A.   Correct.

Q.   I would ask you to retrieve Exhibit 4, if you wouldn't mind -- sorry.  Can you also get 4A, please.  What's the difference between 4 and 4A?

A.   Exhibit 4 is a copy of the application submitted to U.S. CIS seeking asylum in the United States; Exhibit 4A is that same application that has been amended and has been

endorsed by an asylum officer after conducting an interview on April 16, 2004.

Q. And appended to that endorsed 4A, that endorsed interview version of the form, is there also a transcript of an interview with the defendant?

A. Yes, there is.

Q. And is that from an interview on October 21st of 2004?

A. That's correct.

Q. So if I may retrieve those from you?

A. Sure.

MR. CHAKRAVARTY: May I approach, your Honor?

THE COURT: You may.

Q. This is the Exhibit 4 asylum application without any notations on it?

A. Correct.

Q. This is 4A, which looks the same virtually except it has these reverse checkmarks?

A. That's correct.

Q. All right. Is reverse checkmarks a common practice in citizen and immigration services?

A. Yes. It's our practice to check each application, each question that we have asked the applicant during the interview.

Q. Before we go to the actual form, can you tell the jury what this form requests?

A.   An asylum application is an application submitted by a person in the United States or at the border applying to come into the United States who is claiming fear of persecution in their home country on account of one of the five grounds that we've previously discussed.  They have a fear of returning to their country, the fear of persecution, and they have no third safe country that they can return to, and they have not established a residence in a safe third country.

Q.   And what is the standard that they have to meet in order to obtain that benefit?

A.   Generally, it's the preponderance of the evidence; and to establish admissibility to the United States, it's beyond a reasonable doubt.  There's two separate standards in processing.

Q.   And they have to establish that fear of persecution --

A.   Correct.

Q.   -- standard?  So this is an application that's actually submitted when the applicant is in the United States --

A.   That's correct.

Q.   -- as opposed to the refugee status?

A.   Right, to U.S. CIS.

Q.   Appended to Exhibit 4 did, in fact, Miss Kantengwa show her passport, a copy of her passport that was photocopied that day?

A.   Yes.

Q.   And this is a Rwandan passport?

A.   That's correct.

Q.   There is a passport number there?

A.   Yes, there is.

Q.   Is this a copy of the visa that she used to enter the United States?

A.   Yes.

Q.   And is this, in fact, the visa that was issued from Nairobi that was the result of the last visa application that you were just talking about?

A.   Yes, it is.

Q.   And it was issued on March 4th, 2002?

A.   That's correct.

Q.   And, in fact, is this the stamp by the Custom and Border Protection indicating that on January 29th, 2004, she was admitted at Boston?

A.   Yes, it is.

Q.   I'm going to 4A with a date -- oh, here, and, again, does she list her name:  Prudence Kantengwa?

A.   Yes.

Q.   And is the spelling slightly different here, it's Prudence, the English version as opposed to the French version?

A.   Correct.

Q.   And does it list her residence in the United States to be with Beatrice Munyenyezi?

A.   Yes.

Q.   As we saw earlier, that's her sister?

A.   That's correct.

Q.   Does it have an open box where it asks the applicant to list their race, ethnic, or tribal group?

A.   Yes.

Q.   Does she list Hutu?

A.   Yes, she does.

Q.   Now, do you recall how many children she had when -- dependents she was seeking during the refugee application process?

A.   She had three.

Q.   Okay.  And when she's in the United States, she now has how many?

A.   Seven.

Q.   Is it your understanding that she adopted some more children?

A.   I'm not aware if she adopted other children.

Q.   This is the first portion of the questions on the merits.  What's the significance of this question?

A.   That question is identifying the reasons that the person fears return to their country and the reasons for seeking asylum.

Q.   And does that require that they have -- the reason for their fear has to be tied to one of these categories?

A.   That's correct.

Q.   And does she indicate that the reason for her application is that she has received some phone calls and faxes that had given her some concern?

A.   Yes.

Q.   The next page, and on this form as opposed to -- on 4A as opposed to Exhibit 4, this darkened, shaded appearance on the screen here, is that a reflection of the photocopying of highlighting with a highlighter, is that why it's shaded like that?

A.   I would presume.  I would need to see the other document --

Q.   You would?

A.   -- to be sure.

Q.   I won't belabor it, but let's do that so that we don't have to keep going back.  So now I'm putting up Exhibit 4, and does that shading not appear?

A.   That does not appear.

Q.   So does that reflect that that's something that the interviewer had done to the form during the interview?

MR. LANGE:  I think this is beyond the scope of this witness' knowledge, Judge.

THE COURT:  I'm not so sure that it matters one way

or another.

MR. CHAKRAVARTY:  Yeah, it's been admitted already.

Q.  And does she say in answer to Question 3A, the question, "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country such as but not limited to:  a political party, student group, labor union, religious organization, military, or paramilitary groups, civil patrols, gorilla organizations, ethnic groups, human rights groups, or the press or the media," and does she indicate yes?

A.  Yes.

Q.  And so this is a similar question to the question on the refugee form asking about membership?

A.  Correct.

Q.  And this time she says:  "I was a member of the MRND," and then she lists French -- the French spelling, word for that?

A.  Uh-huh.

Q.  "The ruling party before the war of 1994.  I always accompanied my late husband in the party's political" -- "public rallies," excuse me, and then:  "Please see attached paper for additional responses to this question"?

A.  That's correct.

Q.  And that's in contrast to how she answered the question on the Rwanda questionnaire where it asks:  "Were

you or any members of your immediate family ever a member of a political party, particularly, CDR or the MRND," listing the same organization that she lists now on her asylum application?

A.   That's correct.

Q.   Does this application also ask:  "After you left your country where you were harmed or fear harmed, did you return to that country," and she indicated no?

A.   That's correct.

Q.   And did we just see that the first three visa applications were filed from Kigali?

A.   Yes, they were.

Q.   And that's in Rwanda, correct?

A.   That's correct.

Q.   Does it ask here:  "Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted, and sentenced for any crimes in the United States," and she indicated no?

A.   That's correct.

Q.   And are you aware, Ms. Michaud, whether using a fraudulently obtained visa is a crime?

        MR. LANGE:  Objection, leading.

        THE COURT:  Sustained.

Q.   If one obtains a visa through fraud, are there any repercussions for that?

A.   Yes.

Q.   What are you aware of as a repercussion?

A.   Well, they can be prosecuted under federal law; and for immigration purposes, if they obtained a visa or entry into the United States, they're also inadmissible to the United States from obtaining a benefit or visa by fraud.

Q.   Now, was this form submitted under penalty of perjury under the laws of the United States?

A.   Yes, it is.

Q.   It's Title 18 of the U.S. Code, Section 1546, correct?

A.   That's correct.

Q.   Was this form submitted on March 8th of 2004?

A.   Yes.

Q.   And was it signed at the interview on April 16th of 2004?

A.   Yes, it was.

Q.   Now, this question on the questionnaire also has a part E:  "Declaration of person preparing the form if other than the applicant."

     Is there any indication that somebody else prepared this form?

A.   There's no indication at all.

Q.   Now, earlier we read that there were additional pages attached.  Is that one of them?

A.   Yes, it is.

Q.   Does this ask in Question 4, it starts, "Why you believe the horrible mistreatment or threats occurred," and it appears to be a restatement of the question that was being asked.  Does she write:  "My late husband, Athanase Munyemana, a lawyer by profession, served in President Juvenal Habyarimana's office from 1984 until 1994 before the war that wracked Rwanda from 1990 until '94.

Munyemana was in charge of the country's internal security," listing the French name, "in Service Central de Renseignement.  According to the directed military intelligence before his death, my husband left me with the information concerning the 1994 genocide?"

Is that what she lists as a reason why she might be persecuted?

A.   Yes.

Q.   And does she explain the circumstances for why she's filing this application now in this portion where she writes:  "I had a ten-year visa to the United States."

On that point, the visa that was issued that we looked at earlier, was that multiple entry visa valid for ten years?

A.   Yes, it was a B1/B2 visa that allowed for multiple entry.

Q.   That allows somebody to come in and out of the country at their leisure?

A.   Right.  During the validity of the visa, yes.

Q.   "After mission work in Rwanda in November and December of 2003, I had planned to visit friends in Nairobi, Kenya, and my brother and sister in the United States while on my leave in January and February.

It is when I received the -- reached the United States that I received phone calls and faxes from my workmates in Kampala and from friends and relatives in Rwanda and Nairobi informing me about the danger I was facing if I dare to go back to those places:  Rwanda, Uganda, and Kenya."

So is it your understanding from that portion that she is seeking asylum from Rwanda, Uganda, and Kenya?

A.   Yes.

Q.   Then she goes on to explain that she's being sought by the Rwanda Director of Military Intelligence, is that right?

A.   That's correct.

Q.   As further reasons why she's entitled to this benefit, she writes:  "As a lawyer by profession and an attorney, I joined law professors in writing and signing messages sent to foreign media such as Radio France International that condemn the war and violations of human rights by warring parties."

Does she also say:  "I wrote a thesis based on Rwanda history when I was graduating from the Nairobi International School of Theology in 2001"?

A.   Yes.

Q.   And does she repeat that, "Another reason of being persecuted by the current government, my late husband, Athanase Munyemana, a lawyer by profession, worked since 1984 until 1994 at the President's Office, Service Central de Renseignement.  He held different positions such as Director of Interpol and Director of Internal Security"?

A.   That's correct.

Q.   Now, after the April 16, 2004, interview was there another interview conducted on April 21, 2004?

A.   Yes.

Q.   And were these interviews conducted by the Asylum Office of Immigration and -- Citizenship and Immigration Services?

A.   Yes.

Q.   And is this basically a question-and-answer conducted by the interviewer, a CIS employee?

A.   Yes.

Q.   And is Miss Kantengwa asked about her husband, Athanase Munyemana, and, particularly, what kind of work he was doing with the president?

A.   Yes.

Q.   And this is about six months after she had just indicated what kind of work he had done on the asylum application?

A.   Correct.

Q.   And was she asked, "What kind of work was he doing with the president," and does she respond:  "I don't remember very well but I think he was working in the interior office, something to do with the internal security of the country"?

A.   Yes.

Q.   She also described what she did during the genocide in the sense of where she went?

A.   Yes, she states that she fled residency in Kigali.

Q.   And she was asked:  "What did you do there when she went to the southern part of the country," and she said: "I remember that I was with my sister.  I stayed with my sister.  There were some law professors who had also fled from Kigali.  They had come there because the south was still calm.  We did write letters condemning the killing that was taking place"?

A.   That's correct.

Q.   She continues to talk about her stay in Kigali or in the south of Rwanda, excuse me.  On the next page she was asked how she was able to survive?

A.   Yes, she was asked that question.

Q.   And so does she describe how she went through certain roadblocks?

A.   Yes.

Q.   And she indicates that she did not have her own ID card, "the people who were manning the roadblocks could

have killed us.  The people manning the road blocks were Hutus, but they were looking for Tutsis.  They knew that Tutsis would have thrown away their IDs so I was afraid I would be misidentified.  My name is a Tutsi.  I knew that my life was in God's hands"?

A.   That's correct.

Q.   Then is she asked about the timeline?

A.   Yes.

Q.   Does it say April to mid June she was in the south of Rwanda?

A.   Yes.

Q.   And then she was asked how long she was at the border between Rwanda and Congo?

A.   Yes.

Q.   And do you recall if Congo at that time was still called Zaire?

A.   I don't recall.

Q.   She was asked, "How long did you stay near the border before you crossed over?"  And does she respond:  "I think it was, again, one month-and-a-half.  I believe I crossed sometime in July or August"?

A.   Correct.

Q.   Now, Ms. Michaud, can you explain the importance of candor during an asylum interview like this?

A.   Well, the purpose of the interview for any immigration

proceeding, particularly in cases like this, is to elicit information from the applicant, truthful and accurate information from the applicant, that helps us make a determination as to whether the applicant is entitled to the benefit they're seeking and also if they're admissible to the United States.

Q.   Specifically with regards to asylum claims, is credibility at the core of whether they have a credible fear of persecution?

A.   Yes.

Q.   And so when -- is an interview with the asylum office, is that a confrontational interview?

A.   No, it's a non-adversarial, non-judgmental interview.

Q.   And are there follow-up questions asked during that interview?

A.   The asylum office would ask whatever questions they deemed appropriate and necessary to determine the correct response for a question so many follow-up questions could be asked.

