UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )  Criminal Docket
vs.                            )  No. 1:08-cr-10385-RGS-1
                               )  @9:00 a.m.
PRUDENCE KANTENGWA,            )  May 1, 2012
                               )
            Defendant.         )

JURY TRIAL

DAY 7

BEFORE:   THE HONORABLE RICHARD G. STEARNS
          UNITED STATES DISTRICT JUDGE

John Joseph Moakley United States Courthouse
1 Courthouse Way, Courtroom No. 21
Boston, MA  02210

Helana E. Kline, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 5209
Boston, MA  02210

APPEARANCES:


For the Government:


United States Attorney's Office
(By:  Aloke Chakravarty, AUSA &
      John A. Capin, AUSA)
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210



For the Defendant:


Federal Public Defender Office
(By:  Charles P. McGinty, Attorney at Law &
      Bjorn Lange, Attorney at Law)
51 Sleeper Street, 5th Floor
Boston, Massachusetts  02210

I N D E X


Witnesses called on behalf of the Government:


Testimony of:


ALPHONSE KAMANZI


                              Direct Cross Redirect Recross


By Mr. McGinty                   5              56

By Mr. Capin                          28              63


SIXBERT ERICK MUSANGAMFURA

By Mr. McGinty               65             144

By Mr. Chakravarty                102              148



            E X H I B I T S


For Identification:

No.   Description                              Page

B     Letter dated 4/20/12 from the             4
      Department of Justice.


In Evidence:

No.   Description                              Page

29    Plane Ticket Page 1.                       5

30    Plane Ticket Page 2.                       5

4

P R O C E E D I N G S

THE CLERK:  All rise for the jury.

(The jury entered the courtroom.)

THE CLERK:  The case before this court carries Case No. 08-cr-10385, United States of America versus Prudence Kantengwa.

THE COURT:  Good morning, counsel.  Good morning, jurors.  It's a good day to be inside.  I know we're now going to shift our focus to the defendant's case. Mr. McGinty.

MR. MCGINTY:  Good morning, your Honor.  Your Honor, first I would like to have marked for identification purposes a document dated April 30th, and that's for identification purposes only; and, second, two pages which is a document -- an airplane ticket that was furnished by Prudence Kantengwa from her records.  It is a plane ticket reflecting travel, including arrival on January 29th of 2004.

I move to admit those two pages.  Again, one is the face of the ticket, and the second is the face of the ticket with the baggage claim attached.

MR. CHAKRAVARTY:  No objection.

THE COURT:  All right.  The next exhibit, which would be 30?

THE CLERK:  29 -- well, it will be 29 and 30.

(Exhibit B marked for identification.)

(Exhibit Nos. 29 and 30 admitted in evidence.)

MR. MCGINTY:  And, your Honor, the defense would call Alphonse Kamanzi.

THE CLERK:  Good morning.

THE WITNESS:  Good morning.

(Alphonse Kamanzi duly sworn.)

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE CLERK:  Please state your name and spell your last name for the record?

THE WITNESS:  My first name is Alphonse Kamanzi.

DIRECT EXAMINATION BY MR. MCGINTY:

Q.  And how do you spell your last name, sir?

A.  K-a-m-a-n-z-i.

Q.  In what country were you born, Mr. Kamanzi?

A.  I was born in Rwanda on May 2nd, 1948, so I'm 63 today but tomorrow I will be 64.

Q.  And where do you live currently?

A.  I live in East Boston.

Q.  Now, if I could ask you your higher education?

A.  I did law school at the University of Rwanda, the National University of Rwanda.

Q.  And after graduating did you begin to work?

A.  I did.

Q.  And where did you start working?

A.   First of all, I was working as a court clerk from '69 to '74.

Q.   And what sorts of duties would a court clerk have?

A.   The usual duties a court clerk would have, for judges, for files, and so on --

Q.   Now --

A.   -- regarding the cases.

Q.   Now, in 1974 did you travel for training?

A.   I traveled to France, and I stayed there for about two years training in the French judicial system to see how they work and what we can learn from them.

Q.   So this was in the French judicial system that you were getting some training?

A.   Correct.

Q.   Now, when you came back, what position did you hold?

A.   I was a judge of the First Instance Court.

Q.   And would that be the judge of the First Instance Court in Rwanda?

A.   Right.

Q.   Now, what did a judge in the First Instance Court do?

A.   Deciding cases which are brought to court, I mean, issuing judgments.

Q.   Okay, and what level of court would that be?

A.   It's a second level, because we had the lowest level at the county level.  We are deciding some cases of not much

importance, but we are deciding cases in the First Instance; that's the way all cases should start from.

Q. Now, you began in the First Instance in, what, 1978? Do I have that right?

A. I started in 1974 --

Q. I'm sorry.

A. -- that's when I start. And then in 1978 I was promoted as the president of the prefecture, meaning that I was given the responsibility of heading the court. In addition to that, I had the responsibility of overseeing all of those courts in my district.

Q. Now, in 1987 were you further promoted?

A. Yes.

Q. And what were you promoted to?

A. I was promoted to a Justice of the Supreme Court of Rwanda.

Q. I'm sorry I interrupted you. Now, what would a Justice of the Supreme Court of Rwanda do?

A. Review of cases coming from lower courts, deciding on the exact application of the law.

Q. And in 1990 were you further promoted?

A. Yes.

Q. And to what position?

A. I was promoted to President of the Council of State.

Q. And what did the Council of State do?

A.   This is one section of the Supreme Court of Rwanda, and it has the responsibility of judicial review of administrative decisions.

Q.   And as a member of the court, were you also a member of the Constitutional Court of Rwanda?

A.   That's right, because the Constitutional Court is a section of the Supreme Court.  We had three sections actually:  the Council of State, the Commercial, and then the Constitutional Court.  So the Council of State is put together from the Constitutional Court so --

Q.   So -- I'm sorry.

A.   -- from '87 as a Justice of the Supreme Court, I was a member of the Constitutional Court.

Q.   Now, in your work, had you ever done any traveling in connection with your work as a Supreme Court Justice?

A.   I did.

Q.   And where did you travel to?

A.   I travel to France, I travel to Cameroon, and I travel to America here; I travel to Calcutta.

Q.   And when you traveled there, it was in connection with what; what were you doing as part of the traveling?

A.   Well, it was part of our training for acquainting ourselves with other judicial systems.  As a matter of fact, when I came here in 1992, we spent the whole month of August of 1992 visiting other courts in other states, including the

U.S. Supreme Court.

Q.   And did you also visit United States District Courts such as this one?

A.   I did, yes.

Q.   Now, I want to ask you about what the process is for appointment of a judge in Rwanda.  What is the review and decision process on hiring and on promotion within the judiciary?

A.   We have what we call the High Council of the Magistrates, and the High Council has the responsibility of recruiting, appointing, promoting, and hiring matters.  So for one to be appointed a judge or a public prosecutor, he has to go through that system.  He has to be assessed by the High Council of the Magistrates.

Q.   All right.  So --

A.   And then --

Q.   Sorry.

A.   -- they make a proposal to the president after reviewing all the necessary conditions for him to be appointed.

Q.   So is this in the nature of a peer review of the qualifications of a person who is being reviewed for promotion within the judiciary?

A.   Right.

Q.   Now, is that peer review serious?

A.   It was very serious, yes.

Q.   Now, tell us how it was serious; what was the, what was the rigor that was put into that kind of evaluation?

A.   Remember for someone to be appointed in the judiciary there was a file, and whatever was relating to his profession was put there, and it was a quite a body who had the responsibility of maintaining the integrity of the judiciary.  So as such, the way that -- they had the task of ensuring that whoever was in the judiciary was qualified to exercise that profession.

Q.   Now, was this peer review by the high council necessary for a person to be promoted within the judiciary?

A.   It was.

Q.   And then would it be reviewed by another person or approved by another person above the high council?

A.   No.  The high council has the full responsibility of reviewing; and then when it was satisfied that the person was qualified for promotion, they just pushed the proposal to the president.

Q.   Okay.  So getting promoted in the judiciary in Rwanda is not just a matter of getting the approval of the president; do I understand that right?

A.   No, it was not like that.

Q.   Now, did you at any time become acquainted by a person named Athanase Munyemana?

A.   I did.

Q.   And under what circumstances did you meet him?

A.   Athanase Munyemana was a public prosecutor; and as such, he was a member of the magistrates, the High Council of Magistracy.  He worked at the same time when I was working.

Q.   And you -- sorry.

A.   And he got promoted from law school at the National University of Rwanda, so I knew him because he was in the same profession as me.

Q.   Now, did you know him as a friend?

A.   No.

Q.   In what capacity did you know him?

A.   I knew him as a member of the judiciary.  When there are sometimes that we would meet in seminars, meet in professional meetings.

Q.   And in those meetings was the subject of professional -- was the subject of professional matters within the judiciary?

A.   I'm sorry?

Q.   When you met with him or when you discussed things with him, was it in connection with, with legal matters involving the judiciary?

A.   That's right, yes.

Q.   Now, his position was as deputy prosecutor.  Do I understand that correctly?

A.    You do.

Q.    Now, you mentioned that he had been a member of the magistrates.  Can you describe for us what the relationship is between a person in a prosecutor position and a person as part of the magistracy in Rwanda?

A.    Like I said before, the magistrates comprise -- and to this day, comprise, even now, judges, public prosecutors.  So judges, they are there to make -- to make decisions in cases; prosecutors are there to prosecute.  And as such, we had the responsibility of maintaining the integrity of the judiciary, as I say, under the same umbrella of the High Council of Magistrates.

Q.    Okay.  Now, in the United States prosecutors are part of a different branch than the judiciary, meaning that a prosecutor would be part of the executive branch and a judge would be part of the judicial branch?

A.    Yep.

Q.    Now, in Rwanda was this different?

A.    It was different because we are from a civil law system; and when we look into the civil law system, especially in France, prosecutors and judges are magistrates under the same body of magistrates so --

Q.    So -- I'm sorry.

A.    -- we inherited it from the civil law system, especially from France and Belgium.

Q.   Now, I'm going to show you a document and ask you if you could look at it, and the document is in French.

Now, do you see the document in front of you?  Now, this is a document from the employment file of Mr. Munyemana that is part of the evidence in this case.

Do you see it?

A.   Yeah, I see it.

Q.   Now, I'm going to shift to the English version right now and place that here.  This is at the bottom identified by the number 222 of A-file.

Now, this document appears to be a document where Mr. Munyemana is identified as an assistant deputy public prosecutor.  Do you see that?

A.   Yeah, I see that here.  I see that.

Q.   Now, here he is being appointed to the central administration to the rank of personal assistant.  Do you see that; this is in Article I?

A.   Okay.

Q.   Now, this document appears to reflect a transfer and appointment of Mr. Munyemana from the position of deputy prosecutor to a position within the president's office.

Do you see that?

A.   Yeah, I do.

Q.   Now, I want to direct your attention here to the place that I'm pointing to with my finger.  Now, does it appear

that the transfer was on recommendation of the Minister of Justice, and the Minister of Civil Service and Training, and after assent of the High Council of Magistracy?

A.    That's right, yes.

Q.    Now, is the High Council of Magistracy what you had talked about before, which is the peer group evaluating, evaluating the credentials and the capability of a candidate for promotion?

A.    Uh-huh.

Q.    Now, I'm going to go back for a moment to the French version, and I'm going to ask you to direct your attention to the document.

Now, does this document indicate what the manner of transfer of Mr. Munyemana was from his position as deputy prosecutor to his position as, with the office of the president?

A.    Yeah.  It followed the usual procedure, that the high council was asked actually to lend to another government department Mr. Munyemana to work there and to work for that department because they had asked the judiciary to lend them that person.

Q.    All right.  Now, you used the word "lend," do I understand the notion to be that if a person is a deputy prosecutor and has capabilities, he can be lent to another part of government; do I understand that right?

A.   That's right, and it was called "detachment."

Q.   All right.  Now, the word, and I'd direct your attention now to the document in French in front of you, does the heading of the word describe the manner of the transfer?

A.   It does, yes.

Q.   In what way?

A.   In the way that this says that it was a proposal or rather a request from the High Council of Magistrates, which --

Q.   I'm sorry?

A.   -- which would accept that request and then allow the detachment.

Q.   Now, you referred to the word "detachment."  Does the word "detachment" appear in the document, if I might --

A.   That's much better, yes.

Q.   I'm sorry.

A.   I can't see it now; it's blank.

Q.   I'm sorry.  I'm sorry.  If I, if I point to --

A.   Yeah.  I see it now, yeah.

Q.   If I point to the word there, and what I could do is -- would it help, would it help it if I approached you with the document, would that help you?

A.   Okay.

Q.   Now, in this document I know the print is small and

it's difficult to read, my apologies.

A.   It's okay.

Q.   In this document does it indicate what the nature of the assignment is by its use of particular language?

A.   Yes, it does, because it explain how he was taken from the judiciary and lent to the public administration and the process too.

Q.   And the word that you referred to before "detachment" --

A.   Uh-huh.

Q.   -- does that appear in the document?

A.   It does, yes.

Q.   And what is the meaning of "detachment" under Rwandan law?

A.   Under Rwandan law when we --

        MR. CAPIN:  Objection, your Honor.

        THE COURT:  Overruled.

Q.   What is the meaning of the word "detachment" under Rwandan law?

A.   Under Rwandan law when someone, a public servant or -- a public servant or a judge or a public prosecutor is detached, it means that he was or is from his initial profession to a public department, but the detachment should be understood as a temporary position.  It is not definitely, so in that time he can be called back to his initial profession.

Q.   Now, does he remain while detached subject to the same discipline and the same review process?

A.   He does.

Q.   And is his promotion and evaluations made in the context of the new position or in the context of the position of deputy prosecutor?

A.   He stayed under his original statutes and is governed by his original statutes.  He will be evaluated, and then he will be promoted in his initial profession.

Q.   Now, this document indicates that Mr. Munyemana -- I'm sorry, yeah, Mr. Munyemana was transferred to the office of the president in December of 1984, am I correct?  At the bottom it's signed?

A.   That's right, yeah.

Q.   So if I understand this correctly, the document reflects a review and assent by the High Council of Magistracy of this detachment of Mr. Munyemana, in effect, a loan of Mr. Munyemana to this position in the office of the president?

A.   Right.

Q.   And with that recommendation, then it is then signed off on by the president which then formalizes the transfer?

A.   Right.

Q.   Do I understand that correctly?

A.   That's right.

Q.   Now, notwithstanding this transfer, did Mr. Munyemana remain in the Office of the Magistracy, the part of the government described as the Magistracy?

A.   Right, he remained -- like I said, he remained governed by his initial statutes, and he will be evaluated and promoted by the High Council of Magistracy.

Q.   Now, I'll show you a second document.  Now, I'll show you a second document with the same problem; it's hard to read.  Now, can you read that, sir?

A.   I can, yes.

Q.   Okay.  Now, this too, this is identified as Document 21 with a number at the bottom, 2224 of the A-file.  It appears to be a document of August the 2nd, 1988, also in evidence as part of the employment file of Athanase Munyemana.

Do you see that document, sir?

A.   I see it, yes.

Q.   Now, this document appears to be a permanent appointment of officer of the public prosecutor as part of magistracy?

A.   Right.

Q.   Now, the appointment to the president's office was in December of 1984; this document appears to be four years later, August 2nd, 1988.  Do I understand that correctly?

A.   Yes, you do.

Q.   Now, this document, can you tell the jury what the

significance of this appointment is?

A.    In the Rwandan judiciary you are appointed initially
only -- may I say, when you will be evaluated to be promoted
or to be appointed rather on a permanent basis.  So if you
have not satisfied the rules of the profession, if you were
evaluated and you have failed to satisfy the requirements of
that profession, you will not be appointed on a permanent
basis.

Q.    So he is now appointed, if I understand this document,
appointed a permanent member of the magistracy --

A.    Right.

Q.    -- even though at the time he was working in the office
of the president, correct?

A.    Right, because he was still a magistrate.

Q.    Now, does he continue to be subject to the discipline
and the evaluation of the magistracy?

A.    That's right, yes.

Q.    Of the high council?

A.    Yes, his estate, because the high council is whatever
is related to his promotion and so on.

Q.    And did the high council -- was the high council
important in the decision whether to make him a permanent
magistrate or not?

A.    It was because without the proposal, the recommendation
of the high council, he wouldn't be appointed permanently to

the magistracy.

Q.   So, in effect, if I understand this right, he in effect becomes a career magistrate by virtue of this appointment --

A.   Right.

Q.   -- fair to say?

Now, I'm going to show you one more document which appears to be -- I'm to show you one more document, and I'm going to put it up here in French initially.  This document too is from the employment file of Mr. Munyemana.

