6-1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                    Plaintiff,     )
                                   )
                                   )
vs.                                )  No. 08-10385-RGS
                                   )
                                   )
PRUDENCE KANTENGWA,                )
a/k/a PRUDENTIENNE KANTENGWA,      )
                    Defendant.

BEFORE:  THE HONORABLE RICHARD G. STEARNS

JURY TRIAL DAY 6

John Joseph Moakley United States Courthouse
Courtroom No. 21
One Courthouse Way
Boston, MA 02210

APRIL 30, 2012

9:10 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by ALOKE CHAKRAVARTY, ASSISTANT UNITED STATES ATTORNEY, and JOHN A. CAPIN, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Boston, Massachusetts 02210;


For the Defendant:

    Federal Public Defender Office, by CHARLES P. MCGINTY, ESQ., 51 Sleeper Street, Boston, Massachusetts  02210;
        and
    Federal Public Defender Office, by BJORN LANGE, ESQ., 18 North Main Street, Concord, New Hampshire 03301.

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Alphonse Rutaysisre | | | | |
|   by Mr. Capin | 6-4 | | 6-39 | |
|   by Mr. McGinty | | 6-22 | | 6-43 |
| Candace Marie Kelly | | | | |
|   by Mr. Capin | 6-46 | | | |
|   by Mr. Lange | | 6-91 | | |

E X H I B I T S

| No. | Description | In Evd. |
|---|---|---|
| 28 | Photograph | 6-28 |

| No. | Description | For I.D. |
|---|---|---|
| 18 | Statement by defendant to immigration judge | 6-96 |

PROCEEDINGS

THE CLERK:  All rise.  All persons having business before the Honorable Richard G. Stearns, United States District Judge, now sitting at Boston within and for the District of Massachusetts may draw near, give their attendance, and they shall be heard.  God save the United States of America and this Honorable Court.  Court is open, please be seated.

No. 08 CR 10385, United States of America vs. Prudence Kantengwa.

MR. CAPIN:  Your Honor, the government calls Alphonse Rutaysisre.

ALPHONSE RUTAYSISRE, having been duly sworn by the Clerk, testified as follows:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  My name is Alphonse Rutaysisre, Rutaysisre is R-u-t-a-y-s-i-s-r-e.

ALPHONSE RUTAYSISRE, SWORN

DIRECT EXAMINATION

BY MR. CAPIN:

Q.   Good morning, Mr. Rutaysisre.

A.   Good morning.

Q.   Can you please tell these jurors where you live.

A.   I live in Kigali.

Q.   And are you currently employed?

A.    At this time I'm not working but I'm retired.

Q.    When did you retire?

A.    I started to retire this January.

Q.    Congratulations.  Before retiring, sir, where did you work?

A.    I worked at Sonarwa.

Q.    Can you tell the jury what Sonarwa is, please?

A.    It's a company, it's an insurance company that insures people and also their belongings.

Q.    When you last worked with Sonarwa, was it a privately-owned company?

A.    It was owned by the government but also by people as well.

Q.    And when did you start working at Sonarwa?

A.    In 1979.

Q.    Did you work there continuously until you retired this year?

A.    Yes.

Q.    What was your job when you were at Sonarwa?

A.    I was in charge of documents, archive and documents.

Q.    So, in essence in the recordkeeping department?

A.    I'm sorry.

Q.    In essence you were in the recordkeeping department?

A.    Yes.

Q.    What title does the top manager at Sonarwa have?

A.    General director.

Q.    Do you know who the general director was in 1991?

A.    It was Matthieu Ngirumpatse.

Q.    For the record is Ngirumpatse spelled N-g-i-r-u-m-p-a-t-s-e?

A.    Yes.

Q.    And his first name is Matthieu?

A.    Yes, his Christian name.

Q.    I'll put on the overhead, sir, what is part of Exhibit 12A, specifically Charlie document No. 5.  Is this the name of the -- that I'm putting to on the screen in front of you, is that the name of the general director in 1991?

A.    Yes.

Q.    Do you know approximately when Mr. Ngirumpatse started as the general director at Sonarwa?

A.    I do not remember the date nor the month, but I remember it was in 1990.

Q.    Was it -- do you remember was it beginning, middle or end of 1990, if you remember?

A.    It was in the middle of the year.

Q.    And I'm going to show you the French version of the same document, and you looked at that document this morning, correct, sir, before you came to Court?

A.    Yes, you're the one who gave it to me.

Q.    Thank you.  Am I correct in noting that it's a letter addressed to Mrs. Prudence Kantengwa from the general director,

Matthieu Ngirumpatse?

A. Yes.

Q. Am I correct in noting that this letter states Ms. Kantengwa is to start as an employee at Sonarwa on November 22nd, 1990?

A. That's when she started working is when she was employed.

Q. Do you know what political party Mr. Ngirumpatse belonged to?

A. It was MRND.

Q. Do you know whether he belonged to MRND when he started his work as the general director at Sonarwa?

A. Yes, I know about it, and he was a member of MRND even before.

Q. Did -- are you familiar with a period when political parties were allowed to form during the multi-party phase in Rwanda in the early 1990s?

A. They started a little bit before in 1991, and it was after the president gave permission or gave an order that they could form the political parties.

Q. And was that President Juvenal Habyarimana?

A. Yes.

Q. Was he the leader of MRND at that time?

A. He was the president but also he had a general secretary.

Q. Did he continue to be the president after other political parties were allowed to form?

A.   The president at that time was Ngirumpatse, but he was the honorable president.

Q.   Are you talking about the president of the Republic or the president of MRND, the political party?

A.   The president of the Republic was also the honorable president, but the president of the MRND was Mr. Ngirumpatse.

Q.   So focusing on the president of the Republic for a moment, did that continue to be Juvenal Habyarimana after other parties were allowed to form?

A.   Yes.

Q.   And are you saying that he also at that time was known as the honorable president of the MRND political party?

A.   Yes.

Q.   Who was the actual president of -- who was the actual president of MRND, the party, when new parties were allowed to form?

A.   When the multi-parties were allowed to form, the president of the MRND was Matthieu Ngirumpatse.

Q.   Who was the president of MRND immediately before him?

A.   It was the president of the Republic.  I beg your pardon, may I ask the witness to repeat?

Q.   Please.

A.   He was the president of the MRND but he also had secretary general just like a minister would be a minister of a ministry and also will have a secretary general.

Q.   Was Mr. Ngirumpatse the head of the MRND political party at the same time as he was the general director of Sonarwa?

A.   It was after -- when he got to be the president of the MRND, he was replaced as a general manager of the Sonarwa.

Q.   Who was he replaced by?

A.   His name was Nteziryayo Simeon, and I will spell for the record N-t-e-z-i-r-y-a-y-o.

MR. CAPIN:  May I approach, your Honor?

THE COURT:  You may.

Q.   I'm going to show you document 39 from Exhibit 12 which is the French version what I'm putting on the screen in front of the jury which is document 39, Exhibit 12A.  Is the person who signed this letter, sir, the same person whose name you just told us took over as the head of Sonarwa when Matthieu Ngirumpatse became the head of MRND?

THE INTERPRETER:  Could you repeat that, please?

Q.   Did you just tell us that Matthieu Ngirumpatse was replaced by a man named Simeon Nteziryayo?

A.   Yes.

Q.   Is that the same person who signed the letter in front of you, sir?

A.   Yes, it was Nteziryayo.

Q.   And he signed it as the general director of Sonarwa?

A.   Yes.

Q.   Am I correct in noting that this letter is dated July 8th,

1993?

A.    Yes.

Q.    And it's addressed to Mrs. Prudence Kantengwa?

A.    Yes.

Q.    And it indicates her title as assistant chief of the department?

A.    Yes.

Q.    And am I correct in noting that the letter says, "Dear Madam, I am pleased to let you know that you have been appointed to the position of chief of section from July 23, 1991, at which date you are designated as assistant chief of the department"?

A.    Yes, 1993.

Q.    And the person announcing, informing Ms. Kantengwa of her promotion is Simeon Nteziryayo?

A.    Yes.

Q.    Do you know what political party he belonged to?

A.    Simeon?

Q.    Yes.

A.    MRND.

Q.    Are you familiar with a radio station, sir, that went by the initials RTLM, Radio Télévision Libre des Mille Collines?

A.    Yes, I heard of it.

Q.    Were you familiar with the types of information broadcast on RTLM -- were you familiar with the types of information

broadcast on RTLM in the days leading up to the genocide?

A.    It was a radio that was inciting or was sowing hatred.

Q.    Hatred toward whom?

A.    To sow hatred between Hutu and Tutsi.

Q.    Was the message of RTLM more or less extreme than the MRND message?

A.    If you would compare, it was the same.  The only difference is that whatever was spoken at the radio was immediately gone into the population.

MR. CAPIN:  May I approach, your Honor?

Q.    Showing you Exhibit 26, sir, I'm going to put a couple of pages on the screen in front of you, if I may.  I'm going to publish to the jury page 9 of that list, sir.  You can just look on the screen in front of you actually.  I've highlighted a name on the shareholders list of RTLM, a particular name.  Do you see the name I've highlighted, sir?

A.    Yes, I can see the name.

Q.    Now, is that the same name as the person whose letter we looked at a moment ago hiring Prudence Kantengwa at Sonarwa?

A.    Yes.

Q.    And does it read "Matthieu Ngirumpatse, care of MRND"?

A.    Yes.

Q.    And on page 11 of the RTLM shareholder list, do you see the name "S. Nteziryayo"?  Is that the same name as the person we saw that promoted Ms. Kantengwa to chief of section?

A.   Yes.

Q.   Finally, page 5 of the list, can you read us the name that's highlighted on page 5 of the list of the RTLM shareholders?

A.   Yes, I can see the name.

Q.   And it says Prudencienne Kantengwa?

A.   Yes.

Q.   Now, do you know if Ms. Kantengwa's married?

A.   Yes, she's married.

Q.   Do you know what her husband did for a living?

A.   Yes.  She worked at the president's office, at the president's office at the intelligence office.

Q.   Did you ever see Ms. Kantengwa's husband during the course of your work at Sonarwa?

A.   I would see him when he dropped her at work and when he also picked her up from work.

Q.   Was he typically -- when you say dropped her, in an automobile?

A.   Yes.

Q.   Was he usually driving himself?

A.   He had a driver.

Q.   Do you know whether it was a personal vehicle as opposed to a government vehicle?

A.   It was a government's car.

Q.   Assigned a car belonging to Service Central de

Renseignement?

MR. McGINTY:  Objection, your Honor.  Leading.

THE COURT:  Overruled.

A.    Yes.

Q.    Now, sir, when parties were allowed to form -- strike that.  Before parties were allowed to form in Rwanda in the early 1990s, were you a member of MRND?

A.    All the Rwandans were in the MRND.

Q.    Did you continue to be a MRND member after parties were allowed to form?

A.    I went into PSD.

Q.    And PSD stands for what?

A.    It was a social political party that will speak for the people.

Q.    And were there any members of PSD who were in management positions at Sonarwa?  Were any members at PSD in management positions at Sonarwa?

A.    I do not know of any.

Q.    Were all Sonarwa managers members of MRND?

A.    Most of them.

Q.    Did management at Sonarwa treat employees equally regardless of their party affiliation?

A.    Those that went into the opposition parties were not taken as good care of as they were taken care of before.

Q.    Were there ways in which MRND members were treated

differently in your experience?

A.    Yes, that's correct.

Q.    Can you describe for the jury ways in which MRND members received different treatment?

A.    An example was like if a person was a member of the MRND and were sick for permission, normally you would fill out a form, but they were not permitted -- or, no, they would not fill out that form, but those who belonged to another political party, they will have to fill out a form in order for them to have permission.

Q.    Permission to do what, for example?

A.    Like if you want to go to withdraw money from a bank.

Q.    Were there any other ways that management treated MRND members differently?

A.    Wouldn't you judge that it was different if two people are working in the same department and one is required to fill out a form to have permission and the other is not filling out a form?

Q.    Were Sonarwa employees permitted to leave the office to participate in activities unrelated to the insurance business?

A.    They were youth that were employed at the Sonarwa, they would be permitted to go, like, for example, for a week to be trained with the Interahamwe.