Q.   But they're based on the answers given by the applicant?

A.   Yes.

Q.   Are you familiar with something called asylum confidentiality?

A.   Yes.

Q.   What is that?

A.   The service cannot release any information obtained in an asylum application that the applicant's provided to us in order to make a decision on the application.

Q.   Is this an exception because we're in a criminal court?

A.   Correct.

Q.   If false information is provided to an asylum office, how does that affect the asylum office's work?

A.   Well, if false information is provided on an asylum application, then the asylum officer is going to have to try to determine what the correct answer or the correct information was in relation to that question.  If it's determined that the applicant has provided, has provided false information, false testimony, then the application can be denied.

Q.   If an applicant minimizes certain information, how does that affect the asylum office?

A.   Well, the asylum officer is going to look into the facts behind the response and what was the reasoning to ensure there was a clear understanding of the question and to establish the correct answer for that question and take the testimony from the applicant that clearly answers that question.  So any question that was asked that is unclear, the applicant's response is unclear, the asylum officer would, you know, ask that question in a way that the applicant would understand to gain a clear understanding

and a correct answer for that question.

Q.   Is it important to lay -- establish a sufficient record on the asylum process?

A.   Yes, and notes are taken during the asylum process and during the interview process.  The asylum officer will take notes.

Q.   What actions does CIS take in order to assess whether the information being provided is accurate?

A.   Well, based on the answers, we can reach out again to the Department of State; we could do an investigation, seek out scholars that are knowledgeable in the area that affect the application and try to determine whether the answer is correct.

Q.   Do you have any investigative tools?

A.   U.S. CIS does have a fraud detection national security branch that can look into various applications for us, yes, and the asylum office also has a fraud detection national security unit that during the preliminary processing of an application if the interviewing officer feels that the application needs to be referred to fraud detection national security, they will refer for further review for investigation to follow-up, whatever needs to be done, in order to have all the information that we need to make a decision.

Q.   And can you also refer to other investigative agencies?

A.   Yes.   Through our fraud detection national security, they can refer it to Immigration Customs Enforcement, Department of State; they would reach out to other agencies for us.

Q.   What types of actions would CIS take if they had concerns about an applicant having connections with the Rwandan genocide?

A.   Well, the asylum officer would have to look into those concerns because someone that has been involved in the persecution of another person is not entitled to be classified as a refugee under the Immigration Act, so they would not be entitled to asylum status or refugee status overseas.

Q.   Does it make a difference to CIS if information about certain associations or events changes over time when -- from the applicant, so the applicant gives different versions of the same series of events or associations over a period of time?

A.   Could you clarify that?

Q.   Does it makes a difference?  How does CIS view when there's inconsistent information about the same events or associations over a period of time?

A.   Well, inconsistency in information and inconsistencies in testimony obviously cast doubt on the person's credibility, and we would have to seek the correct answer

to the questions or to the information that we're seeking.

Q.   And would you grant the benefit like asylum without having established that credibility?

A.   No.  We would have to establish that before we could act on the application.

Q.   Are you familiar with something called proceedings, immigration court proceedings?

A.   Yes, I am.

Q.   And are asylum applications sometimes heard before the immigration judge?

A.   Yes, they are.

Q.   And is that an adversarial type of proceeding?

A.   That is more of an adversarial-type proceeding, yes.

Q.   Is the legal standard the same in terms of whether somebody's entitled to asylum?

A.   I'm not certain of that.  For immigration court proceedings, I'm not certain of that.  The definition of refugee remains the same, but the court may have a different standard on withholding of deportation and asylum in the court.

Q.   But the definition of asylum remains the same?

A.   Yes.

Q.   In your review of Ms. Kantengwa's applications, did you see any reference to her living in a residence in which there was a roadblock constructed during the course of the

genocide?

A.   Well, I didn't -- all of the transcripts from the court proceedings are in the file.  As we discussed yesterday, the file was 6,000 pages long, and I did not have time to read through the full transcript --

Q.   Okay.

A.   -- to the immigration court.

Q.   Okay.  So aside from the immigration court, in terms of the materials that you did read which I think you said were the exhibits or applications for benefits?

A.   Correct.

Q.   In those did she mention the roadblock?

A.   I can't recall.

Q.   Did she mention who she was living with, particularly Shalom Ntahobali and Pauline Nyiramasuhuko?

A.   Correct.

Q.   Did she mention those names?

A.   Yes.

Q.   Where do you think she mentioned those names?

A.   I can't recall.

Q.   Okay.  Is it possible that she mentioned those relationships, meaning her sister's family?

A.   Yes, because she, she claimed that she moved to the south when she fled, and she stayed with her sister and her brother-in-law.

Q.   So it's possible she didn't mention the name of the brother-in-law?

MR. MCGINTY:  Objection.

THE COURT:  Sustained.

MR. CHAKRAVARTY:  I'll move on, your Honor.

Q.   Would it make a difference if -- to CIS if CIS had recognized that she had, Ms. Kantengwa had, previously given a different answer on her visa Rwandan questionnaire with regards to the associations to the MRND political party and her husband's association with the Service Central de Renseignement?

A.   It would have made a difference because the answer's not being consistent we would have needed.  We would have looked further into those questions.

Q.   And do you have in front of you Exhibits 11, 11A, and 26?

A.   Yes, I do.

MR. CHAKRAVARTY:  May I retrieve those from you, if I may approach, your Honor?

THE COURT:  Yes.

Q.   And are these different documents, 11 -- 11A, is that an English language translation apparently of Exhibit 11?

A.   Yes.

Q.   And Exhibit 26, is that a list of shareholders of the Radio Television Libre des Mille Collines?

A.   Yes.

Q.   And were these materials submitted during the immigration court proceedings related to her asylum claim?

A.   Yes, they were in the A-file.

Q.   And you mentioned that the A-file was voluminous in large part because there were transcripts of those proceedings?

A.   Correct.

Q.   And are Exhibits 5 through 8 excerpts of -- much pared-down excerpts of those transcripts?

A.   5, 7, and 8?

Q.   5, 6, 7, and 8.

A.   Yes, they are.

Q.   And I believe there's also a certificate I think in 1G that you had indicated earlier that when those were transcribed there is a certification saying that those were fair and accurate transcriptions to the best of the ability of the transcriber?

A.   Yes.

Q.   Now, ultimately, if an applicant is unable to sustain her burden in the asylum process, can she be denied the benefit?

A.   Yes.

Q.   And is that based in part on the asylum office's assessment of her credibility?

A.   Yes, it is.

Q.   Are there mechanisms to seek further interviews or request further evidence from an applicant as well?

A.   They can also request further information from an applicant if they deem that it's necessary.  If the application is denied, then the service refers the applicant to the immigration judge.

MR. CHAKRAVARTY:  One moment, your Honor ... that's all I have, thank you.

MR. LANGE:  May I proceed?

THE COURT:  You may.

CROSS-EXAMINATION BY MR. LANGE:

Q.   Good morning.

A.   Good morning.

Q.   I'll begin by talking about the application for refugee status.  That was made in Nairobi, Kenya; is that correct?

A.   Correct.

Q.   I listened to your work history; have you worked overseas?

A.   No, I have not.

Q.   So when you describe the process to the jury as to what happens in a refugee decision, you're relying on your understanding of what the training is and what the practice is within the agency?

A.   Correct.

Q.   Now, as I understand it and as the jury perhaps understands it, the initial application for refugee status is not taken by an officer of the United States government; is that correct, it's done overseas?

A.   That's correct.

Q.   It's done by an employee of something called a joint voluntary agency, is that right?

A.   Yes.

Q.   And a joint voluntary agency is a non-governmental organization which has a contract with the government to do a screening of somebody that wants to get refugee status, is that right?

A.   They contract with the Department of State.

Q.   So the contractor hires the interviewer -- the person who does the initial screening, the interviewer?

A.   The contractor?

Q.   The contractor from the joint voluntary agency that does these initial screenings, they hire their own employees, right?

A.   Correct.

Q.   Do you know anything about the criteria that they use in deciding whom they should hire?

A.   No.

Q.   Do you know anything about the training that they receive or the guidance that they receive?

A.   No.

Q.   Now, it's not a requirement, is it, that a refugee speak English in order to obtain asylum; is that right?

A.   That's not a requirement.

Q.   Do you know what the practice was in Nairobi, Kenya, in 1995 and 1996 with regard to interpreters?

A.   Well, I know that the service, the service's policy has always been to have a translator, a competent translator, available for applicants overseas or in the United States during their proceedings before the service.

Q.   And we know that at least according to some of the records as of 1995 and 1996 our client described her English proficiency as fair, is that right?

A.   Well, on the refugee application, yes.

Q.   All of the documents that this defendant has submitted throughout that lengthy file, they've all indicated her name as either Prudence or Prudentienne, the French version of the first name, correct?

A.   Correct.

Q.   And they've always indicated Kantengwa as her last name, what we call the family name?

A.   Correct.

Q.   What do you know about naming conventions in Rwanda?

A.   I don't know about naming conventions in Rwanda.

Q.   Do you know whether or not a person's name changes or

a woman's name changes if she gets married?

A.   I don't know that.

Q.   As I go through the government's exhibit with regard to the refugee application, Exhibit 3, it makes reference to a violent change in government in Rwanda in July of 1994.  Was there, in fact, a violent change of government in Rwanda in July of 1994?

A.   As her statement states, yes.

Q.   That wasn't my question.  My question was:  was there a violent change of government in Rwanda in 1994?

A.   Yes, to the best of my knowledge there was.

Q.   I'm showing you another part of the application in Nairobi, and it indicates a personal history; is that right?

A.   Yes, it does.

Q.   And that sort of information has been re-requested through the various applications that are in your lengthy file, correct?

A.   Correct.

Q.   And the applicant has been consistent with regard to where she worked and what her education was, isn't that correct?

A.   That's correct.

Q.   What, if anything, do you know from the file about our client's personal situation in Nairobi beginning in 1995?

A.   I only know what has been provided in the application,

in the documents supporting that.

Q.   One of the documents was a death certificate, was it not?

A.   Correct.

Q.   And that was a death certificate for her husband?

A.   That's correct.

Q.   And his name was Athanase Munyemana?

A.   That's correct, yes.

Q.   And we've got a permit for burial that's on the screen in front of the jury?

A.   Yes.

Q.   And it indicates a date of death of, it looks like -- sorry.  It looks like a 22; I can't tell if that's a 2 or a 7, 95?

A.   That's correct.  It looks like either February 22nd or 27th, '95.

Q.   So it looks like either February 22nd or 27th of '95, that was a permit for burial?

A.   Correct.

Q.   So that the request that the husband and the wife and their children be allowed to come to this country, the husband was deleted from the file; in other words, the request that he come became moot, right?

A.   Correct, because there was an application for the husband that was, that was terminated because of the death,

a refugee application.

Q.   The prosecutor showed the jury a letter from a religious group -- I'm sorry.  This is a letter from the defendant, and it's not uncommon that people make requests for reconsideration, correct?

A.   Correct.

Q.   I want to make sure that I and, more importantly, the jury understands what the definition of a persecutor is. It's five parts, right?

A.   Correct.

Q.   Can you recite that for the jury, please?

A.   The persecutor?

Q.   Yes.

A.   Someone that is committing human rights violations. Persecution could be murder, could be rape, could be torture.

Q.   If someone is being subjected to persecution, it has to be as a result of among other things their political opinion --

A.   Yes.

Q.   -- or their ethnicity?

A.   Yes.

Q.   It would not be proper, would it, to exclude someone from consideration because they had a particular ethnicity; that would not be proper, would it?

A.   The five grounds for seeking refugee or asylum is

based on nationality, race, religion, membership in a social group.

Q.   Right, but because a person is a particular -- of a particular race, is that a reason to exclude them?

A.   No.

Q.   Do you know very much about the distinctions, the ethnic distinctions, between Hutus, Tutsis, Twa, and other tribes --

A.   No, I don't.

Q.   Let me finish the question -- and other social or tribal groups in Rwanda?

A.   No, I do not.

Q.   Would it cause you concern if someone was denied consideration for refugee status not based on their -- not being a risk of persecution, but based on the fact that they had a particular ethnicity; would that cause you concern?

A.   Well, could you reword the question, please?

Q.   Sure.  Do you think somebody ought to be excluded from coming here as a refugee because they have a particular ethnicity?

A.   No.  I think if the person has a well-founded fear based on one of the five grounds, they should be considered for admission as a refugee.