Do you see this document, sir?

A.   I see it, yes.

Q.   Okay.  And it appears to reflect Mr. Munyemana's position --

A.   Yep.

Q.   -- in two respects, do you see that?

A.   Yep.

Q.   And there's a reference to him being a deputy public prosecutor, is there not?

A.   In French, yes.

Q.   I'm going to move to the English text so that --

A.   Okay.

Q.   Now, this is a translation of that document?

A.   Okay.

Q.   And this is an evaluation that was completed in 1993 as part of the review of his work, does this reflect what his

position was?

A.   It does, yes.

Q.   And what was his position?

A.   I can say it was deputy public prosecutor.

Q.   So notwithstanding that he's assigned to the office of the president or in this case the office of the prime minister --

A.   Uh-huh.

Q.   -- he still remains in title:  deputy public prosecutor?

A.   Right.

Q.   And here this appraisal report that's dated at the top "1994" reflects that he's now working for the office of the prime minister, correct?

A.   Correct.

Q.   Now, did you understand that the intelligence service had been at some point moved from the office of the president to the office of the prime minister?

A.   I do understand that because after the parties assisted or were introduced in one, they formed a coalition government, and that coalition government comprised a different party from where the president was coming from and then the opposing party.  So because of that new system, they moved that service from the office of the president to the office of the prime minister.

Q.   And that's where he was working at the time?

A.   Yep.

Q.   Do I understand that right?

A.   Yes.

Q.   And the appraisal report reflects both that he is at the office of the prime minister, department of intelligence --

A.   Yes.

Q.   -- but that his position remained:  deputy public prosecutor, correct?

A.   Right.

Q.   Detached from the magistracy?

A.   Right.

Q.   And does the back page of that document, which is identified as No. 2241, similarly reflect that he was a deputy public prosecutor and had spent seven years at that rank?

A.   Yes.

Q.   Now, in 1991 in Rwanda was there a change in the structure of the political parties?

A.   Yes.

Q.   And prior to 1991 what were the choices a person had in terms of possible party membership in Rwanda?

A.   There was no choice.  It was a one-party system, and it was said that whoever was Rwandan was the name of that political party, whether you liked it or not you were -- it

was written that you are a member.

Q.   Now, did that change at some point?

A.   Yeah, it changed when the two-party system was introduced, and that was in 1991.  The constitution changed and allowed every Rwandan to be -- to choose a political party.

Q.   So as of 1991 Rwandans could choose what political parties to belong to?

A.   Right.

Q.   Were there any exceptions?

A.   Yeah, there was an exception.

Q.   And what were the exceptions?

A.   At the same time the constitution was enacted in 1991 they enacted another law governing parties -- political parties; that was in June of 1991.

Under Article 20 of that law, it did emphasize that every Rwandan has a right to choose what political party he wanted to belong to, but the following article, Article 21, wrote in an exception.

The exception was that judges, prosecutors, members of the Armed Forces, and the police could not be members of a political party.

Q.   At the time what was your position in Rwanda?

A.   That was in 1991, I was the president of the Council of State.

Q.   And also that was your association with the Supreme Court?

A.   That's right, yes.

Q.   Now, were you permitted to be a member of a political party once the freedom of opportunity to join political parties became open in Rwanda?

A.   No, I was banned from joining a political party as a judge.

Q.   So you were barred -- I'm sorry, you were barred from being a political party member?

A.   Right.

Q.   So were you a member of a political party?

A.   I was not.

Q.   Now, was that a serious prohibition?

A.   Yeah, it was a serious prohibition because that was the law; and as a judge, I don't see myself breaking the law.

Q.   Now, could Athanase Munyemana have been a member of a political party?

A.   I don't think he could because he was a member of the judiciary; and as such, under the law he was barred from being a member of a political party.

Q.   So if I understand right because he is detached from his position as deputy prosecutor, he still is subject to the constraints as a magistrate?

A.   That's right, because he's still a magistrate; and

from the document you have shown me, given me, that is the confirmation that he was still viewed as a magistrate.

He was being evaluated and promoted as a magistrate, so he was still governed by his initial statutes, and the law under detachment is very precise on that.

Q.   Now, did you see Mr. Munyemana in professional settings over the years between the time you first met him and years later?

A.   I did.

Q.   And can you describe just what the circumstances were of your interaction with him and how frequent it was?

A.   We had professional meetings and professional seminars, and he would come as a member of the magistrates.

Q.   And would you have any conversations with him?

A.   Yeah, we would, in discussions you have vetting whatever problems you have in the judiciary.

Q.   And can you describe him, his personality?

A.   He was a quiet guy, honest, and very professional.

Q.   How often did you speak with him over, let's say, in a year, in the average year, how often would you speak to him?

A.   I'd say four to five times in those professional meetings.

Q.   All right.  So as I understand it, you were not a friend of his, correct?

A.   I was not.

Q.   So your interaction with him would have been on a professional level, right?

A.   Right.

Q.   With, you know, conversations in the context of a professional relationship?

A.   Right.

Q.   Now, can you tell the jury what your view was of his legal skills?

MR. CAPIN:  Objection, your Honor.

THE COURT:  Overruled.

Q.   Can you tell the jury what your view was of his legal skills?

A.   Like I said, he was a guy who knew the law, who was professional, who was very honest; and, indeed, his promotion can attest to this, he was really appreciated as a member of the judiciary.

Q.   Now, did he ever give any indication or sign of holding extremist views of any kind?

A.   I don't -- like I said, he was a quiet guy really.  I had never heard him expressing extremist views, no.

Q.   Did you ever hear him make any comment or say anything about people who were Tutsi?

A.   No.

Q.   Did you ever hear him making any comments that reflected political leanings?

A.   No.

Q.   As far as you know, was he a member of any political party?

A.   No, I'm not aware of it.

Q.   As far as you know, did he express any views that were consistent with the position of any political party?

A.   No.

Q.   Was there ever any review by the high council of Athanase Munyemana in connection with whether he violated any standard of the magistracy?

A.   No.  Because if there was, then he would have been disciplined, and I'm not aware of that.  And as a matter of fact, at one time he was, as I say, a member of the high council, so I have never heard about that.

Q.   I haven't asked you what your ethnicity is.  What is your ethnicity?

A.   Excuse me?

Q.   What is your ethnicity?

A.   I come from a mixed marriage, and that was a long time ago from -- starting from my great grandfather.  He married Tutsi.  My grandfather was married to a Tutsi.  My father, my mother, was a Tutsi, and my wife is a Tutsi.  So that is a difficult position in Rwanda, where you have relatives from both sides.

MR. MCGINTY:  Thank you.  I have no further

questions, your Honor.

THE COURT:  Mr. Capin.

MR. CAPIN:  Thank you, your Honor.

CROSS-EXAMINATION BY MR. CAPIN:

Q.   Good morning, sir.

A.   Good morning, counsel.

Q.   Let's start with what you just told Mr. McGinty about this notion that Mr. Munyemana was a permanent member of the magistracy, okay?  You remember that whole line of questioning?  And Mr. McGinty showed you, showing you Exhibit 13A, I'll put it on the screen for you.

He showed you this page, correct, which indicates that in 1984 Mr. Munyemana was transferred to the central administration, correct?

A.   Yes.

Q.   And that's when he began his work with the Service de Renseignement?

A.   Right.

Q.   And a page I don't think you looked at two pages thereafter indicates that, that in 1985 that position became permanent -- that assignment became permanent, correct?

A.   Yep.

Q.   So Mr. Munyemana, did he go to law school with you?

A.   Excuse me?

Q.   Did he go to law school with you; did you attend law

school together?

A.   No, because he was much younger than me.

Q.   But you both attended the university of -- the law school in Butare, correct?

A.   Yes.

Q.   And he started his career, based on what you looked at, based on the documents you looked at, he started his career in the public prosecutor's office?

A.   Yep.

Q.   And in 1984 he was transferred to the Service de Renseignement, right?

A.   Yes.

Q.   And so at any point from '94 until the time that you left Rwanda as far as you know, he was always working in the Office of the Service de Renseignement, correct?

A.   That's correct.

Q.   So if you had been asked at any point in time was Athanase Munyemana employed by Service de Renseignement, the only honest answer would be yes, correct?

A.   Yes, when he left as such.

Q.   Of course.  Now, he was promoted on numerous occasions, correct, and he eventually became director of the service? For example, here you looked at this document, correct?  If not, I can approach and show it to you.

        Did Mr. McGinty show you Mr. Munyemana's entire

personnel file?

A.   Excuse me?

Q.   Did Mr. McGinty show you Mr. Munyemana's entire personnel file?

A.   He showed me his evaluation file.

Q.   Selected portions of the file he showed you?

A.   I don't know.  I couldn't say.

Q.   Did you see this document?  This document indicates, does it not, that by November 6, 1990, Mr. Munyemana is the director of the Service de Renseignement, correct?

A.   What I think it shows me here is that his salary increased, his salary.

Q.   His salary, because in essence being a member of the permanent magistracy was sort of a civil service protection, correct; what your salary was --

A.   I can't understand what you said.

Q.   It was known as a civil service protection so he was a civil servant assigned to the --

A.   He not a civil servant.  He was a magistrate, in fact.

Q.   He was a magistrate, but did he do any work as a magistrate after 1994 while assigned, while in the Office of the Service de Renseignement?

A.   When you are detached, you are lent to a department which employs you.  You are there to give your expertise, but you still belong to your initial profession.

Q.   But I think we've established, have we not, sir, that when he was lent in 1984, he stayed there until the genocide was over, correct?

A.   It was supposed to be a way of going there on a temporary basis.  The service can request to still employ you or they can send him back.

Q.   And he was -- within the service he was promoted repeatedly, correct?

A.   Promoted by the magistracy, the high council of magistrates.

Q.   So you're saying that Habyiramana had as his director of his internal intelligence somebody selected by another agency?

A.   I don't agree with that.  It was not Habyiramana.  He worked in the civil service as a magistrate, and at one point he was no longer a magistrate.

Q.   So this document indicating that Habyiramana -- signed by Habyiramana indicating that he is transferred to the central administration to the Service de Renseignement, you're saying the president didn't have authority -- the dictator in 1984 didn't have authority to transfer Munyemana to the service?

A.   He should do it under the recommendation of the High Council of Magistrates.

Q.   And didn't you just testify --

A.   He was just signing that recommendation.

Q.   And it's your testimony -- is it your testimony, sir, that the judiciary in Rwanda during the Habyiramana regime was not political at all?

A.   Excuse me?

Q.   Is it your testimony to this jury that the judiciary in Rwanda under Habyiramana was not highly politicized?

A.   I think I cannot say it was not highly politicized.  I think that there is a lot of prejudice because of the genocide.

Q.   My question, though, sir --

MR. MCGINTY:  Can the witness finish the answer, please?

MR. CAPIN:  I think it's nonresponsive, your Honor.

THE COURT:  Yes, I think he missed the question.  Why don't you put it again.

Q.   Well, it's really simply a yes or no question:  are you telling this jury that the judiciary in Rwanda during the Habyiramana regime before the genocide was not highly politicized?

A.   It was a professional body, it was --

Q.   I understand.  My question, sir, though, was:  was it or was it not highly politicized?

A.   It was not politicized.

Q.   And Mr. Munyemana, we've seen that there are a number

of evaluations in his, in his, in his personnel file, correct?

A.   Yes.

Q.   And so, for example, on this one he's evaluated by his first line supervisor as being:  great, remarkable, great; by his second line supervisor as being:  great, remarkable, great, very good; and, ultimately, we know this one was signed by the then director of all of the Services de Renseignement.  Do you know who that was at the end of 1993?

A.   In '93 I think Iyamuremye --

Q.   I'm sorry?

A.   -- the director of the Service de Renseignement in '93 I think it was Augustin Iyamuremye.

Q.   It's Augustin Iyamuremye, you say it much better than I, who was until recently was the Senator of Rwanda?

A.   As a matter of fact, he was a member of a political party.

Q.   Yes, I understand.  I'll ask you a question in a moment, sir.

He was a Senator until recently, and you're aware that he testified during this trial?

A.   That's right.

Q.   And he was Munyemana's boss, right?

A.   He was what?

Q.   He was Munyemana's boss?

A.   Yes.

Q.   And would it surprise you, sir, that the Senator told this jury that in order to ascend through the Service de Renseignement you had to be dedicated and committed and a member of the MRND, would that surprise you?

A.   I don't agree with that.

Q.   So it would surprise you, fair enough.  Now, you fled Kigali when the genocide began, correct?

A.   Yes.

Q.   And you were in danger in part because you fled with your Tutsi wife, correct?

A.   Even myself I was a target.

Q.   Did the fact that your wife was Tutsi put you in greater danger?

A.   Indeed.

Q.   Because, in fact, the genocide which began on April 6, 2004, correct -- or 1994.  The genocide began on August 6, 1994?

A.   August?

Q.   I'm sorry.  Thank you, sir.  April 6, 1994, correct?

A.   April, yes.

Q.   And it lasted for about 100 days, correct?

A.   It started in April and it continued up to July.

Q.   Okay, and it targeted -- the people targeted for killing were primarily Tutsi and moderate Hutu, correct?

A.   Tutsis, political oppositional parties.

Q.   Which tended to be either Tutsi or moderate Hutu, correct?

A.   That's the way, yeah, Tutsis, yes; but whether Hutu, I don't know.  How do I find out?

Q.   Were there any dedicated members of the MRND to your knowledge who held high office at the time of the genocide who were targeted for assassination?

A.   I don't know everybody, but it could be possible.

Q.   And the MRND was, in fact, the political party in power before and during the genocide, correct?

A.   Before the genocide MRND was in power.  After 1991 it was a coalition government.

Q.   And is it your testimony, though, that -- well, let me ask you a question:  is it not true that Habyiramana remained president during the coalition government?

A.   He did.

Q.   And when he was killed, the MRND took over the interim government?

A.   No, it was the coalition government again.

Q.   Okay.  It was Hutu Power?

A.   Not Hutu Power, no.  Hutu Power, that, that was actually a party who was not in charge of the coalition government.

Q.   So when the interim President Sindikubwabo took office,

he was MRND, right?

A.   He was, yes.

Q.   And the dedicated members of his cabinet were all MRND; for example, Pauline Nyiramasuhuko, she was MRND?

A.   But like I said, there were other members from opposition parties who were members of that coalition government.

Q.   Okay.  So you're telling this jury then that the coalition government that came into place before the genocide continued in power during the genocide?

A.   Yes.

Q.   Now, you testified that prosecutors in Rwanda were part of the magistracy?

A.   Yes.

Q.   And by that you include Mr. Munyemana?

A.   Yes.

Q.   And you're telling this jury that the magistracy was inherently not a political entity?

A.   It was not.

Q.   And it was, in fact, as a matter of law at least, it was prohibited for a member of the magistracy to be a member of a political party?

A.   It was, yes.

Q.   And you continued throughout the period leading to the genocide to work as a judge?

A.   It would be not correct to say I was working.  We were all running away.  I was not working.

Q.   Before the genocide began?

A.   Excuse me?

Q.   Before the genocide began until you fled Kigali you continued to work as a judge?

A.   Yes.

Q.   And did you work in Kigali?

A.   I did.

Q.   And as a judge you were doing the kinds of --- fulfilling the kinds of functions you described to Mr. McGinty; you were resolving cases and handling matters of law, correct?

A.   Yes.

Q.   And you were familiar with the laws of Rwanda and the legislation that was passed during your tenure as a judge?

A.   Yes.

Q.   And the job of the Service de Renseignement, though, was that not an inherently political position?

A.   I don't think it was, no.  It was the department in charge of secret matters.

Q.   Internal intelligence, correct?

A.   Yep.

Q.   And during the Habyiramana regime it was the organization that kept track of political opponents of the

regime, isn't that correct?

A.   No.

Q.   And during the interim government -- strike that. During the time of multiparties it was the organization that kept track of what Habyiramana's new political opponents were doing, correct?

A.   I don't think it was because it was under opposition parties, so I don't think they would track themselves.

Q.   Well, then let's focus on what happened when the genocide started.  When the genocide started, opposition party leaders were killed, correct?

A.   Not all of them, but the prime minister was killed.

Q.   But the prime minister was killed, and she was killed on the first day, wasn't she?

A.   Correct.

Q.   And she was the one who was at least nominally at least, if not legally, she was the one overseeing the Service de Renseignement, correct?

A.   Yes.

Q.   Because the Service de Renseignement was assigned to her office, correct?

A.   Excuse me?

Q.   The Service de Renseignement was assigned to the office of the prime minister during the multiparty period?

A.   That's right.

Q.   And prior to that it had been assigned to the office of the president, correct?  Before that it had been assigned to the office of the president?