Q.    What is the Interahamwe?

A.    It was the MRND youth.

Q.    Did the Interahamwe become a militia during the genocide, become a youth militia during the genocide?

A.    If you would please repeat for me?

Q.    Did the Interahamwe play a role during the genocide?

A.    Yes.

Q.    Tell the jury what role they played.

A.    They killed people.

Q.    Are you saying, sir, that Sonarwa management permitted MRND members to leave Sonarwa to attend MRND training?

A.    Yes, it is correct and then also there were even vehicled by Sonarwa's automobile.

Q.    I'm sorry, sir, but I'm not sure if I understood that last phrase.

A.    They were transported by Sonarwa automobile.

Q.    Transported to the Interahamwe training?

A.    Yes.

Q.    Were members of other political parties allowed a leave of absence to participate in political activities?

A.    No, we would only do it on the weekends.

Q.    Do what on the weekends?

A.    If we would go like to go into meetings and also to be informed of a new -- new ways.

Q.    Were MRND members permitted to attend meetings or rallies during business hours while working at Sonarwa?

A.    Any time they would want to leave, they would go.

Q.   And did you actually see MRND members from Sonarwa leave to attend political rallies during business hours?

A.   Yes, we saw them all the time.  It didn't happen once, it happened for months.

Q.   Months during what period?

A.   Like the whole of 1993.

Q.   That was the year before the genocide began?

A.   Yes.

Q.   Do you know after parties were allowed to form in Rwanda whether Prudence Kantengwa changed her party affiliation?

A.   No, I do not know of it.

Q.   Do you know whether she continued to be MRND?

     MR. McGINTY:  Objection.  Assumes a fact not in evidence.

     THE COURT:  Overruled.

A.   I saw her wearing a scarf and she remained with that scarf.

Q.   What's the significance of that scarf?

A.   It could signify or mean that she belongs to a certain political party.

Q.   What political party?

A.   Every party had scarves that would represent them as BOPL or MRND.

Q.   Did the scarf you saw the defendant wearing represent a particular political party?

A.    It was for the MRND.

Q.    Did you ever see the defendant wear anything else indicating her political party?

A.    Like before we left the political party of MRND, we all had the badge of the president's picture with us, but when we left the political party of MRND, we ceased to wear that badge, but those who remained would continue wearing that badge.

Q.    And can you describe the badge, please.

A.    It was a picture just of the head that we would put on like he pointed and it was photographed, and it was like a glass covering, the picture.

Q.    A photograph of whom?

A.    It was the picture of the president of the Republic, Habyarimana.

Q.    And did the defendant continue to wear that badge with the president's picture throughout 1993?

A.    Yes.

Q.    You've told the jury that on occasion MRND members were permitted to leave the Sonarwa offices during business hours to attend political rallies?

A.    Yes.

Q.    Do you know whether the defendant ever attended such rallies?

A.    I don't know.  I remember when the Arusha Accord say that the government has to mix the military, but the MRND did not

agree and so they asked the members to go and make a strike into the streets to -- they go on strike, they went on strike in the streets.

Q.   Are you remembering a specific political rally or event?

A.    It was in 1993 because the accords were not signed yet, the Arusha Accords were not signed yet.

Q.   And are you saying the purpose of that rally was to protest the peace corps.?

A.    It was to protest against the mixture of the Army, of the two Armies.

Q.   And was the protest organized by MRND?

A.    Yes, it was the RPF, no, the MRND that had organized protesting against the RPF Army mixing with the then Army of the government.

Q.   And do you know whether the defendant attended that political rally?

A.    Yes, it's even that day that I saw her wearing that scarf.

Q.   How do you know that she attended the rally on that date?

A.    She walked on the first floor, and I walked on the lower level, and I saw her descending and going.

Q.   How did you learn that there was going to be a rally?

A.    There was a special vehicle assigned to announce, and it had a microphone, and it would announce and also it had the flag on it, and that vehicle was there.

Q.   So that vehicle with the microphone announced the

organization of that rally?

A.   Yes, there were requests, the members of the MRND to go to that protest meeting.

Q.   And aside from the defendant, did you see any other employees of Sonarwa respond to that invitation to the rally?

A.   The differences of the Sonarwa and the MRND, it was different -- I mean it was difficult.

MR. CAPIN:  I'm sorry, please say that again, madam interpreter.

THE INTERPRETER:  Yes, if I allow him, may I ask him to repeat the answer?

MR. CAPIN:  Please.

A.   Because the Sonarwa -- in Sonarwa, there were many members of the MRND, so whatever was done in Sonarwa, the MRND was aware and vice versa, so it was difficult to separate MRND and Sonarwa.

Q.   So my specific question, sir, though is on this particular occasion when the vehicle with the loud speaker announced an MRND rally, did you see other MRND employees join the rally? My apologies, I believe, sir, I mistakenly said MRND employees, I meant did you see any other Sonarwa employees join the rally?

A.   Yes, they went.

Q.   How many employees went to the rally?

A.   Those who attended at that time?

Q.   Yes.

A.   There were many, there were not less than 13.

Q.   Were there any other occasions where you saw such a vehicle announcing an MRND rally while you were at work at Sonarwa?

A.   Let alone that day but even other days that they would go to the meeting they would use that same car.

Q.   And do you remember other specific occasions when you heard invitations to MRND rallies while working at Sonarwa, other specific occasions?

A.   There was also another time when Arusha had asked for the peacekeepers who were on the land of Rwanda to leave the country and so they had asked the ladies that worked at Sonarwa to go and request that those Army or those peacekeepers that they should not leave the country because the women would suffer because it tends when there is war women tend to get to suffer more.

Q.   Was this another occasion on which an MRND rally was conducted while you were working at Sonarwa?

A.   Yes.

Q.   And this loud speaker you spoke of, did it invite women to join the rally?

A.   Yes.

Q.   And are you saying specifically MRND, the women of MRND who were asked to join?

A.   Yes, because they were the ones that were happy or

supported that the French would remain in Rwanda.

Q.   And did you know -- do you know whether any of your female colleagues at MRND joined the rally on that particular occasion?

A.   There were many and among them also Kantengwa joined.

Q.   Do you know a woman named Charlotte Rufyari, R-u-f-y-a-r-i?

A.   Yes, Charlotte, I know of her, but she was from Burundi but she worked at Sonarwa.

Q.   Do you know what political party she belonged to?

A.   Yes, I do because there was no particular party that was in Rwanda, so I'm sure she was a member of the MRND.

Q.   How do you know she was a member of the MRND?

A.   Because she would talk to a man called Hakizayizu, and Hakizayizu would discriminate people in a very highly way, and I will spell for the record if you would permit me.  It's H-a-k-i-z-a-y-i-z-u.

Q.   Was Charlotte Rufyari one of the women who attended MRND rallies while working at Sonarwa?

A.   Yes, she did.

Q.   Do you know a man named Jean de Dieu Uwimana?

A.   Yes.

Q.   Is Uwimana U-w-i-m-a-n-a?

A.   Yes.

Q.   Do you know what political party he belonged to?

A.   Yes, he was the MRND member.

MR. CAPIN:  Nothing further at this time, your Honor.

THE COURT:  Mr. McGinty.

MR. McGINTY:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. McGINTY:

Q.   Mr. Rutaysisre, you testified you saw Prudence Kantengwa wearing a scarf and a pin just a few moments ago.  Am I right?

A.   Yes, that's correct.

Q.   Now, do you recall meeting with the government recently where you only mentioned that she wore a pin but didn't mention scarf?

A.   Because we did not spend so much time together, I stated in brief.

Q.   Now, did you spend time together when government agents went over to speak to you in Rwanda?

A.   I beg your pardon.

Q.   Did you spend time together when government agents went over to speak to you in Rwanda?

A.   No, we did not spend as much time.

Q.   Okay.  Now, do you remember agents coming to Sonarwa in 2008?

A.   Yes, I do remember.

Q.   And do you remember they interviewed you?

A.   Yes.

Q.   And at the time they were asking you questions about Prudence Kantengwa, weren't they?

A.   Yes.

Q.   Now, at the time you didn't mention that she wore either a scarf or a pin; isn't that true?

A.   I think I remember saying about the badge.

Q.   About the badge?

A.   Yes.

Q.   Now, do you remember meeting with a couple of agents who went over and met with you in Sonarwa?  Do you remember that happening?

A.   Of the agent of Sonarwa?

Q.   These were --

A.   What agents?

Q.   These were Americans who had come over to investigate Prudence Kantengwa.  Do you recall that?

A.   I had met with one, but then also there's a time I met with two of them.

Q.   I see.  Now, were they at different times?

A.   Yes.

Q.   How far apart were those times from one another?

A.   I met with some in 2008 and also 2011, but I don't recall the date nor the month.

Q.   I see.  Now, the 2008 meeting was over in Rwanda; am I correct?

A.    Yes.

Q.    Isn't it the case -- let me simplify it.  At that meeting in 2008, you did not tell the agents that you saw Ms. Kantengwa wearing either a scarf or a pin; isn't that true?

A.    Because we didn't spend so much time together, I did not have the time to tell every detail because I didn't know.

Q.    I see.  Now, did you tell the agents -- who did you meet with in 2011?  Who did you meet with 2011?

A.    It was a person that I had met before with his colleague.

Q.    Okay.  Now, was that meeting in the Rwanda?

A.    Yes, it was in Rwanda.

Q.    Now, if I might ask, where did you grow up in Rwanda?

A.    I suppose that's where the place I was born.

Q.    Is where, I'm sorry?

A.    In Gikongoro, G-i --

Q.    Did you go to school there?

A.    Yes, in Gikongoro.

Q.    How many years of schooling have you had?

A.    Six years of primary school.

Q.    Okay.  Now, in 1990, in the period between 1990 and 1994, what department within Sonarwa were you working at?

A.    It was in the Department of Merchandise Transportation.

Q.    Okay.  Where was that located in the Sonarwa building?

A.    Do you know of that house -- how do you want me to explain?

Q.   When you went into the building, was your office on that floor, above that floor or below that floor?

A.   It was on the low beam, on the ground floor.

Q.   On the ground floor?

A.   Yes.

Q.   Now, the service you were in at the time was transportation?

A.   Yes.

Q.   Now, when you spoke to the agents in 2008, you said you were working in the technology department.  Where is the technology department located in Sonarwa?

MR. CAPIN:  Objection.  I don't think we had an answer to the former question, your Honor.

MR. McGINTY:  I'm sorry, I'm sorry.

Q.   In 2008, did you tell the agents that you worked in the technology department?

A.   In 2008 actually they called it the technique department, and they had mixed them.  They had mixed them, there was automobile department and also fire department, so they had mixed them with the technology department.

Q.   Okay.  In 1993 and 1994, were you working in the technology department?

A.   They had not mixed them up, but I was working at the transportation department.

Q.   And what floor was the transportation department on as you

entered the building?

A.   It was on the ground floor.

Q.   Now, you testified a bit about Matthieu Ngirumpatse.  Do you remember your testimony?

A.   Yes, I do recall.

Q.   Now, Mr. Ngirumpatse had been before he became director general at Sonarwa had been an ambassador to Germany and to Ethiopia; isn't that the case?

A.   I know of him being an ambassador, I did not know an ambassador to what countries.

Q.   What year did he come to Sonarwa as director general?

A.   It's 1990, only that I do not recall the month.

Q.   Okay.  Now, do you recall Mr. Ngirumpatse becoming the minister of justice in Rwanda's first multi-party government; do you recall that?

A.   Yes, he was a minister, but I don't recall the year.

Q.   Do you recall he was the very first minister of justice in the multi-party government; do you recall that?

A.   He was a minister before the multi-party was established.

Q.   Thank you.  Do you recall him becoming minister of justice at the time of multi-party in the very first multi-party government?

A.   No, when the multi-party started, he was at Sonarwa.

Q.   And when multi-party started, he left, did he not, to become minister of justice?

A.   No, he did not become a minister, but he went and were nominated as the president of the MRND.

Q.   Okay.  And that was when he became nominated to be the president of MRND, he had left Sonarwa; isn't that the case?

A.   Yes, he left Sonarwa to go to be the president of the MRND.

         MR. McGINTY:  May I approach the witness, your Honor?

         THE COURT:  You may.