Q.   This is part of Exhibit 3; I'm putting it on the screen, and these are notes, and it says here:  Case

Analysis. Who generates that, do you know?

A. This is the refugee officer interviewing the applicant who completes this form.

Q. And this is done typically at a short interview; once the person's filled out their paperwork, they go in front of the refugee officer?

A. Correct.

Q. And it says here "Justification," and it says: "Well, persecution not established, neither does she have a well-founded fear of further prosecution." That's a legitimate justification, isn't it?

A. Well, the justification -- can you look down a little bit further on that form?

Q. Sure.

A. "At the time of the interview the interviewing officer determined that persecution was not established. She had a well-founded fear of future persecution."

Q. But he also determined or she -- do we know if it was a man or woman?

A. I do not know.

Q. The person who did the -- who made the decision out there in Kenya said the PA, and that's the applicant?

A. Yes, the principal applicant.

Q. The principal applicant belongs to the tribe which prosecuted the Tutsis?

A.   I think he says, "which persecuted the Tutsis," but that is the statement, yes.

Q.   Staying with Exhibit 3, there is a letter, is there not, from the defendant indicating that she had had a three-minute interview, and that she was denied consideration because the interviewer said she was a Hutu?

A.   Yes.  Could I please see the exhibit?

Q.   Sure, as soon as I can find it ... I'll blow it up. Would you prefer I hand it to you or would you rather read it?

A.   No, you could just blow it up, if you would, please.

Q.   I'm not sure the jury can read it.  Is that -- is that -- all right.  So that doesn't trouble you, that letter?  What she says in the letter doesn't trouble you as a government professional?

A.   Well --

         MR. CHAKRAVARTY:  Objection, your Honor.

         THE COURT:  I'm not sure what this has to do with -- what her personal opinion has to do with the case.

         MR. LANGE:  All right, I'll withdraw the question.

Q.   This is the -- I showed you the second page of the letter; I'm going to show you and the jury the first page. Hopefully, I can prop it so it makes sense.

   I'm going to read you the portion of the letter.  This says:  "This is to file an application for reconsideration

of your decision to reject my plea for refugee resettlement admission to the United States." Correct?

A.   Correct.

Q.   And the letter is written to the Office in Charge Immigration and Naturalization Service at the U.S. Embassy in Nairobi?

A.   Correct.

Q.   The letter indicates:  "I was asked a single question as follows:  Are you a Hutu or a Tutsi?"  And she indicates the answer was:  "Hutu."  And then she says that "Hutu have killed the Tutsi, what else do you want?"  She said, "She hadn't killed anybody, let alone a Tutsi," and then she says that "I am a Hutu," and added that "not only Tutsis were killed because many Hutu were as well"?

A.   Could you raise the letter just a little bit on the screen?

Q.   Yes, I apologize.  I'm still learning to work with this.  I apologize to you, too, jury.  Is that better or too much?

A.   A little bit too much.

Q.   Okay.  How's that?

A.   That's better.  Thank you.

Q.   Okay.  She says:  "I've not killed anybody, let alone a Tutsi even though I'm a Hutu," and she says that "Both Hutu and Tutsi were killed."  She says that "The interview lasted

three minutes and then there was a denial after another 20 minutes."  That's what the letter says?

A.   Correct.

Q.   And thereafter she asked for reconsideration, "reconsideration for refugee status is denied"?

A.   Correct.

Q.   You were asked a few questions, not too many, on the visa.  I've got Exhibit 4 up on the screen.  This is the application for -- I'm sorry, this is not the exhibit that I wanted to show you.

THE CLERK:  Do the top.

MR. LANGE:  Yeah, this thing here?

THE CLERK:  Yes.

MR. LANGE:  Oh, great.  There's a camera.  May I approach, your Honor?

THE COURT:  You may.

Q.   I'm looking for the exhibit that has --

A.   You're looking for the visa application, the visa or --

Q.   We can save this or at least I can save this.  Thank you.  This is Exhibit 2.  The jury's already seen this, and I'm not going to -- I'm going to try not to repeat myself.

The one visa application that had the Rwanda questionnaire was the one that was ultimately issued?

A.   Correct.

Q.   And that was the one that was applied for in September

of 2001 in the embassy in Nairobi --

A.   Correct.

Q.   -- not in Kigali?  Do you know whether or not the Rwanda questionnaire was used when Rwandan citizens applied for visas, non-immigrant visas, to come to this country back in 2001?

A.   I don't -- I can't confirm that.

Q.   So what you -- I'm sorry, go ahead.

A.   I was going to say it's a Department of State form.

Q.   It's the Department of State that generated that form, and that was based on country conditions in Rwanda?

A.   Correct.

Q.   Do you understand that the point of all of the questions on that form or at least a lot of the questions was to determine whether the applicant should be allowed to come here as a non-immigrant, right?

A.   Correct.

Q.   And I believe that you told the prosecutor when he was questioning you a few minutes ago that if some of the answers to some of the questions might have been different, that would have mattered because there would have been an investigation, right?

A.   It could have.

Q.   It could have?

A.   The questionnaire leads to a security advisory opinion

by the Department of State.  The same form is used in the refugee application process, so I'm not familiar with it.

Q.   But, in fact, in this case there was a security advisory opinion sought, was there not?

A.   Correct.

Q.   Do you know what a visa donkey is?

A.   I do.

Q.   And a visa donkey is where the embassy, the post overseas, sends the personal information to the applicant to a variety of investigative agencies, most directly to the Department of State, right?

A.   Correct.

Q.   And certainly by the end of 2001 and 2002, this country was really or the government of this country was really getting a lot more capable in terms of maintaining databases and checking information, were they not?

A.   Over the years, yes.

Q.   And there was a security advisory opinion sought in this case, was there not?

A.   There was a questionnaire that was there, yes.

Q.   And, I take it, you don't know who Richard Wallen is or was?

A.   I do not.

Q.   I take it you haven't seen the cable -- the donkey visa that was sent to the Department of State in Washington with

a copy to the embassy in Kigali in January of 2002, on January 8th; I take it, you haven't seen that?

A.   I believe I did.  Do you have that?

Q.   I do, yes.

A.   Yeah, could I take a look at it on the screen?  I do believe I've reviewed it as part of the --

Q.   All right.

A.   Yes, I have reviewed that.

Q.   Okay.  That's already been talked about in the case so I'm not going to go over that again, but are you also aware that the Secretary of State, or at least somebody that worked for the Secretary of State, said that there was no objection to the issuance of the visa in this case, right?

A.   Correct.

Q.   And that came back in, I think it was in February, I think of 2002; it came back some months after the visa application in September of 2001, right?

A.   Yeah, correct.  I don't see the date on the form unless it's at the top?

Q.   There we go.  Under the U's there by my finger?

A.   Correct.

Q.   So it's February, it would be the 21st of February, 1654 Zulu time, February 2nd, 2002, right; that's when the approval came out from the Department of State?

A.   Correct.

Q.   Now, you know from the records, do you not, that thereafter the defendant traveled to the United States?

A.   That's correct.

Q.   And she exercised that non-immigrant visa?

A.   That's correct.

Q.   She, in fact, came to the United States three times on the visa, did she not?

A.   Yes, she did.

Q.   Now, we're getting to Government's Exhibit 4, and I just want to -- this is the application for asylum now, okay?

A.   Uh-hum.

Q.   This was filed in -- in fact, it was filed on March 23rd of 2005, does that sound right or at least that's the date that --

A.   Yeah, I'd need to see the bottom of the form to see the date.

Q.   Oh, I'm sorry.  Now, the answers are already in here, but they're not always easy to find, are they?

A.   No.

Q.   So we know the application for asylum was filed on March 8th of 2004, correct?

A.   Correct.

Q.   Where was that filed?

A.   Well, I think if you go back to the front she completed

a 3804, and there should be a stamp on the left-hand side of this form showing where it was actually received.

Q.    Yeah, there is a stamp but good luck trying to read it.

A.    Yeah.  If I looked at it, I may be able to determine where it was filed.

MR. LANGE:  May I approach, your Honor?

THE COURT:  You may.

A.    It was received at the Vermont Service Center in Saint Albans, Vermont, on March 11th -- excuse me, March -- I can't tell the exact date.  It's either March 14th -- it looks like there's two stamps on it.  There are two stamps on it.  One is March 11th, the other is March 4th.

Q.    For what offices?

A.    Saint Albans, New York.  It's one of our service centers for centralized filing of these applications.

Q.    And it was filed from New Hampshire, was it?

A.    Yes, she was in Manchester, New Hampshire.

Q.    And so it went from Manchester, New Hampshire, to Saint Albans, this Application for Asylum and Withholding and Removal?

A.    Correct, because that's the filing location for all of those applications for people living in that jurisdiction.

Q.    I started to ask you about Ms. Kantengwa's use of the, of the visa, the non-immigrant visa, and you indicated that she'd come to the United States three times on the

non-immigrant visa; is that right?

A.   Correct.  I remember reviewing the passport and seeing the various admission stamps for her entry to the United States.

Q.   And this is the form that she filled out in Manchester, and it indicates -- there is a question, Question No. 6; it's indicating her prior entries to the United States?

A.   Is it Question 18, is it?

Q.   Yeah, you're right.  It's 18.  It looks like 18(b).  In any case, she gives -- it's a little bit hard to read because of that stamp, but she indicates that she came as a visitor in 2004 -- I'm sorry, the first one was as a visitor in 2002 in June, several months after the visa was granted, and she went to Newark; is that right?

A.   That's correct.  That's where she entered.

Q.   And the second time she indicated that that was 2003, and that was VIA in Canada?

A.   I believe that would be in Vancouver.  We have CDP or formally the immigration naturalization service had preflight inspection stations aboard, and I believe she probably cleared immigration at Vancouver.

Q.   All right, and VIA would be Vancouver International Airport?

A.   I believe so.

Q.   And the last time that she comes is in 2004 when she

comes to Boston?

A. Correct.

Q. The prosecutor indicated to you that in applying for the asylum Prudence Kantengwa had indicated some concerns about going back to Africa, is that right?

A. That's correct.

Q. She laid those concerns out in some detail, did she not?

A. Correct.

Q. She indicated that she had received phone calls and faxes from Kigali, Kampala, and Nairobi indicating that agents or people involved with the DMI were seeking her out?

A. Correct.

Q. DMI is right here in the form, and it says here the Department of Military Intelligence, correct?

A. That's correct.

Q. Now --

A. Well, that's what she writes.

Q. What, if anything, did you know about the state of democracy in Rwanda in 2003/2004?

MR. CHAKRAVARTY: Objection, your Honor.

THE COURT: This is so far beyond her competence I'm not sure why we're even asking the question.

Q. A question about the state of the political system in Rwanda would best be asked by somebody who worked for the

Case 1:08-cr-10385-RGS   Document 178   Filed 06/07/12   Page 65 of 133

65

Department of State, right; they would have country information?

A.   Right, but these applications are adjudicated by asylum officers so the asylum officers, if they needed further information, could reach out to the Department of State or any other international organization to help clarify any of the answers to the questions or a question.

Q.   So your office would have the ability with the assistance of other agencies to figure out just what the DMI was about in 2003/2004?

A.   Sure, the asylum officer can reach out to any other agency as they deem necessary.

Q.   One of the names mentioned in the asylum application, part of which is on the screen in front of you, is Jean Marie Vianney Higiro, right?

A.   Correct.

Q.   It says that it's her brother?

A.   Yes.

Q.   It says he's living in Wilbraham, Massachusetts?

A.   Correct.

Q.   She also has a sister, Beatrice Munyenyezi, living in Manchester, New Hampshire?

A.   Correct.

Q.   One of the documents you have in the file is the passport, right; we already talked about that?

A.   Correct, a copy of the passport is in the file.

Q.   And that would be a Rwandan passport?

A.   Correct.

Q.   Apparently, an authentic passport from that country's government?

A.   I would presume it was.  That's the passport that the visa was in and the admissions were used.

Q.   If the passport were questionable or counterfeit, she wouldn't have been admitted once, let alone three times, into the United States; isn't that right?  You have to have a passport to come to the United States if you're a foreign citizen?

A.   You have to have a valid passport, yes.

Q.   And every time they use that passport it gets stamped or it often gets stamped, not always but often?

A.   When they enter as a visitor, yes, it should always be stamped during that time, yes, during that period of time, yes.

Q.   And it's not only the United States immigration authorities or customs authorities that use stamps, lots of other countries do?

A.   Correct.

Q.   And you went through the passport getting ready for your testimony today?

A.   I reviewed it.  Yes, I did.

Q.   And you saw lots of things like this indicating an immigration officer from Nairobi, from Uganda, and from other countries?