A.   Before the multiparties, yes.

Q.   So when the prime minister was killed, the Service de Renseignement moved with the interim government to Gitarama, correct?

A.   I don't know.

Q.   You don't know where the interim government was located during the genocide?

A.   It was in Gitarama, but I don't know if the Service de Renseignement was in the government.  I don't know.

Q.   So you don't know one way or the other whether the Service de Renseignement ever moved to Gitarama?

A.   I don't know.

Q.   But if the director of the Service de Renseignement went to Gitarama --

A.   I don't know.

Q.   Assuming for now that the director of the Service de Renseignement went to Gitarama, you'd be confident that the whole service went there as well?

A.   I don't know.  I don't know where it was.

Q.   Fair enough.  Now, you said you attended workshops with Mr. Munyemana while he was living in Kigali?

A.   Yes.

Q.   Now, do you know if he was attending those workshops in his capacity as director of intelligence?

A.   No.  He was attending those lectures first as a magistrate and then as someone who was handling legal matters in that department.

Q.   But you don't know one way or the other, though, whether he had instructions from the Service de Renseignement to perform certain tasks while attending those meetings; for example, gathering --

A.   I don't know.  I wouldn't know that.

Q.   So for all you know he was gathering intelligence?

A.   Excuse me?

Q.   For all you know he was gathering intelligence?

A.   I don't know what the director was doing.

Q.   Of course not, no.  Now, you saw him several times a year in Kigali, correct?

A.   Not several times.  Like I said, just during certain times.

Q.   You never saw him elsewhere in town?

A.   Excuse me?

Q.   You never saw him elsewhere in the City of Kigali?

A.   No.

Q.   Are you aware that he owned a bar?

A.   No, I am not aware of that.

Q.   Okay.  Would it change your opinion about whether he

was politically involved if you were to learn that he owned a bar that was frequented by MRND members and CDR members?

MR. MCGINTY:  Objection, your Honor.  It assumes facts that are not in evidence.

THE COURT:  True.

MR. CAPIN:  Your Honor, we would establish that, not through this witness.

THE COURT:  All right.

Q.  Would it change your opinion, sir, about whether he was politically involved if you learned that he owned a bar that was frequented by MRND members and the more extreme group, CDR?

A.  Like I said, from what I know it would surprise me that he owned a bar where certain people come, but that's different from what I know from me.

Q.  Fair enough.  So if you learned that he owned a bar that was frequented by extremist people, that, in fact, would change your opinion about whether he was politically active, correct?

A.  It would be very difficult for me to believe that he did that.

Q.  I understand it's difficult to believe, but if you were to learn -- if he were to own such a bar, that would change your opinion, right?

A.  I would try not to see if it's not just mere opinion,

because that is very different from what I know from me; I don't even see how he would own a bar.

Q. So if his wife said under oath that he owned something called Nova Scone, a bar in Kigali?

A. Nova what?

Q. Nova Scone, that would be news to you?

A. That's news to me.

Q. So as a member of the judiciary, you could have been terminated or fired only by somebody in the High Council of the Magistrates, correct?

A. Not from somebody, but from the high council. That is a body, not somebody.

Q. Okay. So is it your testimony that Mr. Munyemana could not have been fired from the Service de Renseignement by the president?

A. Not fired, he would just be sent back where he came from. They had no power to fire you, because only the high council could discipline you.

Q. So under the dictatorship then, he had certain protection so if he got kicked out of Service de Renseignement, he could return to the magistracy; is that correct?

A. I didn't hear the question. You said under the dictatorship?

Q. Under the dictatorship. I'm sorry, maybe it's a

terminology question ... was there a dictatorship in Rwanda before multipartyism was introduced?

A.   I don't agree with that characterization.

Q.   Okay.  So in your estimation then the Habyiramana regime was not a dictatorship?

A.   Like I said, there is a lot of prejudice about Rwanda and that's rightly so because of the genocide.  Those horrible events were the only events which were projected to the public, but I would like people to know before the genocide we had a strong and efficient country which was working, and we had a good judicial system.  So I don't think the president had the power to intervene into our affairs within the judiciary because of the system, the system which was there.  The high council was there to oversee us, how we are working.

Q.   So it's your testimony then that Munyemana could not have been political because it was illegal in Rwanda for him to be political based on the rules governing magistrates?

A.   By the rules and on the personality of the guy, I knew he couldn't really be a member of a political party.

Q.   So, certainly, though, when the genocide started, any notion that he couldn't be an MRND member, couldn't join the interim MRND government because of the law would be ridiculous, correct?

A.   I can't agree with what you say.

Q.   Okay.  Wouldn't you agree that it would be ridiculous to suggest to this jury that once the genocide started the law would prevent Munyemana from joining the interim government as an MRND member?

A.   He was not even in the interim government because he was just a civil servant and a member of the magistrates, so he was not a member of a political party or of the government.

Q.   But he continued to be the director of the Service de Renseignement, correct?

A.   He was working as the director of the Service de Renseignement and as a detached magistrate.

Q.   I understand, but you're telling this jury that because he was a detached magistrate, appointed to the Service de Renseignement, as a matter of law even during the genocide he could not have been an MRND member?

A.   I don't think he could attempt to join a political party just during the genocide.

Q.   But you would agree that during the genocide many things that were illegal in Rwanda were done by the government itself?

A.   No.  By militias and some members of the government, but not us.

Q.   Okay.  So you're saying that the interim government did not play a central role in executing the genocide?

A.   Some members of the interim government like I said, because I couldn't say even the members of the interim government who were coming from the political parties could achieve it themselves.

Q.   I'm not sure I understand that answer, but let me ask a different question because I want to make sure that you understand.

Are you saying that -- you are saying that members of the interim government were responsible for ordering the murder of Tutsis, correct?

A.   Some members of the government.

Q.   And some members were responsible for ordering the murder of moderate Tutsi?

A.   Some members of the government?

Q.   Some members of the interim government were responsible for ordering the murder of moderate Tutsi?

A.   Some, yes.

Q.   And some members of the government were responsible for ordering militia to kidnap people, and you know they were responsible for the use of rape as a tool of genocide, correct?

A.   That was a militia as well working or doing those horrible things.

Q.   And all of these things were against the law in Rwanda at the time?

A.   Yes.

Q.   But even though they were against the law, they were specifically condoned by the interim government, correct?

A.   I wouldn't say they were condoned by the whole government, but some members of the government.  And you ought to know that nothing was -- it was chaos.  I mean, in that situation it was chaos.  There was nothing working. People were running, running away.  Others were hiding.

Q.   Well, some things were working, weren't they, sir?

A.   Excuse me?

Q.   Some things were working, correct; for example, you're aware that MRND leaders during the genocide went around the country and encouraged people to kill members of government?

A.   Some members were involved, yes.

Q.   So, for example, you know as a matter of historical fact that on April 19th -- well, let me ask you a question: were you teaching in Butare at the law school?

A.   Teaching?

Q.   Teaching?

A.   No.

Q.   Did you not -- were you not a law professor at some point or a law teacher?

A.   Who?

Q.   Were you not at some point in your career a teacher of law?

A.    Yeah.  I knew some teachers of law, yes.

Q.    But were you yourself a teacher?

A.    No.

Q.    Did you work for the Ministry of Education?

A.    No.

Q.    Was a member of your family employed by the Ministry of Education?

A.    Excuse me?

Q.    Was a member of your family employed by the Ministry of Education?

A.    As a matter of fact, my elder brother was working in the profession, but he died before the genocide started.  He died in 1985.

Q.    Do you remember if anybody, you or any member of your family, was employed from 1976 until 1994 as a member of the -- as a teacher at the Ministry of Education?

MR. CAPIN:  May I approach, your Honor?

THE COURT:  You may.

A.    Who?

Q.    Just take a look at that document and tell me if it refreshes your recollection about whether anybody in your family worked in the ministry -- for the Ministry of Education?

A.    I don't see a name in here.

Q.    You don't see the name?

A.   No.

Q.   This is the last page of that, sir.

A.   That's strange for me.  I see my name here, but I'm not aware of this document.  I never recognize that I'm a teacher.  This is not coming from me.

Q.   Fair enough, thank you.  So your last involvement -- I'll take that back, sir.

Your last involvement in Butare was when, the last time you lived in Butare?

A.   I lived in Butare as a judge and I was in law school there, but I never taught.  It's very strange.  I have never been a teacher.

Q.   So from the time Munyemana left in 1984 on his assignment to the Service de Renseignement, were you aware of what specific assignments he was given within the service?

A.   I wouldn't know.  I know just he was detached and worked there for the Service de Renseignement, but I didn't know his position.

Q.   So you have no idea of what his assignments were within the service?

A.   I have no idea.

Q.   Do you know whether he attended political parties -- I'm sorry, public political rallies of the MRND?

A.   I am not aware of that.

Q.   Okay.  But if he did attend political parties of the MRND, would that affect your opinion about whether he was politically active?

A.   I would be surprised.

Q.   All right.  It would be surprising because it would certainly indicate anybody who attends those political rallies is probably a member of that party, correct?

MR. MCGINTY:  Objection.

THE COURT:  Sustained.

Q.   Why would it surprise you, sir, to learn that Mr. Munyemana attended MRND public rallies?

A.   From what I knew from his profession, he was a professional, I would be surprised that he was attending political party meetings; that he was a professional so I would be surprised.

Q.   Would you be surprised because in your experience in Rwanda people who attended political rallies were members of the party whose rally they were attending?

MR. MCGINTY:  Objection.

THE COURT:  Sustained.

Q.   Now, in your job as a member of the judiciary were you familiar with the statute that established RTLM Radio?

A.   As a what?

Q.   Were you familiar with the statute; did you ever read the statute or see the statute that established RTLM Radio?

A.   Never.

Q.   You never had occasion to look at it?

A.   I had no, I had no business of looking at that, because that was a private thing.  It was not in my profession to look into their studies.

Q.   But you're aware, of course, that there was a statute passed by the Rwandan legislature establishing RTLM Radio, correct?

A.   I'm not aware of that.

MR. CAPIN:  May I approach, your Honor?

THE COURT:  You may.

A.   This is not a government document.  This is a private document.

Q.   Well, that's a private printout of a document which Mr. McGinty has as well.  That is a copy of a statute under Rwandan law, is it not?

A.   No, that's -- I think there is a confusion here. Statutes here, how do you say this -- a corporation can have a government document indicating what they are doing and so on, and the members of the board and so on and so forth, but that is not, that is not a law.

Q.   I see.  So, okay, I think we had a different understanding.  Thank you for that clarification.

A.   Yes.

Q.   So the thing that established RTLM was not a law?

A.   Right, it's not.

Q.   It's simply sort of -- it's akin to articles of incorporation or organization?

A.   No, that's their intent.  It's their document.  It's not a government document.

Q.   Thank you, but were you familiar with RTLM during your time in Rwanda?

A.   I'm not.

Q.   You never heard about RTLM?

A.   I heard about it, but I'm not a member of it, and I didn't appreciate what they were doing so....

Q.   In what sense did you not appreciate what they were doing?

A.   It's public knowledge that they were inciting, during the genocide they were inciting violence.

Q.   It's public what?

A.   It's public knowledge that they were inciting people to kill, that's all so --

Q.   I see, so --

A.   I don't believe --

Q.   -- it was well known by anybody in Rwanda in the time leading up to the genocide that RTLM was a radio station inciting people to kill, is that correct?

A.   During the genocide.

Q.   During the genocide?

A.   During the genocide it was a station just doing propaganda like oppositional media; that's all.

Q.   I'm sorry, I didn't catch the last part of your answer, sir?

A.   Political parties had their media, their magazines, news, and so on.

Q.   But there were only two radio stations, correct?

A.   No, there were more than that.

Q.   Oh.

A.   There was a.m., there was Hotel Rwanda, there was all those radios stations that were just --

Q.   And the message of RTLM was to incite violence against Tutsi at least during the genocide?

A.   During the genocide they did incite people to kill.

Q.   And that was commonly known by all Rwandans, correct?

A.   During the genocide, yes.

Q.   Now, when you went to law school in Butare, did you meet the rector of the university?

A.   The director?

Q.   The rector.

A.   Yes, I did, sir.

Q.   Was that Maurice Ntahobali?

A.   No.

Q.   Do you know who Maurice Ntahobali is?

A.   He was the rector of Institute National, which were

handling the training of teachers, but during the genocide he was no longer there.

Q. He was what, I'm sorry?

A. During the genocide he was no longer there.

Q. Did you know his wife Pauline Nyiramasuhuko?

A. I knew him as a minister, but I had no way of knowing her.

Q. So when the genocide began, you fled from Kigali to Gitarama, correct?

A. Kabwayi.

Q. Kabwayi?

A. Yep.

Q. And you were aware of the violence happening throughout Rwanda at that time?

A. I was aware of that, but I was not myself.

Q. And when we were talking a moment ago about members of the interim government specifically inciting violence, you were aware, for example, that the president himself Sindikubwabo, specifically incited violence in the early days of the genocide, correct?

A. I don't recall anything specific about that. It was alleged that he pronounced a speech in Butare which incited the people to kill.

Q. Would you repeat that answer, please?

A. Excuse me?

Q. I didn't catch the last part of what you said. Repeat that, please?

A. I said it was alleged that when he went to Butare he incited the people to kill.

Q. Were you not aware as a historical matter that on April 1, 1994, Sindikubwabo gave a speech at the stadium in Butare inciting people to kill?

A. That's what I said. I heard about that.

Q. And that speech as well was widely known by all citizens of Rwanda at that time, correct?

A. What people who heard his speech and heard him, yes, I knew that.

Q. Now, how did you first come to this country? What was your immigration status, sir?

A. I came here as a refugee.

Q. And as a refugee, did you have to provide certain information to immigration authorities in connection with your application?

A. Yes, I did.

Q. And were you interviewed as part of that process?

A. I was.

Q. And during that interview did you understand as a trained lawyer that it was important to give complete and truthful answers?

A. Yes, I did.

Q.   Because you know that the answers you give may be material to whether or not you get in this case refugee status, correct?

A.   Yes.

Q.   And you know that immigration authorities need complete and candid and accurate information in order to determine whether you're eligible for refugee status?

A.   Yes.

Q.   And you understand as someone trained in the law that if you had lied or had been evasive or had concealed facts to immigration authorities, that would have been a crime?

A.   Uh-hum.

Q.   And you have no idea what the defendant in this case said to the Department of State authorities when she signed the visa, do you?

A.   I have no idea.

        MR. MCGINTY:   Objection, your Honor.

        THE COURT:   Overruled.

Q.   You have no idea, correct?

A.   I have no idea.

Q.   And you have no idea similarly about what she said about what her husband did for a living?

A.   I don't know.

Q.   And you don't know what she said about her own party affiliation?

A.   I don't know.

Q.   And you don't know anything about what she, what she testified that she saw or didn't see in Butare during the genocide?

A.   I don't know.

MR. CAPIN:   Nothing further, your Honor.

THE COURT:   Anything, Mr. McGinty?

MR. MCGINTY:   Yes, your Honor.

REDIRECT EXAMINATION BY MR. MCGINTY:

Q.   Mr. Kamanzi, how long can a person be detached from their position?

A.   Like I said, it was a temporary position.  When the department where you were detached did not want your services, they would ask your initial profession to take you back or you are safe.  You should ask to go back to what department where you came from, so in this sense the detachment was temporary and the rationale behind that is that when you chose to be a member of a profession, you have a reason so you shouldn't be -- how do I say -- you shouldn't lose that by being permanently detached.

Q.   Now, Mr. Capin showed you a document -- our screens are dead.

THE CLERK:   Oh, I turned it off because I wanted to see where that noise was coming from.  They're on now.

Q.   Now, Mr. Capin showed you this document, did he not?

57

A.    Yes, he did.

Q.    And on the document it refers to a permanent assignment, do you see that?

A.    Yes.

Q.    And it says that on "3/12/84 assigned to A.C. to the rank of S.A.," do you see that?

A.    Yes.

Q.    Now, I want to show you that document.  The word used there is "assigned."  I want to show you that document in French.  This too is the French document from which this document was translated.

      Do you see that document?

A.    Yep.

Q.    Now, on that document it refers to -- in the place where the document that Mr. Capin had showed you, it referred to "assigned" here?

A.    Uh-hum.

Q.    What is the French word that is associated with that translation?

A.    Can you bring it up again?

Q.    Certainly.  So referring here to the "3/12," now, would that be correct that that's March the 12th, '84; the convention being you start with the, with the date and then the month and then the year?