Q.   Now, I show you a photograph and I ask you if you recognize what's depicted on that photograph?

A.   I think it's the building of Sonarwa.

Q.   Thank you.  This is the location where you worked; am I right?

A.   Yes.

         MR. McGINTY:  Your Honor, I move to admit the photograph and I'd ask to be able to display it.

         MR. CAPIN:  Your Honor, a little more foundation.  I'm not sure when Sonarwa was housed in that building.

         MR. McGINTY:  I'll ask that.

Q.   Do you recall, sir, when Sonarwa, the business, was located in the building that is in that photograph?  Do you recall working in the building that is in that photograph?

A.   Yes, that's where I was working.

Q.   Now, during what period were you working in that building?

A.   That I worked in that house?

Q.   In that building, yes.

A.   This building was built by Sonarwa itself, and we started working there in 1984.

Q.   Thank you.

     MR. McGINTY:  Again I move to admit the photograph. May I display it, your Honor?

     THE COURT:  Yes, I believe it will be Exhibit 28.

     (Photograph was marked Exhibit No. 28 and admitted into evidence.)

Q.   Now, the photograph that's up on the screen now, that is a picture of the building that you worked in from 1984 to 1994; do I understand that correctly?

A.   Actually it's up to 2011.

Q.   I was going to ask that next.  Up to 2011.  From 1984 to 2011, this is the building you worked in, correct?

A.   Yes.

Q.   Now, can you point out in this building as you go in, can you tell us what departments are located on the ground floor which would be the floor that is located where this arrow is that I just pointed, what departments of Sonarwa would be located there?

     THE INTERPRETER:  He's pointing.

Q.   You can tap on the screen.

A.   He worked on that side.

Q.   If I could just tap there.  You worked at that side, and

what department was on that floor at the time in 1990 through 1994?

A.    From 1984, it was the automobile department and also the accidental department.

Q.    Now, where was -- did you have a desk, did you have an office on that floor?

A.    It was a desk like this one.

Q.    A desk.  Now, where was it located -- where was it located as you go from the front of the building that is before you toward the back of the building?  Where would your desk be located?

A.    It was on that side but a little bit in the rear.

Q.    Toward the rear?

A.    Yes, towards the rear.

Q.    Now, when you say toward the rear, that was your work station at the time in 1993 and 1994; do I understand that correctly?

A.    Yes.

Q.    Now, where -- what was located on the second floor?  What departments?

A.    Do you mean the first floor or the second floor?

Q.    I'm sorry, what do you call this floor that you were working on?

A.    On the ground floor.

Q.    And what would the next floor up be, what would you call

that?

A.    The first floor.

Q.    The first floor.  And then the next floor would be the second floor; am I right?

A.    Yes.

Q.    And that would be the top floor?

A.    Yes, it's the top floor.

Q.    So what departments were located on the first floor?

A.    There was the accounting, the general accounting office where he's pointing, there.  There was the general accounting office.

Q.    And what other sections would be -- what other departments would be on that floor?

A.    At the first floor, you mean?

Q.    Yes.

THE INTERPRETER:  Your Honor, may I request the other interpreter?

THE COURT:  Yes.

A.    Then there was compensation department, and that's where also Madam Kantengwa worked.

Q.    And what part of the floor was that located at?

A.    Would you please repeat the question?

Q.    On the first floor, can you point to the area where she would have worked?

A.    Where Kantengwa worked?

Q.    Yes.

A.    On that side.

Q.    So, would it be fair to say she worked on a different floor from you; do I understand this correctly?

A.    Yes.

Q.    Was it in a different department from you; do I understand that correctly?  Is that fair to say?

A.    Yes, we worked a different department.

Q.    Now, did the government show you all of the personnel file of Ms. Kantengwa?  Did the government show you all of the personnel file of Ms. Kantengwa?

A.    Would you please repeat your question?

Q.    The government showed you some documents that had Ms. Kantengwa's name on them.  Is that correct?

A.    What government?

THE COURT:  You might define what you mean by the personnel file.  I believe that's confusing.

Q.    The government had put on the screen some documents that had the name of Prudence Kantengwa on them.  Do you recall that?

A.    They're the ones that I'm holding in my hands.

Q.    May I see those?

MR. McGINTY:  May I approach, your Honor?

THE COURT:  You may.

Q.    Thank you.  Other than the documents that they showed you,

the documents that are marked at the top 5 and at the top 39, did they show you any other documents from the personnel file of Prudence Kantengwa or did they show you any other documents that bore her name?

A.   No.

Q.   Now, were you aware in 2008 when you were asked about Ms. Kantengwa, you said she worked in auto claims.  Do you remember saying that?

A.   No, she worked at the compensation, compensation department.

Q.   Now, are you aware of any other section of Sonarwa that Ms. Kantengwa worked at?

A.   You meant sections?

Q.   Sections or did she work on any other floor of the building at any time?

A.   That's the place where she started as far as I know.

Q.   So, as far as you know, she started working on the second floor in the auto compensation department?

A.   No, the first floor.

Q.   I'm sorry, on the first floor, my apologies.  Are you aware that she had originally been hired in the Jaridicle Department?

A.   In the department where she worked, yes, it was in the Jaridicle Department because there was some damage to automobile.

Q.    What was located on the second floor of Sonarwa?

A.    That was the main office and the secretariat office.

Q.    What else is located on that floor?

A.    And there was the Jaridicle Department.

Q.    So on the second floor of the building was the Jaridicle Department, correct?

A.    Yes.

Q.    Are you aware that she was demoted from the Jaridicle Department on the second floor and moved to the first floor in the auto compensation unit?  Were you aware of that?

A.    No, I do not recall that she started there.

Q.    Were you aware that the person who approved her demotion from the Jaridicle Department was Matthieu Ngirumpatse?  Were you aware of that?

A.    No, I wasn't aware.

Q.    Were you aware that when she was originally hired that other persons were hired with her?

A.    It's possible, and actually this letter, it was my first time to see it, I wasn't aware of it.

Q.    Okay.  Now, do you know a person by the name of Jean Pierre K-a-y-i-t-a-r-e?

A.    Yes, I know of him.

Q.    Are you aware that he is Tutsi?

A.    Yes, he's a Tutsi.

Q.    Are you aware that he was hired at the same time as

Ms. Kantengwa?

A.    I do not recall in the manner they were given the job or the time they were given the job.

Q.    Are you aware that both were hired at a time when Matthieu Ngirumpatse was director general of Sonarwa?

A.    I do not recall of Ngirumpatse, but I do recall that it was in that time when Kantengwa was given the job.

Q.    Now, do you know a person named Koma, if I might spell it, N-k-u-r-u-n-z-i-z-a, Koma Nkurunziza?  Do you know a person named Koma Nkurunziza?

A.    Yes, I know of him.

Q.    Okay.  Now, if I might pronounce him Koma, the gentleman known as Koma was in a supervisory position at Sonarwa, isn't that the case?

A.    He was an assistant of the general manager.

Q.    So he was a high ranking individual; am I right?

A.    Beg your pardon, he had not finished.

Q.    I'm so sorry.

A.    He was the assistant of the general manager, but because he wasn't the MRND member, he was in the opposition, it was like he was insignificant.

Q.    He ultimately became the managing director of Sonarwa, did he not?

A.    No.

Q.    Didn't he retire in October, 2000 as the managing director

of Sonarwa?

A.    No.

Q.    In the year 2000, did he not retire as managing director of Sonarwa?

          MR. CAPIN:  Objection.  Asked and answered.

          THE COURT:  Yes. I don't think repeating the question changes the answer.

Q.    He wasn't Tutsi, was he not or is he a Tutsi?

A.    Yes, he was a Tutsi.

Q.    Now, you testified that persons who were part of MRND did not need permission for absences at work?

A.    They did not need permission, or when they requested permission, they were not refused.

Q.    And would the file -- would the personnel file at Sonarwa reflect your party membership?

A.    No.

Q.    It would not.  Now, persons in MRND were given favorable treatment, that was your testimony, correct?

A.    Yes, that's correct.

Q.    They didn't have to seek permission or they quickly got permission if they wanted a leave or time off, correct?

A.    Yes, that's correct.

Q.    And they were more favorably treated in promotion practice, correct?

A.    An example is like this lady --

Q.   Yes or no, were they more favorably treated in promotion practice?

A.   Yes.

Q.   Now, you're aware of a person by the name of Matthieu Hakizayizu, correct?

A.   Yes, I know of him because he was also my leader.

Q.   Okay.  Now, he was an MRND member, was he not?

A.   Yes, since a long time.

Q.   Okay.  And he was -- he was one of several people who were MRND members at Sonarwa; isn't that true?

A.   Yes.

Q.   And he testified that MRND members would try to protect each other?

A.   Yes.

Q.   Okay.  Now, are you aware that Mr. Hakizayizu suspended Ms. Kantengwa from work?

A.   No, I do not know of it.

Q.   Now, Mr. Matthieu Hakizayizu was a member of MRND; am I right?

A.   Yes.

Q.   He protected MRND members, did he not?

A.   Yes, that's correct.

Q.   He would permit them to leave early and to have more time free?

A.   Yes, that's correct.

Q.   Okay.  And you testified that you knew Ms. Kantengwa while at Sonarwa, correct?

A.   Yes, I knew of her.

Q.   Did you not know that she was suspended from work by Matthieu Hakizayizu?

A.   No, I do not know of it.

Q.   Were you aware that -- you testified about Ms. Kantengwa's husband.  Were you aware that her husband, Ms. Kantengwa's husband, was part of an investigation that involved conduct that included Mr. Hakizayizu?  Were you aware that Ms. Kantengwa's husband was part of an investigation --

THE COURT:  You've got to let the interpreter relay the question.

MR. McGINTY:  I'm sorry.

THE COURT:  Go ahead.

THE INTERPRETER:  Thank you.

Q.   Were you aware that Ms. Kantengwa's husband was part of an investigation into MRND conduct that was critical of Mr. Hakizayizu?

A.   I do not know of it, I only know that he worked in the intelligence service in the government.

Q.   Do you know as part of the intelligence service he had interviewed Mr. Hakizayizu in connection with that investigation?

A.   I'm sorry.

Q.   Were you aware that as part of the intelligence service,
Ms. Kantengwa's husband had interviewed Mr. Hakizayizu?

A.   Yes, they would speak.

Q.   They would speak, so when you say they would speak, are
you talking about Mr. Munyemana, Ms. Kantengwa's husband,
speaking to Mr. Hakizayizu?

A.   No, Kantengwa and Mr. Hakizayizu, not her husband.

Q.   When would you see them talk?

A.   During work time, during working hours.

Q.   Did they appear to be friendly?

A.   I wouldn't know their friendship.

Q.   How many times did you see them speaking together?

A.   Many times.

Q.   Now, were you aware at any time that Ms. Kantengwa's
husband had interviewed Mr. Hakizayizu?

A.   No, I did not know.

Q.   Was there any discussion within Sonarwa of the fact that
Prudence Kantengwa's husband was conducting an investigation of
Mr. Hakizayizu?

A.   No, I do not recall.

Q.   And you were unaware that Mr. Hakizayizu had suspended
Ms. Kantengwa?

A.   No, I did not know.

        MR. McGINTY:  No further questions of this witness,
your Honor.

MR. CAPIN:  Just a few, your Honor.

REDIRECT EXAMINATION

BY MR. CAPIN:

Q.   When Mr. McGinty asked you that she was suspended, you note that she was suspended for only three days based on an error she made on one of her claims?

A.   (No response)

Q.   Was it unusual for Sonarwa members to be suspended for some periods of time that they made mistakes on claims they were processing or mistakes that cost the company money?

A.   Yes, it was possible.

Q.   Were you aware of other instances?

A.   In what way?

Q.   Other instances of employees being suspended for mistakes that cost Sonarwa money?

A.   It was possible because they were working in the compensation department.

Q.   Now, Mr. McGinty asked you some questions about speaking to American agents back in 2008, and he suggested to you that they were there to investigate Prudence Kantengwa.  Do you know who in fact those investigators, those American agents were investigating in 2008 based on your personal knowledge?