A.   Correct.

Q.   Did you see the documentation in the file indicating that Prudence Kantengwa was doing missionary work or church work after 2000?

A.   I did review, I did review the application, yes, and in the file I do recall reading that she was coming to the United States as part of missionary work.

Q.   Do you know whether or not Ms. Kantengwa had a round-trip ticket when she arrived in Boston in 2004?

A.   I don't know that.

MR. LANGE:  No further questions, your Honor.

THE COURT:  Anything?

MR. CHAKRAVARTY:  A very brief follow-up.

REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

Q.   You were asked numerous questions about CIS' consideration, what they weigh when they're determining asylum status, why is it important that CIS carefully determine who should get asylum?

A.   Well, U.S. CIS is always seeking to make the right decision on any application that is filed before us, so we have to review and consider all the facts and evidence presented in a case to determine whether the person is

eligible for that benefit.

Q.   And are there policy reasons why that particular benefit is treated very importantly?

A.   Well, I would say that all of our benefit applications are very important.  The asylum, of course, where you're dealing with a very sensitive situation where a person may have fear of returning to their country, so the service is going to be very careful in the adjudications of those applications and consider all the evidence before them.

Q.   And with regards to all applications for benefits is CIS concerned that there may be fraud or there may be misrepresentations in that process?

A.   Yes.  It's one of the reasons we interview people.  It's one of the factors that we have to consider when we adjudicate any application.

Q.   Finally, you were asked about Exhibit 10, you were asked some questions by Mr. Lange; do you have Exhibit 10 in front of you?

MR. CHAKRAVARTY:  Your Honor, may I retrieve that?  May I approach, your Honor?

THE COURT:  You may.

A.   I do have Exhibit 10.

Q.   A technical clarification, you were asked about where and when the asylum applications were filed:  first, is the immigration court for the Boston office located here in

Boston at the JFK building?

A.   The court is located, yes, at the JFK building.

Q.   And were the interviews conducted of Miss Kantengwa in relation to her asylum applications, were those conducted here in Boston at the Boston asylum office?

A.   Well, Boston doesn't have an asylum office here at this time, and I'm not sure about -- what year was that -- 2004? The asylum office may have been located in Boston at that time.  There's no longer an asylum office in Boston.

The asylum office is located out of Newark, New Jersey, and asylum officers travel on circuit rides to Boston to conduct interviews at this time, so the interview probably was conducted in Boston; it may not have been to my knowledge located in Boston.

Q.   Right, so asylum officers would come to Boston to conduct those interviews?

A.   Correct.

Q.   And it does say the location of the interview is Boston?

A.   Correct.

Q.   And this was on April 16th of 2004?

A.   Correct.

Q.   And signed by the asylum officer and by the --

A.   That's correct.

Q.   -- the applicant?  And, again, there's no -- under Declaration of Interpreter, that's blank, and it says:

"Interpreter used, no," correct?

A.   So the interview was conducted in English.

Q.   And, again, on April 16th -- excuse me, October 21, 2004, for the follow-up interview, again at the Boston asylum office, language used, interpreter -- English, and no interpreter?

A.   Correct.

Q.   And, again, that was signed as well?

A.   That's correct.

MR. CHAKRAVARTY:  That's all I have, your Honor.

THE COURT:  Mr. Lange, anything?

MR. LANGE:  Yes, your Honor.

RECROSS-EXAMINATION BY MR. LANGE:

Q.   Do you have Exhibit 17?

MR. LANGE:  May I approach?

THE COURT:  You may.

Q.   I'm showing you Government's Exhibit 17.  That's not in evidence; it's for identification.

Do you recognize that?

A.   I do.  I have seen this in the file, yes.

Q.   What is it?

A.   This is a memorandum to Mark Grim from the training officer, quality assurance and training officer, Beth Ann Payne; she was in the Newark asylum office dated October 19, 2004.

MR. LANGE:  Your Honor, I'd move to strike the ID on Exhibit 17 and move it into evidence.

THE COURT:  I'm sorry, I don't understand.

MR. LANGE:  I'm sorry?

THE COURT:  I don't recall what you're saying.

MR. LANGE:  Your Honor, I would ask that Exhibit 17 be entered into evidence, it's Government 17.

THE COURT:  Again, does the government oppose their own exhibit being admitted?

MR. CHAKRAVARTY:  Well, I think the witness authenticated it.  It's certainly beyond the scope; but in terms of the authentication of the exhibit, the witness has identified it.

THE COURT:  All right.  So it may be admitted, okay.

MR. LANGE:  I'm sorry, I didn't understand the Court's ruling?

THE COURT:  I said it may be admitted.

MR. LANGE:  Thank you.

(Exhibit No. 17 admitted in evidence.)

Q.  Ma'am, that is a record of a follow-up investigation on the asylum request, is it not?

A.  I believe it is.  I'm not familiar with the quality assurance process at the Newark asylum office.

Q.  But ZNK means Newark, and that is where the asylum officers were working out of back in 2004?

A.   Well, I believe so but -- I believe so.  There was an asylum office in Boston at one time.  I'm not certain when that -- when the duties of that office were turned over to Newark.

Q.   All right.  It's in evidence so I'm not going to go through it line by line, just it does indicate that they were asked some questions about Jean Marie Vianney Higiro; is that right; that was the memo that they were to ask -- to do a follow-up interview with Prudence Kantengwa about her application for asylum?

A.   Could I see the top of that memo just because it would be easier to read?

Q.   Sure, and I think I know what you're looking for, its probably this paragraph here (gesturing)?  So the memo is a directive to follow-up with a later interview of Prudence Kantengwa regarding the circumstances for asylum?

A.   Right.  It appears that that is what that is for. Again, I'm not fully aware of their processes at the Newark asylum office.

Q.   It also indicates there were to be questions about the applicant's husband, Athanese Munyemana, correct?

A.   Correct.

Q.   And we already know that he died because we have the burial certificate, right?

A.   Correct.

Q.   And they request additional information about what they call the applicant's story, correct?

A.   Correct.

Q.   It says here, there is a handwritten note; I take it, you don't know who wrote that note:  "Placed on hold, headquarters, possible persecutor.  We need to re-interview," correct?

A.   I'm not sure what the note is.  I saw the note in the file.  I have no idea what it relates to.

THE COURT:  When we finish, Mr. Lange, it's about time for the break.

MR. LANGE:  Yes, I basically have just one more question.

Q.   You were not present during the proceedings in front of the immigration judge, were you?

A.   No, I was not.

Q.   Thank you.

THE COURT:  Thank you very much, Ms. Michaud. Let's take a 25-minute recess, jurors, and we'll come back to the next witness.

THE CLERK:  All rise.

(Whereupon, a brief recess convened at 10:52 a.m.)

THE CLERK:  All rise for the jurors.  All rise for this Honorable Court.  Court is in session.  Please be seated.

74

MR. CHAKRAVARTY:  The government calls Beth Payne.

THE CLERK:  Good morning.

THE WITNESS:  Good morning.

(Beth Ann Payne duly sworn.)

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record?

THE WITNESS:  Beth Ann Payne, P-a-y-n-e.

DIRECT EXAMINATION BY MR. CHAKRAVARTY:

Q.  Good morning, Ms. Payne.

A.  Good morning.

Q.  You work at the State Department?

A.  Yes, I do.

Q.  What do you do there?

A.  I'm a consular officer.  Right now I'm the Director of the Office of Children's Issues.

Q.  Are you also a lawyer by education?

A.  Yes, I am.

Q.  And before you became -- in your current post did you have other positions within the State Department including consular affairs?

A.  Yes.  I've been a visa officer, I've been a consular section chief, I've been the council general, economic officer, a variety of different positions.

Q.  Have you been posted at various locations throughout the world?

A.   Yes, I have.

Q.   Can you describe what some of those are and also the years where you worked at those locations?

A.   Yes.  I started in Kuwait from '93 to '95.  Then, I went to Tel Aviv from '96 to '98.  Rwanda, from '98 until 2001.  Then, I was in the Department of the Office of Children's Issues as a country officer from 2001 until 2003.

Then, I was in Baghdad, Iraq, from 2003 until '4, and Dakar, Senegal from 2004 until '7.  I studied at the National War College from 2007 until 2008.  Then, I was consular general in our council in Calcutta, India, from 2008 until 2011, and now I'm back in the Office of Children's Issues since 2011.

Q.   And have you received specialized training to be a consular officer?

A.   Yes, I have, both at the beginning of my tour in Kuwait as well as throughout the years.

Q.   And as part of that training, did you receive training in security advisory opinions?

A.   Yes, I did.

Q.   Can you describe generally what that is for the jury?

A.   A security advisory opinion is whenever we go back to Washington to the visa office officially and request a review of an applicant's request for a visa before issuing

the visa.

Q.   And are there -- for different circumstances, whether it relates to an applicant's national origin or other circumstances, can there be various different security procedures that are required?

A.   Yes, there are.

Q.   Have you personally adjudicated many visas?

A.   Yes, I have.  I've probably adjudicated thousands of visas.

Q.   Have you supervised the work of others who were adjudicating visas?

A.   Yes, I have.

Q.   And focus now on your posting in Kigali, you said that that was 1998 through 2001?

A.   Yes.

Q.   Do you recall when you left Kigali?

A.   In the summer of 2001.

Q.   And I have placed in front of you what's Exhibit 2 and Exhibit 23, do you recognize those?

A.   Yes, I do.

Q.   And what are those?

A.   The first are visa applications that I adjudicated when I was in Kigali, and there appears to be additional visa applications and cables, and some records from what we call our CCD, Consolidated Council Database, and the second

item are some cables.

Q.   Now, before we talk about the application in front of you I want to have to describe to you a little bit about the visa procedures in Kigali at the time that you were there, how would it work in terms of an applicant who's applying for a non-immigrant visa?

A.   So every applicant who applied for a non-immigrant visa would have to schedule an interview, and I was the only consular officer so if I was in the country, I would be the one adjudicating the applications; and every applicant for a visitor visa would have to prove to me that he or she was not intending to immigrate to the United States.

U.S. law requires that everyone applying for a visitor visa overcome what we call presumption of intending to immigrate, and so during that interview I would decide whether the applicant had overcome that presumption and was therefore eligible for a visa.

Q.   How does one overcome that presumption?

A.   They would talk to me about their ties to the country where they are residents.  They would have to provide factually evidence that they had sufficient ties to the country of residence that would compel them to return to that country.

Q.   And is the burden on the applicant to meet that standard?

A.   Yes, it is.

Q.   How do you assess an applicant's credibility?

A.   What we do is we would, we would have a three- to five-minute interview with somebody, and I would look both at basically their behavioral responses; I would weigh their credibility, and would they make eye contact, did the story make sense; did they answer quickly or did they hesitate?

    So we would look at the substance of the answers they gave as well as just their non-verbal signs, and we've been trained in detecting if somebody non-verbally showed indications of not telling the truth.

Q.   If someone had overcome the presumption that they intended to immigrate to the United States, are there other factors that you look at to determine whether somebody's eligible?

A.   Yes.  After someone has overcome the presumption and we've initially determined that he or she's eligible for visa, we would also run names through a name check system; and if there were any hits in that system, we would have to go back to Washington and seek a review and approval to  issue the visa or if the applicant met any of the requirements for security advisory opinion, we would have to go back to Washington and check with Washington before we issued the visa.

Q.   Are you familiar with certain bars to admissibility?

A.   Yes, there are ineligibility.  Some are permanent, for life; some are permanent with no waiver, others allow for waivers or they only extend for certain periods of time.

Q.   Are you familiar with something called persecutable?

A.   Yes.

Q.   And also terrorist?

A.   Yes.

Q.   And without explaining all of the circumstances to which they could be applied, are those two types of bars to eligibility for a visa?

A.   Yes, they are.

Q.   Now, in your time in Kigali what was your most prevalent concern when someone was applying for a visa in terms of what was the most common initially?

A.   Well, our biggest concern in Kigali was that we saw a lot of people that would use a visitor visa to the states as a way to either claim asylum in the states or Canada or to stay outside of Rwanda.

Rwanda was recovering from a pretty difficult situation, civil unrest, and a lot of people were looking to leave and settle elsewhere so it was hard -- as consular officers, we were always looking at that and making sure that the applicant had something that compelled them to return to Kigali.

Q.   And in your experience in Rwanda for almost three

years, did you make certain observations of Rwandan culture that made it sometimes a little more difficult to conduct an interview?