A.    Okay.

Q.   Okay.  And it says:  "Assigned to A.C. to the rank of S.A."?

A.   Okay.

Q.   Okay.  Now, let me get this all on one page.

A.   Okay.  Okay.

Q.   Does that help?

A.   Yeah.

Q.   Now, what's the word that is in the original that relates to the word translated as assigned?

A.   It is "detachi."

Q.   And what does detachi means?

A.   It's detachment.  It means that you are there as somebody coming from another department.

Q.   Now, does this note tend to confirm a separation from the position of deputy prosecutor or that the person continued to be detached from his position as deputy prosecutor?

A.   To me he continues to be a prosecutor, a public prosecutor, and he is detached.  He is lent to this department.

Q.   Thank you.

A.   And as a matter of fact, when they say "permanent assignment," it's not a permanent assignment that's this, no, it's a permanent assignment as deputy prosecutor.

Q.   And so the reference there to "permanent assignment" is

the deputy public prosecutor?

A.   That's right.

Q.   Thank you.  Now, Mr. Capin talked about the judiciary in Rwanda as being highly politicized, right?  Do you recall him referring to it as highly politicized?

A.   Yeah.  He said that, yes.

Q.   Now, were you highly politicized?

A.   I said we are not.  We are not politicized.

Q.   How did you get your position?

A.   Through the proposal from the high council of magistrates which was in charge of creating, promoting discipline and an honest office and so forth.

Q.   And when you were hired initially by the judiciary, was it based on political considerations or was it a decision based upon your, your grade and your work in your academics at law school?

A.   It was based on my qualifications on what I have been doing since 1969.  It didn't just fall on me like that.

Q.   Now, Mr. Capin -- I'm sorry, I keep interrupting. Now, Mr. Capin referred to the coalition government; do you remember that line of questions?

A.   Yes.

Q.   Now, the coalition government that had existed from '92 included a prime minister of the MDR party; is that right?

A.   Yes.

Q.   And it included a multiparty group of persons who were part of a coalition government, correct?

A.   Right.

Q.   But the office of the president, that continued to be run by Habyiramana; am I right?

A.   Yes.

Q.   You had a prime minister's office which was dominated by the MDR party, am I right?

A.   Yep.

Q.   And within that prime minister's office there were then ministries within that, correct?

A.   Yes.

Q.   And they included persons again of different parties again, am I right?

A.   Right.

Q.   What party if you know was Augustin Iyamuremye a party of?

A.   He was from a political party called Sociopatics.

Q.   So he was not part of the party of the prime minister, do I understand that right?

A.   He was not.

Q.   Notwithstanding that, he was expected to be part of a functioning government under the control of someone who was not a member of his party; do I understand that right?

A.   That's right, yes.

Q.   Now, after the genocide started the prime minister was almost immediately assassinated; is that correct?

A.   Yes.

Q.   The president had been killed, am I right?

A.   Yes.

Q.   A number of persons who were part of that government continued to function as part of that government, do I understand that right?

MR. CAPIN:  Objection, leading, your Honor.

THE COURT:  Yes.  I think you're doing a little more testifying than questioning, Mr. McGinty.

Q.   Do you know whether -- were there persons who were part of the coalition government who then were part of the government after the genocide started?

A.   I can't understand your question.  Say again.

Q.   Were some of the same people who were part of the, of the government that came into place in '92 --

A.   Uh-hum.

Q.   -- did some of them continue to be part of the government in '94?

A.   They continued.  Those who were not killed, they continued to be members of the government.

Q.   Now, there was a change in the presidency; am I right?

A.   Yes.

Q.   And the president at the time was a gentleman named

Sindikubwabo, correct?

A. Yes.

Q. His son-in-law was Augustin Iyamuremye, was he not?

A. Right.

Q. And he took the place of the assassinated Habyiramana, did he not?

A. Sindikubwabo, yes.

Q. Yes, and he was the person that was in Butare and gave a speech to incite hatred and killing, yes?

A. That's what I said, yes.

Q. Now, you yourself were targeted during the genocide?

A. I was.

Q. Can you tell the jury why that was?

A. Like I said, I was descendant of a mixed marriage; and as such, I was targeted. And as a matter of fact, my sister, my nephews, my nieces were killed by militia so I'm a victim of the genocide. These are horrible things, events, who affected me personally --

MR. MCGINTY: I have no further questions.

THE WITNESS: -- so I know there were many people who were killed by militias.

MR. MCGINTY: Thank you. I have no further questions.

THE COURT: Mr. Capin, anything further?

MR. CAPIN: Just two others, your Honor.

RECROSS-EXAMINATION BY MR. CAPIN:

Q. I'm terribly sorry, sir, for your loss during the genocide.

Your family members that were killed, were they Tutsi primarily?

A. They were killed by militia because they were attacked by the Tutsi. Like I said, this is a difficult position in Rwanda where you find yourself; you don't know who will kill you. They can come from either side.

Q. And am I correct in understanding that in Rwanda in 1994 it was not uncommon for Hutu Rwandans to have relatives who were Tutsi as well?

A. Yes.

Q. And, in fact, you know of instances where people who participated directly in the genocide killing Tutsi might have sheltered their own Tutsi family members at the same time?

A. Like I said before, there were horrible things that were happening, that happened.

Q. But my question, sir, is: was it -- I am correct in understanding, am I not, that it was not uncommon for Hutu involved in the genocide to at the same time protect and shelter their own Tutsi relatives; isn't that right?

A. Some did.

Q.   Yeah, because, because blood/family relationship was more important than ethnicity, right?

A.   I don't know.  In some cases, yes; but in other cases, you have people who kill their own.

Q.   And just a couple of last questions, sir.  You again said in response to Mr. McGinty with regard to this notion of the assignment of Munyemana to the Service de Renseignement, you called it temporary?

A.   I said in that instance it was temporary.

Q.   But you would agree, would you not, sir, that from 1984 when he was assigned to Service de Renseignement, Athanase Munyemana served out the rest of his career before, during, and through the genocide as a member of the Service de Renseignement?

A.   As a magistrate detached --

Q.   Okay.

A.   -- it was in his evaluation, and the high council continued to direct him, to follow him so they could call him any time.

Q.   But he was working directly in the Service de Renseignement, correct?

A.   Correct.

Q.   Under Habyiramana working in the president's office, correct?

A.   Habyiramana and the prime minister who was in a

oppositional party.

Q. Okay. But before the opposition time under Habyiramana, he was working in the president's office, correct?

A. Yes.

Q. And under -- during multiparty working in the prime minister's office?

A. Yes.

Q. And you're aware, sir, that it was not uncommon during the multiparty period for Habyiramana to assign people in essence to be spies in other ministries?

A. I'm not aware of that.

MR. CAPIN: Fair enough. Nothing further.

THE COURT: Thank you very much, Mr. Kamanzi.

THE WITNESS: Thank you, your Honor.

MR. MCGINTY: Your Honor, the defense calls Sixbert Musangamfura.

THE CLERK: Good morning.

THE WITNESS: Good morning.

THE CLERK: Please raise your right hand.

(Sixbert Erick Musangamfura duly sworn.)

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: My name is Sixbert Musangamfura.

DIRECT EXAMINATION BY MR. MCGINTY:

Q.   Good morning, Mr. Musangamfura.  How are you?

A.   Very good, sir.

Q.   Where were you born?

A.   Gikongoro.

THE COURT:  I'm sorry, could you have him spell his name?

Q.   Sorry.  Can you spell your name out, please?

A.   M-u-s-a-n-g-a-m-f-u-r-a.

Q.   Now, sir, where were you born?

A.   Gikongoro.

Q.   And where is that?

A.   It's in the south of Rwanda.

Q.   And what is your ethnicity?

A.   I am from the ethnic group of Hutu.

Q.   If you could kindly just raise your voice just a little bit, if I might bring this over to you, and I'm sorry your ethnicity is?

A.   A Hutu ethnic group, sir.

Q.   Can you tell us what your higher education is?

A.   I studied in the Rwandan National University, history and geography.  I majored in history.

Q.   And when did you end your studies?

A.   In '87.

Q.   And in '87 did you begin work?

A.   Yep, I did.

Q.   And where was that?

A.   I worked for the Government of Rwanda, Ministry for Interior, but at that time I was giving a radio program, an educational program on a national radio station.

Q.   And was that part of your work with the interior ministry to be doing this, this radio work?

A.   Yes.  It was an educational organization, yes.

Q.   And how long did you do that radio work?

A.   I did it until 1989.

Q.   And how long were you with the interior ministry itself?

A.   I continued until 1990 because at that time I moved to a rural area where I was doing educational programs with a corporation I directed.

Q.   Now, was there some other activity that you had begun in 1990?

A.   I started a newspaper.  It was the first independent weekly in Rwanda.  It was in '90.

Q.   And what was the name of this independent weekly?

A.   Isibo, I-s-i-b-o.

Q.   And did that stand for something?

A.   Yeah, it was -- I'm sorry, we were struggling for political space in Rwanda and freedoms.

Q.   And did the name indicate something, Isibo?

A.   The name indicates competition.  Competition, yes.

Q.   Now, is it through Isibo that you had met Athanase

Munyemana?

A.   Yeah, that's correct, sir.

Q.   Now, when you talk about what Isibo was for, can you tell us what the objectives were that you had when you first created it?

A.   Come again?

Q.   Can you tell us what the objectives were, what you hoped to be able to express when you started Isibo?

A.   Initially, we wanted to be a voice for the voice writers because the public media were eliminating the area, and we just wanted to be a voice so we could encourage and fight for opening up the political space, freedoms, human rights.

Q.   Now, were there other newspapers that were being published at that time?

A.   There was another weekly that was big, which was Inuatto Weekly in Bajo.  The name says "The Truth," and it belong to the government, and it was a military government and dictatorship so you can imagine what kind of news that were there at that time.

Q.   Okay.  Now, so when you started your newspaper, were there other competing newspapers out there at the time trying to give a voice in the way you were?

A.   At that time there came other newspapers, but they were monthlies and maybe one issue in three months.  So it was

the only one that was independent, private, weekly.  It was the only one we had.

Q.   Now, when you say "independent," do you mean independent of the Rwandan government?

A.   Yes, sir, that's correct.

Q.   Was that a brave thing to do at the time?

A.   I think it was my duty.  I felt that we had to talk. We felt that we needed to fight for the rights of the people who didn't have anywhere to talk.

Q.   Now, do you recall your first issue, the first issue that you put out?

A.   I do.

Q.   How many were -- and how many issues in that first issue or how many copies were in your first issue?

A.   Well, we had 1,000 copies, yes.

Q.   Okay, and how did you distribute them?

A.   We put them out and we were setting them out on the street and -- especially on the streets, yes.

Q.   And what was the reaction to this first publication of Isibo?

A.   The first reaction was, when it came out, it was something that didn't happen before, and people were all talking about that, that you finish it the same evening, and they were talking about corruption when the government was saying there was no corruption here.

So we were seen like heroes at that time, and the next day I went to jail. From that time I think I've been arrested, until 1994 I've been arrested over 12 times.

Q. Did you publish weekly?

A. Yeah, we did. Maybe sometimes we would miss a day, but we did -- we tried to keep it current.

Q. And when you say "you were arrested," were you taken into actual custody?

A. Actually, well, I've been arrested and I stayed in the, in the cells, and there was a time I was arrested by the intelligence service. Actually, I was kept for three days in what they call the backyard of the presidential office. That was an internal secret organization that put us there.

Q. Now, if I might just back up for a second. In 1991 did you make a particular report about the Kigali area?

A. Yes, I did.

Q. And what was that report?

A. The pavilion in the end of -- in 1990 the Government of Rwanda told us that, they told the population that the war has ended, and that the government has won; and the pavilion suddenly in January 1991, they attacked Ruhengeri prison, which was the strongest prison in Rwanda where political prisoners were, and they attacked the prison itself. They were afraid of being detected by the RFP.

I wrote on the front page comparing it to the

operation of Israel in Uganda at Entebbe.

Q.   I'm sorry, comparing it to the operation of?

A.   They attack the prison in Ruhengeri took political refugees, and the officers who were in jail there, they took them with them, and it happened when the government was saying the war has ended.

Q.   So this, so this was a big prison break --

A.   Yeah.

Q.   -- by RPF forces that were coming in from the Uganda area, do I understand that right?

A.   That's correct.

Q.   And it was a big story?

A.   Yeah, it was.  It was.

Q.   How did the government react to that story?

A.   Actually, it was -- I think they were devastated, and they had -- the public media had the duty to tell.  I mean, to minimize it and to say:  Yeah, they tried, and the people who they've taken, they just attacked criminals who went to jail, to prison, and the people were expecting independent media to talk about that.

        Of course, the international media was commencing largely that operation.  I'm the only one that had commented that and compared that to the operation of Israel to when they attacked Entebbe International Airport in Uganda to free hostages.

Q.   Okay.  Now, this is the event that you were describing a few moments ago where you were taken into custody by, by officers of the intelligence service; am I right?

A.   Yeah, that's right.

Q.   Okay, and you mentioned that you were held for a time; how long were you held?

A.   Three days.

Q.   How were you treated?

A.   Pardon?

Q.   How were you treated while you were held?

A.   Actually, I was beaten up.  We released the newspaper. It was in the afternoon.  I went back to Kibeho.  Because I was scared actually to stay in Kigali, I went to Kibeho and early that morning the house was surrounded, and they just took me and just they took me to their headquarters.  And I stayed there for three days, no eating, nothing, violence and threats.

Q.   Now, at some point you were brought to a room, do you recall?

A.   I was taken to different rooms during the interrogation. If we are talking about how I met the person who removed and released me from there?

Q.   Yes.

A.   Yeah.

Q.   So at some point did someone come in or did you go into

a room and someone was in the room?

A.   Yeah.   They call me after three days into that room where there was a person who had been actually interrogating me.   One of the four had been interrogating me regularly. Then there was another person who introduced himself and said he was Athanase Munyemana.

Q.   Had you met him before?

A.   No.

Q.   So he comes in and introduces himself, do I understand that right?

A.   Yes, that's correct.

Q.   And what did he do?

A.   Actually, I tell you, he gave me his hand and said, he said:  My name is Athanase Munyemana.  I am sorry.  I have reviewed your case.  You are free to go.

Q.   Now, in your presence did he look at the file; did he look at any of the papers?

A.   Yeah, he had a bunch of papers, all the things that I had been interrogated by, and they were signed and he had that, yes.

Q.   And had anyone else in those three days shook your hand?

A.   No.

Q.   Or treated you like a human being?

A.   What I can say is that people there were rude, and

that's how we knew even it was the intelligence service at that time.  They were rude.  It was the first time someone gave me a hand, and I was actually surprised.

Q.   Okay.  And how did he present himself to you, if you could describe that?

A.   In terms of?

Q.   In terms of how he looked, how he behaved toward you?

A.   I think he avoided my eyes.  He avoided me, yeah.

Q.   And what did he say to you?

A.   He said:  I'm sorry I put you through this.  You are free to go.

Q.   And were you then --

A.   Yeah.

Q.   -- released?

A.   Yeah, I was released.  Actually, I walked out of that. I said:  I can go?  He said:  Yeah, just go, go.  Then, I left.

Q.   Now, after this arrest and your release, did you get any international attention?

A.   Yeah.  When I was arrested, I guess there had been some pressure from embassies, and, actually, I think the following day I went to the American embassy.  From that time I'd been talking to staff from the embassy.  I was referred some training, even here in the U.S., and in other African countries so I got some attention, that's correct.

Q.   And you were offered training, did you follow up on the training?

A.   Yeah, I did.

Q.   And where did you go?

A.   I came here.  I've been to different cities visiting different kinds of media.  The thing was just, it was just because of the media we had at that time in Rwanda, it was something that was new, and we did need training, and the first -- the best training I got was just to see how everything worked.

Q.   Did you visit newspapers --

A.   Yes, I did.

Q.   -- in the United States?

A.   I did, yeah.

Q.   Where did you visit?

A.   I went to -- first I went to New York.  We visited some African media, even media from people from Israel.  We went to San Antonio.  We went to Santa Faye, Cleveland, Hartford, Washington, D.C.

Q.   And did you bring what you learned back to Rwanda in terms of developing your Isibo weekly?

A.   Yes, definitely.  I think the first computer I used, I mean, the first laptop I used, I got it from here; I was using it for media operations so I got it from here.  It was from the U.S., and they used to say that, yeah, now because

of the work they do it's better here than there.