A.   I know of their faces, but I do not know their names.

Q.   And you don't know who in fact they were investigating?

A.   I'm sorry.

Q.   And you don't know who in fact they were investigating?

A.   Yes, they asked me of Kantengwa, but I do not know why they were investigating or who they were investigating.

Q.   Do you know if they were investigating any other people in Rwanda?

A.   No, I do not know because they did not ask me of it.

Q.   Mr. McGinty asked you some questions about Mr. Ngirumpatse having served as an ambassador representing Rwanda, and in that job he was appointed by the MRND president Habyarimana, correct?

A.   Yes, that's correct.

Q.   Now, Mr. McGinty asked you some questions about other Tutsi employees.

A.   Yes.

Q.   What is your ethnicity, sir?

A.   I'm a Tutsi.

Q.   Were these other Tutsi employees that Mr. McGinty mentioned allowed to go out during business hours while at Sonarwa to attend political rallies?

A.   If you weren't a member of MRND, it was not possible.

Q.   Not possible to do what?

A.   It wasn't possible to get permission unless you filled out a form.

Q.   Now, on those occasions when you saw MRND employees responding to the car with the megaphone inviting them to join

a rally, did you see any of them stop by the personnel department to fill out a form?

A.    No.

Q.    On those occasions, you saw Ms. Kantengwa go out in response to the invitation to an MRND rally?

A.    No, she did not ask or invite any permission.

Q.    On those occasions did you see Ms. Kantengwa put on any additional garments?

A.    There was the pin and then also the scarf.

Q.    Was she wearing the scarf during business hours or did she add it to join the rally?

A.    When they went to the rally.

Q.    And was the scarf unique to the MRND, that particular scarf?

A.    It was an usual thing for them, but to us, it was an unusual thing because we were -- we feared.

Q.    You feared what?

A.    Because we knew that the people of the opposition did evil things or bad things.

Q.    Now, Mr. McGinty asked you some questions, and this is my final line of questions about Mr. McGinty asked you questions about whether you ever had conversations with Prudence Kantengwa.  Did you ever engage her in conversation?

A.    I could not speak to the wife of my leader.

Q.    Why not?

A.   Because of the people who are employed at such important places, we would fear them.

Q.   Now, when you say the wife of your leader, who is your leader?

A.   Like my boss, my direct boss in my service.

Q.   Now, I want to understand what you meant when you said, "I could not speak to the wife of my leader."  Could you explain that?

A.   I did not say that he was my boss or my leader.

Q.   Did I misunderstand -- let me ask the question again, perhaps there was an interpretation issue.  Why did you not speak or engage Ms. Kantengwa in conversation?

A.   Because she was the wife of my leader.

Q.   Do you mean my leader?

        MR. CAPIN:  Your Honor, I think we have an interpretation issue.  Do you mean my leader or a leader?  Is it possible, madam interpreter, the witness is saying a wife to a leader?  Perhaps you can clarify with him.

A.   Oh, a leader.

Q.   A leader.  Why could you not speak with -- when you say a leader, who's the leader you're referring to?

A.   The wife of the leaders because we knew that the husband worked at the intelligence services, we did not only honor them, but we also respected them and feared them because if we talked to them, they could either lie or say that we did

something that we did not do.

MR. CAPIN:  Nothing further, your Honor.

RECROSS-EXAMINATION

BY MR. McGINTY:

Q.   You mentioned when you saw these garments, they were unusual and they made you fear.  Do you remember saying that?

A.   Yes.

Q.   And the garments now were the scarf and the pin.  Do I understand that right?

A.   Yes.

Q.   And these are the things that told you that a person was a member of MRND?

A.   Yes.

Q.   And if a person were to ask you whether someone is a party member, wouldn't it be important to say yes, I saw them wearing the colors or the clothing of the party, would that not be important?

A.   To them.

Q.   Not to you to communicate it to them?

A.   To communicate to who or to --

Q.   If someone asked you a question whether someone was a party member, you could answer I saw them wearing the colors of the party, could you not?

A.   Yes.

Q.   You told us when you saw the scarf it made you fear?

A.   Yes.

Q.   And you remember the fear upon seeing the scarf, correct?

A.   Yes, I do remember.

Q.   When you met with agents in 2000 -- strike that.  When you met with investigators in 2008, isn't it true that you never mentioned seeing a scarf or a pin on Ms. Kantengwa; isn't that true?

A.   I did not tell -- maybe I did not tell them, but it's not because I wasn't aware of it.

Q.   And isn't it true when you met with agents in Rwanda, or, I'm sorry, isn't it true when you met with Americans in Rwanda in 2011 you first mentioned a pin but you didn't mention a scarf; isn't that true?

A.   I said of the pin because they would have it with them at all times, and the scarf will be only worn when they would go to the rallies.

Q.   And in that meeting in 2011, you never said I saw her wearing a scarf; isn't that true?

A.   We only saw each other or we met for a brief moment so I could not say everything in detail.

Q.   How long was this moment?

A.   When we met?

Q.   Yes.

A.   It wasn't even an hour.

Q.   Now, these Americans had flown over to Rwanda.  Did they

meet with you in Sonarwa?

A.    Yes.

Q.    And they met to ask you questions, didn't they?

A.    Yes.

Q.    And you had important information to tell them, didn't you?

A.    Because the time was short or brief, I wasn't able to tell everything that I knew.

Q.    So you didn't mention that you saw her in a scarf; am I right?

        MR. CAPIN:  Objection.  Asked and answered.

        THE COURT:  Sustained.  You need not answer that again.

Q.    In 2008, when the agents came to you, they brought a photograph with them, didn't they?

A.    Yes, they did show me the picture.

        MR. CAPIN:  Objection.  Beyond the scope, your Honor.

        THE COURT:  Sustained.

        MR. McGINTY:  I have no further questions of this witness.

        THE COURT:  Thank you very much, Mr. Rutaysisre, that concludes your testimony.  All right.  Jurors this is an opportune time for the morning recess.  We'll take 25 minutes, and then we'll return for the next witness.

        THE CLERK:  All rise.

( A recess was taken.)

THE CLERK:  All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE CLERK:  Please be seated.  Court is in session.

CANDACE MARIE KELLY, having been duly sworn by the Clerk, testified as follows:

DIRECT EXAMINATION

BY MR. CAPIN:

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  My name is Candace Marie Kelly, K-e-l-l-y.

Q.   Please tell us how you're employed.

A.   I'm a special agent with the Department of Homeland Security, homeland security investigations.  I've been an agent for five years.

THE COURT:  Could you move the microphone a little bit closer.

Q.   It's especially important since you're going to be doing a lot of talking.  Special Agent Kelly, do you have in front of you Exhibits 5 through 8?

A.   I do.

Q.   And are those exhibits to an immigration proceeding, the top of each states U.S. Department of Justice Executive Office for Immigration Review, U.S. Immigration Court?

A.   Yes.

Q.   And each relates to the matter of Prudence Kantengwa?

A.   Yes.

Q.   And it bears an A file number on each document, it states file A098277297?

A.   Correct.

Q.   And those proceedings are before an immigration judge?

A.   Yes.

Q.   Am I correct in noting that at the bottom of each exhibit it indicates which attorneys appeared for which party?

A.   Yes.

Q.   And for the Department of Homeland Security, the attorney was Mary C. Kelley?

A.   Yes.

Q.   And for the respondent for Prudence Kantengwa, the attorney was David McHaffey?

A.   Yes.

Q.   Now, have you agreed to in essence act as a reader to read in, to read to the jury certain portions of these transcripts for today's proceedings?

A.   Yes.

Q.   I'm going to start you then directed to line and page, Special Agent Kelly, starting with Exhibit 5.  Am I correct in noting that Exhibit 5 on the first page indicates that it is testimony given on August 24th, 2006?

A.   Yes.

Q.   And is Exhibit 6 testimony given on February 2d, 2007?

A.   Yes.

Q.   Exhibit 7 given on June 20th, 2007?

A.   Yes.

Q.   And, finally, Exhibit 8 is May 16th, 2008?

A.   Yes.

Q.   Turning to Exhibit 5, I'm going to track these to make it simple.  Am I correct in noting that each page number bears at the center of the page at the bottom bears a page number?

A.   Yes.

Q.   And in the right-hand corner, there's what we call a Bates number, which in this case states Kantengwa, A file- so for the second page of Exhibit 5 several zeros and ending in 205?

A.   Yes.

Q.   So, for either presentation, I'm going to direct your attention to the last three or four digits of the Bates number, understood?

A.   Yes.

Q.   So, turning to Exhibit 5, Bates number 205, I'll read the question and ask you to read the answer, agreed?

A.   Agreed.

Q.   Thank you.  "Judge to Ms. Kantengwa:  Ma'am, please stand and raise your hand.  Ma'am, do you swear that any testimony you provide this Court will be the truth, the whole truth and

nothing but the truth?"

A.    "Yes, I do."

Q.    Line 16, "Ma'am, your name, first of all?"

A.    "Prudence Kantengwa."

Q.    Special Agent Kelly, am I correct in noting that at the beginning of each of the four proceedings that are transcribed from the documents in front of you the same oath is given to Prudence Kantengwa?

A.    Yes, that is correct.

Q.    And in each instance she swears to tell the truth, the whole truth and nothing but the truth?

A.    Yes.

Q.    Turning to the next page of Exhibit 5 bearing Bates number 221, line 18, Judge to Ms. Kantengwa:  "First of all, ma'am, is all the information in your asylum application truthful and accurate?"

A.    "Yes, it is truthful."

Q.    "Have you reviewed the application before coming to court today?"

A.    "Yes, I think there are minor -- we do have some corrections."

Q.    Turning to Bates Number 224, line 19, Judge to Ms. Kantengwa:  "All right.  So, ma'am, as amended, is all the information true in your application?"

A.    "Yes."

Q.    Turning to page 225, Mr. McHaffey, who was counsel for Ms. Kantengwa, Mr. McHaffey to Ms. Kantengwa:  "What country are you from?"

A.    "Rwanda."

Q.    "Okay.  Are you married?"

A.    "I am a widow."

Q.    Next page.  Line 19, "Okay.  When did you last live in Rwanda?"

A.    "In 1994."

Q.    "Okay.  Where were you living?"

A.    "In Kigali."

Q.    "What did you do for work?"

A.    "I was working in an insurance company."

Q.    "Okay.  Was that a government position?"

A.    "No."

Q.    I'm going to publish on the overhead a page from Exhibit 4A.  I show you this page, and I ask if I read a particular provision correctly.  Does this document caption details of background as part of Ms. Kantengwa's asylum application?  Do you see that?

A.    Yes.

Q.    And am I correct in noting that at the bottom under employment, the second item reads, "Attorney and chief department, insurance company, Kigali, November 1990 to April, 1994?"

A.    That's correct.

Q.    Go back a line to put you back in context, line 226, I'm sorry, Bates Number 226, last line, question 25:  "Okay.  Was that a government position?"  Continuing on the next page.

A.    No.

Q.    Turning to Bates Number 228, the following page, line 6, "Okay.  When did you leave Kigali?"

A.    "In April, 1994."

Q.    Okay.  And Judge to Ms. Kantengwa.  Question:  "What month?"

A.    "April."

Q.    "April.  What day in April?"

A.    "The 12th."

Q.    Would you turn to Bates Number 225 in Exhibit 5, please, I'm sorry, 257, line 23; do you see that?

A.    Uh-hum.

Q.    Judge to Ms. Kantengwa.  Question:  "I just want to get a sequence of events down so you went from Rwanda two times in the year 2000.  The first time you got a passport and the second time you applied for a Visa and you were denied.  That Visa was the U.S.?"

A.    "Yes, your Honor."

Q.    "And it was denied and then you returned in 2001 to Rwanda?"

A.    "I don't think so, your Honor.  I think that was 2003."

Q.    "2003?"

A.    "Yes."

Q.    "And when in 2003 did you return to Rwanda?"

A.    "November or December."

Q.    "November or December and there was three times that you went to Rwanda in 2003?"

A.    "I think it's three times."

Q.    "Three times?"

A.    "Yes."

Q.    "And that was after you came to the United States for the first time; is that correct?"

A.    "Correct."

Q.    Bates stamp 259, the following page, line 14, Judge to Ms. Kantengwa.  "The second trip --" I'm sorry.  "And what about the second trip?"  Line 14.

A.    "The second trip, yes, I had to get in touch with the (indiscernible) leadership in the U.K., and I had the training. I had to complete my training on (indiscernible) development and from there I was attending a conference in Vancouver, Canada, a conference organized by one of the (indiscernible) we call (indiscernible), and from there I decided to visit my sister and my brother, yes."