A.   Well, you know, Rwanda, it was a very complex place, Rwanda, and it had just survived a pretty tragic genocide and there were -- there were a lot of unrest.  Rwandans were -- you couldn't tell by their name who they were related to because they didn't share the same name, so it was hard to find connections between people to know who was from what family.

I mean, it's a pretty closed society so people don't talk very openly to foreigners, to diplomats, about Rwandan culture.  So as a consular officer, I had to spend quite a lot of time really delving into Rwandan culture and learning, learning it more.

Q.   And so now I'll direct you to Exhibit 2.  For the benefit of the Court and the jury, I'll put it up on the screen.

        MR. CHAKRAVARTY:  If I may approach, your Honor?

        THE COURT:  You may.

Q.   Do you recognize the handwriting in the red ink?

A.   Yes, that's my handwriting.

Q.   And that means that you adjudicated this visa?

A.   Yes, that's correct.

Q.   And are these your initials here?

A.    Yes.

Q.    BP?

A.    Yes.

Q.    And these are your notes?

A.    Yes.

Q.    "214(b)," what does that indicate?

A.    That means that the applicant did not overcome the presumption that she was an intending immigrant and was therefore ineligible for the visa.

Q.    So this visa was denied by you on September 14th of 2000, correct?

A.    That is correct.

Q.    Do you have a specific memory of this applicant?

A.    No, I do not.

Q.    The next application denied on September 21st, 2000; did you also deny this application?

A.    Yes, I did.

Q.    Again, that's your handwriting on this form?

A.    Yes, it is.

Q.    And your initials?

A.    Yes.

Q.    And, again, you took different notes on this one?

A.    Yes.

Q.    And then this is not in red ink, but on September 28th of 2000 your initials "BP," that indicates no change?

A.   Correct.

Q.   So three weeks in a row this applicant had come to you?

A.   That is correct.

Q.   Now, in your review of just these three applications before court today and what you just saw, was there anything that raised red flags to you with regards to the contended immigrant function?

A.   Yes.  Just looking at these notes, not remembering the actual interview itself, but losing an old passport is a red flag for me because it could be that the person's hiding a pattern of travel from me; and I would have no way of knowing the pattern of travel without seeing the old passport, and I will often ask for an old passport in order to evaluate whether this individual has traveled and maybe overstayed a visa elsewhere or not.

The individual had not traveled to Europe; that's another indicator.  Has this person traveled widely and come back?  The fact that a person has traveled before and returned to his or her home is a sign that they do not intend to immigrate.

If they had worked one year at a job, that meant not a very long period of time in their current employment, and someone who's not been employed for a long time, again, doesn't have those ties I'm looking for that compel return.

And then I indicated that she worked in Nairobi.

Again, she was applying in Kigali when her job and residence was in Nairobi, meaning that she'd already indicated a willingness to leave her country and live elsewhere, and I circled "widowed" because, again, I was looking at family ties.

Q.   Now, going to the next application, did you make some more notes?

A.   Yes.  So if somebody applies twice in rapid succession like this, we want to be able to give the applicant the chance if there were facts that had not been revealed in the first interview, if there was evidence of ties to the country of residence that we had not detected earlier, I will look at those questions.

And so I focused on the fact that she had a house in Rwanda, that she was renting; it was common in Rwanda for people to own property and to rent, and that was not a compelling-enough tie because quite a lot of people lived outside of Rwanda and rented property inside Rwanda.

Q.   So this indicates she was renting her house for 80,000 Rwandan francs?

A.   That is correct.

Q.   And then again she repeated that she lived in Nairobi?

A.   Correct.

Q.   Third?

A.   So if someone applies three times in rapid succession,

I would just basically look and see:  has there been any change of circumstance?  Is there any new information?

You know, a person's already now had two opportunities to explain his or her situation, and so it's very common for me at the third time in three weeks just to say no change if there had been no difference between this application and the time we spoke a week or two earlier.

Q.   Now, at the time of these applications did you have complete awareness of everything that she had previously submitted to the U.S. government?

A.   No, I did not.

Q.   Particularly, did you have any indication that she had filed a refugee application before?

A.   I did not.

Q.   If you did know that, would that make a difference to your analysis?

A.   Yes, it would.

Q.   How so?

A.   If someone has filed for asylum in the United States, it would be very difficult to overcome the presumption that someone is intending to immigrate.  Because to me, I interpret that as an intention to leave where they are living now and live in the United States.

And, again, with the law requiring the applicant to overcome a presumption of intending immigration and show me

compelling ties to, in her case, Kenya or Rwanda, having claimed asylum somewhere else goes against that ability to show me they have such strong ties that would compel them to return to Rwanda or to Kenya.

Q.   Would the fact that the applicant had family in the United States bear on your decision whether to issue a visa?

A.   Yes.  That's highly relevant because, again, if someone has a lot of ties to the United States, that can actually be a barrier to showing that they have compelling ties elsewhere, so it matters a lot where their immediate family members live.  Do they have strong family ties in Rwanda or are all their family ties now in the United States?

And if they're in the United States, it would be harder for that person to demonstrate that he or she's eligible for a visa.

Q.   And in this particular application, on all of these applications, are there specific questions inquiring of both those facts?

A.   Yes, there are.

Q.   Is that Question No. 31 and Question No. 32?

A.   Yes.

Q.   And in each of the three applications submitted to you in 2000, did the applicant indicate that she had never previously sought to immigrate to the United States and that she had no family in the United States?

A.    Looking at these applications, she answered no to all the questions.

Q.    Having been rejected on those three occasions, your review of this exhibit, did you -- could you tell whether she applied shortly after she last met with you?

A.    I could just see from looking at the visa application that she applied at a later date and what appears -- I can't tell where it is, but a different consular officer interviewed her at a later date.

Q.    And according to the date of that submission, is that October 17th of 2000?

A.    Yes, that's what it appears to be.

Q.    So less than a month after she had met with you?

A.    Yes.

Q.    When you conduct an interview for purposes of visa, how do you ensure that you're effectively communicating?

A.    I spoke French, and I don't recall the language that I interviewed this applicant with, but most of the applicants in Rwanda spoke either French or English.  If somebody did not, we would have people in my office or in the embassy that would act as interpreters.

Q.    If an applicant appears deceptive to you in an interview, does that have a bearing on your decision?

A.    Very much so.  Because in order to evaluate whether a person has compelling ties to their home country, I have to

be able to believe that person; and we are trained to detect deception, because if someone is giving us an answer that appears to be a good answer but appears to be deceptive, we will then find that person ineligible for a visa.  It's not uncommon to find someone who appears to be deceptive and therefore not eligible.

Q.   When you deny somebody for not overcoming the burden of an intended immigrant, are they permitted, as happened in this case, to apply again?

A.   Yes.

Q.   So it's only under certain bars that prohibit them from applying again under certain circumstances?

A.   They can always apply, even if they're permanently ineligible, but they may not be issued a visa if they're ineligible, so anybody can apply as often as he or she wishes.

Q.   In your review of the visa file, did you also notice letters of support?

A.   Okay.  Yes, I see a letter to Nairobi.

Q.   Are there letters to you?

A.   Yes, they would be to me and Kigali.

Q.   And Betty Payne, is that how they referred to you?

A.   It wasn't uncommon for French speakers to misunderstand my name because they don't really have a t-h, so they often call me "Betty."

Q.   And what impact do letters of support have?

A.   It's really important that the applicant stand on his or her own when applying for a visa.  While we may review letters of support, while we may use information, factual information, in a letter of support to help educate us about the purpose of travel, letters of support cannot make someone eligible for a visa; they just give us factual information that we would then use in our determination.

Q.   This fourth visa application in another post, was this also refused?

A.   It appears to be, yes, under 214(b).

Q.   And in this one does it indicate that the applicant had been refused two times by the Canadians in October of 2000?

A.   Yes, that is correct.

Q.   And you had last interviewed her in September, late September of 2000?

A.   Yes.

Q.   So after six refusals for application for visas to come to North America, does that have any significance to a consular officer?

A.   Well, it's just a sign that someone may be a little bit desperate.  You know, why does a person keep applying? And, you know, as a consular officer I would be somewhat suspicious of an applicant by application five or six, especially in such a rapid succession because very little

has changed in his or her circumstances, and, again, the applicant has to show they have compelling ties; and if that hasn't changed, why is the applicant still applying?

Q.   Are you familiar with the Rwanda donkey?

A.   Yes, that is -- we call our security advisory opinions by names of animals.  It's shorthand.  It's our sort of professional speak, and so a visa's donkey, a Rwanda donkey, is just a type of security advisory opinion we have to send.

Q.   And that's one of those circumstances that you mentioned earlier that is required to be done?

A.   Yes, it is required.

Q.   And the information in the Rwanda donkey, where is that collected; how is that collected?

A.   Well, whenever -- at that time whenever any visa officer was adjudicating an applicant from Rwanda who met certain minimum requirements, then that visa officer would have the applicant or would fill out a questionnaire that would get more information from the applicant, and then the answers to that questionnaire would have to be sent with the security advisory opinion request back to Washington.

Q.   And is that commonly called the Rwanda questionnaire?

A.   Yes.

Q.   And why was the Rwanda questionnaire created?

A.   When I first arrived in Rwanda, the department was collecting some minimal information from every Rwandan

who applied in order to screen out individuals who were implicated or suspected in participating in the 1994 genocide.

Soon after I arrived, in consultations with the department we realized that this minimal screening was insufficient; that while the Government of Rwanda had some lists of individuals they suspected of being implicated in the genocide, that list was incomplete, and we were concerned that Rwandans who were implicated in the genocide would take the opportunity of sort of a vacuum to come to the United States and take advantage of the benefits we have here in the United States in order to avoid possible investigations for genocide.

And so we realized we needed to gather more information from Rwandan applicants that would allow us to better screen individuals to see whether or not that individual may have been implicated in the genocide.

Q.   And did you have a role in drafting that questionnaire?

A.   Yes, I did.

Q.   Okay, and describe what your role was.

A.   What I did is I worked in collaboration with the visa office in Washington with my contacts in Rwanda, and we developed what we thought would be a comprehensive set of questions that would help us identify any red flags, any indicators, that would warrant further investigation and

that would help us craft an investigation depending on the answers to those questions.

So we put a lot of time and thought into developing those lists of questions, what really would we need to know in order to properly screen applicants.

Q.    Aside from obvious policy reasons, were there reasons to keep people who may be involved in the genocide out of the United States?

A.    Yes, we had learned from history that people who commit these types of war crimes after, you know, there's a period of unrest, they tend to flee.  They tend to go places where they can hide.  They tend to go places where it can be difficult for them to then be extradited if, if required; and it's important that the United States be a leader in the world of showing that we are not going to be a safe haven for people who commit acts of genocide.  We will not be a safe haven for people who participate in war crimes.

And we wanted to send a signal that we will watch closely, we will do our best in order to screen out any of these individuals that may be looking to come to the United States as a safe haven, so it had very important policy implications as well.

Q.    And do you recognize this as being a completed version of the questionnaire that you helped craft?

A.    Yes, I do.

Q.   Now, did that questionnaire ultimately become incorporated into State Department policy?

A.   Yes, it was required before any Rwandan applying outside of Rwanda who met a certain age requirement that this question be completed; and that the answers be sent to Washington, info'd to me in Kigali, and I would do an initial screening investigation, if warranted, and Washington would not approve the visa issuance until it was approved in Kigali.

Q.   And when you say info'd, you're using a verb?

A.   I'm sorry.

Q.   So you're talking about you were copied on the cable or the e-mail essentially?

A.   Yes, it's the equivalent of a cc. line in an e-mail except we just call it info'd.

Q.   And that was the procedure required under the standard security advisory procedure across the whole world?

A.   Correct.

Q.   And so did you receive while you were in Kigali some of these info cables --

A.   Yes.

Q.   -- related to people around the world who were applying from Rwanda?

A.   Yes, Rwandan Nationals who were applying anywhere outside of Kigali.

Q.   And what would you do when you got the information?

A.   I would review the questionnaire, and I would look for any types of indicators that would warrant further investigation.  Sometimes I could just tell from the questionnaire that no further investigations is required.  We didn't want, we didn't want to fully investigate every applicant because that would slow down the visa process for legitimate travelers, and we always had this tension; we had to balance speed, and we didn't want to inconvenience visa applicants with the need to spend some time investigating.  And so based on the answers to the questions, I would decide how I would further investigate, if further investigation was warranted.