Q.    Now, at the time were you a member of any political party?

A.    Yes.  I was close to MDR opposition party, yes.

Q.    Okay.  And the MDR, what was the MDR party; what did it stand for?

A.    Democracy and human rights.

Q.    And was the MDR part of the coalition government that was then part of the Government of Rwanda?

A.    Actually, before the political space was sealed until I think 1991, that was when the political parties -- it was just at that time, and they start to arrest.  And because of the war, an agreement was reached to have a transitional government, and the opposition was part of the agenda of the government.

THE COURT:  Mr. McGinty, why don't we stop here for the morning.  It's about five of 11.  All right.  Jurors, let's take the 25-minute recess, and we'll return to hear the rest of the witness.

THE CLERK:  All rise.

(Whereupon, a brief recess convened at 10:55 a.m.)

THE CLERK:  All rise for the jurors.  All rise for this Honorable Court.  All rise.  Court is in session.

MR. MCGINTY:  May I proceed, your Honor?

THE COURT:  You may.

Q.   Thank you.  When you were speaking a few moments ago --
let me change the subject just a little bit.  You were, you
were involved with the media in Rwanda; is that right?

A.   Yes.

Q.   And you were involved with the print media, correct?

A.   Yes, that's correct.

Q.   I want to ask you about a radio station:  RTLM, do you
remember that radio station?

A.   I do.

Q.   And do you remember what it was intended to be at the
start?

A.   At the start it was a time when Rwanda was seeing so
many newspapers that I had the idea to create and promote
new media was there to the opening of -- I mean, it came out
of the freedom of speech, so RTLM was that in principle; it
was seen like one of another media, just to give the words
to the people.

Q.   Okay.  Now, do you know at the inception what its
target audience was and what its, what its program was going
to be?

A.   Actually, they were a bit vague on that.  They weren't
that clear, but what was clear is that it's a new media.  We
only had a radio station that belonged to the government,
and that one was private.  So what you see in the print
media and private, the quality was better because the

debate was -- there was more debate than when it was under the control of the government so people thought it was something that was going to be private and independent.

Q.   Okay.  And up until that point there was one radio station in Rwanda, am I right?

A.   Yeah, that's correct.

Q.   And that was Radio Rwanda?

A.   Yeah, that's correct.

Q.   And would it be fair to say that the programming on Radio Rwanda was dry?

A.   Yeah, it's correct.  It was just, I remember the news, if it was, let's say, ten minutes news, it was about the president and his ministers for almost 90 minutes so it was just for propaganda.

Q.   Now, would you agree with the statement that the RTLM station was meant to be a voice of the people; would you agree with that statement?

A.   Actually, they said that when they started, and they attracted so many people who believed in it.

Q.   Okay, and that it was also meant to reach out to ordinary citizens in its programming?

A.   Yes.

Q.   And that it was intended to play the latest music, popular music?

A.   Yeah, they did that when they started.

Q.   And that was the means by which it developed its audience?

A.   Yes.

Q.   And it also permitted call-in shows where people could call in and get their voice on the radio?

A.   Yeah.

Q.   And this was rather a novelty in Rwanda, am I right?

A.   Yes.

Q.   So a subscription price was set up that was low enough for people to contribute to the radio station?

A.   Yeah.

Q.   Now, RTLM changed, didn't it?

A.   Yes, it did.  It did.

Q.   Now, because you were in the media when did you start noticing the change?

A.   Actually, personally, at first, I noticed when they started recruiting the staff.  There was the noise about the new radio station playing on a.m. soon.  Then, when we saw that they were recruiting directors, editors-in-chief, there were no artists.  The colleagues in the media who have been extremists being appointed to their senior positions, we said:  What is this radio station?

    And that was in the beginning when they started their programs, that's when they appointed the directors, editors-in-chief, and the other department -- head of

different sections of the radio station.

Q.   All right.  So you -- if I might say this, you recognized the names of some of the people in the media that were getting hired at RTLM?

A.   Yes, that's correct.

Q.   Do I understand that?  And you knew what their politics were, am I right?

A.   Yes.

Q.   So do I understand that because you were in the media and you knew these people, you began to see what the staffing was going to be; am I right?

A.   Yes, I --

MR. CAPIN:  Your Honor, I object to the leading nature of these questions.

THE COURT:  It could be a little less leading, Mr. McGinty.

Q.   So as you noticed these staffing changes, what were you beginning to perceive?

A.   Well, I tell you when I saw the people they were bringing in, I understood that if you bring in extremists, then it will be a voice of the extremists, but the people who had been subscribed, they didn't know until they realized that it was a monster.

Q.   Now, the subscription price for people to pay, do you know what that was?

A.   The subscription?

Q.   Right.  Do you know what that subscription was?

A.   I think it was 5,001 francs.

Q.   Do you know approximately what that was at the time in U.S. dollars, any idea?

A.   You mean now?

Q.   Do you know what it might have been at the time?

A.   At the time in U.S. dollars maybe ... let's see, maybe $20 or --

Q.   Now, you're just making an estimate of that, right?

A.   Yeah, it was an estimate, $20, about, I think; I'm not sure.

Q.   Now, do you know whether among the subscribers to RTLM included any persons who later became members of the RPF government?

A.   Yeah, I know.

Q.   And do you know, do you know of persons who were subscribers who were just ordinary citizens?

A.   Yeah, I do.

Q.   Now, RTLM at some point became a voice for hate radio in Rwanda; am I right?

A.   That's correct.

Q.   Now, when did RTLM become -- turn the corner and start becoming a virulent voice of hatred in Rwanda?

A.   Actually, I stated that before.  When you bring in

extremists and you give to them the microphone, that's the language they had in the mouth, and that's what they showed to the people at that time and we saw that immediately.

Q.   When did they show that?

A.   Of course there was a claim that we were in a war, the country was in a war, and then when they started their programs, of course, after -- apart from the music and their entertainment and their bringing in programs, they would commenting about political parties, and the comments against the opposition was terrible so then we saw that it was a new voice for them.

Q.   And did that become increasingly virulent over time?

A.   Yeah, definitely.

Q.   And what happened when the genocide started in the programming at RTLM?

A.   Then, they became the voice for the genocide, encouraging people to kill people, and giving directions, even relaying some information to where people were hiding and things like that.

Q.   Now, when you were doing your reporting at Isibo, did part of your reporting include covering the Arusha negotiations?

A.   Yes, that's true.

Q.   All right, and in that coverage did you meet people?

A.   Yes, I did.

Q.    And who were you meeting when you went to cover the Arusha negotiations?

A.    Who I met?

Q.    Yes.

A.    I met, I met members of the pavilion, their delegates to the government; I met even the delegates from the government side, and observers, followers, diplomats.  I've gone there, I've covered all the negotiations.  I've gone in there almost every time they were meeting there.

Q.    So did you meet the opposing parties --

A.    I did.

Q.    -- as part of your reporting?

A.    I did.

Q.    Now, I want to bring your attention to the assignation of Habyiramana; do you remember that?

A.    I do.

Q.    Where were you when you learned of that?

A.    I was home.  It was just after work.  I was just home and something had occurred in our home.

Q.    And do you remember what you did?

A.    The first thing I did was, as a journalist, I tried to call, to confirm if the information was true.  Because even if you were calling and saying -- listening to RTLM and saying that Habyiramana had been assassinated, then the thing to do was just to call to get the information

confirmed, to ask what were the reactions in different parts of the city; what was the official guards doing, what was everybody doing, was there some panic?

Q.   And among other things did you call the American embassy?

A.   Yes, I did.  I called the DCM of the embassy, a Joyce Leader.

Q.   And what does DCM mean?

A.   Deputy Chief of Mission, yeah.

Q.   And that was Joyce Leader, and what was your conversation with her?

        MR. CAPIN:  Objection, your Honor.

        THE COURT:  Overruled.

Q.   And what was your conversation with her?

A.   She confirmed that the rumors of the president assignation was true, and she saying that according to the information they had at that time that things were supposed to go bad, and she requested me to look out for -- to concentrate on my family and myself at that time.

Q.   Okay, and do you recall the -- were you married at the time?

A.   Yes, I was.

Q.   Did you have any children?

A.   I had children, yeah.

Q.   And what were the ages of your children?

A.    Three and two.

Q.    And when she told you to look out for your own safety, what did you understand that to mean?

A.    Actually, there had been assassinations of other political leaders in the, in the recent months before that, and we knew there was some kind of treason.  When someone was assassinated from the opposition, opposition people were blaming immediately the government, the other side.  When it was someone from the ruling party, they were blaming Tutsi and even from the opposition.  So we'd been a target so many times whenever there were, whenever there were assassinations of officials.  So it was clear that there were even the roadblocks in Hamara at that time.  The situation was really tense even before the assignation.

Q.    Now, what happened to you at your home?

A.    My phone went silent.  Then, I went to the neighbors because I -- I wanted to stay in touch with people to follow and to know what was happening.

And I went to the neighbors and I tried to call some other people and they said:  Please, it's better to get your family away, and you don't go back to the house until you know where things are going.

Q.    What happened at your house?

A.    My house was attacked, not the day after, but the following day, and a part of the house was destroyed.

Q.   Were you there at the time?

A.   No, I wasn't.

Q.   And where was your family?

A.   My family was hiding.  We had a neighbor who was by name of Cheri Manetti (phonetic), and we'd been neighbors, and I used to have a car and to give her a ride to -- either him or the wife, when they were going to work so they just accepted to take us, to hide us.

Q.   And was that to hide your family or you or just your family?

A.   My family.  At first, I went there; the family joined, and then they advised me just to move away.  And even myself, I mean I understood because at that time the killings had started, and, I mean, in the country.  And they were looking for people, even the rebellion was calling:  Look for them and kill all of them, finish as many people as you can get.

     Then, I understood that to stay with the children and the wife was to expose them.  I decided just to move to another hide out nearby, so in my mind if I was found by the militia, I will die alone and they will survive.

Q.   Now, did you manage to get rescued?

A.   Yeah.  Actually, the following day after that they send some people.  They evacuated me and took me to their stronghold, and at the end they went to the Bujumbura where I stayed there until the end of the war with my family.

Q.   So when you say "the rebellion," the people in the rebellion found you, can you tell the jury who the people in the rebellion are?

A.   There weren't any necessarily, but most of them -- the rebellion was created by former refugees, Tutsi refugees, who were especially in Uganda, and at that time it was a time of change; we had a democratic opposition inside the country, and it was announced that --

Q.   I guess I'm sorry, I should have made my question a little more precise.  Was it RPF that came to rescue you?

A.   Yes, that's correct.

Q.   -- in Kigali?

A.   Yes, that's correct.

Q.   And can you just describe, were they RPF soldiers; who were the RPF people to take you from Kigali and bring you to Bujumbura?

A.   I don't understand the question, sir.

Q.   I'm just asking, were these RPF soldiers who came to --

A.   Yes.

Q.   Okay, and they found you at a hiding place?

A.   Yes.

Q.   And how did they take you out?

A.   No.  Actually, I was evacuated from there, and then just they took me to a place, an area under their control, with my family and the other people they were looking for.

Until the end of the war I stayed there.

Q.   So you were in safekeeping of the RPF, do I understand that right?

A.   I was --

Q.   You were in the safekeeping of the RPF?

A.   Yes, that's correct.

Q.   So you basically had gone from Kigali to the north of Rwanda which was under control of the RPF?

A.   Yes.

Q.   Now, did you begin to have conversations with people in the RPF about a role for you?

A.   No.  Actually, at that time, at that time there were mostly stakes in the country about modern thinking of what will become of us?  We didn't know how the war would end. All the way from Kigali to Bujumbura, the information that we were getting was terrible.  People -- the country was destroyed, and it wasn't a time to think of what would become of it.

Q.   All right.  Now, did you at some point become involved in efforts to create a government that would --

A.   Yes, I did.

Q.   And can you just describe for the jury what exactly that involved?

A.   When the -- actually, early in June when the, when the rebellion was going to seize the state power, it was the

time to think about how to rebuild.  There was, there was this peace acumen that was there.  It was -- I will rephrase.

I was too close to the person who was supposed to be the prime minister of that post, position.  I mean, that peace accord, the prime minister; I was too close to him, and I was sent a telegram by RPF to Kampala with some other colleagues to try to talk to Mr. Faustin Twagiramungu who became prime minister, because he was a bit reluctant to come back.

He was saying:  Yes, let's talk when the war -- after the war has ended.  And then they said:  We should be ready. When we reach Kigali, we should be ready up to appoint a government, and you are the person who has been designated for that.

Q.   So you went to Kampala, do I understand that correct?

A.   Yes, I did.

Q.   And there were efforts made to get the prime -- the designate a prime minister of Arusha, of course?

A.   Yes.

Q.   To join on in the new government that would run Rwanda, is that right?

A.   Yes.

Q.   And in that, in that effort, what steps did you take to try to encourage people to become part of this new government for Rwanda?

A.   Actually, as a person who has been during that time in the rebellion stronghold, there were so many rumors and people wanted to know if it was true or not.  They said, They are killing Hutus.  They are doing bad things there. You've been there; tell us, what is happening?

I said:  It's good if you come and you join this government.  Then we can shape what we want our country to be after this tragedy.  That was, I tell you, I think that's the role I had at that time.

And after when we went back to Kigali, we arranged, I think, two meetings.  There were people from RPF and people from oppositional parties just to discuss about how we will choose the government.  And when the government was appointed, I had been the first person who was writing meetings of the cabinet meetings, and I did that work until I was appointed to something else.

Q.   So when was the new government appointed?

A.   The 19th of July, 1994.

Q.   And what was your function in connection with that new government?

A.   At that time I was secretary general of the cabinet, and I was the person who was in charge of writing down the meetings and preparing the cabinet meetings.

Q.   Okay, and did you in that connection attend all the cabinet meetings to discuss the new structure of government?

A.   Yes, I did.  I did.

Q.   Now, at some point did you get appointed to a different position?

A.   In August I was appointed to the internal secretary organization, the Service de Renseignement in French.

Q.   Okay, and is this the same service that had been led by Augustin Iyamuremye?

A.   Yes, that's correct.

Q.   So when you were appointed to the service, what was the condition of the service in terms of personnel and in terms of its administration?

A.   When I was appointed there, actually all we had was literally a building and no staff, no equipment; it was only a building.  And when we talk about a national intelligence organization, it means a huge network; we didn't have anybody.

Q.   So how many persons did you have on staff at the time?

A.   At the time when I started?

Q.   Yes.

A.   I think I got about ten, around ten people who came from I think in the past who had been working there.  About ten, and we start looking for other people.  And, actually, it was the whole administration in Rwanda, all ministries, they were issuing not calling people to come back and to join their work saying the government has resumed.

Wherever you are, if you get this message, come back.

Q.   Okay.  Now, what steps did you take to try to build this Service de Renseignement.  Forgive the bumbling of the words.  What steps did you take to try to rebuild the service?

A.   The first thing I was supposed to do, and that's what I did at that time, it was to think of who was there and where are those people?  Because even to appoint new people in different positions, we needed to know their whereabouts, the whereabouts of the people who were in those offices.  Are they alive or dead?  What has been their role in this tragedy?  What they have done during all this time?

That was the first thing to do, especially I'm talking about senior officers who were, who were -- who had been working there as directors, chief of department.

Q.   So did you look into the conduct during the war, during the genocide, of persons who were senior personnel in the service?

A.   Yes, I did.

Q.   Now, did that include the conduct of Athanase Munyemana?

A.   Yes, that's correct.

Q.   What steps did you try to learn about the background of persons and what they might have done during the genocide?

A.   The first thing was to talk to people who knew them.

Luckily, Iyamuremye was just the person prior there when I took over for the service so he was my first source and --

Q.   If I might just interrupt you there for a second.  So you actually went to Augustin Iyamuremye to talk to him?

A.   Yes, I did.

Q.   And do you remember specifically having a conversation with him about Athanase Munyemana?

A.   Yes.

Q.   And what were you looking to learn from him?

A.   Actually to know about the whereabouts of people, their conduct during that time, and even an accommodation:  would, as a person who had been working with him, and I did that even for other people who had been in the positions in that cabinet to know who are they, where are they, where have they been, what have they done during all this time?

Q.   What would you have -- would you have considered a person for -- would you consider bringing a person back if they had been extremists before the genocide or during the genocide?

A.   No.  Actually, if people had been well-informed, if we had some information that people had been involved in the killings, the approach was just to even to get them back and to put them in jail, but the priority at that time was to rebuild the service and the people who had been in office; they were working for a government, and you don't just kick

people out without knowing where they are, and you need to write down something.  You need to know what they've been doing during all that time so we had to investigate in detail.

Q.   What did Senator Iyamuremye tell you about Munyemana?

MR. CAPIN:  Objection, your Honor.

THE COURT:  I assume you're not offering this for the truth?

MR. MCGINTY:  I'm not.