Q.    And where you were reading "indiscernible," does the word "indiscernible" appear in parentheses indicate that the audiotape -- the language on the tape was in fact

(indiscernible) to the stenographer?

A.   Yes.

Q.   Turning to Bates stamp 260, line 20.  "All right.  So, according to the passport on page 36, you entered Rwanda November 16th, 2003.  The second time you entered, December 6th, 2003 and left on December 18th, 2003.  Then the third time you entered was December 23d, 2003, but there is no departure stamp?"

A.   "A departure stamp?"

Q.   Turning to Bates stamp 330, line 11.  Ms. Kelley to Ms. Kantengwa, Ms. Kelly being counsel for the government, for the Department of Homeland Securities.  "You have been truthful in all your documents, correct?"

A.   "Correct."

Q.   Turning to Exhibit 6, Special Agent Kelly.

     MR. CAPIN:  One moment, your Honor.

Q.   I'm going to go back to Exhibit 5, Ms. Kelly, Special Agent Kelly, Bates stamp number 238, please, line 2.  Question: "Okay.  Where did the escort take you?"

A.   "The escort took us to town."

Q.   Judge to Ms. Kantengwa:  "And where is that?"

A.   "Gitarama was towards the south.  We were heading towards my sister's house because it was still safe.  There were no killings by that time so Gitarama was in the middle.  It was still safe, but there were some roadblocks in between from

there to get around them."

Q.   Back to Bates stamp 227, please.  "After the government's position?"  Question:  "Government position?"  The answer is no, correct?

A.   Correct.

Q.   The next question.  "Okay.  What did your husband do for a living?"

A.   "He worked for the government."

Q.   "What was his position?"

A.   "He was in charge of interior security -- "

Q.   "Okay."

A.   " -- in the intelligence service department."

Q.   "And what office was the intelligence department assigned to in the government?"

A.   "In 1994, it was the prime minister's office."

Q.   "Okay.  Where was it before that?"

A.   "In the president's office."

Q.   Okay.  Judge to Ms. Kantengwa:  "When did it change?"

A.   "I believe it changed in either 1992 -- I think it was 1992 when they had a multi-party due to the centralization of power.  They changed the president and prime minister."

Q.   "Do you know what work your husband did in the intelligence department?"

A.   "He was in charge of security, interior security."

Q.   Judge to Ms. Kantengwa:  "What does that mean?"

A.   "His position required that (indiscernible) the details about the work he was working at the intelligence department."

Q.   Mr. McHaffey to Ms. Kantengwa:  "Did you speak of his work at home?"

A.   "Because of the confidentiality of the job, we didn't talk about it."

Q.   I will publish a portion of Exhibit 4A, specifically questions regarding the applicant's husband, "Athanase Munyemana."  Do you see that, Special Agent Kelly?

A.   Yes.

Q.   I know it's hard to read, so I may have to approach in order to read it more effectively.

        MR. CAPIN:  May I approach, your Honor?

        THE COURT:  You may.

Q.   It's highlighted, am I correct in noting that under the question, "Can you please tell me if you know what your husband's various positions were within the government of Rwanda between 1980 and the early 1990s?"  Answer:  "I married my husband in 1985 when he was 29 years old, I was 21 years old.  At that time he was working with the president of Rwanda, Juvenal."  Did I read that correctly?

A.   Yes.

Q.   Bates stamp No. 231, line 2, question, Mr. McHaffey: "Okay.  Do you know whether your husband was still doing the job when he was at home after the attacks started?"

A.    "Yes, he was coordinating from the megaphone."

Q.    "Do you know if he went to the office during that time?"

A.    "No, he didn't."

Q.    "Okay.  Now, you said earlier that you left on April 12th, 1994.  Could you please describe your departure from the house?"

A.    "When we -- my husband coordinated an escort.  He called some people -- I mean, he got some people from the military to see if we could an escort, and the escort was fine, but this was going to come out to our house because, as I said, the rebel groups were surrounding, and they were shooting on top of us, and it was since 7:00.  Yes, so when I was -- when we were leaving, those rebel groups shoot -- I mean shot at our house.  The bullet did not have power to destroy the house.  (Indiscernible) so when I was about to get in the car, the phone rang, I went to the phone, and (indiscernible)."

Q.    Judge to Ms. Kantengwa:  "So who called?"

A.    "I don't remember who called.  It must have been -- I thought it was maybe the security people, the escort people, (indiscernible) on the main road so we did, I mean, enter the car and we drove down."

Q.    Mr. McHaffey to Ms. Kantengwa:  "Who was with you when you departed?"

A.    "I was with my husband, our three kids, my sister, my sister-in-law, my nephew, the Tutsi guy had two or four of his

kids, my nephew and two other kids who had come to (indiscernible) at our house."

Q.    Question.  "Okay.  How many cars did you use to leave?"

A.    "We used two."

Q.    "So you went and answered the phone.  What happened after you finished with your phone conversation?"

A.    "When I finished answering the phone, we went and I joined the others who were waiting for me in cars so we drove down. We met the first rebel groups.  The first rebel group gestured to my husband to stop so he told them that we were taking one of our kids to the hospital and that he was coming back otherwise they would have taken him as a traitor who is leaving, they would have killed us if he didn't tell them that we were coming back."

Q.    "Who was manning the roadblock?"

A.    "They were mobs, militia."

Q.    "Okay."

A.    "Yes."

Q.    "Where did you go after you got through the roadblock?"

A.    "We were heading down to the main road to meet the escort who went down, and we met the escort on the main road."

Q.    Judge to Ms. Kantengwa:  "How far was that from your house?"

A.    "It will take about -- I think four meters."

Q.    "Four kilometers," you think?

A.   "I think so."

Q.   Mr. McHaffey to Ms. Kantengwa:  "Okay.  What identification did you bring?"

A.   "My ID was on my back, I had the passports on my pants, and that was an issue."

Q.   "Why was it an issue?"

A.   "Because we were supposed to show IDs at the roadblock, and when we met the escort, he asked if I had ID.  When I looked in my pants, I couldn't find it.  I remembered I left it on the table in the house."

Q.   "What issue on the ID was important, if you know?"

A.   "Well, the IDs at the time, it indicated your ethnic group, the Hutus and the Tutsis and TWA."

Q.   "And your passport didn't do that?"

A.   "No."

Q.   "Do you know whether your husband brought any government documents with him from the house in the cars?"

A.   "No, he did not bring any documents.  After (indiscernible) then they started killing people, he made sure that any papers that indicated he was working for the government was burned just in case if they came into our house to see if he was working for the government."

Q.   Okay.  Judge to Ms. Kantengwa:  "Did you have an identification card then? "

A.   "Yes, he did."

Q.    "So he didn't destroy his personal documents, he destroyed other documents?"

A.    "Yes."

Q.    "What documents did he have in the house that he destroyed?"

A.    "I don't remember very well which documents he had, he had nomination documents."

Q.    "Nomination documents?"

A.    "Nomination, I mean, documents appointing him to the post he was covering."

Q.    "Anything else?"

A.    "I don't remember correctly.  But I think that probably was the documents that talked about related to the day when (indiscernible) was still the main party so we used to have some information about the party."

Q.    Bates number 238, please, line 11.  Mr. McHaffey to Ms. Kantengwa:  "How long were you in Gitarama?"

A.    "In Gitarama, we didn't take long.  My husband had to get in touch with the chief of civil courts, the chief justice, so that they can -- they can take the documents and show my identification so after we go get the document, we proceed to Butare."

Q.    "And where did you go in Butare?"

A.    "In Butare we went to my sister's house."

Q.    "Which sister is this?"

A.    "(Indiscernible)"

Q.    "Okay.  Did your husband go with you to the hotel?"

A.    "Yes, we did because we left the house, I think around ten o'clock in the morning.  There were too many people trying to get in town so the time that it would normally take us was two hours and a half.  It took us the whole day so we reached at night at my sister's place.  We spent the night.  We went to Gitarama the following day."

Q.    And Judge to Ms. Kantengwa:  "Why did he go there?"

A.    "He was to join the government in Gitarama so he would continue the security work he did."

Q.    Mr. McHaffey to Ms. Kantengwa:  "How long were you in Butare?"

A.    "I was in Butare about one month and a half."

Q.    I publish a portion of Exhibit 4, 4A rather, a portion of the asylum application to Ms. Kantengwa.  Do you see on this document Special Agent Kelly where it indicates timeline?

A.    Yes.

Q.    I want to read it to you and tell me if I read it correctly.  "Timeline to mid-June and south of Rwanda, then went to the border between Rwanda and Congo.  How long did you stay near the border before you crossed over?  I think it was again one month and a half.  I believe I crossed some time in July or August."  Did I read that correctly?

A.    Correct.

Q.   Bates Number 328, please, line 17.  This is Ms. Kelley to Ms. Kantengwa.  Was that in Kigali?

A.   Yes, it was in Kigali.

Q.   And about when did he own that?

A.   And I think the end of 1993.

Q.   And he was still working for the government at that point, correct?

A.   Correct.

Q.   He never stopped working for the government, right?

A.   Correct.

Q.   Bates Number 329, line 8.  Ms. Kelley to Ms. Kantengwa. "But it is fair to say, though, and you talk about this in your affidavit, that he went on to Gitarama to continue his government work after he dropped you off in Kigali," and then it says phonetic spelling, correct?

A.   Correct.

Q.   "He kept working for the Government, right?"

A.   "Until we went -- he went out of the country."

Q.   "Until you fled the country, correct?"

A.   "Yes."

Q.   "And you and your husband and Shalom all fled to Zaire," correct?

A.   Correct.

Q.   Exhibit 6, please, Bates 432.  Ms. Kelley to Ms. Kantengwa.  Question:  "Well, your husband continued

working after April of 1994, right?"

A.   I'm sorry, you said page 432?

Q.   Bates number 432, line 24.  "Well, your husband continued working after April of 1994, right?"

A.   "My husband was working with the prime minister."

Q.   "Well, what happened to the prime minister?"

A.   "She was killed."

Q.   "So after she was killed, and she was killed in April of '94, correct, right?"

A.   "I believe so."

Q.   "And your husband continued working, correct?"

A.   "Correct."

Q.   "In fact, you talk about him in your declaration, he continued on to Kigali, correct?"

A.   "Yes."

Q.   "Yes, and you said he continued on to Kigali?"

A.   "Correct, counselor."

Q.   Judge to Ms. Kantengwa:  "What was that work, if you know?"

A.   "I don't know the details of his work there, your Honor. What I know is he was in charge of the national security but I don't know if his boss was -- bosses were right on top of him."

Q.   Turning please to Exhibit 7, Bates number 709, line 20, Ms. Kelley to Ms. Kantengwa:  "Now, ma'am, you told us you were a lawyer in Rwanda, correct? "

A.    "Correct, counselor."

Q.    "And your husband was a lawyer also, correct?"

A.    "Correct, counselor."

Q.    "He was a civilian, he wasn't in the military during his tenure in Rwanda?"

A.    "Correct, counselor."

Q.    Judge to Ms. Kelley:  "Habyarimana, who is that?"

Ms. Kelley to Judge:  "President Habyarimana."  Ms. Kelley to Kantengwa, question:  "Correct?"

A.    "Correct, counsel."

Q.    "And he -- at his last post he was -- he was not in the military either, correct, he was running the internal security?"

A.    "He never belonged to the military, counselor."

Q.    "Okay.  Thank you.  You told us before that the MRND had been the unique political party up until 1992, correct?"

A.    "Up until the multi parties which I believe was 1991."

Q.    "I believe you said on direct '92, but your memory today is '91, but, at any rate, it was the unique party you told us, correct?"

A.    "Correct, counsel."

Q.    "And President Habyarimana was the president when it was the unique party, correct?"

A.    "Correct, counsel."

Q.    "And he was MRND, correct?"

A.     "Correct, counsel."

Q.     I will publish Exhibit 11H, your Honor, 11A which is a translation for the record of Kinyarwandan document 81.  I want to read it, and tell me if I read it correctly, "This is a document that is dated 1992 with the caption, "The Republic of Rwanda," at the top.  Do you see that, Special Agent Kelly?