Q.   Now, how much time did you spend actually crafting these questions designed to get to that kind of information?

A.   You know, I actually don't remember the number of hours we spent, but we spent considerable time.  You know, this questionnaire couldn't be changed easily.  It wasn't like every month if we learned something new we could change the questionnaire, so we put a lot of time and effort into crafting these questions to make sure we got it as right as we could right from the start.

Q.   Why was there this requirement that the information be sent to Kigali as well as headquarters?

A.   Because we had the local expertise.  Washington

recognized that they didn't know as much about Rwanda as we did, and we also had local contacts.  I could go to the Ministry of Justice and ask questions if need be; I had contacts in the Rwandan community that could answer questions for me; I had local Nationals, Rwandans, that worked for me that would help me, and so I had an expertise in Rwanda that Washington simply didn't have.

Q.   And could the answers on this questionnaire affect how a visa was adjudicated or any other action by the State Department?

A.   Oh, absolutely.

Q.   Describe some of the ways that some of the answers on this questionnaire could affect State Department action?

A.   For example, if someone indicated that an immediate family member was a member of, say, for example, the Interahamwe, I would then look into that further, and I might go and ask questions of different contacts:  Well, do you know who this individual is?  What do you know about what happened?  I might ask the Ministry of Justice to, to look into their files and tell me what you have on this individual.  So a family connection to a member of the Interahamwe would be extremely relevant to how closely I'm going to investigate this individual.

Q.   And so that's how it would affect you in Kigali as you're conducting your investigation?

A.   Correct.

Q.   How would it actually impact the issuance of a visa?

A.   So you had -- this could go two ways:  there could be sufficient information for Washington to find that the applicant is permanently ineligible for engaging in acts of genocide.  And so if I had uncovered sufficient information for further investigation, I would send that back to Washington; Washington would take whatever legal measures are required for permanent ineligibility.

There are many times when we may not have uncovered enough information for permanent ineligibility, but the answers may still be relevant to determine whether the applicant overcomes the presumption of intending to immigrate.  Again, a good example is that there were certain families that were implicated in the genocide. Individual family members, there may not be sufficient evidence that they engaged in acts of genocide, but we know that they're trying to get out of the region.  We know they're trying to, for example, leave Uganda or leave Kenya or leave Tanzania and find a home elsewhere; and if we realize that the family itself may be implicated in the genocide, it would be hard to overcome that presumption of intending immigration because we know those families are trying to leave and settle either in the United States or Canada.

Q.   And was the issuance of a visa, the restriction of travel essentially, was that important to the strategy on how to deal -- by the US government on how to deal with that, with the genocide?

A.   Absolutely.  We want to also send a signal; unfortunately, it's usually the elite in countries because they're in power that engage in these acts, and we know that it's important to powerful elite families to travel. They want to have an education in the United States for their children.  They want to be able to see medical doctors in the United States.  We've got the best medical care in the world.

There are reasons why it's important to them that they can freely travel around the world; and, again, it's from a policy perspective, we want to send the message that no matter how powerful you are, no matter how elite you are, if you engage in acts of genocide, if you engage in war crimes, you're not going to come to the United States for medical care; you're not going to come to the United States for an education.

Q.   So are there certain questions on this questionnaire that are so-called red flag questions?

A.   Yeah.  Pretty much every question is an important question.  Again, we didn't want to ask extraneous information that would waste my time and waste the time of

the visa officer.  So, for example, when I look at place of residence on April 6th, I will actually look and see where was the person right when the genocide ended, and then I'm going to look at the date they left Rwanda, and I'm going to look for patterns of travel.  So I know where certain groups of people antiquated in the genocide went once the Rwandan Patriotic Army took control over Rwanda.

There was a certain pattern of travel within the country and then outside the country, so I would look at that.  So that's why we have the dates of:  when did you leave, where did you go?  Then, where did you go afterward?  Again, I'm looking at where certain groups of refugees went that were implicated in the genocide.

Q.   And so there are -- that's the reason for all these questions about where were you and --

A.   Yes.

Q.   -- do you have family members in different places?

A.   Yes.

Q.   And then there are some that are just explicit:  have you been accused of participating in the genocide by the government of Rwanda or others?  And it says:  If so, explain.  What is the value of having:  "If so, explain"?

A.   Well, you know, there may have been people who the Government of Rwanda accused but were actually innocent, and so that's the type of information we're looking for.

You know, just the determination would always be the determination of the United States government.  It wasn't ever, you know, if you were accused by another government of something, we would still want to look into it.  So if someone said:  Yes, I've been accused; here's the situation, I am innocent, then that's relevant for us.

Q.   In addition to the grant or denial of a visa, would a consular officer who receives information indicating that someone may have been implicated in the genocide, would they have other options at their disposal as well in terms of giving that information to other people?

A.   I don't quite understand your question.

Q.   I'm sorry.  Are there other agencies at the post that may be interested in security-type information?

A.   At that time in Kigali we had the Department of Justice which may be interested; we had a legal attache who may be interested in this information.  We didn't have a lot of agencies at the time that I served in Rwanda.  There may be some agencies looking into it, but at that time we didn't have --

Q.   Okay.  So I guess I'm thinking of, so for the Rwandan questionnaire if somebody was applying for a Rwandan visa -- excuse me, a visa who was a Rwandan National and they were applying in Kigali, would you issue the Rwandan questionnaire?

A.   No.

Q.   Why not?

A.   Because basically we presumed that if the Government of Rwanda was looking for somebody or somebody was, you know, escaping justice that they probably weren't going to be applying in Rwanda itself.

However, the Rwandan government would get new information all the time, and so it wasn't uncommon if someone lived in Rwanda after the genocide and then left, if they got some indication that maybe they were being, you know, suspected of genocide, but we did not issue this in Rwanda because we just assumed that it's a small country and the Rwandan government, if they wanted a person, they would know that they were in Rwanda.

Q.   And you indicated that there would be different name checks that were sent; to your knowledge, is there a comprehensive list of everyone who may have been involved in the Rwandan genocide?

A.   No.   There was a list that the Government of Rwanda provided of suspects, but that would be far from comprehensive, because, again, they were still gathering information when I was there.   They had not started this form of local justice called Gacaca, and there were still a lot of investigations taking place, and so the list that I saw from the Ministry of Justice was far from comprehensive.

Q.   In addition, were there other tribunals or other institutions that would populate those lists?

A.   Yeah.  You had the International Tribunal for Rwanda, ICTR, that was located in Arusha, and so they were also prosecuting suspects of genocide and investigating.

Q.   And before I go on with a few of the specific questions, did this procedure continue after you had left Kigali?

A.   Yes.

Q.   And, obviously, it was implicated, the same procedure was used in the visa that was allowed in this case, correct?

A.   Yes.

Q.   Just quickly to go to Exhibit 23, this is Certificate of Authenticity apparently signed by Hillary Clinton, and is this the donkey cable?

A.   Yes, it is.

Q.   And then this is the last page is the response cable indicating the department has no objection --

A.   Yes.

Q.   -- correct?  So Question 6 on the questionnaire asks: "Are you Hutu, Tutsi, or mixed?"  Why did you ask this question?

A.   You know something ... unfortunately, the genocide was based on ethnicity, and, therefore, ethnicity was relevant to screening people to see whether they had been implicated in the genocide, and this again is a piece of information

that helps us know more about the applicant, to know whether or not we want to further investigate.

Q.   And so does the membership in any of those particular categories by itself indicate the need -- a need to deny the visa?

A.   Nothing by itself indicates the need to or indicates that someone's ineligible for a visa.  I would look at this all in totality, not one answer in and of itself would lead to ineligibility.  If it did, we'd only have one question on the questionnaire.

Q.   The fact that this applicant indicates "mixed" when in all previous and all succeeding documents filed with the U.S. government she claims to be of the Hutu extraction, would that inconsistency make a difference to you?

A.   If someone gave me inconsistent factual answers, that would go to the credibility of the visa applicant.  Again, you know, I would look and say:  Well, if you told me one thing yesterday and now you're telling me another thing today, what am I to believe?  I mean, that's what consular officers are trained in determining credibility.  So inconsistent answers to the same questions, I would interpret as a less than credible visa applicant.

Q.   Question 15, it asks:  "Have you or your immediate family members (spouse, parents, siblings, or children) been living outside of Rwanda since April 6, 1994?  If so,

please specify the location and occupations for each family member since April 6, 1994, include specific dates," why did you ask this question?

A.   Well, this was a question of, you know, we want to know what family members you've got outside Rwanda.  Did you -- you know, did you move outside Rwanda versus are you applying outside only because you're on vacation somewhere?

And where you're living matters because we know where certain groups of people who were implicated in the genocide tended to settle, tended to live at the time.  So we wanted to know, you know, where's your family living right now, since the end of the genocide, April 6th was the start of the genocide.

Q.   And so if an applicant had written here that they had two siblings who were living in the United States, one of them left during the genocide and one of them left after the genocide, would that make a difference in assessing this application?

A.   That would be relevant, yes, it would.

Q.   What would you do differently as an agency in that circumstance?

A.   You know, I might ask more questions, find out:  Okay, you know, when did your siblings leave; what was their pattern of travel?  I might then scrutinize the applicant a little bit more closely.

It's hard to speculate, but that's highly relevant. It would lead to additional questioning.

Q.   Question 17 asks:  "Were you or any of your immediate family members (spouse, parents, siblings, or children) ever a member of the Armed Forces of Rwanda (FAR), the Army or militia force, the Gendarmerie, Police Communal, Service de Renseignement, Presidential Guard, the Interahamwe, PALIR, or ALIR.  If so, please explain." Again, why did you ask that question?

A.   Again, whether family members or the individual client was a member of any of these organizations that had some connection with the genocide or suspected genociders, membership alone isn't sufficient, but it would just mean that I would want to go into more depth, maybe ask a few more questions.  For example, we'll use Interahamwe, again. If your brother was a member of the Interahamwe, what was his position?  You know, was this a foot soldier or was it the senior person; was this a decision maker?

That's highly relevant to, you know, knowing more -- it was important to know the family connection, and it would help me then answer some questions or ask the questions I would want to ask to various contacts to gather more information.

Q.   And if a correct answer to this was:  yes, what would the follow-up reaction by the State Department be?

A.   I would want to know more information.  Again, it says:  "If so, explain."  And so I would want to see the explanation, more details about the answer.  And then if I were receiving this in Rwanda with the answer "yes," and an explanation, then I would tailor my investigation based on that.  I mean, every investigation I conducted was based on the answers to these questions.

Q.   Specifically, if the applicant disclosed that her husband was the Director of the Service de Renseignement, how would that have affected the analysis?

A.   That would be highly relevant because, again, that's a very -- that's an incredibly senior position in an organization that did participate in the genocide, and I would want to know more.

Q.   If she had indicated that her brother-in-law was the leader of the Interahamwe in Rwanda, how would that have affected you?

A.   I have to say this was for immediate family members so spouse, parents, siblings, children, if they did indicate that a non-immediate family member was a member, I would want to investigate that as well.

Q.   Okay.  But because you specified:  "Spouse, parents, siblings, or children" --

A.   Yeah.

Q.   -- it's not clear that you would have to disclose who

your in-laws were?

A.   Correct.

Q.   And Question 18 asks:  "Were you or any of your immediately family members (spouse, parents, siblings, children) ever a member of a political party, particularly CDR," it spells it out in French, "or MRND, organization (civil society) or association in Rwanda.  If so, explain."

     Why do you ask that question?

A.   Again, the same thing.  There were certain senior members of the MRND that were implicated in the genocide. I'd want to know that.  If someone was a member of that political party, what was the position?  You know, how important was this person in that party?

     Certain civil society organizations were implicated in the genocide.  I'd want to know.  It doesn't mean that someone who was a member of the political party or was a member of a civil society actually had done anything wrong, but I need to know that so I can look into it further.

          MR. CHAKRAVARTY:  Thank you, Ms. Payne.

          THE COURT:  Any cross-examination?

          MR. LANGE:  Yes.

     CROSS-EXAMINATION BY MR. LANGE:

Q.   Good morning.

A.   Good morning.

Q.   You were asked about the non-immigrant visa applications

which were refused in 2000, and it appears that they were refused by you on three separate days?

A.   Yes.

Q.   Was your office there in Kigali with regard to reviewing requests for non-immigrant visas open every day of the week or was it just one particular day of the week?

A.   We weren't open all five days.  We did have certain days when we did not adjudicate visa applications.  I believe it was four times a week, but this was about 12 years ago so I can't remember exactly.