THE COURT:  All right.

Q.   What did he tell you?

A.   He said that actually he commended most of the directors who were working under him.  He said they're okay, and especially during the whole genocide.  Actually, that service, that didn't function at all, at all.  Those people, they were just in hiding, and they were supposed to run the national intelligence service.

Q.   When you say that it was not functioning, how do you know that?

A.   I know that -- first, I know that if a service is functioning when you take over, you have some, you have some information that those people have been working.  They haven't.

Two, when -- the genocide didn't last for years and years; it lasted 100 days.  First, the government moved

from Kigali to Gitarama.  All those people were very busy taking their families away, trying to secure their families, and expecting instructions to go back to work.

And the government that was supposed to give instructions to go back to work, it was they run until it went out of the country.  Those people had been running to Gitarama, Butare, until they reached home.

Q.   And when you spoke to, when you spoke to Augustin Iyamuremye, did he make any specific recommendation about Mr. Munyemana?

A.   Yeah, he -- actually, he commended, he commended to me; he didn't give anything negative about the people who had been working, especially directors.  Because when he took over that service, the people who were close to all the people who were opposed to the change, actually, they didn't move to the service.  They stayed within the presidential premises, either working for the president or they were given different positions.

Q.   So if a person cleared this review process, did you take any steps to try to encourage them to come back?

A.   Yeah, we did.

Q.   And, generally, what sort of steps would you take to try to encourage a person to come back?

A.   The first one is to know, to locate the person, to know exactly where the person is; two, to know how to get to

that person, and even that's how we got to Iyamuremye.  We knew, we got information where he was, we knew the UN mission that was there to help bring him back to Kigali. Those were especially for senior people we were using, especially UNIMAR, that was in Kigali.

Q.   UNIMAR was the UN --

A.   Assistance mission, yeah, for Rwanda, or we could even use our contacts.  We were building up a network to bring people back and to give them security until they reach their appointment.

Q.   Okay.  Now, were you ever successful at reaching Mr. Athanase Munyemana?

A.   No.  No, we didn't.

Q.   As the head of the intelligence service, were you receiving reports relative to killings that were occurring by government soldiers?

A.   Government after the genocide?

Q.   Yes.

A.   Yeah, definitely, definitely.

Q.   Okay, and what was that; what was the general nature of that information?

MR. CAPIN:  Objection, your Honor.

THE COURT:  The general nature, all right.

Q.   What was the general nature of that information?

A.   Actually, when the war ended, the people who were

slaughtered were from the ethnic group of Tutsi, and most of the soldiers, the officers, at that time they were Tutsis.  They were officers and even soldiers who were involved in the prisons, so those killings, we had them alone on a daily basis and property; most of the people who took over at that time didn't have any property in Rwanda because they were refugees.  So those victorious soldiers, they reached the capital empty, and there were houses and so -- and so they're bringing their families from refugee houses and from other places out of Rwanda, so they needed places to keep them.

And the people there, I remember in Rwanda at that time people were struggling to, to reach fast and to get fast a house, and they used to write in Kinyarwanda (non-English unintelligible), "is taken."  Simply put, "is taken."

If someone then comes, you find him there, especially then, if it's a person who was in Rwanda before, who has been working for the dictatorship that was there, then that person will die.  That we used to have those -- that kind of information on a daily basis.

Q.   Was there also any information about activities in Kibeho?

A.   In Kibeho?

Q.   Yeah.

A.   Yeah.

Q.   Okay, and did you raise concerns about these issues within the cabinet?

A.   Yeah, we did, and it was -- we used to have, I'll tell you until the crisis that destroyed the -- I mean, the first post-genocide government, it was based on that. Differences on how to finish -- I mean, how to stop those killings after the genocide.

Q.   All right, and the killings you're talking about were what now?

MR. CAPIN:   Objection, your Honor.

THE COURT:   Overruled.

Q.   The killings that you're talking about that ripped apart the first post-genocide government, what killings are you referring to?

A.   There were other killings targeting ethnic killings. You mentioned Kibeho and --

Q.   And what was Kibeho?

A.   And even it started at that time in some areas.

Q.   What was the Kibeho occupancy?

A.   Kibeho?

Q.   Yes, and what was that incident; what happened there?

A.   They were -- it was a place where intelligence people stayed, Hutus.  The war has ended and we tell them:  you can go back to your properties.  Go back, get your properties,

and the war has ended.  The government is going to provide security.

That was the official message, and I believe that message was genuine at that time.  Then, they put a fuse and they said:  We don't trust this government.  There were extremists inside.  That one I'm sure, they were.

Then, suddenly, some minister officers, they give instruction to shoot, and over 4,000 people died there.  It was a terrible disaster, a terrible disaster.

Q.   Now, did you and other ministers raise concerns about these killings?

A.   Yeah, definitely.

Q.   Within the cabinet?

A.   Yeah.

Q.   And what was the result of raising these concerns within the cabinet?

MR. CAPIN:  Your Honor, I object to the relevance.

THE COURT:  Yes, I think we're beginning to get a little bit far afield.

MR. MCGINTY:  Just I'm wrapping this up, your Honor, if you'll just bear with me a moment?

THE COURT:  Okay, but I think we've gone a little far afield.  Do you think you can bring it in?

Q.   As a result of communications within the cabinet, what did you do?

A.   Actually, at that time clearly we -- we ended up having to elect two sides in the government.  Some, they were just saying:  if we don't stop this, and, actually, the then prime minister made an official speech on that.

He said:  You can't just say those are prisos (phonetic), and the Army is killing people and we are here. He said that on the national radio.  It was in the international media, so in the government there was like a rift; people who say those things we sort them out slowly, slowly, and others who say:  if we don't stop this, we should, we should -- we will be accountable if we don't stop this now.

Q.   And what happened to you?

A.   I tell you I was frightened, and that was the end of August.  I resigned, and I left the country.

Q.   Okay.  And when you resigned, did it have anything to do with concerns about your physical safety?

A.   Yeah, definitely.  We had a prefect; it was a governor of the Butare area.  Actually, that was a person who had been very vocal on the issue of killing.  He was assassinated, and, in fact, until now there has been no investigation.

At that time I was there, we, we give to the government the first, the first information we got about the assassination, how he was assassinated, and it was very

strange, it was never investigated, we understood.

Q.   Okay.  And as a result of that, were you concerned for your own safety?

A.   Yes, I was.

Q.   And why was that?

A.   I was concerned because I knew I've seen cases of people who were assassinated; and when -- after I left Rwanda, the people I left with, the then interior minister, Mr. Seth Sendashonga, we were ambushed in Nairobi in 1996.

At that time he stayed in the hospital for some days in 1998; then, he was assassinated in Nairobi.  At that time the Government of Kenya closed the Rwandan Embassy, and -- in 1996, and so the relations between Rwanda and Kenya went bad.

Kenya said they arrested a diplomat from the embassy and asked him, wanted this diplomat to waive immunity so they can prosecute; Rwanda refused, Kenya closed the embassy.  That is what happened.

Q.   Now, do you continue to be involved in political activities involving Rwanda?

A.   Yes, I am.

MR. CAPIN:  Objection, your Honor.

THE COURT:  Sustained.

Q.   And, finally, were you to return, if you were to return to Rwanda --

MR. CAPIN:  Objection, your Honor.

THE COURT:  Sustained.

MR. MCGINTY:  I have no further questions of this witness.

THE COURT:  Mr. Chakravarty?

MR. CHAKRAVARTY:  Thank you.

CROSS-EXAMINATION BY MR. CHAKRAVARTY:

Q.   You came here from Finland, is that right?

A.   That's correct, sir.

Q.   Thank you for joining us.  And you came here to testify for the Defendant, Prudence Kantengwa?

A.   Yes, sir.  I came here for justice, sir.

Q.   And do you know Prudence Kantengwa?

A.   No.

Q.   And you met Athanase Munyemana at one time?

A.   Yes.

Q.   You've described the environment in Rwanda during the Habyiramana administration, and it was I think in your words a dictatorship; is that fair to say?

A.   Yes.

Q.   And there was no dissent permitted in Rwanda, correct?

A.   Yes.

Q.   If you were to vocalize dissent, then you would be targeted by the government, correct?

A.   Yes.

Q.   And it was an MRND government, is that right?

A.   Yes.

Q.   In fact, there was only one political power --

A.   Yes.

Q.   Or political party allowed in the country, right?

A.   Yes.

Q.   And so at some point when it was mandatory for all of Rwandese, you too were obliged to be a member of the MRND, correct?

A.   Yes.

Q.   But even as early as 1990 you wanted to encourage freedom of speech so that the peoples' voices could be heard if they were opposed to the MRND, correct; is that right?

A.   (Witness nods head.)

Q.   I'm sorry.  I know you're nodding but the record can't pick up a nod as an affirmative, so you have to articulate yes or no.

A.   Yes.

Q.   So the way that you as a journalist felt that you might be able to start increasing the freedom of speech was to create a periodical, a magazine, called, I think it was: Isibo?

A.   Yes, that's correct.

Q.   And you told the jury that your political inclinations

were associated with a new political party that was forming once the multiparty system came into play called the MDR?

A.    Yes.

Q.    Now, the MDR is not the same thing as the MRND, correct?

A.    No.

Q.    MRND was Habyiramana's party that was the party in power, correct?

A.    Yes.

Q.    And MDR was an opposition party to that?

A.    Yes, sir.

Q.    And, in general, they wanted, MDR wanted, reforms in government, correct?

A.    Yes.

Q.    They wanted more political enfranchisements by people who were living in the country?

A.    Yes.

Q.    And you were part of that movement?

A.    Yes, I was in the -- yeah, I was part of that.  Yes.

Q.    And you were apparently a gifted journalist and very articulate because your magazine was quite influential, correct?

A.    Yes.

Q.    And people enjoyed reading it, and they enjoyed getting the other perspective, not just the MRND-governmental perspective, correct?

A.    Yes.

Q.    And I think you articulated that that was the real value that you were offering during that time after multiparties, that you were starting a dialogue and showing that it was possible to say critical things about the party in power, correct?

A.    Yes.

Q.    And in every democracy it is important to show that people are involved and to show that you can stand up and say -- disagree with government, correct; and you also described how in dictatorships, particularly in the Rwandan dictatorship, you did that at some great personal risk, correct?

A.    Yes.

Q.    And, in fact, some of that concern was actually realized?

A.    Yes.

Q.    Because Habyiramana ran a very tight ship and he had control over the different ministers in his government, correct?

A.    Yes.

Q.    And he had people that he appointed in positions of authority that were answerable to him, correct?  I'm sorry, again, I would just ask you to answer.

A.    Yes.

Q.   So if someone who was running the governmental branch or an organ refused to do something that Habyiramana wanted him to do, then that person was jeopardizing his own position, correct?

A.   Yes.

Q.   Maybe sometimes even his own life, is that fair to say?

A.   Yes.

Q.   And the Service de Renseignement, which in English translated roughly to intelligence service, correct?

A.   Yes.

Q.   That's a branch which you ultimately headed up after the genocide, correct?

A.   Yes.

Q.   That was Habyiramana's secret police, correct?

A.   Yes.

Q.   They were internal security?

A.   Uh-hum.

Q.   They were the agency that was responsible for determining who was being critical of the government?

A.   Yes.

Q.   Specifically, of Habyiramana himself?

A.   Yes.

Q.   Because that threatened Habyiramana's power, and so that was what you were concerned would be the arm of government that would censor you as the editor of Isibo?

A.   Yes.

Q.   And, in fact, that's exactly what happened?

A.   Yes.

Q.   It was the Service de Renseignement that kidnapped you and brought you to their headquarters, correct?

A.   Yes.

Q.   And their headquarters was, in fact, in the backyard, you said, of --

A.   Yes.

Q.   -- of the president's compound?

A.   Yes.

Q.   It was as close as you can be to the president?

A.   Yes, that's correct.

Q.   And it was there where over three days you went through hell when they were asking you questions interrogating you, not feeding you, just so they could extract information and so they could persuade you not to be critical of the president, correct?

A.   Yes.

Q.   It was the Service de Renseignement that was the arm of Habyiramana that was keeping everybody in line, was keeping the people in line with what the government's vision was of Rwanda, right?

A.   Yes.

Q.   And that's who you had the courage to stand up against?

108

Now, at the time did you know the leaders of the service, did you know who they were?

A.   Who were the leaders, no, but, normally, in Rwanda we used to know the head of that service because of their post.

Q.   Because they're so high in the government --

A.   Yeah.

Q.   -- people know; and, for example, in America people would know who the head of the CIA is.  And at that time in the early '90s in Rwanda you knew that the head of the Service de Renseignement was one of Habyiramana men; he had to be --

A.   Yes.

Q.   -- correct?  It would be ridiculous --

A.   Yes.

Q.   -- to have somebody --

A.   Yeah.

Q.   -- not associated with the president be the president's secret police, correct?

A.   Yeah, that's correct.  Yes.

Q.   And so it was his agents, it was that director's agents, that went out and kidnapped you, correct?

A.   Yes.

Q.   How many people were there that kidnapped you?

A.   Actually, there were two.  There were two, yeah.

Q.   And they grabbed you; did they stick you in a car?

A.   Yeah, I was taken to Kigali with -- they had a car that was in Kibeho, and they took me to Kigali.

Q.   Okay.  So the Service de Renseignement had branches all around the country, correct?

A.   Yes.

Q.   And that's because their goal was to find out what people were saying in every different part of the country?

A.   Yeah.

Q.   And they would report that back to the Service Central de Renseignement, which was based in Kigali, correct; that was the headquarters?  Sorry.  Again, you just have to articulate yes or no.

A.   Yes.  It's difficult to say yes or no because some information is not that correct.

Q.   Okay.  So what part did I say that was not correct?

A.   The part that was not correct is the information; they had a mission to protect the country.  They had the mission even to, to inform the government about what was happening in the country.

Q.   That's correct, they were --

A.   Then what the government will do from that, it was the business of the government, but they had it in the mission to inform.

Q.   Right?

A.   Even if they wanted to make decisions, they needed to

get first the information.

Q.   And that's what an intelligence agency is, correct?

A.   Yep.

Q.   They gather information, provide it to the decision makers, in this case the president, who would decide how he would act on that --

A.   Yeah.

Q.   -- correct?  Sometimes that might mean using police powers, correct?

A.   Yes.

Q.   Sometimes it might mean issuing propaganda, correct; there were a variety of tools in the arm of the executives to use that information?

A.   Yes.

Q.   But information is power and the Service de Renseignement was responsible for bringing that power to the president so he knew what was happening in his country, right?

A.   Yeah.

Q.   And that happened even after the multiparties, correct?

A.   Yes.

Q.   Your friend, Faustin Twagiramungu became -- he was the MDR leader, correct; he was the leader of the opposition party at that time?

A.   Yes.

Q.   And there was a prime minister during the multiparty system who was also a guy, who was also an MDR member, correct?

A.   Yes.

Q.   And so there was finally some beginnings of political enfranchisement, correct, but the service was still responsible for getting information and providing it to those decision makers, correct?

A.   Yes.

Q.   And you would agree with me, would you not, that until the beginning of the genocide President Habyiramana still ruled with an iron fist, isn't that fair?

A.   Actually, his authority had diminished.  His authority had diminished, and people could say no to him and sleep and work the next day.  Before it would never happen.

Q.   That would never happen before?

A.   Yeah.  And so to us his authority was just, it was diminishing.

Q.   And so you viewed that as success, correct?

A.   As success of what?

Q.   Success of the multiparty system, the --

A.   Yes.

Q.   -- the increased dialogue, right?

A.   Yeah, of course.  They were just having access and diminishing that, the power that was concentrated in the

hands of one person, yes.

Q.   But you would agree with me that there were still arms of Habyiramana in the multiparty government, correct?

A.   Yeah.

Q.   He definitely still had some influence; he definitely still had some control?

A.   Yeah.

Q.   And it was still a country that was evolving from a dictatorship to something that was more democratic?

A.   Yes.

Q.   And during that same time there were powers in Rwanda who were trying to further alienate different ethnic groups and different social classes in order so that they could yield power themselves, correct?

A.   Yes.

Q.   And some of them were in the MRND, and they exploited ethnic divides for that purpose, correct; and the MDR even itself broke into two factions, correct?

A.   Yes.

Q.   And one of those was the MDR power which was --

A.   Yes.

Q.   -- Hutu power, correct?

A.   Yes.

Q.   So there were some extremists who originally had been part of MDR who took on more extreme positions, correct?

A.   Yeah.  Actually, there was a power struggle, and the people who were extremists at the end, they came out and they were visible and they could surface anywhere.