A.     Yes.

Q.     And it states, "Presidential Order 112/06 of March 18, 1992, regarding promotions and appointments of first category of senior staff of Central Administration.  We, Habyarimana Juvenal, President of the Republic, considering this decreed law of March, 1974, regarding the general policy of public servants as modified and completed this day, especially its Articles 9, 10 and 11."  Skipping down to, Based on the recommendations of the prime minister, the Minister of Labor and the Minister of Finance and after counsel administers sufficient reading of January 27 and February 14, 1992, all having been decided and satisfied Article 1, the staff of whom the names, employees' numbers and ranks are mentioned respectfully are in Columns 2, 3 and 4 of the attached table to the present order are commissioned to the ranks shown in Column 5 and are assigned to the duties included in Column 6."  Did I read that correctly?

A.     Counsel, I cannot see it on the screen.

Q.     My apologies.  Okay.  Let me just read that last section

again.  I am pointing to it now, "The staff of whom the names, employees ' numbers and ranks mentioned respectfully are in Columns 2, 3 and 4 of the attached table to the present order are commissioned to the ranks shown in Column 5 and are assigned to the duties indicated in Column 6."  Did I read that correctly?

A.    Yes, that's correct.

Q.    Turning to the attached table, am I correct in noting that one of the people indicated in column 2 is Athanase Munyemana?

A.    Correct.

Q.    And his position is being changed from deputy public prosecutor to director of national intelligence; is that correct?

A.    Correct.

Q.    Moving to Bates Number 742, please, line 9, Ms. Kelley to Ms. Kantengwa.  "Who was trying to kill your brother?"

Mr. McHaffey to Judge:  "Objection.  It's the same question."

Ms. Kelley:  "It hasn't been answered, Judge."  Judge to Ms. Kelley:  "She has answered it.  She said her brother told her that the presidential guard was after him.  Five minutes after he left, the presidential guard came looking for him."

Ms. Kelley to Ms. Kantengwa:  "So is that a yes?  The presidential -- do you know that the presidential guards are looking to kill your brother?"

A series of objections, page Bates number 743,

Ms. Kantengwa to Ms. Kelley:  "According to what my brother told me, yes."  Line 19, Ms. Kelley to Ms. Kantengwa.

Question:  "But your husband wasn't sought after by the presidential guard, was he?"

A.    "No, counsel."

Q.    "Because he wasn't opposition.  Right, ma'am?"

A.    "He was not in a political party, counsel."

Q.    So just so we can follow this portion more clearly, question:  "Because he wasn't opposition.  Right, ma'am?"  Line 24.

A.    "He was not in any political party, counsel."

Q.    "He was not in any political party.  Is that your answer, ma'am?"  Line 5:  "Then why, ma'am, your 589 application, do you state your husband and you attended all the public rallies for the MRND?"

A.    "I don't think I said I attended all of the political parties for the MRND."

Q.    Turning please to Bates 760, line 23, Ms. Kelley to Ms. Kantengwa:  The head of security before the fighting broke out was a member of the opposition party.  He was not trusted and not rejoined the government after the plane crash."

        MR. CAPIN:  I'm sorry, I think I must have skipped a line, your Honor.

Q.    I see.  Ms. Kelly's reading from a document, "He was not trusted and did not rejoin the government until after the plane

crash." "My husband therefore was left with a job of overseeing security issues." Aren't you saying in that paragraph that your husband got promoted? We're on Bates 761, line 5.

A. "No."

Q. "The head of security?"

A. "No, counsel. That's what you understood, that's not what I meant."

Q. "Well, what are you saying, ma'am?"

A. "I was saying that he was the one because he was already the head of the national security, but there was someone who was overseeing the internal organization, I mean, the intelligence department."

Q. "So he became the head of everything, right?"

A. "He did not become the whole as such, but it was because he was one in charge of security he was the one to call -- I mean -- to be called there to be talked to --"

Q. So he --

A. "-- by the services."

Q. "To become the head of everything?"

A. "No, he didn't become as such by nomination, counsel."

Q. "No, I didn't ask you that, ma'am. He became the head of everything after that other gentleman --" Judge to Ms. Kelley: "When you say everything?" Ms. Kelley to Judge: "Security." Ms. Kelley to Ms. Kantengwa: "Right, ma'am?"

A.   "I wouldn't say that.  He did his job according to the nomination of -- I mean '84 and also being a party to the prime minister because that head of the department was also working for the prime minister --"

Q.   Let's break it down.

A.   "-- so that's why I was saying that.  He did not have someone to help him in the job and he didn't become the head by nomination, if that's what you are implying."

Q.   "Well, it's fair to say that your sentence says the head of security so this gentleman was the head of the security before the fighting broke out.  Right, ma'am?"

A.   "Well, counsel, when I said it was the head of the (indiscernible), which I think I translated the Department of -- I think Central -- I don't remember, it was a security, but the security I mean I mentioned in that it was the Department of (indiscernible)."

Q.   "And your husband took over for him?"

A.   "He did not take over.  I mean, he took over as such but he was left alone."

Q.   Line -- Bates 763, line 16, it was more interesting for the jury if we publish this so they can follow along.

Ms. Kelley to Ms. Kantengwa:  "So his boss was not around?"

A.   "His boss was in another district so he couldn't address him. "

Q.   "So your husband took over the role of his boss, correct?"

A.   "I don't -- I wouldn't say that he took over the role of his boss, counsel."

Q.   "When you say he wasn't trusted, who didn't trust him now?"  Judge to Ms. Kelley:  "Well, let's find out who he was." Ms. Kelley to Judge:  "In the paragraph she is referring to the individual."  Judge to Ms. Kelley:  "No, I want to know the name of the individual."  Ms. Kelley to Judge:  "Oh." Ms. Kelley to Ms. Kantengwa:  "What's the name of the individual?"

A.   "He was called Augustin."

Q.   "Augustin what?"

A.   "I don't remember -- I mean the correct name, but I think Imuramwe."

Q.   Judge to Ms. Kantengwa:  "Can you spell that?"

A.   "It's I-y-a-m-u-n-y -- I'm sorry.  Let try it again.  It is I-m-u-r-a-m-w-e."

Q.   Ms. Kelley to Ms. Kantengwa:  "And he was killed?"

A.   "He died in Rwanda."

Q.   Now, Special Agent Kelly, are you aware that Augustin Imuramwe testified in this court yesterday or the day before?

A.   I am not aware.

Q.   Have you seen the government witness list in this case?

A.   I have not.

Q.   Moving onto Bates number 771, Ms. Kelley to Ms. Kantengwa:

"Now, what was his job before the president plane was shot down?  What agencies was your husband overseeing?"

A.    "My husband was in charge of the national security and the Department of Prime Minister."

Q.    "Well, that party only went under prime minister when multi parties came in, correct?"

A.    "Correct."

Q.    Turning please to 777, line 2.  "Now, it's fair to say that your husband was trusted by the government post April 6th, '94, correct, they kept him working, right, ma'am?"

A.    "Come again, please."

Q.    "They kept him employed, right, ma'am?"

A.    "Who are they, please?"

Q.    "The government, ma'am, the April 6th government was formed after April 6th, 1994.  They kept him employed, didn't they, ma'am?"

A.    "I don't think that the government fired any of the (indiscernible).  The ones who could work during their offices --"

Q.    "But the presidential --"

A.    "Which is what my husband did."

Q.    "But the presidential guard was killing some people, correct, ma'am?"

A.    "Correct, counsel."

Q.    "And your husband stayed employed, didn't he?"

A.    "Together with others, counsel."

Q.    Judge to Ms. Kantengwa:  "And until when?  When was the last time your husband worked for security?"

A.    "I would say to my understanding he was -- he was working until he came out of the country and that was I think July."

Q.    Ms. Kelley to Ms. Kantengwa:  "Right.  Because you didn't tell us, ma'am, that he dropped you in Gitarama because Gitarama becomes the headquarters for the government.  Isn't that in your statement, ma'am?"

A.    "No, he didn't drop me in Gitarama."

Q.    "I'm sorry, you're right, I misspoke.  He dropped you in Butare and then he went back to Gitarama because Gitarama was the head of the government.  Correct?"

A.    "Counsel, yes, that's right, it was government at the time."

Q.    "And your husband went back there because he was still working, right, ma'am?"

A.    "Yes."

Q.    Following page, please, 779, Ms. Kelley to Ms. Kantengwa.  "Now and not only, ma'am -- and not only, ma'am, was your husband not on the list to be killed but you and your husband got a military escort out of Kigali.  Correct?"

A.    "Correct."

Q.    Judge to Ms. Kantengwa:  "And what was what date?"

A.    "It was April 12th."

Q.    Judge to Ms. Kantengwa, there was an exchange between counsel.  Jumping to line 17, Judge to Ms. Kantengwa:  "What was the date you left Kigali?"

A.    "The date is April 12th, your Honor."

Q.    "And you went there on that date, and you went where on that date?"

A.    "I went -- we went to Butare south where my sister stayed."

Q.    If we just turn to Exhibit 8, please, Special Agent Kelly, Bates 1737, line 19.  "Ma'am, you don't remember telling us that the man who was running internal security was not trusted, and if he could not be trusted, and, therefore your husband was left with running the internal capacity?"

A.    "He was still doing that.  He was still in his capacity of --  in his title as the director of internal security, but he was not permitted to take over a supervisor's position."

Q.    Next page.  "Didn't you tell us, ma'am, that the supervisor wasn't trusted?"

A.    "I said that that's what was believed and perceived."

Q.    "Now, ma'am, you just told when your counsel asked you, you said you stopped being a member of the MRND in 1991, correct?"

A.    "Correct, counsel."

Q.    "Did you not donate money in 1992?"

A.    "I don't think I did, counsel."

Q.   Bates 1760, please, line 6.  Ms. Kelley to Ms. Kantengwa:

"Now in -- you told us on redirect that your husband had no

political ideology, right?"

A.   "That's what I think."

Q.   "Well, ma'am, you were married to him.  Was he -- did

he -- was he a member of a political party in 1994?"

A.   "No, counsel."

Q.   Go back, Special Agent Kelly to Exhibit 5, Bates 235,

please, line 18.  Mr. McHaffey to Ms. Kantengwa:  "Okay.  And

the party is MRND?  Is that what it is?"

A.   "Yes."

Q.   "Were you a member of that party?"

A.   "No."

Q.   "Okay.  So what happened once you reached the escort and

you discovered your ID was missing?"

A.   "Come again, please?"

Q.   "What happened after you reached the escort and you

discovered your ID was missing?"

A.   "Even before you go to that question about the MRND, you

asked me if I was a member."

Q.   "Yes."

A.   "Before the parties everyone was a member of that party.

Yes, but with the multi parties you had to -- people would

apply to be members.  Yes, so I was not a member, but I husband

was a member of that political party."

Q.   "Okay, but you had been.  Is that right?"

A.   "Come again?"

Q.   "You had been a member at one point.  When did you stop being a member? "

A.   "It wasn't like you were a member.  That was the country's party.  There was a unique party that was running."

Q.   I'm going to show you a portion of Exhibit 4, which is Ms. Kantengwa's asylum application.  I'm going to read you a question and answer.  Please tell me if I read it correctly. I'll zoom in on the question first because it's hard to make out.  "Have you or your family members ever belonged to or been associated with any organization, groups in your home country, such as, but not limited to, a political party, student group, labor union," et cetera?  Am I correct in noting the box yes is checked?

A.   Correct.

Q.   And that below that is written the following:  "I was a member of MRND in (Mouvement Revolutionnaire National pour le Developpement) the ruling party before the war of 1994.  I always accompanied my late husband in the party's public rallies.  Please see attachment paper for additional responses to this question."  Did I read that correctly?

A.   Yes.

Q.   As part of the attachment, tell me if I read this correctly, in response to, "Why do you believe harm,

mistreatments or threats occurred," it is written, "My late husband, Athanase Munyemana, a lawyer by profession, served in President Juvenal Habyarimana's office from 1984 to 1994. Before the war that wracked Rwanda from 1990 to 1994, Munyemana was in charge of the country's internal security (Securite Nationale Interieure du pays) in Service Central de Renseignement according to the director of military intelligence (DMI), before his death my husband left me with the information concerning the 1994 genocide."  Did I read that correctly?