Q.   Is it possible that it was only one day a week?

A.   It's highly unlikely that we would conduct non-immigrant visa interviews only one day a week.  That would be inconveniencing the applicants.

Q.   I take it, it does matter whether an applicant has a sponsor in terms of coming to the states?

A.   Actually, it doesn't.  A lot of visa applicants mistakenly believe that having a sponsor is relevant for a non-immigrant visa application.  It may be for an immigrant visa application, but for a visitor visa there is no such thing as a sponsor for visitor visa.

We'll look at the letter and see if there's relevant information that would educate us about the eligibility of the applicant, but there's no procedure in place for sponsoring somebody for a visitor visa.

Q.   If the applicant wants to come back with additional information, they're certainly allowed to do that, are they not?

A.   Absolutely.  They have to apply again.  If someone's been found ineligible for a visa and then has additional information that he or she believes would be relevant to his or her eligibility, then she would submit a new visa application.

Q.   Okay, and that might include letters from potential sponsors -- even though they might not be important to you, the applicant might understand that it would make a difference?

A.   Yes, the applicant is welcome to submit whatever she believes is relevant to her eligibility.

Q.   Now, in the testimony about denying the visas I understand you to say that -- understood you to say that the fact that the applicant has not traveled very much is something of a red flag?

A.   If someone has not traveled previously to a western country and come back, that's information that then educates us about:  would that person if they traveled to the United States come back?

So it's more like if someone has traveled extensively to Europe and come back, that's helpful; it shows us, demonstrates, that they come back to their home.

Q.   That they have an intent to return?

A.   That there's something that compels them to return to their home.

Q.   I take it that you were not involved in the decision to grant the visa in 2001?

A.   I was not.

Q.   You did not know what Ms. Kantengwa's employment situation was by that time?

A.   I would not have known.

Q.   You did not know the extent of her travel at that time?

A.   I would not have known.

Q.   And certainly with regard to 2003/2004, you have no idea whether she had traveled to the United States prior or what her travel history was?

A.   No.

Q.   To find that out, you would want to look in the passport, right?

A.   Well, I don't want to speculate about anything.  If I had a visa application in front of me and I was adjudicating it, I would look at a passport; I would ask questions.

Q.   Okay, and it would matter if the passport were full of stamps for travel to places like -- well, out of Africa?

A.   It depends.  I'll be honest, sir --

Q.   You should be.

A.   -- I would look and see whether some of those stamps

may be fake or not.  As an adjudicating consular officer, when I adjudicate a visa, I'm going to look at what's in front of me, and then I'm going to look at the applicant, and I'm going to see how the applicant answers questions.

And because, unfortunately, I know that a lot of documentation, including stamps in passports, can be faked, so that it's more relevant for me to be looking at the actual applicant, which is why we require these interviews to take place.

Q.    And the interviews are three to five minutes, is that what you said?

A.    About three to five minutes.

Q.    Because you don't have much time because often there's a lot of people coming in seeking applications?

A.    We want to make sure that we facilitate travel to the United States for legitimate travelers.

Q.    You talked about what you did to assess credibility, and that's a judgment you make during that short interview, correct?

A.    Uh-hum.

Q.    Just say yes or no.

A.    Yes.  I'm sorry.

Q.    And is it fair to say that in some cultures eye contact, looking away, is a sign of respect when you're talking to somebody who you view as being an authority?

A.   It depends on the culture.  As adjudicating officers, we spend a lot of time learning the culture and learning what our indicators of deception are depending on the culture, and there are some microexpressions that cross cultures where we can see say, for example, a microexpression of disgust or anger that we find actually is shared across cultures.  So, again, it would depend on where the applicant -- you know, where the visa interview is taking place, and we would train our consular officers based on that culture.

Q.   You had -- I gather while you were in Kigali, you had contacts with the global government authorities and with others that you could turn to when there's a question about somebody's application?

A.   That is correct.

Q.   But I take it that given the amount of time that you had to do this, it was very often the case that you simply made a judgment call on the spot?

A.   It depends.  I would look at the actual application; and depending on the answers, screen it out and decide: okay, this I can immediately go to Washington and say:  this appears to be okay to issue, or I would say this requires more investigation.

Q.   The Rwandan questionnaire that he was asking you about a few minutes ago, you were involved in drafting that?

A.   That is correct.

Q.   And that questionnaire was not used in Kigali, it was not used in Rwanda?

A.   That is correct.

Q.   It was not used because you had assumptions about people who were in Rwanda in terms of whether at that time they were at risk or not at risk?

A.   That is correct.

Q.   This questionnaire, it doesn't have any indication that it's being filled out under the penalty of perjury, does it?

A.   I don't understand the question.

Q.   It's a two-page questionnaire, correct?

A.   Uh-huh.

Q.   This is it; there's no signature line for the applicant, is that right?

A.   It would be part of the visa application, and so when they sign the visa application and they'd submit the questionnaire with the application, we'd consider it part of the application.

Q.   But the applicant himself or herself doesn't sign off on that questionnaire?

A.   They don't sign the actual questionnaire.

Q.   They fill out these questionnaires before they see the consular officer?

A.   I don't know what the process was in Nairobi.  That's

because I didn't, I didn't have applicants fill out the questionnaire; I can't talk about what my process was.

Q.    When you generate -- I'm sorry.  When you generated the questionnaire, did you generate some instructions as to how it was to be used in other embassies?

A.    No.  We let different embassies decide based on their workload situation how they wanted to have the questionnaire completed.

Q.    So whether there was going to be a follow-up to one or more questions, that was up to whichever officer was --

A.    That's correct.

Q.    -- filling out the request?  Did you craft Question 14?

A.    I crafted all the questions.

Q.    It says:  "Were any of your immediate family members (spouse, parents, siblings, children) have been in Rwanda since April 6th of 1994," is that right?

A.    What I don't know is whether --

Q.    My question is, did I read it right is my question?

A.    Yes, you read it right.

Q.    All right.  So the question obviously has --

A.    Right.

Q.    It doesn't make sense, does it?

A.    Right.

Q.    Is it, was it intended to determine whether the family members had been in Rwanda continuously or whether they'd

been back or just how was it -- what was the intent as opposed to what was actually asked?

A.   What I would imagine had happened was some language got juxtaposed, and I believe, and, again, this is to the best of my recollection:  "Have any of your immediate family members been in Rwanda since April 6, 1994," was what that most likely intended to say, and what I don't know is whether when the post transcribed the question from the instructions from Washington whether they made a typo or whether Washington made a typo or I made a typo.

Q.   Being in Rwanda, was that intended to determine whether the applicant had been in Rwanda continuously or whether they'd been back to Rwanda?

A.   Whether they had been in Rwanda.

Q.   For the whole time?

A.   At any time.

Q.   At any time?

A.   Have they been in Rwanda since April 6th, stand alone.

Q.   So if they'd come back from somewhere else than Rwanda, from Rwanda and come back, the answer would still be yes?

A.   We would hope that they would answer, if they had ever been in Rwanda, even for an hour since April 6th, that they would say yes.

Q.   That's my point, thank you.

Do you know -- I gather you don't know whether the

consular officer in this particular case with regard to Question 15 followed up on just what was meant with regard to living outside of Rwanda? That was left to the consular officer's discretion as to whether they were going to follow-up on that anyway to explain what the question meant?

A.    I don't know.

THE COURT:  Was that a question, Mr. Lange? You started with the premise that she doesn't know what she doesn't know, and then I never got to a question.

MR. LANGE:  Okay.

Q.    Now, Question 15, the answer is:  Yes, to the question "immediate family members being employed by the Government of Rwanda on July 15th of 1994," right?

A.    Uh-hum -- yes.

Q.    And, again, it was left to the consular officer's -- there's no direction given to the -- whoever was going to be using this form as to how to follow-up the question, whether it should be followed-up or what should be done with it?

A.    Right.

Q.    Now, as the prosecutor pointed out already, with regards to Questions, actually, 15 -- 14, 15, 16, 17, and 18, the questions all go to immediate family members?

A.    Uh-hum, and for you or any of your immediate family members so it includes the applicant.

Q.    Immediate family members are defined as spouse,

parents, siblings, or children?

A.   That is correct.

Q.   It would not include relations by marriage; in other words, other than the spouse?

A.   Your spouse.

Q.   It would not include in-laws?

A.   This did not envision in-laws.

Q.   And it doesn't say in-laws in parenthesis?

A.   Correct.

Q.   With regard to Question 17, there's a list of different entities included in that, in that question, correct?

A.   Yes.

Q.   Ma'am, what, if anything, do you know about the changing of the name MRND; what MRND stood for at various times?  Do you know whether in 1994 or 1991 the abbreviation meant something different over the course of time?

A.   I do not know.

Q.   The point of the Rwandan questionnaire was to determine whether there should be investigative follow-up?

A.   It was a screening mechanism in order to help us screen individuals who may be implicated in the genocide, and so the questions would help me in order to see if I needed to investigate someone for possible ineligibility as participating in the genocide and then it could also help

visa adjudicators in determining whether someone overcame the presumption of being intending to immigrate.

Q.   Every non -- every embassy outside Rwanda that was processing the requests from a Rwandan -- a citizen of Rwanda for a non-immigrant visa be -- the Rwandan questionnaire in the application would be sent, as you say, info'd to Kigali?

A.   That is correct.  Whenever the adjudicating officer outside of Kigali sent a cable with the answers to these questions to Washington, in order to seek approval to issue the visa I would receive a copy of that cable as well in Rwanda.

Q.   And you would also, would you receive -- you would receive everything; you wouldn't just receive the Rwandan questionnaire correct?

A.   I would just receive the cable.

Q.   Would the cable, would the cable say anything other than what was in the Rwandan questionnaire?

A.   I would just receive whatever the applicant -- the adjudicating consular officer put in the cable.

Q.   And the adjudicating officer could certainly put in the name, date of birth, anything like that?

A.   If the adjudicating officer chose to.

Q.   And that would result in a security clearance both from your office and also from the Department of State?

A.   Technically, my office doesn't give security clearances, only the State Department can clear an applicant.  I would educate Washington by giving them additional information and say:  Okay, on this visa applicant, here's the information I received.  Sometimes I'd share it with post, but only Washington would actually give a clearance.

Q.   The Rwandan questionnaire was eliminated in 2006, is that right?

A.   I have no idea.

Q.   With regard to the security check that was done by the State Department, there were a series of computer databases that they had available?

A.   Yes.  We had something called class or classified lookout system.  For every visa applicant, their name was run through this lookout system.

Q.   Do you know about any of these systems' names:  CIS?  Do you know what that is?

A.   I do not know what CIS stands for.

Q.   How about DACS?

A.   I do not know.  I know class.  That's sort of the consular; that's what, you know, we learn of class.  I don't know what individual databases Washington is then accessing.

        MR. LANGE:  Thank you.

        MR. CHAKRAVARTY:  Nothing further.

THE COURT:  Thank you very much.  Next witness, please.

MR. CAPIN:  Your Honor, the government calls Augustin Iyamuremye, and this witness, your Honor, is going to require an interpreter.

THE CLERK:  Good afternoon, sir.

THE WITNESS:  Good afternoon.

THE CLERK:  Will the interpreters please raise their right hands.

(Zena Ntiranyibagira, Interpreter, and
Jacqueline Adam, Interpreter, duly sworn.)

MR. CAPIN:  May it please the Court, I believe this particular witness plans to testify in French.

THE CLERK:  So we'll do that in French then.  Please raise your right hand again.

(Zena Ntiranyibagira, Interpreter, and
Jacqueline Adam, Interpreter, duly sworn.)

THE CLERK:  Thank you.  Please raise your right hand, sir.

(Augustin Iyamuremye duly sworn testifies
through the interpreter as follows:)

THE INTERPRETER:  Yes, the truth, the whole truth, and nothing but the truth and may God help me.

THE CLERK:  Thank you.  Please be seated and state your -- state your full name and spell your last name for

the record.

THE INTERPRETER:  I-y-a-m-u-r-e-m-y-e, Augustin, A-u-g-u-s-t-i-n.

DIRECT EXAMINATION BY MR. CAPIN:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  As we can all see, you are speaking to us through an interpreter?