Q.   Some of those extremists existed in the MRND as well, is that correct?

A.   Yeah, that's correct.

Q.   And MRND generally had issued propaganda throughout this time encouraging a distrust of Tutsis, is that fair to say?

A.   Yes, that's correct.

Q.   And that's largely because in October of 1990 the RPF, what you call the rebellion group, the RPF, the Rwandan Patriotic Front, attacked Rwanda from Uganda?

A.   Yes.

Q.   And since that time a narrative was propagated by the government to suggest that the country is under attack, this is a time of war, we have to band together against the inyenzi or the cockroaches who were coming in, correct?

A.   Yeah.

Q.   And inyenzi was the word for cockroaches, it was frequently the term used to describe the Tutsi?

A.   Yes.

Q.   And during the genocide it was the word used in order to motivate militias and others to root out inyenzi who may be in their neighborhoods, correct?

A.    Yes.

Q.    It was a radical word?

A.    Uh-hum.

Q.    And RTLM Radio, for example, used that word --

A.    Yes.

Q.    -- saying inyenzi are out, what can you do to stop them?  So the Hutu power and the extremists also developed a coalition from across different political parties, is that fair to say?

A.    Yes.

Q.    So it wasn't just like there was one political party that was Hutu extremist, and then there was one that was everything else, correct; there was a variety on the spectrum, and at one pole were the Hutu power extremists, correct?

A.    Yeah, that's correct.

Q.    And they were largely responsible for perpetrating the genocide --

A.    Yeah, that's correct.

Q.    -- during this time?

A.    Yeah, that's correct.

Q.    Now, in that multiparty time period before the genocide began there were also many political rallies as these political parties started to develop a following; is that fair to say?

A.   Yes.

Q.   And, again, political rallies were crucial to demonstrate the power of a political party as having some relevance as well as to propagate the message of that political party, right?

A.   Yes.

Q.   And so there were festive occasions, is that fair to say?

A.   Yes.

Q.   And as a reporter I'm sure you attended some of these political parties -- rallies?

A.   Yes, I did.

Q.   And the leaders of each of the political parties would speak at these events, correct?

A.   Yes, that's correct.

Q.   And there were -- it was common in Rwanda that each political party would wear colors or badges or other insignia associating themselves with that political party, is that correct?

A.   That's correct.

Q.   Did you wear MDR clothing or other badges?

A.   No, I didn't.  I didn't.

Q.   And you were a reporter and you wanted to be able to circulate beyond just the MDR in order to get your stories, is that fair to say?

A.   Actually, I didn't, I didn't think that way.  I thought I didn't have to do that.

Q.   It's not necessary, it's not mandatory to do that?

A.   Yeah.

Q.   It was just a common phenomenon in Rwanda; you weren't obliged to wear those clothes, correct?

A.   No, I didn't.  Even if I was, I was to cross that highly propaganda aspect, it wasn't what I felt I should do and I didn't do it.

Q.   Because that was your personal choice, correct?

A.   Yeah.

Q.   And there were a lot of people who did make the choice --

A.   Yeah, they did.

Q.   -- to wear their badge on their sleeve, correct?

A.   Yeah.

Q.   Wear their politics outwardly, correct?

A.   Yes.

Q.   Was it also your experience that people of the same political party, activists, politicians, that they would congregate in the same places?

A.   Yes.

Q.   So, for example, certain bars might be associated with one political party or one group over others?

A.   Yeah.  At the end we ended up noticing that people

from some political parties used to feel more confident in having been in one certain place than in another.

Q.   And that's partly attributable to this notion of "groupthink" where everyone in a group thinks the same thing, then it's less likely that there will be some kind of dissent?

A.   I think in some places people where they can discuss their things and with no dissenting voices; people used to feel comfortable at the time in those places.  It's the reason why when you see places where people were discussing opposition and others supporting the government.  I think that the tensions were so high that if you put them in the same bar, they end up killing each other fighting.

Q.   And, in fact, that happened on the streets sometimes?

A.   Yes, it did.

Q.   Different political parties would actually clash --

A.   Yeah.

Q.   -- in combat --

A.   Yeah.

Q.   -- correct?  And most of the political parties had their own youth wing, correct; for example, the MRND had the Interahamwe movement?

A.   Yes.

Q.   But other political parties had youth wings, and they would often clash, correct, because people felt so strongly

about their political views --

A.   Yes.

Q.   -- about where the country was headed?

A.   Yes.

Q.   Now, as a journalist during the multiparty period you also investigated whether there was corruption in the government, correct?

A.   Yes.

Q.   And that was another aspect of your work that brought a lot of scrutiny, correct?

A.   Yes.

Q.   And you did that, again, at some great personal risk, correct?

A.   Yes.

Q.   And, in fact, you found that there was corruption in government, correct?

A.   Yes.

Q.   And, in fact, you found that it was highly politicized in terms of how the people rose to positions of powers and what authorities they actually had?

A.   Yes.

Q.   And frequently the president would appoint people to positions of power who were from the same region as him --

A.   Yes.

Q.   -- correct?  He was from the north of the country,

correct?

A.   Yes.

Q.   And he would appoint people in positions of power for no more reason than he knew them, and they were from his region, correct?

A.   Yes.

Q.   And because regional loyalty was important in Rwanda?

A.   Uh-hum.

Q.   And that's a cultural phenomenon there, is that fair to say?

A.   Yes.

Q.   In addition to your magazine, Isibo, during that same time period where different journals, political journals, were coming into play, various other political parties also had opposition magazines, correct?

A.   Yeah.  At the end there were so many opposition magazines, yes.

Q.   And partially to combat this the Service de Renseignement run by Habyiramana created a pro-MRND magazine, is that fair to say?

A.   I would not say it like that; but if you have information about that, you can say it, but to me I think that people from the party MRND were able to do that without even using those services.  Maybe people from the service, the intelligence service, could give information to Ashem

maybe or maybe just they could arrange occasions of sensitive information about opposition leaders.  They could do that but to learn to create, it's not something that I would say like that.

Q.   Okay.  So the MRND didn't need to create their own magazine because they had the tools of government; they had Radio Rwanda, they had the television --

A.   No, they did.  They did.  They created MRND.

Q.   So they created their own magazines as well?

A.   Yeah.

Q.   And so would you agree with the statement that -- just give me one moment -- would you agree with the statement that the Service Central de Renseignement called a meeting with journalists in early 1990 and dictated the issues that were off limits for discussion?

A.   Can you repeat that?

Q.   Sure.  Would you agree that the Service Central de Renseignement in early 1990 called a meeting with journalists to dictate the issues which were off limits for discussion?

A.   Yes, that happened.  Yes, it happened.

Q.   Would you also agree that the chief of the service designated an intelligence officer to serve as an advisor to the press?

A.   I would say no.  At the time I don't remember something like that, but I remember they called the journalist to

tell that we are in war -- in a war; you can't just write anything, and they did but to appoint someone to be attached to the media, simply I know people from the intelligence service who were just arresting and beating us.  If that's what you mean, you are correct.  If you mean something else, I can't tell that to you.

Q.   So they were trying to intimidate you essentially?

A.   They did.

Q.   They did intimidate you?

A.   They did.

Q.   Are you familiar with the journal Kangura?

A.   I am, yes.

Q.   And that was an extremist --

A.   Very.

Q.   -- journal which was the print equivalent of the RTLM, correct?

A.   Yes.

Q.   During the genocide it helped rally anti-Tutsi rhetoric, helped rally anti-Tutsi sentiment amongst the country, correct?

A.   Yes.

Q.   And they would frequently criticized Tutsis and those who helped them as being traitors --

A.   Yes.

Q.   -- correct?  And so there was an influence of the

media on the masses within Rwanda during the course of the genocide, correct?

A.   Yes.

Q.   And the service did nothing to discourage that media, correct?

A.   Well, actually, I didn't -- during the war I can't say that the service -- the intelligence service has gone in three different phases like during the war administration.

First, rigidity and the harsh approach, and then it was the same.  And then when the internal opposition accessed the government, all those things they were interested in, we couldn't breathe; it was different from what it was before.

Q.   And back to my question, though:  there were some types of media --

A.   Yes, that's correct.

Q.   -- which the government was opposed to, and then there was some that they wanted out there, correct?

A.   Yes.

Q.   And to your knowledge Kangura was never discouraged by the government, correct?

A.   It wasn't; but when the opposition entered the government, they started to engage Kangura and even other extremists' aspects.

Q.   Now, at the time that RTLM began there was already a

radio station, correct, in Rwanda?

A.   Yes.

Q.   And that was the governmental radio station:  Radio Rwanda?

A.   Yes.

Q.   And you were aware of the person who was in charge of Radio Rwanda and the television in Rwanda, correct?

A.   Yes.

Q.   His name was Jean-Marie Vianney Higiro?

A.   Actually, he came after.  He came after.

Q.   When did he come?

A.   I don't remember exactly the date, but at that time the person in charge of Radio Rwanda was fired actually because of extremist speech.  And when he was fired, that's when the opposition have access to the government. The opposition had some, some position in the government, and they insisted that they should have a say in whatever the media is doing, in whatever the government was doing, and a person who was there, Ferdinand Nahimana, was fired; and, actually, he resurfaced in the -- actually, that's the reason why I say when the RTLM was created.  The people who were appearing there, we knew exactly that person was fired for extremist speech.  Now, he's there comfortably in the meeting, so that's when he was appointed to replace the person who was fired because of extremist speech.

Q.   That was Ferdinand Nahimana?

A.   Yes.

Q.   And so when was that, when was Higiro appointed the head of Radio Television?

A.   The date, I don't have it.

Q.   Roughly?

A.   I think it's in 1992; but the date, I don't have it. It's after the opposition wars in the cabinet.

Q.   And do you recall when RTLM started?

A.   The date, the exact date, I don't have it.

Q.   It was in 1993, though, wasn't it?

A.   Yes.

Q.   So in 1992 Jean-Marie Vianney Higiro became head of Radio Rwanda?

A.   Yes.

Q.   He was a member of the MDR, your political party, right?

A.   Yes.

Q.   He was a friend of yours?

A.   Actually, I didn't know him like that. I haven't talked to him before sometime because I seen him when I was doing a program, a radio program. I mentioned that I've done some professional programs.

Q.   But you saw him at Radio Rwanda?

A.   I've seen him already --

Q.   Okay.

A.   -- and I think I spoke to him sometime in 1993, yeah.

Q.   Okay.  You knew who he was, but you were not friendly with him at that time?

A.   Right, I don't think so.  I've never gone, I've never gone to his family, I've never gone to him.

Q.   Okay.  Since that time have you become friends with him?

A.   Not friends like that, no, no, no.

Q.   But you work together now?

A.   We don't.

Q.   You do not?

A.   He is in the opposition.  He has this, he's trying, which I don't actually -- I'm not there.

Q.   I was just trying to establish the relationship, and so you don't know his family, you don't know the defendant?

A.   The defendant, this is the first time I see her here.

Q.   So in 1992 when Higiro became head of Radio Rwanda, it was the only radio station being broadcast from within Rwanda, is that fair to say?

A.   Yes.

Q.   And then in 1993 RTLM started a radio station?

A.   Yes.

Q.   And it started under the auspices of, not unlike you had talked about earlier, about increasing the channels of information, increasing the media exposure to the public,

correct?

A. Yes.

Q. But even at that time it was, in fact, President Habyiramana who was the single largest shareholder in RTLM; is that correct, sir?

A. Yes.

Q. And I'm just showing Exhibit 26 on the screen, in fact, it shows Habyiramana, one million shares, correct, and you said that the average starting share was 5,000?

A. Yes.

Q. And 5,001 francs, I think you estimated is something like $20?

A. At that time but now I'm not sure.

Q. Well, that's a rough estimate, but you would agree with me that the standard of living in Rwanda back in 1994 was very low?

A. It was.

Q. Correct?

A. That's right.

Q. Even now it's probably not more than 40 cents a day for average income, correct?

A. Yes.

Q. And at that time 5,000 Rwandan francs was a lot of money to the average Rwandan, correct?

A. Yes.

Q.   So it's fair to say that the people who were shareholders of RTLM when it first started were amongst the elite, correct?

A.   Yeah, I would say so.

Q.   Because nobody else had that kind of spare money to put into a radio station, correct?

A.   Yeah.  I would put it like, in Rwanda to understand that people needed to support the media and even put -- take some shares, one needed some kind of education; I think so.

Q.   Because education was important for purposes of social status, correct?

A.   Yes.

Q.   And there were very few lawyers in Rwanda at that time, correct?

A.   Yes.

Q.   And there were even fewer female lawyers, correct?

A.   Yes.

Q.   How many female lawyers would you venture to guess were in Rwanda in 1993?

A.   I think two or three.  Two or three.

Q.   In the entire country?

A.   Yes, two or three.

Q.   And so in 1992 Jean-Marie Higiro becomes the head of Radio Rwanda; in 1993 RTLM starts, is that correct?

A.   Yes.

Q.   And I know I asked you that, but you were just answering my next question.  And Radio Rwanda was free to all Rwandans, right?

A.   Yes.

Q.   And because the previous, the predecessor, head of Radio Rwanda was an extremist they had to be very careful not to incite the population on Radio Rwanda, correct?

A.   Actually, when he was removed, and it was clear that that was the reason why he was removed, the opposition insisted to have someone who was not an extremist, someone who was more than anything a professional.

Q.   And Nahimana, the predecessor who was the extremist, he went to RTLM, correct?

A.   Yes.

Q.   And it's in that context that if someone were buying shares in RTLM, then they would certainly know that Habyiramana was the largest shareholder and that Nahimana had gone to RTLM, correct?

A.   I don't believe that.  How they get the information, if they say there's a new radio station that is going to be open, if you need to buy shareholders, we are selling them from 5,001 francs.  We didn't put the lists on the outside. I haven't seen that.

Q.   Okay.

A.   I couldn't have written on that because I was totally

opposed to that, yeah.

Q.   Okay, but you knew that, right?  Back in 1993, when RTLM was starting, you knew that Habyiramana and now Nahimana were now going over to this RTLM station?

A.   Yeah, I did.  I wrote about that, yes.

Q.   And I think you already said that anyone in Rwanda would have known that during the genocide RTLM was hate radio; it was inciting people to kill?

A.   Yes.

Q.   That's common knowledge?

A.   Yes.

Q.   In fact, right now it's international common knowledge?

A.   Yes.

Q.   Let's talk about a moment about your interaction.  You were kidnapped and brought to the president's backyard of the compound.  What kinds of questions did they ask?

A.   Actually, they asked me about, first, where did you get the information you've written?  Two, who is paying for you to print this information?  Three, what kind of interaction do you have with the other chains?

And the questions, they were around that, and what is the chain of -- the chain of communication.  How do they send information to you?  They were convinced that they were -- that our mothers were slaughtered by RPF.  They were convinced that there was a way they send money to us;

they send information to publish, and things like that. Because they said: if you are a citizen who is committed to security of the country, you couldn't say that. To say that, that is something very important; it was criminal.

Q. So they were asking you questions that intelligence officers ask, correct?

A. Yes.

Q. And that's information that you as a former intelligence officer, you would want to know those same types of things?

A. Yeah. Yes.

Q. Who is in your network, where are you getting funded, and what external forces are you dealing with?

A. Yes.

Q. And they asked you those questions over and over again for three days?

A. Yes.

Q. And they treated you harshly, did they beat you?

A. I think they did. Yeah, they did, but not really. I think the way they did it, the way we had been doing it in Rwanda, we had been beaten so many times; and we mention when it was real serious, but, beaten, yeah. Some officers will beat you.

Q. You had been beaten on several occasions by these intelligence services, correct, because they were cracking

down on dissent --

A.    Yeah.

Q.    -- amongst the media --

A.    Yeah.

Q.    -- correct?  And it was that same motivation to you anyway that led to them beating you to try to extract information out of you, and it was after three days of that behavior when you were asked those three questions in many ways:  who were you talking to, who was funding you, and have you been dealing with the RPF, it was after three days that you met Mr. Munyemana?

A.    Yes.

Q.    And he came and he saved you; he saved you from the fate that you were suffering from?

A.    I don't say that he saved me.  I don't say he saved me. He told me:  You are free to go.

Q.    Because he was in charge, right?

A.    I can't say he saved me because I wasn't supposed to be there.

Q.    Okay.

A.    I was doing my work.  Why, why was I there first?

Q.    He didn't save you, correct?  He was part of the service, correct?

A.    That's not right.  I don't see it as saving me, no.

Q.    Okay.  So he was the one that let you go; he had the

authority to let you go?