A.    Correct.

Q.    Please turn to Exhibit 6 Bates 390, line 8.  I'm sorry, line 9, Ms. Kelley to Ms. Kantengwa:  "Now you told us, ma'am, that you were a lawyer in Rwanda.  Correct?"

A.    "Correct, counsel."

Q.    "Who were you a lawyer for?"

A.    "Come again?"

Q.    "Who did you work for?"

A.    Ms. Kelley to Ms. Kantengwa:  "Who did you work for?  No, who did you work for?  "

A.    "I worked for an insurance company."

Q.    "What was the name of the company?"

A.    "Sonarwa."

Q.    "Sonarwa, S o-n-a-w-a-r-a, correct?"

A.    "Correct."

Q.    "And when did you start working there, ma'am?"

A.    "I believe it was November, 1993."

Q.    "Who hired you, ma'am?"

A.    "The same organization, Sonarwa."

Q.    "Right, but who personally hired you?  Who interviewed you?  Who gave you the job?"

A.    "I don't remember the director at the time."

Q.    "You don't remember, ma'am?"

A.    "No."

Q.    "Well, and you were -- you became chief.  Right?"

A.    "Correct."

Q.    "Who promoted you to chief?"

A.    "Well, the executive director of the company."

Q.    "Who was that, ma'am?"

A.    "I don't remember.  There were two persons.  I don't know if it was the first one or the second one."

Q.    "Well, just give us their names."

A.    "I don't know.  I don't know their names.  I think one was Matthieu, Matthieu Ngirumpatse."

Q.    Yes, we're not down there yet.  Ngirumpatse.  According to this transcript, at least, Matthieu -- the question is: "Matthew Ngirumpatse, N-i-r-i-g-a-m-p-a-t-s-e."  The answer is: "Come again, please?"  And I won't spell the name again, the question says:  "Matthieu Ngirumpatse.  Right, ma'am?"  And the answer is:  "Matthew Ngirumpatse?"  Did I read that correctly?

A.    You did.

Q.    And on the following page, page 339, please, do you see line 12?

A.    Yes.

Q.    Ms. Kelley to Ms. Kantengwa:  "And can you tell us what MRND stands for?  What was the formal name of the party?"

A.    "I don't remember, counsel."

Q.    I'm sorry, I think Special Agent Kelly perhaps we're out of sync.  Line 13:  "Can you tell us what MRND stands for? What was the formal name of the party? "

A.    What page?

Q.    We're on page 399, I might have misguided you.  After "What was the formal name of the party? "

A.    "I think it was -- I'm trying to see the country report."

Q.    And by "country report," do you know if she's referring to an exhibit as part of that proceeding?

A.    I believe so.

Q.    "Ma'am, it's in your 589 application.  Right, ma'am?" Judge to Ms. Kantengwa, line 19:  "Are you saying you did not know that he was the MRND?  Is that what you're saying, Matthieu Ngirumpatse?  The question is was he the head of MRND? Do you know that?"

A.    "I don't remember, your Honor."

Q.    Next page, please, Bates 400, looking at line 6:  "And, ma'am, you were a member of the MRND, right?"

A.    "Counsel, I've been saying that I don't know how to answer that question."

Q.    "Well, just say yes or no, ma'am."

A.    "No, before 1991, before the multi parties everybody was a member of the MRND because (indiscernible).  That was the ruling party and everybody was a member."

Q.    "So are you --"

A.    "After the -- after the multi parties people who wanted to join other parties then they had to apply for membership."

Q.    "And you stayed as a member of the MRND, right, ma'am?"

A.    "Come again, please."

Q.    "You continued.  Even after the multi party you continued to remain with MRND.  Right, ma'am?"

A.    "I would say no because I didn't apply for membership."

Q.    I'm sorry, did you say "I didn't apply for membership?"

A.    Yes, it states "I didn't apply."

Q.    Please turn to Bates 479, line 24, Ms. Kelley to Ms. Kantengwa:  "Now, and also on that, the next question, No. 18, it asks you if you have ever been a member of the MRND, correct, you or your spouse or parents or any family members, and again you answered no?"

A.    "Yes, counsel.  I said no because this was at the multi party time.  As you can see, they listed other political organizations there."

Q.    "Were you or any of your immediate family members ever a

member not during the multi party organization times ever a member?"

A.    "I did not say -- I mean, I said, you know, because for me I refer myself to a period of time after the war because that's what they were -- to me that's what they intended to check."

Q.    "Oh, you know what they intended when they asked were you ever a member.  Right, ma'am?"

A.    "That's what I thought."

Q.    Please turn to page 721.  I believe that's in Exhibit 7. Looking at line 19, this is Ms. Kelley to Ms. Kantengwa. "Wasn't Sonarwa one of the parastatal organizations, ma'am?"

A.    "Yes, it was counsel."

Q.    "So he was favoring the north with the parastatal companies.  You worked with the parastatal company, and your husband was the head of internal security.  That's correct, ma'am?"

A.    "No, it's not correct, counsel.  My husband was not the head of the internal -- I mean the salaries of what they were -- (indiscernible).  He had someone who was heading that entire department."

Q.    "But he was the second in command, right?"

A.    "He had -- yes, he had -- yes, he was the director of that internal security -- I mean security, but there were some other services I mean in the department, and in Sonarwa where I was working I wasn't working for society."

Q.   Please turn to Exhibit 8, page 1704, line 18.  This is counsel Ms. Kantengwa's counsel Mr. McHaffey to Ms. Kantengwa:  "When did you stop being a member of MRND?"

A.   "In -- I believe 1991 when the multi parties came in, the multi parties, and then Rwandanese were to choose which party to belong to and take a membership.  They were given membership cards."

Q.   "Okay."

A.   "Yeah, so before that I was a member of the MRND.  Every Rwandanese was a member of the MRND, the unique political party."

Q.   "Do you -- after multi parties started, did you join a political party?"

A.   "No, I didn't."

Q.   "Why not?"

A.   "Because I wasn't interested in political matters and I did not believe in any political leader -- I mean party."

Q.   Turn back to Exhibit 5, please, Bates 238, line 18.  This is Mr. McHaffey to Ms. Kantengwa:  "And where did you go in Butare? "

A.   "In Butare we went to my sister's house."

Q.   "Which sister is that?"

A.   "Indiscernible."

Q.   "Okay.  Did your husband go with you to the hotel?"

A.   "Yes, he did because before we left the house around -- I

think around 10:00 in the morning there were too many people trying to get in town so the time it would normally take us was two hours and a half.  It took us the whole day so we reached at night my sister's place.  We spent the night.  We went to Gitarama around the following day."

Q.   Did does it say "he went to the following day"?

A.   Correct, "he went."

Q.   Judge to Ms. Kantengwa:  "Why did he do there?"

A.   "He was to join the government in Gitarama so that he would continue the security work that he did."

Q.   Mr. McHaffey to Ms. Kantengwa:  "How long were you in Butare?"

A.   "I was in Butare about one month and a half."

Q.   Would you please turn to Exhibit 6, Bates 401, line 4, Ms. Kelley to Ms. Kantengwa:  "I'm going to read you question 3A of your 589 application.  I was a member of the MRND and you say what MRND is, Movement Revolutionary National For The Development.  The ruling party before the war of 1994, I always accompanied by late husband in the party's public rallies."

A.   "May you please read it again for you?"

Q.   "Ma'am, were you a member of the MRND?"

A.   "The way you read it I don't think that that's what I wrote."

Q.   Next page, Ms. Kelley to Ms. Kantengwa:  "Ma'am, if you could read along with us."

A.   "Yes, counsel."

Q.   "I was a member of the MRND.  You go on to explain what MRND is?"

A.   "Correct."

Q.   "The ruling party before the rule of 1994, I always accompanied my late husband in the political public rallies -- I'm sorry, in the party's public rallies.  I read it correctly.  Right, ma'am?"

A.   "No, you didn't.  You didn't say it, counsel.  What I heard you say was the ruling party -- I meant from '75 when the party was still -- I mean was ruling up to 1994."

Q.   Would you please turn to 414, Bates 414 in the same document, line 3.  "Well, and that's how you got involved with RTLM, correct, you said that's you got involved, that's why you got involved with RTLM, right?"

A.   "Well, counsel, not involved in the sense that (indiscernible).  That's when I gave my contribution."

Q.   "Right.  So who was the person that was starting out?"

A.   "I don't know, counsel."

Q.   "Well, who came to you and asked you for the money?"

A.   "I don't remember the person.  As I said, they were going all over the country to ask for contributions, but I don't remember who came to me."

Q.   "Well, what did they say?"

A.   "They need contributions to start the radio station."

Q.    "And did you ask what radio station?"

A.    "No, counsel."

Q.    "You didn't ask anything?"

A.    "They said just a radio station."

Q.    "Well, when they needed contributions for a radio station, what did you say?"

A.    "I said go ahead and I gave my contribution.  I said what I can -- what I can give you.  This is the music the citizens -- this is the type of music that citizens would be listening to."

Q.    "So they told you some description of what RTLM was going to be?"

A.     "No, counsel.  I don't think they gave that description.  As I said, what I was told was what I told you."

Q.    "Well, you just told us that though that they said yes, it's like the type of music that citizens would be listening to so they must have told you something about the station, correct?"

A.    "What I heard, counsel, was to create a radio station that people would hear all about traditional music."

Q.    "And you didn't ask any follow-up questions?"

A.    "No, counsel, that was good enough for me."

Q.    "Can you tell us who else contributed?"

A.    "No, counsel.  I don't know."

Q.    "And do you know now years later how RTLM was involved and

what happened in Rwanda?"

A.    "No, counsel."

Q.    I'm going to show you a portion of Exhibit 26, Special Agent Kelly.  I'll post it on the screen.  Do you see Exhibit 26 is captioned, List of Shareholders of Radio Television of Thousand Hills RTLM"?

A.    Yes.

Q.    I'm going to walk you through certain pages and I will ask you if I read the names correctly.  On page 3, Habyarimana, Juvenal, Kigali indicating 1 million shares; is that correct?

A.    Correct.

Q.    On page 5, Kantengwa, Prudentienne, 5,000 shares?

A.    Correct.

Q.    On page 9, Matthieu Ngirumpatse, care of MRND, 5,000 shares?

A.    Correct.

Q.    On page 11, Maurice Ntahobali, Kigali, 25,000 shares?

A.    Correct.

Q.    Same page, first initial S. Nteziryayo, N-t-e-z-i-r-y-a-y-o, Kigali, 30,000 shares; is that correct?

A.    Correct.

Q.    Finally on page 12, Pauline Nyiramasuhuko, Kigali, 5,000 shares?

A.    Correct.

        MR. CAPIN:  Just a minute, your Honor, I want to get

some of the pages that were affected by the Court's ruling this morning.

Q.    If I could ask you to go back to Exhibit 5, please, Special Agent Kelly, Bates 244, please.  Question, line 1: "Did he work for the government?  Is that what you said before he left?"

A.    "You mean my brother?"

Q.    "Yes."

A.    "My brother was the director of the radio and television."

Q.    "Where is your brother now?"

A.    "He's in the United States."

Q.    "Okay.  Do you know how he -- what status he arrived in the United States?"

A.    "Yes, he was a refugee."

Q.    "Do you know what year?"

A.    "In 1994.  Yes, 1994 in July."

Q.    "Do you know what group he is associated with?"

A.    "Yes, he is."

Q.    I'm sorry, "Do you know what group --" line 18, "Do you know what group he is associated with?"

A.    "He is now with RUD.  It's an acronym that stands for Right For Unity and Democracy."

Q.    "And do you know what position he has in that organization?"

A.    "He is the president."

Q.   Now, you understand, Special Agent Kelly, that the brother referred to in this transcript was not the head of RTLM, he was the head of the other radio station?

A.   Yes.

Q.   Bates 257, line 87.  Judge to Ms. Kantengwa:  "I just want to get the sequence of events down, so you went from Rwanda two times in the year 2000.  The first time you got a passport and the second time you applied for a Visa and were denied.  That Visa was the U.S.?"