A.  Yes.

Q.  Am I correct in understanding you speak French?

A.  Yes, I speak French and I understand French.

Q.  Do you also speak any Kinyarwanda?

A.  Yes, I also speak Kinyarwanda.

Q.  Do you also speak some English?

A.  Yes, but not fluently, not fluently English.

Q.  Thank you.  Would you please tell us, sir, where you live?

A.  I live in Rwanda in the District of Kigali and the local place is in Kicukiro.

Q.  Can you spell that?

A.  K-i-c-u-k-i-r-o.

Q.  Are you currently gainfully employed, sir?

A.  I am retired.

Q.  When did you last work?

A.  I was in the Rwanda Parliament and the Senate until

October 2011.

Q. What was your title as a member of Parliament?

A. I was a Senator.

Q. Senator, have you lived in Rwanda your entire life?

A. I lived in Rwanda except in the period of my studies, university studies because I did them in Belgium.

Q. What years did you live in Belgium, sir?

A. From '69 until '76.

Q. And what did you study?

A. I studied veterinary medicine.

Q. Did you do any additional studies after your studies in France?

A. Could you please repeat the question?

Q. I think I made a mistake. Did you study anything further beyond your studies in Belgium?

A. In '76 -- in '77 I did one year of specialization in France.

Q. What was your area of specialization?

A. I did a specialization in microbiology at Montpellier University.

Q. And after studying microbiology, did you return to Rwanda?

A. Yes, I returned to Rwanda.

Q. And what kind of work did you do upon your return?

THE INTERPRETER: I'm sorry, I couldn't hear.

Q.   What type of work did you do upon your return to your home country?

A.   Almost at the end of July in '77 until '84 I was a researcher and a teacher at the National University of Rwanda in the lab, the university lab.

Q.   And where is the University of Rwanda at which you taught?

A.   University of Rwanda is in the City of Butare.

Q.   Okay.  Continue, sir.

A.   I was teaching animal health, and I was the head of the department of the faculty.

Q.   And you did that until 1984?

A.   Yes.

Q.   What did you do -- did you live in Butare for those seven years between 1977 and 1984?

A.   Yes, I was living there in Butare.

Q.   What did you do after 1984?

A.   After '84 until '90 I was director of a milk factory in the City of Nyanza.  Nyanza is N-a -- N-y-a-n-z-a, Nyanza.

Q.   By a "milk factory," do you mean dairy, sir?

A.   Yes, it's a dairy product like meat or cheese.

Q.   And did I understand you did that until 1990?

A.   Until December '90.

Q.   And December '90 what did you do?

A.   After December '90 I was the preffay in Gitarama

prefecture.

Q.   Is a prefecture, in essence, equivalent to a state in our system?

A.   At that time it was like a province.

Q.   And were you, in essence, as the preffay the governor of that province?

A.   Yes.

Q.   Did you belong to a political party, sir?  Did you belong to a political party while you were the governor of Gitarama?

A.   When I was preffay of Gitarama, it was a time when we had only a unique party for everybody.

Q.   And what was that party?

A.   That political party was MRND.

Q.   Did there come a time when other political parties were permitted to form in Rwanda?

A.   I think in '91, around June, there was -- the constitution changed.  There was a new law, the law changed, and it allowed more than one party.  There were many parties, political parties.

Q.   Did you use the term "multipartyism"?

A.   Yes.  Yes, I use that meaning that there was more than one party that was accepted or allowed.

Q.   And did new parties, in fact, begin to form in Rwanda sometime thereafter?

A.   Yes, many more.  After the change of the constitution many political parties were established.

Q.   Did you continue to be a member of the MRND after the system was opened up to new parties?

A.   I changed and I became a member of the democratic social party.

Q.   Is that commonly known by the initials PSD?

A.   Yes, it's called PSD.

Q.   How long did you continue to be the mayor -- I'm sorry, I'm sorry, the Governor of Gitarama?

A.   In June '92 I was nominated to the service of prime minister.

Q.   In what capacity?

A.   As Secretary General of Intelligence Interior --

Q.   Internal intelligence?

A.   Internal intelligence.

Q.   And it was at the Service Central de Renseignement, is that right?

A.   No, it was no longer the central service of the agents because that type of service has been dismantled with the coming of the new system.

Q.   Did the Service Central de Renseignement reconstitute under a different name?

A.   That was divided.  It was divided in three different services; one was intelligence, which was under the

direction of the prime minister.

Q.   And who hired you in your capacity as the secretary general?

A.   It was the prime minister.

Q.   And is the secretary -- were you the secretary general of the new Service de Renseignement?

A.   Yes, I was general secretary of the new service.

Q.   And the prime minister who hired you, do you know what -- was that a man or a woman?

A.   The prime minister who nominated me was a man, and he was later replaced by a woman.

Q.   And what party did those two people belong to, if you know?

A.   Both belonged to the MDR political party.

Q.   Is that one of the new parties that had formed after multipartyism was introduced in Rwanda?

A.   Yes, it was one of the new political parties.

Q.   When you began your work as the secretary general of the Service de Renseignement, where was the office located?

A.   Like I said, the old intelligence central services, before it was dismantled it was -- the office was in the office of the president of the republic.

Personally, when I took over that function, the other two other services had moved; one to the ministry of the interior, and the other one that belonged to the defense

department had their own offices, and those services had stayed there because in the prime minister's office they didn't have enough offices.

Q.   So the service remained in the office of the president?

A.   No, not in the same office but we had a common entrance but we had our own -- they call it our own building, which we also had a secondary office to our own offices.

Q.   You spoke of the establishment of a number of parties after multipartyism was permitted?

A.   Yes.

Q.   After multipartyism started were there common ways that people would use to indicate their party affiliation?

A.   Those who would belong to a particular political party, they would recognize themselves by wearing hats or wearing scarves or wearing such outfits that have a certain printout or have similar colors or even some are like, like badges.

Q.   A badge?

A.   Yes, like a badge.

Q.   Did the MRND have particular colors associated with it? Did the MRND have particular colors that were associated with it?

A.   Yes, they had particular colors that belong to them so they could recognize themselves.

Q.   And what were they?

A.   It was green, yellow, and black.

Q.   And did the MRND have a badge, a badge that was associated with it?

A.   Yes, there was, the one of the president that was in power at the time that continued to show, show up.

Q.   And who was that president?

A.   President Habyarimana.

Q.   So am I to understand the badge had the image of Habyarimana on it?

A.   Yes, it was President Habyarimana.

Q.   Did MRND members commonly use such a badge before multipartyism was instituted?

A.   Yes.

Q.   Did MRND members continue to use the badge after the introduction of multipartyism?

A.   Those -- yes.  Those who wanted to show in a particular way or special way that they were members of the MRND, yes, they did continue to wear that badge, but it was to show that they were really, really in a special way members of that party.

Q.   When you say "in a special way," do you mean that they had especially powerful feelings in support of the MRND?

A.   They wanted to show that they want to -- they have kind of an allegiance to the party that they associate themselves to it in a particular way.

Q.   Was it common during the -- after the introduction of multipartyism for people to associate in clubs or other establishments based on party affiliation?

A.   Can you repeat the question?  I'm not understanding very well.

Q.   Certainly.  I'll try to simplify it.  Was it common after the introduction of multipartyism for people to associate socially at particular establishments based on their political affiliation, for people to associate at particular establishments such as clubs or bars based on their political affiliation?

A.   You could see, for example, in cities such as Kigali some places or bars that people used to go to depending on which party they belonged to that could meet there after the meetings or to organize their political meetings, and they have a tendency like to exclude other people, and that happens for all other parties.

Q.   Was it common for particular parties to conduct rallies, to conduct rallies in support of their party?

A.   It was the main activity to show the power.

Q.   Would you explain what you mean by "show the power"?

A.   For example, the number of the members, the number of flags or the songs.

Q.   When you moved to the -- when you became general director of the Service de Renseignement, did you meet a man

named Athanase Munyemana?

A.    Yes.

Q.    And in what capacity did you meet him?

A.    He was an employee of that same service so when I met him it was in that capacity as an employee of the same Service de Renseignement.

Q.    What was his job in the Service de Renseignement?

A.    Now, in the new service he was the director of intelligence.

MR. CAPIN:  May I approach, your Honor?

THE COURT:  You may.

Q.    I'm going to show you what is in evidence, sir, as Exhibit 13 which are employment records.  Did you have occasion to briefly review those this morning, sir?

A.    Which one, this one?

Q.    The records in front of you.  Take your time and flip through them.  Do you recognize those as the set of documents that you reviewed this morning?

A.    Yes.  Kind of, yes.

Q.    I'm going to ask you questions about just a few pages of that record, sir.

You'll notice I've placed stickers on certain pages with numbers on them; do you see the number 1?  Is No. 1 the document we're looking at on the screen, sir?

A.    Yes, that's the one.  Yes, it is.

Q.    If you could look at the copy in front of you, the paper copy, please, sir?

A.    Yes.

Q.    I'm putting on the screen that same page in its English translation, Exhibit 13A, for the record, your Honor.

Are we looking at a marriage certificate, sir?

A.    Yes.  As I can see, it's a marriage certificate.

Q.    And does it indicate the marriage, the marriage of -- for some reason I cannot -- there we go -- of Athanase Munyemana?

A.    Yes.

Q.    And does it indicate that he is marrying Mrs. Kantengwa?

A.    Yes.  Yes.

Q.    Could you please look at the document, the page of that record that has a Sticker No. 2 on it.

A.    Yes, I see it.

Q.    Mr. McGinty's indicating ... is that a diploma, sir?

A.    Yes, it's a copy of a diploma.

Q.    Is it Mr. Munyemana's diploma?

A.    According to the indication I see, yes.

Q.    And does it indicate that in 1983 Mr. Munyemana graduated with a law degree?

A.    Yes.

Q.    And during -- when you came on board at the -- as the general director of the Service de Renseignement, were

you Mr. Munyemana's direct supervisor?

A.   Yes, I was director of his services, and I was also his direct supervisor/director.

Q.   Would you please look at Page No. 3 or I should say the page with a sticker that has a "3" on it.

Is that Mr. Munyemana's passport application, sir?

A.   Yes, it's an application form that requires a passport.

Q.   And is the passport application Athanase Munyemana?

A.   Yes.

Q.   And does it indicate that the spouse of Mr. Munyemana as being Kantengwa, Prudentienne, Care of Sonarwa, Kigali?

A.   Yes.  As a spouse, yes.

Q.   And Sonarwa was a state-owned insurance company?

A.   Yes.

Q.   Very briefly now I'm going to show you, sir, three documents.

Do you see the document with a Sticker No. 4 on it?

A.   Did you say 4?  It's 4?

Q.   It's No. 4, yes.

A.   Yes, I see it.

Q.   Is that in essence an employee's performance evaluation?

A.   Yes, it's called, like it's called an employment evaluation.

Q.   And who is evaluating Mr. Munyemana's employment on

this particular form?

A.   I see that it's myself.

Q.   I'm pointing at the screen in front of you.  Is that your signature, sir?

A.   Yes, I recognize that's my signature.

Q.   And the date on this is October of 1992, correct?

A.   Yes.

Q.   And I'll simply put on the screen in front of you, sir, another such evaluation.

     Does this indicate that you further evaluated Mr. Munyemana in December of 1993?

A.   Yes.  Yes.  Of course, yes.

Q.   Sir, I want to draw your attention to April 6th of 1994; did anything unusual happen that day?

A.   Well, on that date, April 6th, '94, is the day when the one who was to be president, Habyarimana, his airplane fell or crashed.

Q.   And where were you on that date?

A.   On April 6th I was in the City of Gisenyi.

Q.   And did the president's plane crash in Kigali?

A.   Yes, the president's airplane crashed in the evening in Kigali April 6th.

Q.   Did the death of the president mark the beginning of dramatic events in Rwanda?

A.   Yes.

MR. CAPIN:  This may be a good time to stop, your Honor.

THE COURT:  Yes, I think we're about to switch topics.

All right, jurors, we'll meet again tomorrow at the usual time:  9 a.m.  I'll look forward to seeing all of you then.

THE CLERK:  All rise.

(Whereupon, the jurors exited the courtroom, and the proceedings concluded at 12:57 p.m.)

133

C E R T I F I C A T E


     I, Helana E. Kline, a Registered Merit Reporter,

Certified Realtime Reporter, and Federal Official Court

Reporter of the United States District Court, do hereby

certify that the foregoing transcript, from Page 1 to

Page 133 constitutes, to the best of my skill and ability,

a true and accurate transcription of my stenotype notes

taken in the matter of the United States of America v.

Prudence Kantengwa.


     /s/ Helana E. Kline                    June 7, 2012

     Helana E. Kline, RMR, CRR

     Federal Official Court Reporter