A.   I can explain in Rwanda --

Q.   No, just did he have the authority to let you go?

A.   Yes.

Q.   He must have because after he came in and said:  You could go, you were able to leave?

A.   Yes.

Q.   He was in charge of all those people who had been asking you questions for all that time, correct?

A.   Yes.

Q.   And it took him three days to find out that you were there?

A.   I just say what happened to me.

Q.   That's all we can ask.

A.   I just say what happened to me, yeah.

Q.   Now, the file that you say that he was looking for, that was a dossier on you, correct?

A.   Yes.

Q.   So he was spying on journalists, correct; that's what the secret police did?

A.   I think we had different services in Rwanda at that time.  They, especially those Secret Services, they had people in charge of deciding -- I mean, having the authority to sign arrest warrant and things like that; he was one of those.

And in order to sign, he had to study the file, and I think any other person in that position had that responsibility to review the file and to make the decision that will be -- then the person will be taken to the bunk or not.

Q.   And your crime, the reason he signed for you to be arrested and to be released, was because you wrote something critical of the president, correct?

A.   The way I was arrested -- what he wrote in that, I don't know, but the way I walked out of that room, that's when I knew, and that's what I said.

Q.   But your crime was just writing something critical of the president, correct?

A.   What they saw as a crime was to write something critical about the war.

Q.   About the war?

A.   Yeah.   Because, actually, I was taken there because of, because of the issue on the attack of the prisoners, if we're talking about that.

Q.   Okay.   That was the trigger that -- you had been writing things critical of the president before then, but what prompted this event was your criticism of the raid on Ruhengeri?

A.   Yeah.   You ask me how I happen to meet Munyemana, and it was after that when I was kidnapped and taken there and

until the time I walked out of that room.

Q.   And eventually in July of 1994 right after the genocide ends, you then took his position, his former position; is that fair to say?

A.   Actually, I went to intelligence in August 1994.

Q.   Sorry.

A.   And not his former position, because Munyemana was head of a department.

Q.   So he was a director, you took Augustin Iyamuremye's position?

A.   Yes, that's correct.

Q.   As chief of all of the service?

A.   Yes.

Q.   And so then you found that there were no people left at the Service de Renseignement, correct?

A.   Yes.

Q.   And that you described on direct examination, you can't run an intelligence service without agents to run, to get intelligence, correct?

A.   Yes.

Q.   And as a journalist you relied on sources, you relied on sources to develop information that you could then report on, correct?

A.   Yes.

Q.   So it was natural in your skill set to start running

intelligence sources where before you used to run journalism sources?

A.    Yeah.  I don't think I did, yeah.

Q.    Sorry.  People used to give you information --

A.    Yes.

Q.    -- as a journalist; and now as an intelligence officer, people were also giving you information?

A.    Yes.

Q.    So you needed to build up --

A.    The network.

Q.    -- the capacity --

A.    Yes.

Q.    -- in the Service de Renseignement?

A.    Yes.

Q.    And the former members of the Service de Renseignement, is the only person you talked to Senator Iyamuremye -- excuse me, I'm butchering the name?

A.    Are you asking if he's the only person I talked to?

Q.    Yes, after you took over the position?

A.    Yes, he was not the only person I talked to.

Q.    Were there other former members of the service that you spoke with?

A.    Yes.  Definitely, yes.

Q.    Were they in Rwanda?

A.    Yes.

Q.   Okay, and what positions were they in?

A.   Well, actually, among those people we had another one like Ms. Josee Mukandamage.  That one was a director as well in charge of administration.  She was appointed by Munyemana.

There was Ephram Ndangamira; he was in the justice department; he was appointed by Munyemana.  Those were there and until I left.  Actually, they stayed there.

Q.   So they've been there for -- you don't know whether they're there now but when you left Rwanda, they were still there?

A.   I know one is still there; the other one is dead, but at that time we had some --

Q.   Okay.

A.   I think there were only ten people who reported back.

Q.   Okay, and you would agree with me that during the genocide Senator Iyamuremye, excuse me again, that he was deposed; he was no longer allowed to be the head of the service during the genocide, correct?

A.   Yes.

Q.   And so it was Munyemana who was in charge of intelligence gathering?

A.   No.  Actually to say it like that is wrong.  The service, during the genocide the service died; it didn't even --

Q.   There was no more service?

A.   It didn't make any report, any staff meeting, nothing.

Q.   So if Athanase Munyemana retrieved the Service de Renseignement's vehicle, the vehicle for the chief, and drove it to Gitarama to be with the rest of the government, that wouldn't have happened during your -- in your construction of the service not operating during the genocide?  I'll rephrase that question; it was horrible.

A.   Yes.

Q.   So if Munyemana retrieved the company car that the Service de Renseignement's official vehicle that was delegated to the director, then he would not have been able to legally do that during the genocide because there was no more service?

A.   I wouldn't say it like that because, actually, the people who were directors of the department until they left, that's how it was.  They were actually intelligence in the case of -- there was some kind of rotation, even when I was in the office, directors -- if the head of the service wasn't there, there was some kind of rotation.

Q.   A succession --

A.   Yes.

Q.   -- so that somebody would take their place?

A.   Two, those transports, that was given to senior civil servants in Rwanda.  It was transports that was helping them

to go to work, and even the transport was just attached to them, and they weren't vehicles attached only, only to the director; I haven't seen that.

Q.   Right, so --

A.   I haven't seen that.

Q.   Okay.  So Munyemana may have had his own car; in fact, he did have his own car?

A.   I think there were many cars within the service, and I think he could have had access.

Q.   So if he went and took Senator Augustin Iyamuremye's car, despite the fact that he had his own car, that would be indicative of the fact that he was relieving him of his position, correct?

A.   I wouldn't say that.  That was the first time that I hear that.

Q.   And that would surprise you, because your understanding is the service ceased to exist, correct?

A.   Yes.

Q.   And so if he then drove that car to Gitarama where the seat of government was during the genocide, after the first few days of the genocide, then that would also surprise you, correct?

A.   No.  Actually, the government was appointed on the 11th of April after a total confusion, and the first thing the government says:  Let's move to Gitarama.  Gitarama,

it's a small, it's a small -- I would say at that time it was -- we say it's a city, but it was a town of how many public buildings were in Gitarama, where you move the whole cabinet, all those positions, and so and so, that actually I would say there wasn't capacity for that.  So the first thing that people did was to go to Gitarama and see if they could find a place where the service, the services, whatever would be posted and they -- some they left like that.  They never came back to Gitarama because the war was raging here, so to say that government services to secure even where they could -- I think a responsible officer would make sure, because they have archives, if they leave the country, if they leave the archives behind, either in London or secure places where they evacuated to, and I think that was something officers did, yeah.

Q.   Okay.  My question to you, sir, is:  if Mr. Munyemana went to Gitarama during the genocide to be part of the government during the genocide, that's where they were based, correct?

A.   To be part of the government?

Q.   I'm sorry, I didn't hear your answer.

A.   Did you say "to be part of the government"?

Q.   Yes, to be part of the government.

A.   He didn't.  He wasn't.

Q.   And you were at that time taken across the demilitarized

zone into territory controlled by the RPF, correct?

A.   Yes.

Q.   And that was in Byumba?

A.   Yes, Byumba.

Q.   That's in the north?

A.   Yes.

Q.   So do you know who was in Gitarama running the government at that time?

A.   Who was running the government?

Q.   Yeah?

A.   The president, they appoint a president who was Sindikubwabo.

Q.   Sindikubwabo, and he was MRND, correct?

A.   That's correct.

Q.   And he actually wept on radio, including RTLM, to order to incite people to participate in the genocide?

A.   Yes.

Q.   In fact, the genocide started in Butare much later than it started in the rest of the country?

A.   Yes, that's correct.

Q.   And that's because Butare was historically a very liberal town, a liberal prefecture I should say?

A.   I think Butare was, before it was a stronghold of the opposition; and to put that poison in the people there, it took some time to reach people; they resisted actually.

Q.   In fact, the preffay, the governor, of the prefecture was Tutsi, correct?

A.   Yeah, he was Tutsi.  Yes.

Q.   And then the PSD was the main opposition party that was based in Butare?

A.   Yes.

Q.   The bottom line is there wasn't very much MRND involvement in Butare, correct?

A.   No.

Q.   But there were a few pockets, is fair to say?

A.   Yes, that's correct.

Q.   There were some parastatal organizations which were influenced by the MRND --

A.   Yes.

Q.   -- by Habyiramana?  Parastatal organizations were used throughout the country as kind of waves to have nepotism by Habyiramana and put people that he wanted in positions of authority so they could make some money too, correct?

A.   Yes.

Q.   And there were also a few government ministers who were located in Butare?

A.   Yes.

Q.   In fact, Mr. Sindikubwabo lived -- he was originally from Butare, correct?

A.   Yes.

Q.   And you've been to Butare, right?

A.   Yes, I have.

Q.   And you are aware that Pauline Nyiramasuhuko was also based in Butare?

A.   Yes.

Q.   And she was the Minister of Women and Families?

A.   Yes.

Q.   I think just before the genocide, and she was also minister during the genocide as well, correct?

A.   Yes.

Q.   And she was also in the MRND?

A.   Yes.

Q.   Were you familiar with the hotel that she and her husband owned on the main road, Kigali to Butare Road in Butare?

A.   I know it.  I know it.

Q.   Okay.  Were you aware that her son, Shalom Ntahobali, was head of the Interahamwe in Butare?

A.   He was active but in a diminishing -- but to be the head; that one, I'm not very sure.  If he was the head, I'm not very sure.

Q.   Okay, but he was very influential in Butare in the Interahamwe?

A.   Yeah, he was.  He was influential, yes.

Q.   So to get support for the genocide in Butare some of

these key figures had to rally people in order to start attacking the Tutsis like they had elsewhere in the country --

A.   Yes.

Q.   -- correct?  And I think you mentioned the speech on the radio, do you know there was this rally that occurred in Butare Stadium in Butare as well?

A.   Yes.

Q.   And the genocide finally reached Butare --

A.   Yes.

Q.   -- then around April 19th, so a couple weeks after the president's plane was shot down; is that fair to say?

A.   Yeah.

Q.   And then like the rest of the country Butare was engulfed in the chaos and killing that you described?

A.   Yes.

Q.   Now, Mr. Musangamfura, you recognize that this case is not about the genocide, correct?

A.   I don't think it's very -- I mean, I don't have to say anything about the case itself.

Q.   You don't know what the legal charges are, correct?

A.   Actually, I don't.  Yeah.

Q.   And so you don't know what the defendant's represented to the U.S. government about herself and about her associations and about her husband, correct?

A.   I don't.

MR. CHAKRAVARTY:  Just one moment ... that's all I have, your Honor.

THE COURT:  Mr. McGinty?

MR. MCGINTY:  Thank you, your Honor.

REDIRECT EXAMINATION BY MR. MCGINTY:

Q.   Mr. Musangamfura, the government asked you if you had any association with Mr. Higiro; do you recall those questions?

A.   Yes.

Q.   Okay, and Mr. Higiro is Jean-Marie Vianney Higiro; is that his name?

A.   Yeah.

Q.   And that is Ms. Kantengwa's brother, am I right; and that would be Athanase Munyemana's brother-in-law, do I understand that right?

A.   Yes.

Q.   And he was appointed the head of Radio Rwanda in, as you recall, 1992; am I right?

A.   Yes.  I don't remember the exact date, but, yeah.

Q.   And that was an attempt to make -- to get extremists out of Radio Rwanda and put in someone who was a professional?

A.   Yes.  Yes.

Q.   Now, you understand that he was a moderate, that he was

a moderate Hutu?

A.   Yeah.   That one I know, he was, yeah.

Q.   Did you also understand that he was a member of the MDR political party?

A.   Yes.

Q.   And that at the start of the genocide that he was airlifted out of Rwanda courtesy of United States Forces?

A.   Yes.

Q.   And that he is currently living in the United States, am I right?

A.   Yes.

Q.   And he's a professor at Western New England College?

A.   Yes.

Q.   And you also understand that he is an opponent of the current regime in Rwanda?

A.   Yes.

       MR. CHAKRAVARTY:   Objection, your Honor.

       THE COURT:   Overruled.

Q.   In fact, quite a vocal opponent of the current regime in Rwanda; am I correct?

A.   Yes.

Q.   Now, you spoke to -- after the genocide you spoke to Mr. Iyamuremye, am I right?

A.   Yes.

Q.   And he had been the head of the intelligence service --

A.   Yes.

Q.   -- in the period between 1992 and 1994, correct?

A.   Yes.

Q.   And that was the Service de Renseignement, correct?

A.   Yes.

Q.   And he was the one that was directing policies during the period between 1992 and 1994, fair to say?

A.   Uh-hum.

Q.   Now, when you spoke to him after the genocide, and you were asking specifically about Athanase Munyemana --

A.   Yes.

Q.   -- did he give you any derogatory information about Mr. Munyemana?

        MR. CHAKRAVARTY:  Objection, your Honor.

        THE COURT:  I think that's a yes or no answer.

Q.   Did he give you any derogatory information?

A.   Yes.

Q.   Did he give you any information critical of Mr. Munyemana?

A.   No.

Q.   And you said that you had spoken to a number of other people about Mr. Munyemana, am I right?

A.   Yes.

Q.   And some of the names that you gave, you mentioned several of the names of the people that you had spoken to, a

Joseph --

A.   Josee, it's Josee, J-o-s-e-e.

Q.   J-o-s-e-e?

A.   Yes.

Q.   And you had spoken to an Ephram?

A.   Yes.

Q.   And these people, one of them was an analyst at the service --

A.   Yes.

Q.   -- in the period before the genocide, am I right?

A.   Yes.

Q.   And the other, Josee, was also --

A.   In charge of administration.

Q.   In charge of administration?

A.   Yes.

Q.   And you asked them whether they had any derogatory information about Mr. Munyemana, am I right?

A.   Yes.

Q.   And you were told that there wasn't any, am I right?

A.   Yes.

Q.   And as I understand it, you were prepared if Mr. Munyemana -- strike that.

     You were prepared if you were able to reach Mr. Munyemana to ask him to come back and to be your support at the intelligence service; do I understand that

correctly?

A.   Yes.

MR. MCGINTY:   I have no further questions, your Honor.

MR. CHAKRAVARTY:   Very briefly, your Honor.

RECROSS-EXAMINATION BY MR. CHAKRAVARTY:

Q.   Many people from Rwanda fled after the RTF took power, correct?

A.   Yes.

Q.   And it was part of your task to try to locate where Mr. Munyemana was in light of the fact that he was likely no longer in the United States, correct -- excuse me, not the United States, Rwanda.

The fact that he was no longer in Rwanda, you were trying to locate him outside of Rwanda; is that fair to say?

A.   We were trying to know the whereabouts of people.  If they were alive and where they were or dead, how they died.

Q.   But you did know where many of the refugees from Rwanda were outside of the country:  in Congo, in Kenya?

A.   Yes.  They were in the different places, yes.

Q.   And, in fact, some of the ministers -- for example, if Pauline Nyiramasuhuko lived with Athanase Munyemana in a refugee camp, you would certainly know that, correct?

A.   When I took over that service, I didn't know that.  I didn't.

Q.   Okay.  But if you knew that Mr. Munyemana was a member of MRND, you wouldn't have asked him to come back and be a member of your service; is that correct?

A.   He wasn't; and I think as far as I can go, I don't know him being a member of MRND.

Q.   Because if he was, you certainly would not have him come back, correct?

A.   Still if someone is working for the government, you don't just fire a person without knowing or having facts; you don't just fire someone like that.

MR. CHAKRAVARTY:  Thank you, your Honor.

THE COURT:  Thank you very much, Mr. Musangamfura, for your testimony.  Can I just confer maybe with Mr. McGinty just on the schedule; I just need some guidance for tomorrow. This needn't be on the record.

(Whereupon, a brief discussion commenced
 off the record.)

THE COURT:  All right, jurors.  We're right on schedule.  We'll finish up the defendant's case tomorrow so plan to be here all day Thursday; you'll have the arguments, the charge, and be able to begin your deliberations.

All right.  The jury will be excused until tomorrow morning at 9:00.

THE CLERK:  All rise.

(Whereupon, the proceedings concluded at 12:57 p.m.)

C E R T I F I C A T E


    I, Helana E. Kline, a Registered Merit Reporter,

Certified Realtime Reporter, and Federal Official Court

Reporter of the United States District Court, do hereby

certify that the foregoing transcript, from Page 1 to

Page 150, constitutes, to the best of my skill and ability,

a true and accurate transcription of my stenotype notes

taken in the matter of the United States of America v.

Prudence Kantengwa.


    /s/ Helana E. Kline                    June 7, 2012

    Helana E. Kline, RMR, CRR

    Federal Official Court Reporter