A.   "Yes, your Honor."

Q.   "And it was denied, then you returned in 2001 to Rwanda?"

A.   "I don't think so, your Honor.  I think it was 2003."

Q.   "2003?"

A.   "Yes."

Q.   "And when in 2003 did you return to Rwanda?"

A.   "November or December."

Q.   "November or December, and there were three times that you went to Rwanda in 2003?"

A.   "I think it's three times."

Q.   "Three times?"

A.   "Yes."

Q.   "And that was after you came to the United States for the first time.  Is that right?"

A.   "Correct."

Q.   The next line, question 13.  "What about the second trip?"

I'm sorry, we're on Bates 259, Special Agent Kelly.

A.    "The second trip, yes, we had to get in touch with the (indiscernible) leadership in the UK, and I had the training. I had to complete my training on (indiscernible) development and from there I was attending a conference in Vancouver, Canada, a conference organized by one of the (indiscernible) we call (indiscernible), and from there I decided to come over and visit my sister and my brother, yes."

Q.    Bates 260, line 20.  "All right.  So, according to the passport on page 36, you entered Rwanda on November 16th, 2003. The second time you entered December 6th, 2003, and you left on December 18th, 2003.  Then the third time you entered was December 23d, 2003 but there was no departure stamp."

A.    "A departure stamp?"

Q.    Turning please to Exhibit 7, Bates 814, please, line 11. "Now after you left Gitarama, you traveled to Butare, correct?"

A.    "Correct, counsel."

Q.    "And you went to your sister, Beatrice.  Correct?"

A.    "Correct, counsel."

Q.    "And was this a small hotel, correct?"

A.    "Come again, please?"

Q.    "You told us in one of your documents it was a small hotel.  Correct?"

A.    "It was a hotel but it was very old.  I think that's what I mentioned."

Q.    "And she was there -- you were there for a month and a half you told us?"

A.    "Correct."

Q.    "And her mother-in-law and father-in-law were there at the time, correct?"

A.    "Not correct because I don't remember if -- when we reached the mother-in-law was there but the father-in-law was there."

Q.    "Well, and you know the mother-in-law was Pauline Nyiramasuhuko?"

A.    "Correct."

Q.    And Judge to Ms. Kelley:  "Can you give us the spelling on the last name, counsel?"  Ms. Kelley to Judge:  "I'll get you the proper N-y-i-r-a-m-a-s-u-h-u-k-o."

          Please turn to Bates 826, line 21:  "Now you said -- so Shalom was taking care of you? "

A.    "Not only of me or my kids, but we were about I think 40 people in the hotel."

Q.    "But he was taking care of you and your kids?"

A.    "I'm saying that Shalom was taking care of everybody that was in that hotel."

Q.    "Everybody that were in that hotel."  Question: "But -- and one of them was you and your children, right, ma'am?"

A.    "Correct, counsel."

Q.    "Where is Shalom now?"

A.    "He is in Tanzania and Arusha in prison."

Q.    "He's in prison also.  What is he being accused of now?"

A.    "He is being accused of having raped women helped by his mother."

Q.    Judge to Ms. Kantengwa:  "I'm sorry, having women held by his mother? "

A.    "Helped."

Q.    Ms. Kelley to Judge.  "Helped."  Judge to Ms. Kantengwa: "Helped?"

A.    "Helped by the mother and the mother who looked for Tutsi women and gave them to Shalom for him to rape them."

Q.    "And they're both charged with genocide, right, ma'am?"

A.    "Counsel, please rephrase that.  They were charged -- I mean they are being -- they are on trial being charged with having participated in the killings of 1994."

Q.    Question:  "And so I just want to understand this.  You were living with Pauline Nyiramasuhuko and --" indiscernible to me, at least "-- Ntahobali and meanwhile your husband was with the government in Gitarama.  Correct?"

A.    "By the way, Pauline was not living there, Pauline was with the government, counsel."

Q.    "Who was with the government?"

A.    "Pauline."

Q.    "Oh, it's your testimony that Pauline was with the

government, she wasn't at the hotel; is that your testimony?"

A.   "Yes, it is.  She did not live at the hotel.  She came occasionally, I don't know how many times but she was not living in the hotel, counsel."

Q.   Bates 831, please.  "Now, ma'am, can you tell us what was outside that front door of -- well, let me back up for a moment.  Pauline's house was a hotel and in the back was a steep drop, right, a steep hill?"

A.   "Come again, please."

Q.   "The hotel was on a hill in the back.  The back had a steep hill, correct, if you can remember?"

A.   "I don't remember.  I wouldn't say so."

Q.   Judge to Ms. Kantengwa:  "Well, you describe it, ma'am."

A.   "It wasn't steep.  I wouldn't say that it was a steep hill as such.  There was a compound in the back."

Q.   Ms. Kelley to Ms. Kantengwa:  "And a hill, right?  There was a hill?"

A.   "Well, it was in the back, but I don't think you can call it a hill as such."

Q.   "And that hotel was on a main road in Butare, correct?"

A.   "Correct."

Q.   The next page Bates 838, I'm sorry, 833, line 2, Ms. Kelley to Ms. Kantengwa:  "And there was a front door to the hotel, correct? "

A.   "Correct."

Q.    "And there was a roadblock outside that front door, wasn't there, ma'am?"

A.    "No, counsel."

Q.    "No roadblock, ma'am, outside the front door?"

A.    "Never a roadblock outside the front door."

MR. CAPIN:  Can I have just a moment, your Honor. Your Honor, nothing further at this time.  Just so the record is clear, the entire exhibit is in evidence.  In the interests of efficiency and not reading the entire thing to the jury, we certainly would be highlighting portions for today's presentation.

THE COURT:  Jurors, you will have the entire exhibit with you in the jury room.

MR. LANGE:  May I proceed?  May I proceed?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. LANGE:

Q.    I just want to call your attention to Bates number 1710. These are questions during the immigration proceeding from Prudence Kantengwa's attorney, Mr. McHaffey to Prudence Kantengwa.  Question:  "When you were in Butare, you stayed at the hotel, as you testified.  While you were there, did you witness a roadblock in front of the hotel?"  And the answer?  What's the answer?

A.    "No, counsel, there was no roadblock in the hotel."

Q.    "And how long were you there at the hotel?"

A.    "I was there until the end of May."

Q.    "When did you get there?"

A.    "Towards April, 1994."

Q.    "So you were there for about six weeks?"

A.    "Yes, your Honor."

MR. LANGE:  Thank you.

THE COURT:  Is that it?

MR. LANGE:  That's it.

THE COURT:  Thank you, Ms. Kelly.

MR. CHAKRAVARTY:  Your Honor, together with the exhibits submitted for the consideration of the, jury this is the government's final witness in this case in chief, the government would rest.

THE COURT:  All right.  Then jurors the government has now presented to you the evidence in which it is for you to consider on the issues that will be put before you.  Perhaps I could see Mr. McGinty and Mr. Capin for a second.  This is one of the rare times, twice I have to do this, to have a sidebar.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

MR. LANGE:  Before we do a Rule 29, I wanted to move Government Exhibit 18 into evidence.  It's a statement by the defendant submitted to the immigration judge.

MR. CAPIN:  Objection, your Honor.  It's hearsay.

MR. LANGE:  It's part of what the Judge considered in

the Court's material.

THE COURT:  No.

MR. McGINTY:  Your Honor, we're filing a Rule 29, and I tried to incorporate in here the bases for the objection to make it as coherent as possible.  Given the length of the objections, I would ask that my all comments include the written comments that are in the motion.

THE COURT:  Do you want me to send the jury out?

MR. McGINTY:  I think we should do that, yes.

THE COURT:  Are you ready to go forward?

MR. McGINTY:  I'm ready to go forward, yes.  If I could have a five-minute break, I'd be most appreciative.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT:  Jurors, I think this is going to take 10 minutes or so, so why don't you go out and stretch and we'll bring you back in.  There's no reason to make you sit here.

THE CLERK:  All rise.

(A recess was taken.)

THE CLERK:  All rise.

THE COURT:  I obviously haven't read this as closely as I should have, but I think I've got the drift, Mr. McGinty. I think applying the standard I have to at this time of the Rule 29 I don't think I have much choice but to deny the motion obviously conditionally.  It's always open to be renewed after a jury verdict in the case, but some counts, as is always the

case, is stronger than others. Again, looking at everything in the light most favorable to the government there is a sufficient basis for the case to proceed at this point to the jury. How long do you think your case will be in the affirmative?

MR. McGINTY: Given changes in the government's case, yesterday we've tried to make adjustments. My expectation is it's going to be considerably shorter, and it will be well within the two weeks we had spoken about. My guess is I won't be going possibly past Wednesday for that matter, so I think the initial projection this was going to be two weeks --

THE COURT: Yes.

MR. McGINTY: -- I'm fairly confident that we'll be completed shy of Thursday.

THE COURT: When the jurors come back in, I'll tell them we'll expect them to be ready for deliberations, arguments and charge on Thursday.

MR. McGINTY: I think that's fair.

THE COURT: Give me a warning tomorrow if you think you're going to finish earlier on Wednesday, I know my preference always when I tried cases is to have some breathing room between the close of the case and final arguments. It's a little tough to stop and try and argue. Obviously we can't waste the jury's time. Let's see how we're doing.

MR. McGINTY: I'll be mindful of that. My expectation

is we're going to be well inside that two-week period.

THE COURT:  Fine.

MR. CAPIN:  Your Honor, one clarification, the motion to dismiss Count 10 intends to dismiss the last count of the indictment.  After the government's dismissed five counts prior, we renumbered with the possibility it could go to the jury.  In fact, we will submit it anew, should be a motion. Well, I guess I'll leave it to the Court whether we should move to amend the indictment to reflect --

THE COURT:  It's not really a motion, I don't have any say over what you --

MR. CAPIN:  This is a dismissal, fair enough.  If the governing document is the indictment unredacted, which I suppose is the case, then I would withdraw that notice of dismissal because the intention is to dismiss Count 15 of the indictment as the indictment goes in.

THE COURT:  I would rather that the case be presented to the jury in terms of a whole sequential number of counts.  I don't want them speculating about why it jumps from one to here, from back here to there, they will begin to think that there are other crimes that the government is not pursuing. It's not a good practice, so if you want to tailor the dismissal accordingly, that will be fine.

MR. CAPIN:  I'll do that.

THE COURT:  Mr. McGinty, do you want to go forward

today or tomorrow morning?

MR. McGINTY:  Given the time, probably tomorrow morning.  Could I ask, with the indictment, if the counts are renumbered, the jury will be getting the entire indictment less those counts?

THE COURT:  I don't give the jury the indictment.  I will describe, as I did at the beginning, I will describe to the jury in my instructions the structure of the indictment and specifically what each count says.  Particularly I have to specify the language that is alleged to have been injurious, but I don't think the government should get three closing statements which in fact is what the indictment does, so I've never submitted it.  I know that was the old practice was submitting.

MR. LANGE:  So, your Honor, we'll be getting a new version indictment 1 to 10?

THE COURT:  No, they're just going to tailor the dismissal so that it makes clear which charge in fact is being withdrawn.

MR. LANGE:  I just have one other thing, I'd request that we be allowed to mark 18 for ID, I know it's not going into evidence.

THE COURT:  18 for identification, so marked.

(Statement by the defendant submitted to the immigration judge was marked Exhibit No. 18 for

identification.)

THE COURT:  Terri, let's bring the jury in.

THE CLERK:  All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE CLERK:  Please be seated.  Court is in session.

THE COURT:  Jurors, I don't know if you consider this good news since it's an interesting case, but we're well ahead of where we anticipate being.  We are going to go forward with Ms. Kantengwa's case.

I'm going to suggest we start tomorrow morning. There's not much we can do in 10 minutes that remains today. Mr. McGinty expects that case to conclude on Wednesday, so possibly Wednesday, more likely Thursday morning you'll have the case for deliberations, and we're at least a day or two ahead of where we expected to be.

Again, I don't think there's that much we can do in 10 minutes given the fact that we're not under any real pressure of time given how efficiently the lawyers have presented the case, so I'm going to suggest we adjourn today but reconvene again tomorrow at the same time, 9:00.  The jury will be excused for the day and be here at 9:00 in the morning.

THE CLERK:  All rise.

(Whereupon, the hearing was adjourned at 12:51 p.m.)

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript

of the record of proceedings in the above-entitled matter to

the best of my skill and ability.




/s/ Valerie A. O'Hara

Valerie A. O'Hara, RPR          Dated June 15, 2012

Official Court Reporter

6-98