1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * * * * * *
*UNITED STATES OF AMERICA       *
                                *   CRIMINAL ACTION
          v.                    *   No. 08-10385-RGS
*                               *
PRUDENCE KANTENGWA,             *
A/K/A PRUDENTIENNE KANTENGWA    *
* * * * * * * * * * * * * * * *


BEFORE THE HONORABLE RICHARD G. STEARNS
UNITED STATES DISTRICT JUDGE AND A JURY
JURY TRIAL DAY 5
April 27, 2012


APPEARANCES:

        UNITED STATES ATTORNEY'S OFFICE, (By AUSA Aloke Chakravarty and AUSA John A. Capin) 1 Courthouse Way, Suite 9000,  Boston, Massachusetts 02210, on behalf of the United States of America

        OFFICE OF THE FEDERAL PUBLIC DEFENDER, (By Charles McGinty, Esq., and Tamara Fisher, Esq.) 51 Sleeper Street, 5th Floor, Boston, Massachusetts  02210, on behalf of the Defendant

        OFFICE OF THE FEDERAL PUBLIC DEFENDER, (By Bjorn Lange, Esq.), 22 Bridge Street, Concord, New Hampshire 03301, on behalf of the Defendant


                              Courtroom No. 21
                              1 Courthouse Way
                              Boston, Massachusetts 02210



James P. Gibbons, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts  02210
jmsgibbons@yahoo.com

P R O C E E D I N G S

(8:45 a.m.)

THE CLERK:  All rise.

Court is open.  You may be seated.

THE COURT:  Good morning.

I just received the government's response to the defendant's objections to portions of Exhibits 5 thru 8. Some of it the government does not object to.

But, Mr. McGinty, I see their point.  I'm trying -- I haven't finished, I am going to have to do it while the trial is going -- I'm trying to match up what you're proposing to insert into the record.

I can see what the government is doing.  Obviously, they are trying to make their case by showing those portions of the transcript where they believe that a lie was told.

But the material that you are nominating be included does not seem to fit under the doctrine of completeness, because most of it is not really relevant to what the government has designated.  It's just material that I can understand you might want in the record, but it seems like it more appropriately would be offered as part of a defendant's case, not as part of the government's case.

MR. LANGE:  Your Honor, but it's the same -- it was part of what the immigration judge considered.  It is part of the submission that Prudence Kantengwa made.

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  But, as I made clear, I do not much care what the immigration judge considered.  I am concerned with what this jury decides.

MR. LANGE:  I think it is supported by the doctrine of open completeness, and of course you know our position with regard to the immigration judge's decision.

THE COURT:  I understand that the doctrine of completeness means that if it is relevant to the material that is being offered in part, it clearly comes down under that doctrine.  But if the statement is about cultivating oranges in California, and then the material goes on to talk about travel in Egypt, that does not fall within the doctrine of completeness.

MR. LANGE:  Your Honor, I think it's less tenuous than that.  This goes to the defendant's credibility.  It's a prior statement.  It's supported on an asylum application.

THE COURT:  We do not admit prior statements -- I mean, that's -- if your client testifies, it might be admissible to rebut a suggestion of recent fabrication, but hearsay does not come in just because it is in writing.

MR. LANGE:  I think it's also important that it's a prior proceeding in which the government has had the opportunity to cross-examine, and we certainly have not objected to significant portions of the cross-examination of the defendant on these very issues.

PDF created with pdfFactory trial version www.pdffactory.com

4

THE COURT:  I will go through and make a ruling.

By "ruling," I am just giving you my initial reaction. I have not had a chance to digest and consolidate all of this, but does the government -- is there anything else you need to add?

MR. CAPIN:  With regard to that, no, your Honor, but there is an issue with respect to the witness currently on the stand that we would like to be heard on.

THE COURT:  Go ahead.

MR. CAPIN:  It came to my attention that there is information in the report of investigation provided as *Jencks* for this witness that is inconsistent with both the -- is in error.  And we have made a couple of disclosures to the defense in that regard.  It came to my attention a few days ago, and I disclosed this to Mr. McGinty, and it involves the chronology of when this witness was in Butare.

Since then I have gone back -- I've gone back to the original notes of that interview, and it turned out that the error is in the ROI, in the report of investigation.

So we've now disclosed that material to Mr. McGinty, showing that, in fact, there's no inconsistency in the witness's version of events, specifically as it relates to when he was in Butare.

The reason I raise it now is because half an hour ago I

PDF created with pdfFactory trial version www.pdffactory.com

had produced to Mr. McGinty several pages of handwritten notes, and I don't know if he has had a full opportunity to look at them.  But I have a sense that he may make an argument that he is ill prepared to cross-examine this witness because of this late disclosure.

The notes consist of a few hundred words.  Defense counsel -- there's a few people at counsel table.  I think they can digest it, but the government will not object, if the defense feels it's disadvantaged, to interrupting the testimony of this witness.  We can proceed to our next witness and resume after Mr. McGinty has had sufficient time to digest this new information.

THE COURT:  That's fine with me.

MR. McCARTHY:  Well, your Honor, the government about a week ago disclosed that the Senator was going to testify differently than what he had given in his report of investigation; that he had seen the roadblock, which inferentially meant that he was in Butare for a longer period of time.

That disclosure stood alone until less than a half hour ago when I was given notes, which notes appear to be inconsistent with the report of investigation in which it ought to have been disclosed at that time.

I am -- if I could have just a few more minutes to review these to decide --

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  Let him finish his direct examination, and then if you decide you wanted to do further cross-examination until later today or until Monday, let me know.  I don't see an issue.

MR. LANGE:  Just briefly, your Honor.  We'd ask to submit a supplemental submission with regard to the transcript issue.

THE COURT:  Now we're back to A?

MR. LANGE:  I'm sorry for that.

THE COURT:  It's hard to follow the tennis match.

All right.  We will a bring the jury down.

THE CLERK:  All rise.

(Recess.)

THE CLERK:  All rise for the jury.

(Whereupon, the jury entered the courtroom.)

THE CLERK:  All rise for the Honorable Court.

The case before this Court carries Case No. 08cr10385, United States of America versus Prudence Kantengwa.

THE COURT:  Good morning again, Counsel.

Good morning, Jurors.  I'm glad to see everybody here, and we are off on time.

Mr. Capin.

MR. CAPIN:  Thank you, your Honor.

**AUGUSTIN IYAMURERE, resumed**

PDF created with pdfFactory trial version www.pdffactory.com

**DIRECT EXAMINATION, (Cont'd.)**

BY MR. CAPIN

Q    Senator, good morning.

A    (Through the Interpreter) Good morning.

Q    One of the last questions I asked you yesterday was what effect the assassination of the Rwandan President on April 6, 1994, had in your country.

Can you please tell this jury if that event had political consequences in your country?

A    (Through the interpreter.)  After the death of President Habyarimana, it triggered the killings of the Tutsis and also the genocide, but not only the killings of the Tutsis, but also the political Hutus that were moderates.

Q    Did the killing of moderate Hutus have any effect on the functioning of government?

A    (Through the Interpreter)  At the beginning, all the leaders were targeted, and they were killed, including the first minister.

Q    By "first minister" do you mean "Prime Minister"?

A    (Through the Interpreter) Yes.  At that time, April 6, the Prime Minister was Agathe Uwilingiyimana.

Q    Was she assassinated?

A    (Through the Interpreter) She was killed the next day.

Q    Were other political leaders killed at that time?

A    (Through the Interpreter) Yes.  The leaders of the

PDF created with pdfFactory trial version www.pdffactory.com

opposition parties, or the moderate parties, were also assassinated.

Q    Who did the assassinations?

A    (Through the Interpreter) It was the guard, Presidential Guard, and the military.

Q    The Presidential Guard and the military.

      Did that disrupt the functioning of the government, the murder of those individuals?

A    (Through the Interpreter)  At that time there was no government.  So if I was to use that word, it would be a lesser word to use.

Q    When you say "at that time there was no government," do mean that there ceased to be a government upon the assassination of President Habyarimana?  When you say, "at that time there was no government," to what time are you referring?

A    (Interpreting.)

Q    Let me interrupt, please.

      Sir, it is very difficult for the interpreter to interpret long passages, so perhaps you pause after every short sentence or so.

A    Okay.

Q    Would you please repeat -- you answered the question, and, if you would like, I can repeat the question.

A    (Through the Interpreter)  After the crash of the plane

PDF created with pdfFactory trial version www.pdffactory.com

of the President, the next day, the next morning, the First Minister, the Prime Ministers that were in the opposition, they were assassinated.  The others went into hiding and others also fled.

So what I want to say here is that the next day, on the 7th, there was no government in place.

Q   Did a new government or interim government form thereafter?

A   (Through the Interpreter)  Yes.  From April 7, that's when the new government were established.

I'm going to correct.

I'm correcting.  On the 7th there was no government but there was kind of like an assembly of the military.  The next day, on the 8th, they gathered and they nominated a new president.

Q   Who was that new president?

A   (Through the Interpreter) It was the former President of the Assembly, and his name was Théodore Sindikubwabo.

Q   Could you please spell "Sindikubwabo" for the record.

THE INTERPRETER:   S-I-N-D-I-K-U-B-W-A-B-O.

Q   Were you related in any way to the new President, Sindikubwabo?

A   (Through the Interpreter)  Yes.  He was the father of my wife.

Q   And do you know what political party they belonged to?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  He was -- he belonged to MRND party.

Q    Do you know -- did the new government, formed on April 8, 1994, include members of the various parties that had formed during multipartyism?

A    (Through the Interpreter)  They included the members of the MRND and also some other parties.  Yes, they included also the leaders from the other parties, but, like I said, many others from the opposition party were killed, so there were -- only the remaining were the extremists that we called the "Hutu extremists."

Q    Did you use the term "Hutu Power"?

A    (Through the Interpreter)  Yes, I used the "Hutu Power," who were also allied with the political party of Habyarimana.

Q    And Habyarimana, like Sindikubwabo, was a member of the MRND, correct?

A    (Through the Interpreter)  Yes.

Q    Do you see on the screen in front of you, sir --

        MR. CAPIN:  It's a portion of Exhibit 2, your Honor.

Q    -- the term at the bottom of the page, "MRND"?  Do you see that?

A    (Through the Interpreter)  Yes, I can see that.

Q    Can you read to us the words in parentheses after

"MRND"?

A    (Through the Interpreter) Movement Revolutionaire National Pour le Development.

Q    At some point did MRND -- the initials "M-R-N-D" stand for something different?

A    (Through the Interpreter)  Before the political multiparty, the MRND was a single party, and all Rwandans had to be members of the MRND party.

In 1991 the Constitution changed and also accepted the members of the other parties, and the MRND also got registered as a new party, political party.

It took the MRND as a movement of the democracy, (unintelligible French) and democracy.

Q    Let me interrupt for one second.

Did the initials "M-R-N-D" stand for different words when the party reregistered in 1991?

A    (Through the Interpreter)  Initially, it should have been M-R-N-D-D, but they remained with the MRND.

Q    Did those initials stand for something different when the party reregistered after multipartyism began?

A    (Through the Interpreter)  On the paper, it was --

Q    Sir, smaller phrases, please.

A    (Through the Interpreter)  On the paper, we had a denomination that had added another word the former denomination.

PDF created with pdfFactory trial version www.pdffactory.com

Q    By "denomination," do you mean "name"?

A    (Through the Interpreter)  No, I'm saying how they called MRND.

Q    What the party was called.

A    (Through the Interpreter)  It continued being named MRND as the former single party.  It had not changed for the people.

Q    Did the initials after the change stand for different words?

A    (Through the Interpreter)  No, they remained with the same initials.

Q    Did the political ideology of MRND change after multipartyism?

A    (Through the Interpreter)  No, the former -- or the political landscape had not changed at all.

Q    Sir, where were you when you learned that President Habyarimana had been assassinated on April 6?

A    (Through the Interpreter) On the night of April 6, I was in the town of Gisenyi.

Q    What were you doing there?

A    (Through the Interpreter)  I had gone for a meeting.

Q    Is that where you learned of the President's death?

A    (Through the Interpreter)  Yes.  That's where I learned about the death of the President.

Q    Is that also where you learned of the assassination of

PDF created with pdfFactory trial version www.pdffactory.com

the leaders of political parties?

A    (Through the Interpreter) Yes.

Q    You mentioned that certain opposition leaders were murdered and certain members of parties from the opposition were fired when the genocide started.

Did these events affect your status as the Secretary General in any way?

A    (Through the Interpreter)  Yes, I stopped working at that time.

Q    How did you learn of the death of political opponents of the MRND?

A    (Through the Interpreter)  The next day the radio RTLM started announcing that there were some assassinations of the opposition against the MRND.

But also at that time I was also able to communicate -- at the beginning I was able to communicate with Kigali by phone.

Q    You mentioned that you learned this information in part by RTLM radio.

What was RTLM radio?

A    (Through the Interpreter)  It was a private radio, and it was radio/television.  And it belonged to the CDR and also a clan of the President Habyarimana and also the MRND.

Q    Did you say it was privately owned?

A    (Through the Interpreter)  Yes.  It was private because

PDF created with pdfFactory trial version www.pdffactory.com

it did not belong to the government, but did belong to the members of the government but being a private radio.

Q   When you say "members of the government," you mean it belonged primarily to the MRND members?

MR. McGINTY:  Objection.  Move to strike.

THE COURT:  Overruled.

A   (Through the Interpreter)  Not exclusively, but most of them belonged to the Presidential or the MRND party.

Q   You've described the ideology of MRND.  Can you describe the ideology of RTLM as it compares to MRND?

A   (Through the Interpreter)  RTLM was propaganda radio. It was the -- it especially did the propaganda for the President, Habyarimana.  And it was also doing the propaganda and also going against the RPF, and, in general, it was also vigorously against the Tutsis and the opposition.

Q   You've described certain parties as being extremists. Was the message of RTLM more or less extremist than the MRND message?

A   (Through the Interpreter)  I could say that the MRND was on the right extreme, and the CDR was on the other extreme, but I can classify RTLM as extremist as the MRND was.

MR. CAPIN:  With all respect, I am not sure that the interpretation captured what the witness said, based on my rudimentary French.

PDF created with pdfFactory trial version www.pdffactory.com

Q   On a continuum, from less extreme to more extreme, would you please place MRND, CDR and RTLM?

A   (Through the Interpreter) The court interpretation was not correct, but maybe I have explained myself not correctly, but I will explain myself.

THE INTERPRETER:  May I ask the interpreter what that means?

THE COURT:  Yes.

(Whereupon, the interpreters conferred.)

A   (Through the Interpreter)  The MRND was the extreme right, right wing --

THE WITNESS:  Right wing.

And the far right wing, it was CDR.

A   (Through the Interpreter)  CDR was on the far right wing, far right wing.

And the RTLM was at the right wing, but the extreme right wing.

Q   Does that mean that the RTLM ideologically was more extreme in its anti-Tutsi message than the MRND?

A   Yes, of course.

Oui.

(Laughter.)

Q   Did the RTLM play a role in the genocide, sir?

A   (Through the Interpreter)  I think the most propaganda during the genocide, it was mostly the responsibility of the

PDF created with pdfFactory trial version www.pdffactory.com

RTLM.

Q    How did that propaganda manifest itself?  What was the specific role in the genocide?

A    (Through the Interpreter)  The RTLM journalists were inciting the population.  They even went to the extreme of saying -- revealing where the Tutsis were hiding.

They were very powerful and they were very strong in putting music -- it was popular music, but extremist against the Tutsis.

Q    The music itself conveyed an extremist anti-Tutsi message?

A    (Through the Interpreter)  It was well-studied, and, yes it had the melody of inciting the people to be against the Tutsis.

Q    Do you mean that the verbal message as accompanied by a melody?

A    (Through the Interpreter)  Yes, yes.  And also against the Hutus that did not want to kill or assassinate.

Q    So it had an anti-Tutsi and also and anti-moderate Hutu message?

A    (Through the Interpreter)  Yes.  There was even a song at that time that also exists today that it says:  I detest or I hate the shy or the less-going-forward Hutus.

Q    And by "shy" or timid or "less-going-forward-Hutus," what did you understand that to mean?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  It wanted to say about the Hutus that would not go forth and kill.

Q    And kill who?

A    The Tutsis -- those who did not go forward and go and kill the Tutsis.

Q    So you were in Gisenyi, then, correct, sir, when you learned about the death the Habyarimana?

A    (Through the Interpreter)  Yes.

Q    From there at some point did you return to Kigali?

A    (Through the Interpreter)  Habyarimana died on April 6. I stayed in Gisenyi up to April 10.  And I was looking for a way of going back to Kigali, and I was able to return on April 10.

Q    Had you learned that -- strike that.

Sir, before the genocide began, you were a member of an opposition party, correct?

A    (Through the Interpreter)  Not only I was a politician, but I was also a member of the PSD political party.  And I was designated to be a minister.  And I was also to be -- I was designated to be a minister in the government that were opposing the RPF --

THE WITNESS:  No, no.

THE INTERPRETER:  Correction.

A    (Through the Interpreter)  The government, the transition government that were -- that were designated by

PDF created with pdfFactory trial version www.pdffactory.com

the Arusha Accord.

Q   You were designated to be a minister before the genocide began, correct?

A   (Through the Interpreter)  Yes, I was designated before.

Q   Sir, if you learned when the genocide began that political party leaders such as yourself were being assassinated in Kigali, why did you go back to Kigali?

A   (Through the Interpreter)  I wanted to flee and go into the Congo, but I had reasons to go back into Kigali.

I had my children in Kigali alone, and I knew that if I was going to go there, I was going to be oppressed. And my wife at that time was not in Kigali, but she was here in the United States.

And the second reason is the one that had become the President, it was my father-in-law.  And I was thinking that I would be able to explain to him or to convince him that it was a mistake to accept to be President.  Because I knew he was manipulated, because he was not to be President after the a Arusha Constitution.

Those are the reasons I attempted and wanted to go back into Kigali.

Q   How long did you stay in Kigali after you returned?

A   (Through the Interpreter)  I stayed in Kigali up to April 12.

Q   And on April 12 did you leave Kigali?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  After April 12 I left and went in Butare.

Q    How did you get to Butare?

A    (Through the Interpreter)  I went by car.

Q    Did you have a driver?

A    (Through the Interpreter)  When I came from Gisenyi, I had my driver and he had stayed with me.

Q    When you traveled to Butare on the 12th, did you pass any roadblocks between Kigali and Butare?

A    (Through the Interpreter)  There were more roadblocks in Kigali, and the bigger roadblock that we came across was at the Nyabarongo River --

     THE INTERPRETER:  And I will spell Nyabaronogo for the record.

     N-Y-A-B-A-R-O-N-G-O.

     Nyabarongo River.

Q    Were there roadblocks along the route from Kigali to Butare before the genocide began?

A    (Through the Interpreter)  Yes.

Q    Describe the roadblocks that existed before the genocide began.

A    (Through the Interpreter)  Before the genocide, the roadblocks that were there were the roadblocks for the military.  They were put obstacles or objects that would hinder.  It could be a log of wood or metal in the middle of

PDF created with pdfFactory trial version www.pdffactory.com

the road, and even other objects such as stones.

Q    Did such roadblocks exist on the road from Kigali to Butare before April 6, the day the genocide began?

A    (Through the Interpreter)  Only the roadblocks for the military, but not the population roadblocks.

Q    So are you distinguishing between military roadblocks and other types of roadblocks?

A    (Through the Interpreter)  Before the genocide, there were roadblocks for the military, and I also said that after the -- when -- after the genocide, or after April 6, there were also roadblocks for the population.

Q    Were the military roadblocks that existed before the genocide permanent or semipermanent in nature?

A    (Through the Interpreter)  There was some other roadblocks that were permanent, and there was also occasional roadblocks in some places.

Q    Did more roadblocks form on the route from Kigali to Butare after the genocide began?

A    (Through the Interpreter)  Yes.

Q    Were they different from the military roadblocks that existed before the genocide began?

A    (Through the Interpreter)  Yes.  They existed not only on the principal road, but even in the smaller -- like in the smaller community or in the villages.

Q    Are you saying that new roadblocks were installed on

PDF created with pdfFactory trial version www.pdffactory.com

smaller roads?

A    (Through the Interpreter)  Yes.  And the authorities would call upon the people to establish those roadblocks for security.

Q    So were some of those roadblocks established by citizen militias?

A    (Through the Interpreter)  Yes, of course.

Q    Are you familiar with the term "Interahamwe"?

A    (Through the Interpreter)  Yes.

Q    Tell the jury please what "Interahamwe" means.

A    (Through the Interpreter)  At the beginning, Interahamwe was a youth association for the MRND party, but also the other political parties had a youth association; and sometime they would even come against each other, but the difference with the Interahamwe is they had military formation or training.  And among them were also military.

And as it developed, or as if went on, and there were also competition among the political parties, and it started being violent during the genocide.  And during the genocide they played a big role in assassinating or killing the Tutsis.

Q    Did the Interahamwe play a big role in staffing or working at the roadblocks?

A    (Through the Interpreter)  Yes, and especially the activities were seen mostly at the roadblocks.

PDF created with pdfFactory trial version www.pdffactory.com

Q    When did you arrive in Butare, sir, on what date?

A    (Through the Interpreter)  I arrived in Butare on April 12.

Q    Did you stay in Butare for some period of time?

A    (Translating.)

Q    I'm sorry, in Butare.

A    (Through the Interpreter)  I stayed in Butare until the end of May.

Q    Where did you stay in Butare upon your arrival?

A    (Through the Interpreter)  The first week I stayed at one of my brother-in-law's.

Q    Where did you go thereafter?

A    (Through the Interpreter)  And after that I went to the religion institute.  It was called ICA, I-C-A, Catholic institute.  It was about a kilometer and a half from my brother-in-law's.

Q    I'm sorry?

        MR. McGINTY:  I'm sorry.  Can we have the name again?

        THE INTERPRETER:  I-C-A.

        MR. McGINTY:  I-C-A?

Q    Does "catechist," does it refer to "catechism," in essence, a Catholic institution?

A    (Through the Interpreter)  Yes.

Q    Do you know -- you testified yesterday that when you

PDF created with pdfFactory trial version www.pdffactory.com

were became Secretary General of Security Services, that Athanase Munyemana was the Director of Internal Security.

Do you remember that?

A   (Through the Interpreter)  Repeat, please.

Q   Before the genocide began, what was Athanase Munyemana's job?

A   (Through the Interpreter)  He was a director of the security services that I directed.

Q   Does "renseignement" also mean "intelligence," Director of Intelligence Services?

A   (Through the Interpreter)  Yes.

Q   So to make it easier for us, I'm going to call it "Director of Intelligence Services."

Do you know if Mr. Munyemana continued in his role as a director of the Intelligence Services after the genocide began?

A   (Through the Interpreter) Yes.  Yes, sir.

I know, because one day he found me in Butare.  I had gone with the car from my work, and he told me that the car was needed by the Service, and so I gave the car without any discussion.

Q   By "Service" do you mean by the Intelligence Service?

A   (Through the Interpreter) Yes.

Q   When the new government formed after the genocide began, did it remain in Kigali?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  Because he came and asked me that question, so I suppose that he continued working even at that time with the Secret Service.

Q    My question, sir -- maybe I asked it wrong.

Did the government, the central government of Rwanda, change its location from Kigali to another location after the genocide began?

A    (Through the Interpreter)  After the new government were formed, they had to flee, and the whole administration had to move into Gitarama.

Q    And did Mr. Munyemana move with the government to Gitarama?

A    (Through the Interpreter)  I suppose so, because the Service and also the government had moved into Gitarama.

Q    Was it at some point after the government moved to Gitarama that Mr. Munyemana came to retrieve the government car in your possession?

A    (Through the Interpreter)  Yes.  Because myself, I went to Butare on the 12th.

Q    Do you know what political party Mr. Munyemana belonged to.

A    (Through the Interpreter)  When I worked with him, he did not belong to any party.

Because we worked together, and we talked together, I knew that he sympathized with the political party of MRND,

PDF created with pdfFactory trial version www.pdffactory.com

and I could see his frequent presence.  But I was only convinced of his obedience to the political party when I saw that he had accepted to continue in the service of the Intelligence Service, and he belonged to that government that everybody knew that were responsible for the genocide. You could not work in that government if you were not pro MRND or pro CDR.  They could not accept you if you were not the member of those parties.

Q   I want to ask you, sir, to describe -- I believe you testified yesterday that you lived in Butare for a number of years as a professor at the university?

A   (Through the Interpreter)  Yes.

Q   Were you very familiar with Butare when you arrived in April of 1994?

A   (Through the Interpreter)  Yes, I was familiar with the town of Butare, because I even had a house and also had family in Butare.

Q   Did you have a house in April 1994 in Butare?

A   (Through the Interpreter)  Yes, I had a house at that time.

Q   If you had a house in Butare, Senator, why did you stay with your brother-in-law when you arrived on April 12?

A   (Through the Interpreter)  The house that I owned was next to the house of the residence of the President then.

Q   Are you talking about your father-in-law, Sindikubwabo?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  Yes, it was my father-in-law.
Even at his place I could not stay because the Presidential
Guard that were surveying that place, they were
represented -- they represented --

Q    A "threat"?

THE INTERPRETER:  A threat.  They represented a
threat.  They were a threat to me.

Q    Is this the same Presidential Guard that you testified a
few minutes ago had assassinated the leaders of political
parties when the genocide began?

A    (Through the Interpreter)  Please repeat.

Q    Is the entity that you're describing, the Presidential
Guard, the same entity that you described as responsible for
killing leaders of non-MRND parties when the genocide began?

A    (Through the Interpreter)  Yes.  It was the same
Presidential Guard.

Q    And it was for fear of the Presidential Guard that you
didn't stay in your own home in Butare?

A    (Through the Interpreter)  Yes.

Q    Can you tell us geographically where in Butare your
house was?

A    (Through the Interpreter)  I was on the-- it was down
the hill near the University of Rwanda.

Q    Was it in a sector or place called Mukoni?

A    (Through the Interpreter)  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Q    How far was that from your brother-in-law's house?

A    (Through the Interpreter)  Maybe a kilometer, or 800 meters.

Q    Sir, I would like to have you describe for the jury using a photograph --

MR. CAPIN:  May I approach, your Honor?

THE COURT:  You may.

Q    -- where you were staying in Butare.

Do you recognize this, sir?

A    (Through the Interpreter)  Yes.

Q    Perhaps it would be easier --

MR. CAPIN:  May I ask the witness to approach the jury box?

(Whereupon, the witness stepped down.)

MR. CAPIN:  Can everyone see that?

(Jury nods affirmatively.)

MR. CAPIN:  Sir, perhaps you could step closer to the court reporter on the other side.  And, Madam Interpreter, it might be better for you, too.

THE INTERPRETER:  Sure.

Q    Sir, what do you recognize this photograph to be depicting?

A    (Through the Interpreter)  Immediately, I think of the house of my brother-in-law where I was with my children.

Q    Is that shown on the photograph?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  Yes, I can recognize it easily.  It was the second house and it was right where I'm showing (indicating).

Q    Do you recognize this road, sir?

A    (Through the Interpreter)  Yes, it's the University Avenue.

Q    Do you recognize this structure (indicating)?

A    (Through the Interpreter)  It was the school that belongs to the -- the Protestant School, the Anglican Protestant Church.

Q    Was that complex commonly known as the "EER"?

A    (Through the Interpreter)  Yes.

Q    Do you recognize this structure?

A    (Through the Interpreter)  It was the house or the hotel of Ntahobali Maurice.

Q    Did Ntahobali Maurice have a wife?

A    (Through the Interpreter)  His wife, her name was Pauline Nyiramasuhuko.

Q    Was it both a house and a hotel?

A    (Through the Interpreter)  Yes.  It had a residence and also a bar, and also it had a boutique at the hotel.

Q    Did the hotel have a name?

A    (Through the Interpreter)  I don't recall very well, but, yes, it had a name.

Q    Do you know whether Pauline Nyiramasuhuko had any role

Q    in the government?

A    (Interpreting.)

Q    I didn't ask during the genocide.

I will ask the question again.

Do you know whether Pauline Nyiramasuhuko played any role in the genocide [sic] at any point in time -- any role in the government at any point in time?

A    (Through the Interpreter)  She was a minister in the transitional government.

Q    In the transitional government?

A    (Through the Interpreter)  Yes, the transitional.

Q    The government that formed when the genocide began?

A    (Through the Interpreter)  She was a member of the former government, and even when the new government was formed, she was also a member.

Q    Do you know what political party she belonged to?

A    (Through the Interpreter)  She was a member of the MRND party.

Q    Do you know if Pauline and Maurice had any children?

A    (Through the Interpreter)  Yes, she had children.

Q    Do you know the names of any of the children?

A    (Through the Interpreter)  Yes.  I knew one of their son's name, but the others were young, so I don't remember their names.

Q    The name of the son whose name you knew, who was that?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  I retain the name because it was a familiar name in Rwanda, and his name was Shalom.

Q    When did you first meet or come to be familiar with Shalom?

A    (Through the Interpreter)  I knew his family.  I was more familiar with his family.  He was younger than me, but, yes, I knew him, but we were not very familiar with each other.

MR. CAPIN:  Madam Interpreter, the last thing he said --

Q    Did you say you attended his wedding?

A    (Through the Interpreter)  Yes.  I assist at the wedding more for the family, but not for him particularly.

Q    Did you know Shalom's wife?

A    (Through the Interpreter)  No.

Q    Did you know whether Shalom's wife was related to anybody else that you knew?

A    (Through the Interpreter)  No.

Q    Do you know whether Shalom's wife had any sisters?

A    (Through the Interpreter)  Yes.

Q    Do you know the identity of any of her sisters?

A    (Through the Interpreter)  I knew of a younger sister that I had seen while I was staying at my brother-in-law's and she was managing the shop.

Q    Younger sister of whom?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  The sister of Shalom.

Q    I'm talking about Shalom's wife.

Does Shalom's wife have a sister that resided in Kigali?

A    (Through the Interpreter)  What I knew is that Mr. Munyemana, that worked with me, during the pre-wedding I learned that the fiancee of the son of Ntahobali, that she was the sister-in-law of my director.  That's how I learned that there was a sister.

Q    I'm going to try to simplify this a little bit.

So when you refer to your director, who are you referring to?

A    (Through the Interpreter)  I say that I have learned that the sister-in-law of Munyemana was the wife of the son of Ntahobali.

Q    Are you saying that Shalom's wife was married to Athanase -- I'm sorry.

Shalom's wife was Athanase Munyemana's wife's sister?

A    Wife.

(Laughter.)

Q    I'm making this worse.

(Laughter.)

Q    Are you saying that Shaloms' wife was the sister of Munyemana's wife?

A    (No response.)

Q    Are you saying that Shalom was married to the sister of Munyemana's wife?

A    (Through the Interpreter)  Yes, that's what I'm saying.

Q    Do I remember correctly on the marriage certificate in Munyemana's employment file we saw yesterday that Munyemana's wife was Prudence Kantengwa?

A    (Witness nods.)

Q    So Prudence Kantengwa was the sister of Shalom's wife?

A    (Through the Interpreter)  Absolutely.

Q    Now, sir, how long did you stay at this particular residence with your brother-in-law?

A    (Through the Interpreter)  I stayed until the next Sunday, and it was about the 17th.  I remember very well that day because I went to the EER after mass.

Q    After the 17th did you move somewhere else?

A    (Through the Interpreter)  No.

          THE INTERPRETER:  Or "when"?  I don't --

Q    Did you leave your brother-in-law's house after April 17?

A    (Through the Interpreter)  After that I went to the Catechist Institute, ICA.

Q    During the several days that you remained at your brother-in-law's house, did you move relatively freely around Butare?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  More or less, because that week there were not killings at that time.  So more or less we could just move.

Q    Describe the atmosphere during that week from the week starting with April 12 in Butare.

A    (Through the Interpreter)  After the 12th, there was so many refugees coming from Kigali, and practically it was like the whole town of Kigali had emptied itself into Butare; and, therefore, there were so many people in Butare.

And when the government fled, so everybody was scared, and so they fled to the south because the killings had started also in Kigali.

Q    We're looking at an exhibit that's Marked 28A.

Where in relation to the center of the town of Butare is this?

A    (Through the Interpreter)  It's towards the south of the town.

Q    Is the town --

A    (Through the Interpreter)  It's the -- there is the commercial place -- the business area.

Q    Does this photograph depict an area near the center of town?

A    (Through the Interpreter)  I don't understand.

Q    Does this photograph depict an area near the center of the town of Butare?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  The center of Butare is not big, and where it's showing is the prefecture.

Q    The governor's office, in essence?

A    (Through the Interpreter)  The office of the prefect was around there.

Q    Did you move around freely in the area of the center of Butare during that week that you stayed at your brother-in-law's house?

A    (Through the Interpreter)  Not much, but two or three times I went towards that place that he was pointing.

Q    Towards the prefecture?

A    (Through the Interpreter)  Yes.

Q    Did you see any new roadblocks installed during this first week that you were in Butare in this part of town (indicating)?

A    (Through the Interpreter)  From the beginning, the roadblock was around there at that intersection, and there was the BSR School.

Q    Is this a roadblock that existed before the genocide began, the one you're describing now?

A    (Through the Interpreter)  The roadblock existed, but it was not permanently there.

Q    And you're talking about a roadblock that was by the officer's school?

A    (Through the Interpreter)  At that intersection on the

PDF created with pdfFactory trial version www.pdffactory.com

road that is going towards the school.

Q   Did any new roadblocks form, or were any new roadblocks put up in Butare while you were there before leaving your brother-in-law's house?

A   (Through the Interpreter)  Before I left, the roadblocks were not established there.

Q   After you left your brother-in-law's house, were new roadblocks established in Butare?

A   (Through the Interpreter)  Yes, when the genocide started in Butare.

Q   When was that?

A   (Through the Interpreter)  Nineteenth or 20th.

Q   Of April?

A   (Through the Interpreter)  Of April.

And that's when we started seeing the other roadblocks in the area.

Q   Did you tell us the location of some of the roadblocks you saw set up when the genocide arrived in Butare?

A   (Through the Interpreter)  Those that I remember, it was that one.

Q   You're indicating a roadblock in the area near the intersection by the hotel?

A   (Through the Interpreter)  Yes, at that intersection (indicating), and toward also the prefecture.

Q   At what would be depicted immediately off the picture to

PDF created with pdfFactory trial version www.pdffactory.com

the left if the picture were larger?

A   (Through the Interpreter)  The one that I recall.  And there was another one also in front of the Hotel Faucon.  And also in the area I was staying.  And also near the ICA there were roadblocks.  And before you could cross or go through there, you would go through a roadblock.

Q   Those several roadblocks you just described, when were they set up?

A   (No response.)

Q   You have just named the location of several roadblocks, correct?

A   (Through the Interpreter)  Yes.

Q   When were they installed?

A   (Through the Interpreter)  From the 19th and after the speech of the President inciting to commit the genocide in Butare.  And also after they fired at the prefecture that was there before.  It was at that time, that's when the massacres started in the town of Butare, and the Interahamwe had come from Kigali, and so they started establishing roadblocks in the area.

Q   I want to ask you several questions, sir, about the roadblock that you pointed to in this area of the photograph (indicating), but for that purpose, I think, perhaps, it would be easier if you resumed the witness stand.

        (Whereupon, the witness resumed the stand.)

PDF created with pdfFactory trial version www.pdffactory.com

Q    Before I ask you the questions about that specific roadblock, I would like to ask you, what caused you to move from your brother-in-law's house to the Catholic institution?

A    (Through the Interpreter)  I told you, because I was a leader of an opposing political party, and I was close to the Prime Minister that was assassinated.

The members of my own party that were extremists, they had sought to eliminate me, and I had learned about it, and I knew they were going to use the Presidential Guard to execute me.  And I had confirmed information that at any time, at any occasion, even though I was the brother-in-law -- or the son-in-law of the President, I had to hide.  And at that time I knew that he had no power to protect me, and that's why I went to a discreet or better place for my safety.

Q    Did you observe anything specific that caused you to leave your brother-in-law's house, anything specific in Butare?

A    (Through the Interpreter)  Yes.  I saw the Presidential Guard that were watching me, and I was warned by a relative that had heard a conversation, a conversation of those military saying that they knew where I was staying, that at any time they could get rid of me.

Q    Did learning that the Presidential Guard knew your

whereabouts cause you to leave your brother-in-law's house?

A    (Through the Interpreter)  Yes.

Q    When you left your brother-in-law's house, did you observe the roadblock that you pointed at in Exhibit 21A -- sorry.  21A in front of --

When you left your brother-in-law's house, on that date did you see the roadblock that you told us was set up in front of your brother-in-law's house?

A    (Through the Interpreter)  The roadblock that I saw, it was at the intersection, so it really wasn't opposite the house of my brother-in-law.

Q    That roadblock, was it there the day that you left your brother-in-law's?

A    (Through the Interpreter)  Yes.

Q    Was that the first time you saw it?

A    (Through the Interpreter)  Yes.  When we arrived there, I saw the roadblock.

Q    On what date did you first see the roadblock?

A    (Through the Interpreter)  The first time I saw, on the 12th.  There was a roadblock at the intersection to what's the road going to the school, the ESO.

Q    Did a new roadblock go in on or about the 17th before you left your brother-in-law's house on the road in front of the hotel you described?

A    (Through the Interpreter)  Later.

PDF created with pdfFactory trial version www.pdffactory.com

Q    On what date?

A    (Through the Interpreter)  Between the 20th.  That week of the 20th.  Maybe between 20, 21, but it was during that week that I had gone to see my children.

Q    At that new roadblock, did you see individuals working at the roadblock?

A    (Through the Interpreter)  They were mostly the youth and they were -- they would have, like, sticks, and also they would have rocks with them and they were gathered on the roadblocks.

Q    Was that particular roadblock staffed by Interahamwe?

A    (Through the Interpreter)  In that area, what I remember there were many military that would come from town and going towards to the ESO.  And I also would see the casualties of war and also other military that were wounded.  And in front of the houses, I would see also the Interahamwe going back and forth.

Q    The new roadblock that went in on or about the 20th, did you see that on more than one occasion?

A    (Through the Interpreter)  I would not go through that place many times during that whole month.

        MR. CAPIN:  Was there more to the answer?

Q    Did you just say that you didn't go many times, but you went a few times to visit your children?

A    (Through the Interpreter)  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Q   Was that because your children remained at your brother-in-law's house?

A   (Through the Interpreter)  Yes.  My children stay at my brother-in-law's.

Q   So am I correct in understanding you saw the roadblock for the first time on or about the 20th?

A   (Through the Interpreter)  The week of the 20th, yes. The week of the 20th.

Q   Of April?

A   (Through the Interpreter)  April, yes.

Q   When is the next time you saw that particular roadblock?

A   (Through the Interpreter)  I don't recall very well, but I remember when I left at the end of May, I saw many/few roadblocks on that route.

Q   I'm talking, sir --

          MR. CAPIN:  May I approach, your Honor?

          THE COURT:  You may.

Q   -- specifically about the roadblock you pointed at when you were standing before the jury in this area here (indicating).

A   (Through the Interpreter)  The first roadblock that I saw was military, and I remember it very well.  Even at the end of the month of May when we were fleeing, alongside that road there were even small roadblocks.

Q   When you say, "small roadblocks," you mean small

barriers?

A    (Through the Interpreter)  There were not many people on that roadblock, but you could see there were obstacles or objects hindering the way through.

Q    So in this area here, what type of obstacles did you see as part of that roadblock?

A    (Through the Interpreter)  It would be like bricks, and there would be like logs of trees.

Q    Tree logs?

A    (Through the Interpreter)  And also small stones.

Q    Now, on how many occasions did you see a roadblock in this vicinity here (indicating) that included stones and bricks and tree logs?

A    (Interpreting.)

Q    I'll ask the question differently.

Did you see the roadblock you just described on more than one occasion between the first time you saw it and when you left Butare at the end of May?

A    (Through the Interpreter)  Yes.

Q    On those occasions that you saw it, was it always staffed by people checking IDs?

A    (Through the Interpreter)  Yes.  Yes.  They was searching and they were controlling everyone who was going through.

Q    Approximately how many people were working at that

PDF created with pdfFactory trial version www.pdffactory.com

roadblock on each occasion you saw it?

A   (Through the Interpreter)  At that big roadblock could be 20, 30 people; but on the smaller roadblocks it could be three or four people.

Q   I'm focusing, sir, on this particular roadblock (indicating) now.

You're saying 20 or 30 people were working at this particular roadblock?

A   (Through the Interpreter)  At that intersection, the main roadblock that I would say was that one at the intersection, but the other smaller roadblocks that I would see, people were more freely walking around and were just going back and forth.

Q   The materials you described making up the roadblocks, rocks, bricks, and tree logs, could you point to where you saw those approximately?

A   (Indicating.)

Q   Is that where they began?

A   (Through the Interpreter)  Yes.

Q   Did they continue up in this direction (indicating)?

A   (Through the Interpreter)  Yes.

And also there were -- there was some Interahamwe that would chase the refugees on the other side of the road as that he pointed.

Q   What type of refugees?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  It was Tutsis.  It was mainly Tutsis.

Q   Where did you see the Interahamwe chasing Tutsi refugees?

A    (Through the Interpreter)  I either saw one there in front of that house, and a pickup, a pickup of the urban commune.  There were some Interahamwe at that pickup, and they will take them down to the university.

Q   Did you see groups of Tutsi refugees anywhere depicted in this photograph?

A    (Through the Interpreter)  You cannot really recognize on the picture, and I'm not really referring to the pictures.  I'm just remembering what I saw -- recalling with my memory what I saw at the time.

Q   So am I correct in understanding that on your memory you saw obstacles set up along this stretch of road right here (indicating) while you were in Butare?

A    (Through the Interpreter)  Yes, absolutely.

Q   And that you saw military and Interahamwe working at that roadblock?

A    (Through the Interpreter)  Yes.

Q   Is that the roadblock in which you say you saw approximately 20 to 30 such personnel each time you saw it?

A    (Through the Interpreter)  More or less, yes.

Q   And is the last time you saw that roadblock on or about

PDF created with pdfFactory trial version www.pdffactory.com

May 30?

A    (Through the Interpreter)  Yes.

Q    And between the time you left your brother-in-law's house and May 30, you saw that specific roadblock on more than one occasion, correct?

A    (Through the Interpreter)  Yes.

MR. CAPIN:  I have nothing further.

THE COURT:  Mr. McGinty, why don't we take the break now while you make your decision.

Are you going to proceed with cross-examination?

MR. McGINTY:  I will proceed.

THE COURT:  Rather than interrupt you in five minutes or so, jurors, why don't we take the morning recess now, and we'll come back in 25 minutes for cross-examination.

THE CLERK:  All rise.

(Recess.)

THE CLERK:  All rise for the jury.

(Whereupon, the jury entered the courtroom.)

THE CLERK:  All rise for the Honorable Court.

Court is open.  You may be seated.

THE COURT:  Do we have our witness?

MR. CAPIN:  Yes, your Honor.

(Pause in proceedings.)

MR. McGINTY:  May I proceed?

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  You may.

MR. McGINTY:  May I approach the witness, your Honor?

THE COURT:  You may.

**CROSS-EXAMINATION**

BY MR. McGINTY

Q   Good morning, Senator.

I'm going to show you a piece of paper and ask you if you recognize what's on it?

A   (Through the Interpreter)  Yes.

Q   Now, is this a document in French which lays out the structure of government under the Prime Minister.

A   (Through the Interpreter)  Yes.

Q   Could you help us understand a little bit about the structure of your organization within that document?

A   (Through the Interpreter)  What we call the hierarchy or organization of the Prime Minister.

Q   I apologize for interrupting.

If you do recognize that, I will show it to the government and ask that it be displayed, and you can explain it from there.

(Pause in proceedings.)

MR. McGINTY:  May I have this marked for identification and admitted?

THE COURT:  Tell me what the next exhibit number

PDF created with pdfFactory trial version www.pdffactory.com

is.

THE CLERK:  I think it's 27, Judge.

THE COURT:  Twenty-seven?

THE CLERK:  I believe so, yes.

**(Defendant's Exhibit No. 27 received in evidence.)**

BY MR. McGINTY

Q    Senator, good morning.

I've placed on the screen here a document.  It appears to set out an organizational chart, although the words are in French.

Could you kindly show us where in the organizational chart you would be and provide some orientation for us there.

A    (Through the Interpreter)  If you look at the chart, if you go down to the third, after "Service Renseignements, Secretary General," that's the function I was in charge of, I was doing.

Q    If I could tap on that.

A    (Through the Interpreter)  Yes, where you just put arrows.

Q    And then beneath that there are three subparts to that. Would you describe what those are?

A    (Through the Interpreter)  That's the Secretary of the Interior Intelligence, Internal Security.

Q    And that would be Internal Security.

A    (Through the Interpreter)  "Renseign Interieurs," which is "interior intelligence."

Q    The second one would be what?

A    (Through the Interpreter)  Management of Personnel.

Q    And the next one is what?

A    (Through the Interpreter)  "Surveil Et Transmission," which would be, "Transmission" and -- "Surveillance and Transmission."

Q    Where would Athanase Munyemana be in that chart, if any place?

A    (Through the Interpreter)  Asthanase Munyemana would be on the second rank, "Renseign Interieurs," Interior Intelligence.

Q    So he is a subordinate of yours?

A    (Through the Interpreter)  Yes.

Q    And he is in charge of the interior section of the Security Service; am I asking that right?

A    (Through the Interpreter)  Interior, yes.

Q    And there were two other persons who were in charge of these other sections also within the Service?

A    (Through the Interpreter)  Yes.

Q    Now, as your subordinate, Mr. Munyemana was assigned a number of tasks by you; was he not?

A    (Through the Interpreter)  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Q    So, for example, there was an investigation into certain disturbances in Gisenyi and Ruhengeri?

A    (Through the Interpreter)  Yes.

Q    Do you recall that?

A    (Through the Interpreter)  Yes, sir, I recall that.

Q    And do you recall there was a commission that you headed in February through April of 1993 relating to those disturbances?

        THE INTERPRETER:  May I request the counsel to repeat the question, please?

        MR. McGINTY:  I'm sorry.

Q    Do you recall that between February and April of 1993 there was a commission that you headed to investigate those disturbances?

A    Yes.

Q    And those disturbances involved instances of killings?

A    (Through the Interpreter)  Yes.

Q    Where people's houses were burned?

A    (Through the Interpreter)  Yes.

Q    And where refugees were created by the disturbances?

A    Yes.

Q    Now, the report recommended that there ought to be consequences for the persons who had conducted these outrages?

        MR. CAPIN:  Objection on relevance, your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  Sustained.

MR. McGINTY:  Your Honor, this is for purposes of establishing what it is that the Service did.

THE COURT:  Sustained.

Move on.

Q   As part of that commission, did you nominate Athanase Munyemana to be part of it?

Yes or no, did you?

A   (Through the Interpreter)  It wasn't me who nominated that commission.  It was a government committee.

Q   I see.

But he participated in that commission, did he not?

A   (Through the Interpreter)  Yes.  He participated as a member.

Q   And the commission's findings were critical of conduct by people in MRND; isn't that right?  The commission's findings were critical of conduct by people in MRND, right?

THE INTERPRETER:  Would you repeat the last part of the question?

Q   Of MRND?

A   (Through the Interpreter)  The results -- the report and the results that came out from that commission showed that there was some people from the government that had had part in those killings.

Q   And the findings were signed on by each member of the

PDF created with pdfFactory trial version www.pdffactory.com

commission; isn't that right?

A    (Through the Interpreter)  Yes.

Q    So -- I'm sorry.

A    (Through the Interpreter)  Not all the members.  There was one member who abstained.

Q    Who abstained for one particular finding; am I right?

A    (Through the Interpreter)  Yes.

Q    But otherwise concurred in all the other findings?

A    (Through the Interpreter)  Yes.

Q    And, again, the findings were critical of MRND and recommended further investigation and prosecution, correct?

A    (Through the Interpreter)  Yes.

Q    And, again, a participant in that who concurred in the results was Athanase Munyemana?

A    (Through the Interpreter)  Yes.  He was part of that, yes.

Q    One of your priorities at the Service, at the Security Service, was to identify and address human rights disturbances that occurred within Rwanda?
          To address human rights --

A    (Through the Interpreter)  Yes.

Q    And there was a -- strike that.
          And during your time as the head of the Service, that was one of the priorities of the Security Service; was it not?

PDF created with pdfFactory trial version www.pdffactory.com

A   (Through the Interpreter)  Yes, of course.

Q   Now, while Mr. Munyemana was working there, you also did evaluations of his work performance; did you not?

A   (Through the Interpreter)  Yes, I did evaluate him.

Q   And the evaluations were extremely positive; were they not?

A   (Through the Interpreter)  Yes.  He was a very, very good technician, yes.

Q   Now, just let me back up a moment.

In the commission report that addressed the conduct -- the MRND conduct in Gisenyi and Ruhengeri --

A   (Through the Interpreter) Yes.

Q   -- one of the people that was criticized, was named and criticized in that report, was a person named Matthieu Hazayezu?

A   (Through the Interpreter)  I don't remember very well that name, because there are so many people in that report, so many names in that report.

MR. McGINTY:  May I approach the witness, your Honor?

THE COURT:  You may.

Q   Now, do you recall that one of the people -- well, let me approach you and ask if you recognize that document?

A   (Through the Interpreter)  Yes, sir, I recall that.  I can recognize that.

PDF created with pdfFactory trial version www.pdffactory.com

Q   Now, if I direct your attention to the last pages, do you recognize that among the people interviewed for this report was Mr. Matthieu Hazayezu?

A   (Through the Interpreter)  Hm-hmm.  Yes.

Q   And you recall that he had been a designated coordinator of demonstrations if Cyome?

THE INTERPRETER:  Cyome?

MR. McGINTY:  However you pronounce it, C-Y-O-M-E.

A   (Through the Interpreter)  Yes, it's written over there.

Q   And do you recall that it was critical, the report and your findings were critical, of how Mr. Hazayezu, as a leader of MRND, had failed to protect civilians against harm?

A   (Through the Interpreter)  This report is dated in '93, so I do not -- or cannot speak to all of what is in the report.

Q   Okay.

But directing your attention to this section here, which is identified as page 11, Mr. Hazayezu is specifically named in this report; is he not?

A   (Through the Interpreter)  Yes.  It is obvious in this report.

Q   Right.

And he was one of the people identified as leading demonstrations, and one of the consequences of this report

was the recommendation that further investigations and prosecutions be conducted of these people?

A   (Through the Interpreter)  Yes.

Q   Thank you.

MR. McGINTY:  Your Honor, at this point I am putting on the screen a letter that is in Government's Exhibit, I believe, 13, the records of Sonarwa, that reflects that Mr. Hazayezu, named in the report, caused the suspension of Prudence Kantengwa in 1994 after he had been interviewed in connection with the investigation by Prudence Kantengwa's husband after the interview of Mr. Hazayezu in connection with the investigation of which Mr. Munyemana was a part.

Q   Now, you testified about MRND.  Do you recall that testimony?

A   (Through the Interpreter)  Yes, over here.  Yes.  Right here.

Q   And one of the documents you were shown was this document here.  And directing your attention down to No. 18, the name that is given on this is, in No. 18, is Movement Revolutionaire Pour le Development, which appears to be "MRD."  That's the way it's written there.

Now, isn't it the case that the actual name of MRND was the "Movement Revolutionaire National Pour le Development"?

A    (Through the Interpreter)  I don't understand the question.

Q    In other words, as this is rendered here, is there not a word missing?

A    (Through the Interpreter)  Yes.  Yes.  There is -- the abbreviation is "MRND."  So it's "Movement Revolutionaire National Pour le Development."

Q    So as it's rendered here, one of the words is missing from that, correct?

A    (Through the Interpreter)  As it is, yes.  As it is written, there is one word missing.

Q    Now, that was the name before the multiparty system came into effect in Rwanda in 1991, correct?

A    (Through the Interpreter)  Before and after.

Q    Well, before the MRND, the "Movement Revolutionaire National Pour le Developemnt," was the unique party that all Rwandans belonged to, correct?

A    (Through the Interpreter)  Yes.

Q    Now, you testified that after multiparty came into place, the official name for the party, the President's party, was the "Movement Revolutionaire National Pour le Development Democratie"?

A    (Through the Interpreter)  Yes.

        Yes, but the abbreviation stayed the same.  It stayed as "MRND."

PDF created with pdfFactory trial version www.pdffactory.com

Q    I'm asking you what the official name was, and the official name would also carry the word "democracy," right?

A    (Through the Interpreter)  Yes.

Q    Now, you testified a little bit about the RTLM radio station.  Now, when you talked about it, you mentioned that there were investments.  You had mentioned that there were investors in RTLM?

A    (Through the Interpreter)  That had bought, like, shares.

Q    Right.

And there were perhaps over a thousand people who had purchased shares in this newly developed radio station?

A    (Through the Interpreter)  It's possible.

Q    When you testified about it, you were testifying from your own knowledge; were you not?

A    (Through the Interpreter)  Yes.

Q    Now, based on your own knowledge, RTLM was created through a piece of legislation that provided for the creation of a private radio.  Are you aware of that?

A    (Through the Interpreter)  Yes.

Q    That in the legislation it described that the radio would avoid any divisionism between the people; are you aware of that?

A    (Through the Interpreter)  Yes.

Q    Now, are you also aware that there were a number of

PDF created with pdfFactory trial version www.pdffactory.com

persons who were affiliated with the RPF that were
shareholders in RTLM?

A    (Through the Interpreter)  Yes.  But I'm also aware that
there were some people that were threatened for having
bought shares in the radio.

Q    Who were -- well, let me ask you about the RPF members.
      Christopher --

A    (Through the Interpreter)  That, I don't know.

Q    Are you aware that Christopher B-A-Y-I-V-A-M-O, a
minister in the RPF government, had been an investor in
RTLM?

      THE INTERPRETER:  The last name.  Can I see the
last name?

      MR. McGINTY:  B-A-Y-I-V-A-M-O.

      THE INTERPRETER:  Christopher Bayivamo.

      MR. McGINTY:  It's B-A-"Z"-I-V-A-M-O.

      THE INTERPRETER:  Christopher Bazivamo.

Q    Are you aware that he was an investor in RTLM?

A    (Through the Interpreter)  Yes.  I know.

Q    And he in the RPF was the Minister of Mining, was he
not?

A    (Through the Interpreter)  Yes.

Q    Are you also aware that Boniface Muhagu [ph.] was also
an investor in RTLM?

A    (Through the Interpreter)  But when they bought shares,

PDF created with pdfFactory trial version www.pdffactory.com

they were not a member of RPF.

Q   Right.

But they -- inferentially, they were anticipating that it was going to become the vehicle of hate radio; fair to say?

THE COURT:  How can you put yourself in their mind?

MR. McGINTY:  I'm sorry?

THE COURT:  The question is asking for speculation about what somebody else might have been thinking at a given point in time, and I just don't think it works.

Q   Now, are you aware that there were other RPF, or persons who became affiliated with RPF government, who were also investors in RTLM?

A   (Through the Interpreter)  The questions aren't precisely clear.  Do you mean that were members or who became members?

Q   Who became members of RPF?

A   (Through the Interpreter) Yes.  That, yes.  Okay.

Q   Now, you described that you were in Gisenyi when you learned about the President's plane crashing?

A   (Through the Interpreter)  Yes, I was in Gisenyi.

Q   I want to try to understand the time sequence here. Between the 6th and 10th of April of 1994, you were in Gisenyi; am I right?

A   (Through the Interpreter)  That's exact.  That's

PDF created with pdfFactory trial version www.pdffactory.com

correct.

Q   You then left on the 10th, and you went to Butare; am I right?

I'm sorry.  I'm sorry.  I'm sorry.

Kigali.

A   (Through the Interpreter)  Yes.

Q   On the 12th you had gone to Butare; am I right?

A   (Through the Interpreter)  That is correct, yes.

Q   On the 12th you had gone from Kigali south to Butare on the main road; am I right?

A   (Through the Interpreter)  Yes, that's correct.

Q   Did you stop in Gitarama?  Did you stop in Gitarama?

A   (Through the Interpreter)  Yes.

Q   Did you --

A   (Through the Interpreter)  I went via or through Gitarama.

Q   Did you stay in Gitarama?

A   (Through the Interpreter)  No.

Q   Now, Gitarama was where the transitional government was, had moved to from Kigali, correct?

A   (Through the Interpreter)  Yes.  They left that day, yes.

Q   So you left Kigali at the same time that everyone else left on the main road heading south?

A   (Through the Interpreter)  I left after, the same day.

PDF created with pdfFactory trial version www.pdffactory.com

Q   But you were part of the large exodus out of Kigali heading south?

A   (Through the Interpreter)  No, I was not in that same convoy.  I was not in the same group or convoy.

Q   I'm sorry.  I don't mean to be suggesting that you were in a convoy, but lots of people left Kigali that day heading south?

A   (Through the Interpreter)  Yes.  Even my kids, my children, left before.

Q   Your children had left before?

A   (Through the Interpreter)  The same day, but a little bit before.

Q   So when you left, you did not leave with your children?

A   (Through the Interpreter)  No.

Q   Who did they go with?

A   (Through the Interpreter)  With members of my family, the family of my father-in-law.

Q   When you say the family of your father-in-law, this is the person who had become invested as the President of the Republic of Rwanda; am I right?

A   (Through the Interpreter)  The one that had became the new President.

Q   So later you were talking about how the Presidential Guard were a threat to you, that they might harm you?

A   (Through the Interpreter)  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Q    But, as I understand it, when your children were leaving in -- or leaving from Kigali, they were in the company of your father-in-law?

A    (Through the Interpreter)  Yes.

Q    You headed down to Butare, arriving on the 12th?

A    (Through the Interpreter)  Yes.

Q    And on the 12th you say that there was one roadblock, and that was at the intersection toward the road going to the ESO.

A    (Through the Interpreter)  Yes.

MR. McCARTHY:

MR. McGINTY:  If I might approach the witness, your Honor?

THE COURT:  You may.

Q    If I understood correctly, you pointed to the area of this corner here as the place where that roadblock was (indicating)?

A    (Through the Interpreter)  Yes.

Q    Can you put that pen across there?  Am I placing that accurately?

A    (Through the Interpreter)  Yes.

Q    So, if I might, so the barrier is placed where my pen is.  I hope I'm not blocking, but over here.

Now, that road, this was the single barrier that you encountered in Butare; do I understand that?

PDF created with pdfFactory trial version www.pdffactory.com

THE INTERPRETER:  Excuse me?

Q   This was the single barrier that on that day you saw in Butare?

A   (Through the Interpreter)  In the city of Butare on that date, on that specific date.

Q   On that day, okay.

And that barrier that you testified about controls the side road going in the direction of the ESO, correct?

A   (Through the Interpreter)  But also toward the Commissioner Central Headquarters and toward the hospital.

Q   I see.

So on that little road there, as you go up that little road, you could go to the right toward the market?

A   Yes.

Q   To the right and then over to access the ESO?

A   (Through the Interpreter)  Hm-hmm.

Q   To the left towards the hospital?

A   (Through the Interpreter)  Yes.

Q   Now, this was the only roadblock that you saw on the 12th?

A   (Through the Interpreter)  It's the only roadblock that I remember very well on that specific date.

Q   On that day.

And that was manned by the military; do I understand that right?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  On that date, yes.

Q    By the military, right?

A    (Through the Interpreter)  Yes.

Q    For purposes of security at the ESO, correct?

A    (Through the Interpreter)  Yes, but also to forbid people from crossing and going across.

Q    Now, from the 12th through the 18th you stay at your brother-in-law's, correct?

A    (Through the Interpreter)  Yes.

Q    What is your brother-in-law's name?

A    (Through the Interpreter)  His name is Francois Karimunda.

        THE INTERPRETER:  I will spell that for the record, K-A-R-I-M-U-N-D-A, Francois.

Q    Now, he is the son-in-law -- I'm sorry.  He's your brother-in-law, correct?

A    (Through the Interpreter)  He is the husband of the sister of my wife.

Q    I see.  So he is also the son-in-law of Sindikubwabo?

A    (Through the Interpreter)  Yes.  That's correct.  That's what it means, yes.

Q    So he is the son-in-law of the President of the Republic, correct?

A    (Through the Interpreter)  Yes, that's correct.

Q    And his house, if I understand this right, is located --

PDF created with pdfFactory trial version www.pdffactory.com

am I pointing to this correctly?

A   (Through the Interpreter)  Next to the garage.

Q   So the garage -- the MSM garage is here at the end, (indicating), right?

A   Hm-hmm.

Q   At the end, and the next house is the house of your brother-in-law?

A   (Through the Interpreter)  Correct, yes.

Q   So it's this house here (indicating).

The second house, which, in this image from June 1, appears to be the house where the white vehicle appears to be poised almost in front of; fair to say?

A   (Through the Interpreter)  Yes, over there.  Yes, over here.

Q   Now, you testified that you stayed at your brother-in-law's until the 18th, correct?

You said it was the 20th that you say the roadblock that was in this area here (indicating) started?

A   (Through the Interpreter)  I said that there were small roadblocks over there and there (indicating).

Q   Over there and there, where we're pointing to.

A   (Through the Interpreter)  Along that road.

Q   But where were the roadblocks along that road?

MR. McGINTY:  Actually, if we could approach the jury?

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  You may.

(Whereupon, the witness stepped down.)

Q   Now, if you could kindly show us where these small roadblocks were?

A   (Through the Interpreter)  Even before in front of the house of my brother-in-law, I remember very well that when we left, they called me so I can leave toward Gisenyi around the 30th.  There was Interahamwe militia that were -- that were putting roadblocks along that street over here, even over there, over here (indicating).

Q   Let me just ask, what date was this?

A   (Through the Interpreter)  With my memory, toward May 30.

We had to go through and pass people who were obstructing this area (indicating).

Q   So toward May 30 you saw that activity of obstruction starting?

A   (Through the Interpreter)  Toward that date, May 30.

MR. McGINTY:  Okay, thank you.

(Whereupon, the witness resumed the stand.)

Q   You then testified that as of the 18th you had gone to the -- I believe it was the ICA; that you stayed there until about May 30; that the only times you came back this way were to see your children.

A   (Through the Interpreter)  Not only that.

PDF created with pdfFactory trial version www.pdffactory.com

Q    And your children remained at your brother-in-law's house throughout that period?

A    (Through the Interpreter)  But for a certain time they went to Gitarama.

Q    Your children went to Gitarama?

A    (Through the Interpreter)  One time they went to Gitarama, and then they came back.  But they didn't stay at Gitarama.  So they came back to Butare.

Q    When they went to Gitarama, do you remember what date that was?

A    (Through the Interpreter)  No.  I don't remember at all. I don't remember the date.

Q    It was after you had gone to ICA or before?

A    (Through the Interpreter)  It was way, way after that, way after.

Q    Now, you gave an interview to the United States investigators who went over to interview you in 2008; do you recall?

A    (Through the Interpreter)  Yes.

Q    Now, agents had gone over to Rwanda in about August of 2008, and they told you that they were there to conduct an investigation, right?

A    (Through the Interpreter)  Yes.

Q    And they met with you on August the 24th, 2008?

A    (Through the Interpreter)  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Q    Do you remember talking to them?  Do you remember talking to them?

A    (Through the Interpreter)  Yes.

Q    Do you remember that they asked you what you were doing in the time from when you learned about the President's plane crashing?

A    (Through the Interpreter)  Yes.

Q    Do you remember telling them that you were in Gisenyi, and shortly after that left and went to Kigali?

A    (Through the Interpreter)  Yes.

Q    You said you spent three days at your brother-in-law's in Butare until the 18th of April.

      Do you recall saying that to them?

A    (Through the Interpreter)  Yes.

Q    Do you remember telling them that you then left and went to Gisenyi?  Do you remember telling them that?

A    (Through the Interpreter)  I went toward Gisenyi almost toward the end of May.

Q    Do you remember telling the agents that you went to Butare then to Gisenyi?  Do you remember telling them that?

A    (Through the Interpreter)  I have to be clear.  I left Gisenyi April 10.  Then I went to Kigali.  And then from Kigali to Butare.  And then toward the end of May I went again to Gisenyi when the seat of Kigali was about to be seized.

PDF created with pdfFactory trial version www.pdffactory.com

Q    Did you tell that to the agents who met with you on August 24, 2008?

A    (Through the Interpreter)  Yes.

Q    You did?

A    (No response.)

Q    Did you tell them -- you told them that there was a roadblock that was at the gates of the ESO, remember?  Isn't it true that was the single roadblock that you mentioned to them during that interview?

A    (Through the Interpreter)  The one I had seen when I arrived in Butare.

Q    But they were asking you about your experience from the time you left Gisenyi during the period of the genocide, and you talked to them about going to Butare, correct?

A    (Through the Interpreter)  Yes.

Q    Did you tell them that you stayed in Butare not from the -- not up to the 18th of April, but that you stayed there --

         MR. McGINTY:  I'm sorry.

         THE COURT:  Mr. McGinty, you've got to give the interpreter time.

Q    -- until May 30.

         Actually, let me back that up.  I made you unnecessarily confused.

         Did you tell the agents that you stayed in Butare

PDF created with pdfFactory trial version www.pdffactory.com

until May the 30th?

A    (Through the Interpreter)  Maybe not that exact date, but I did not hide my activity in Butare.

Q    If you did not -- well, strike that.

Isn't it the case that you mentioned one single roadblock to the agents?

A    (Through the Interpreter)  I didn't take notes, so I don't know the conversation that we had.

MR. McGINTY:  Excuse me for a moment.

(Pause in proceedings.)

Q    You have a house in Butare; do I understand that right?

A    (Through the Interpreter)  I used to have a house.

Q    So you are very familiar with Butare and how it's laid out?

A    (Through the Interpreter)  Yes.

Q    I want you to point, as best you can -- and I apologize for the overhang of clouds here.

Can you show us where the gates are to the ESO?

A    (Through the Interpreter)  It's toward here (indicating).

Q    So up here (indicating)?

A    (Through the Interpreter)  But there are two entrances, two gates.  There used to be one over there for the school, and then one where the entrance of the employees or the officers would use.

PDF created with pdfFactory trial version www.pdffactory.com

Q    Now, before -- strike that.

When you were talking to the agents in August of 2008, the only roadblock you described was the roadblock at the gates of the ESO?

A    (Through the Interpreter)  No.  I would like to clarify.

At that moment, the roadblock for the ESO, the one in front of the garage.  Even now if you ask any of the people, the roadblock of the ESO, it was over there (indicating).  There's a difference between the entrance and the roadblock.

Q    Okay.

So if there are notes that reflect that you said that the roadblock was at the gates of the ESO, that would be a mistake, because that's not what you said, right?

A    (Through the Interpreter)  It would be a mistake because the entrance, like door, and the access, or the entrance that goes to the ESO is different.  That's two different things.

Q    Did you mention to them that as of the 18th of April that you sought refuge at the ICA?

A    (Through the Interpreter)  Yes.

Q    And that appears in the notes that the agent took of the interview?

MR. CAPIN:  Objection.

MR. McGINTY:  Don't we have a stipulation that it

doesn't?

THE COURT:  Are you saying it "does" or "does not"?

MR. McGINTY:  "Does not."

MR. CAPIN:  Objection.

This witness has no knowledge of that.

THE COURT:  Yes.  How would he know?

Sustained.

Q   Now, your father-in-law had a house in Butare?

A   (Through the Interpreter)  Yes.

Q   There was a -- it was just outside of Mukoni, which would be about, you described, a kilometer down the road?

A   (Through the Interpreter)  Yes.

Q   Now, that was his house during the period of the genocide; am I right?

A   (Through the Interpreter)  Yes.

Q   In your meeting with the agents, did you not tell them that you left Butare on or about April 18, 1994?

THE INTERPRETER:  What date, sir?

MR. McGINTY:  April 18, 1994.

A   (Through the Interpreter)  That I left Butare on April 18?

Q   Yes.  Is that what you told the agents when you met them in August of 2008?

A   (Through the Interpreter)  I'm not understanding.  You mean June?

PDF created with pdfFactory trial version www.pdffactory.com

Q    No, April.

A    (Through the Interpreter)  I am little bit confused with the date.

Q    When you were interviewed by the agents in August of 2008, did you tell them that you had left Butare on or about April 18, 1994?

A    (Through the Interpreter)  I left toward the end of May, May 30th.

Q    On April 19 your father-in-law --

A    (Through the Interpreter) Nineteen or eighteen?  I'm sorry.

Q    On the 19th of April, the day after the 18th, your father-in-law arrived in Butare --

A    (Through the Interpreter)  Yes.

Q    -- the President of the genocide government, and he gave a speech at the stadium calling on people to "clean up the dirt"?

A    (Through the Interpreter)  Yes.

Q    Were you in Butare that day?

A    (Through the Interpreter)  I was in Butare at the ICA, and I would like to say that one of the reasons why I went to hide was because his own Presidential Guard had started to come to Butare, and I was at the ICA to hide, because it's those Presidential Guard that had brought the genocide to Butare, and they had come with him.  So I was in ICA

PDF created with pdfFactory trial version www.pdffactory.com

because of them.

Q    They came with him, correct?

A    (Through the Interpreter)  There is like an advance team that came before, and then with him, and then after.

Q    He was part of a group of government officials that came.  He was the President of the government.

A    (Through the Interpreter)  Yes, he was.

Q    The Presidential Guards were his personal guards, weren't they?  Yes or no, they were his personal guards?

A    (Through the Interpreter)  Yes.  It was all his guards.

Q    And it's your testimony that his personal Presidential Guards would not protect the husband of the President's daughter?

A    (Through the Interpreter)  Yes.  I confirmed that.  And I have the proof of that.

Q    You -- in what time did you cross from Gisenyi into Goma in the Congo?

A    (Through the Interpreter)  I would like to clarify the confusion.

Q    No.  Hold on.

        When did you cross into Zaire?

A    (Through the Interpreter)  Yes, I did.  I crossed and went to Zaire.

Q    What was the date?

A    (Through the Interpreter)  July 14.

PDF created with pdfFactory trial version www.pdffactory.com

Q    Between May 30 and July 13 where were you?

A    (Through the Interpreter)  I was at the President in Gisenyi.

Q    Well, you said -- I'm sorry.

A    (Through the Interpreter)  Can I complete my answer?

Q    Yes.  Absolutely.

A    (Through the Interpreter)  On the 22nd of April, the President, Sindikubwabo, brought to the Prime Minister to ask and request for my protection so that I didn't be killed.  And that letter exists, and it's documented somewhere.

Q    That's April 22?

A    (Through the Interpreter)  Yes, 22nd April.

Q    Because you wanted a piece of paper -- you wanted some assurance of your own protection?

A    (Through the Interpreter)  That shows that.  Because I was threatened, that's why I needed that.

Q    You wanted that assurance that you wouldn't be harmed?

A    (Through the Interpreter)  It's not me that asked.  He saw it.  He knew I was threatened.  And he threatened that he would resign if some members of his family would be harmed.  And there were some that got killed, some members of his family.

Q    So this was on April the 22nd you were guaranteed safety?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  At that moment I didn't know he had written that.  I got to know it after.  But on the 30th they took me, and they took me to Gisenyi with the whole family.

Q    Now, when you say "they took me," who is "they"?

A    (Through the Interpreter)  Everybody, all the family.  They -- my brother-in-law called me and all the family to house.

Q    I'm asking who is the "they" that took you?

A    (Through the Interpreter)  We left in the car.

Q    Who is -- when you say "they took us," who is the "they" who took you?

A    (Through the Interpreter)  The son of my -- it's the son of my father-in-law that -- he took him to find us.  They escorted us.

Q    The assurance of your personal safety, which was this letter from the -- the letter that was written to the Prime Minister, was --

A    (Through the Interpreter)  I don't know the letter, but I got to know it after.  That's the way to show you I knew I was threatened.

Q    Right.

        But you said that the letter was written on April 22?

A    (Through the Interpreter)  Maybe 21st, 22nd.

PDF created with pdfFactory trial version www.pdffactory.com

Q    Now, is it your testimony you didn't learn that there was an assurance of your personal safety until the end of May?

A    (Through the Interpreter)  What do you mean?

Q    Is it your testimony that you only learned about the assurance of your safety by May 30?

A    (Through the Interpreter)  No, no.  I even got to know when I was in the government right after, after July, but through journalists.

Q    So when did you find out that there was an assurance of your personal safety?

A    (Through the Interpreter)  I had no assurance even in Gisenyi.

Q    So your testimony is that when you left at the end of May from Butare in the company of your son-in-law, you did not know you had an assurance of personal safety?

A    (Through the Interpreter)  It was the best choice I have to follow, but I knew that at any moment if I had left that convoy, I could be threatened at any time.

Q    Okay.

     When you say a "convoy," did some of the people who came to you get you in Butare, were some of them from the Presidential Guard?

A    (Through the Interpreter)  Yes.

Q    And they took you to Gisenyi, correct?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  Yes.

Q    To be with your father-in-law, correct?

A    (Through the Interpreter)  No, he indicated -- or maybe he was already there.  We were not together.

Q    I'm sorry?  You were not together?

A    (Through the Interpreter)  No.  I wasn't with him.  We weren't together.

Q    You weren't together on the trip, but you were going to Gisenyi to be with your father --

A    (Through the Interpreter)  Yes, to be with him in the next house, like in the house on it.

Q    So for whatever period between, let's say, June 1 and the 13th of July, you were in the midst of the genocidal government of Rwanda?

A    (Through the Interpreter)  What do you mean, "in the midst"?

Q    Did you have a conversation with your father-in-law about the killings in Rwanda?

A    (Through the Interpreter)  Yes, I had a conversation with him.

Q    And in the conversations with him, did you attempt to dissuade him of the killings that the Rwandan government was involved in?

A    (Through the Interpreter)  Even in Butare, when they killed the Queen, I took all the risk to go and see him, and

PDF created with pdfFactory trial version www.pdffactory.com

I told him that was the worst case, that was the worst thing.

Q   I'm sorry.

You learned about the killing of the Queen, and while you were in Butare you left Butare?

A   (Through the Interpreter)  Yes, I went to see him.  I went to see.

Q   Where did you go?

A   (Through the Interpreter)  At his house, at his residence, and I told him the truth face to face.

Q   And you went to see him in Butare at his house outside Mukoni?

A   (Through the Interpreter)  Yes, from ICA up to his house.

Q   When you crossed over into Zaire, did you live with your father-in-law?

A   (Through the Interpreter)  No.  I went on my side to Goma, and he -- he went with other people toward Bukavu.

Q   Now, you had communications at that point after the genocide with the Rwandan government, did you not?

A   (Through the Interpreter)  Which moment?  Which period?

Q   After the genocide was over, did you have communications with the Prime Minister of the new government in Kigali?

A   (Through the Interpreter)  As long as I was outside the country, I did not have communication.

PDF created with pdfFactory trial version www.pdffactory.com

Q    Did you have communications while you were in Goma, any communications with the new Prime Minister of the Rwandan government that succeeded after the genocide?

A    (Through the Interpreter)  I had communication with him only when I came back to Rwanda, only when I returned back to Rwanda.

Q    When did you return back to Rwanda?

A    (Through the Interpreter)  I returned or came back almost the beginning of August.

Q    Between July 13 -- between July 13 when you crossed into Zaire and the beginning of August when you returned to Rwanda, did you have any communications with anyone from the Rwandan government about the terms of your return to Rwanda?

A    Never.

Q    Did you have any conversation or communication with anyone, any person?

A    (Through the Interpreter)  I have never had any conversation with anyone.  I decided to return back myself with no conditions, and I asked -- I knew that the General Dallaire from the U.N. Mission was in Goma.  I approached him, and I asked him to be able to take me to Rwanda, because I just want to go back.

Q    When you met with him, did you discuss whether you would get a ministerial post upon returning to Rwanda?

A    (Through the Interpreter)  No, I did not discuss with

PDF created with pdfFactory trial version www.pdffactory.com

him about that.

Q   Did you discuss the terms of a possible return to Rwanda with your children?

MR. CAPIN:  Objection as to relevance.

THE COURT:  You're losing me, Mr. McGinty.

MR. McGINTY:  Just another moment, your Honor.

A   (Through the Interpreter)  My children were very young to influence me.  I just informed them by my return.

Q   Were you not concerned for whether, if you returned to Rwanda, you might face harm because of your association with your father-in-law?

A   (Through the Interpreter)  I knew that very well.  Even my own house and his house, when we had stayed in Butare, had been destroyed, but I preferred to return back to Rwanda.

Q   Do you recall any conversation with General Dallaire about any terms of your return to Rwanda?

MR. CAPIN:  Objection.

THE COURT:  I think we've exhausted this, Mr. McGinty.

MR. McGINTY:  May I approach the witness, your Honor?

THE COURT:  Can we move to something perhaps a little more relevant?

MR. McGINTY:  Well, your Honor, this, I would

PDF created with pdfFactory trial version www.pdffactory.com

submit, is relevant because it goes to credibility.

If I might approach?

THE COURT:  I don't think you're making a lot of progress, but, all right, try one more time.

Q   I show you a document and ask you if this refreshes your recollection about your conversation with General Dallaire?

(Pause in proceedings.)

A   (Witness reads document.)

(Through the Interpreter)  I do not know this letter.  It is the first time I see it.

MR. CAPIN:  Objection.  There is no question before the witness, your Honor.

THE COURT:  True.

Q   Does this refresh your recollection about your conversations with General Dallaire?

A   (Through the Interpreter)  No.  General Dallaire knew me, and I don't discuss any terms with him.

Q   Now, upon your return to Rwanda, you became the Agricultural Minister; did you not?

A   (Through the Interpreter)  Yes.

Q   Before you did, did you not seek assurances from the Prime Minister about your safety?

A   (Through the Interpreter)  You mean before I go, I return?

Q   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  No, I did not seek to.  No, I did not.

The proof is that even when I return back I did not automatically became minister.  My political party, the member of my party that had survived, they had an assembly, or a meeting.  We were five candidates, and I was chosen among those five candidates that were there.  So I could not know before I was going to become a minister.

Q    Now, just for a moment, back to the time of the -- immediately after the President's plane crashed.

You testified about moderate Hutus being targeted for assassination.

Now, among the moderates who were targeted were moderates who were part of the MDR party, correct?

A    (Through the Interpreter)  Yes.  There were some members of the MDR.

Q    Now, among those who were targeted for killing was Jean Marie Higiro; is that right?

A    (Through the Interpreter)  It's possible, but he wasn't killed, and he was MDR.

Q    He was MDR and --

A    (Through the Interpreter)  Yes, he was a member of MDR.

Q    Right.

He was part of the moderate government, wasn't he?

A    Yes, he was among those who were moderate.

PDF created with pdfFactory trial version www.pdffactory.com

Q    At the time of the genocide, you know that he was air-lifted out by the United States just as it started?

MR. CAPIN:  Objection.  Relevance.

THE COURT:  Sustained.

MR. McGINTY:  Your Honor, it goes to materiality.

THE COURT:  It doesn't.

Sustained.

Q    Are you aware, sir, that in 2003 your government sought to have Mr. Higiro returned to Rwanda?

MR. CAPIN:  Objection, your Honor.

THE COURT:  I'll give you one more question.

Ask it again.

Q    Are you aware that in December of 2003 that your government sought the return of Mr. Higiro to Rwanda?

A    (Through the Interpreter)  How is that?

Q    By letter to the United States or United Nations Security Counsel.

A    That I do not know.

Q    You were Foreign Minister for Rwanda in the year 2000, were you not -- in the year 2000, Foreign Minister?

A    (Through the Interpreter)  Yes.

Q    And, as part of that, you were knowledgeable about persons that Rwanda was seeking to have returned to Rwanda?

MR. CAPIN:  Objection.  Relevancy, your Honor.

THE COURT:  Let's see if we can make it relevant.

PDF created with pdfFactory trial version www.pdffactory.com

You're going to have to show how this is somehow connected to this defendant and that it's a material issue.

MR. McGINTY:  Your Honor, the inquiry that was made, as one of the government exhibits shows, related to Prudence Kantengwa's brother, Mr. Higiro.

THE COURT:  If you can make that connection through this witness, then fine.

Q    Were you aware of your government seeking the return of Mr. Higiro to Rwanda?

MR. CAPIN:  Objection, asked and answered.

A    (Through the Interpreter)  I can't answer that question. I never knew that story.  I already said I do not know.

Q    So as you sit here today, are you aware of your government's efforts to try to get Mr. Higiro returned to Rwanda?

A    (Through the Interpreter)  You are -- you are -- you are making me learn that.

Q    I'm asking you whether, as you sit here today, you know that?

A    (Through the Interpreter)  No, I do not.

MR. McGINTY:  May I have a moment, your Honor?

(Counsel conferred.)

MR. McGINTY:  Nothing further.

THE COURT:  I assume there is nothing further, Mr. --

PDF created with pdfFactory trial version www.pdffactory.com

MR. CAPIN:  Very briefly, your Honor.

**REDIRECT EXAMINATION**

BY MR. CAPIN

Q   Senator, Mr. McGinty asked you about the different names that the MRND went by over time.

Do you remember those questions?

A   (Through the Interpreter)  Yes.

Q   Did the same party go by the initials "MRND" before, during, and after the genocide?

THE INTERPRETER:  Could you repeat the question for the interpreter?

Q   I will rephrase the question.

Did the same party go by the initials "MRND" before multipartyism as during multipartyism?

A   (Through the Interpreter)  Yes.  That party had the same abbreviation, even the official documents.

Q   And the same party retained the same initials during the genocide, right?

A   (Through the Interpreter)  Yes.

Q   And the leadership didn't change?

A   (Through the Interpreter)  No, it did not.

Q   And the ideology didn't change?

A   (Witness shakes head.)

Q   Mr. McGinty showed you a letter from the defendant's employment file.

PDF created with pdfFactory trial version www.pdffactory.com

Do you recognize the name Matthieu Ngir ---

MR. CAPIN:  Can you pronounce that for me?

THE INTERPRETER:  Ngirumpatse, Matthieu.

Q   So on screen in front of you is a portion of the exhibit indicating that Prudence Kantengwa is being hired at Sonarwa.

Do you see that?

A   (Through the Interpreter)  Yes, I see that.

Q   Are you familiar with the name of the signatory on this letter?

A   (Through the Interpreter).  Yes.  He was the President of MRND.

Q   Mr. McGinty asked you a few questions about RTLM.

Did you describe RTLM as being an anti-Tutsi, extreme propaganda radio station before the genocide?

A   (Through the Interpreter)  The radio RTLM was established to do the propaganda.

Q   And was it a propaganda radio station from its very inception?

A   (Through the Interpreter)  Yes, from the beginning.

Q   Mr. McGinty asked you some questions about interviews with agents in 2008, and he asked you if you told those agents that you left Butare on April 18.

Did you, in fact, tell the agents that you left your brother-in-law's house on April 18?

PDF created with pdfFactory trial version www.pdffactory.com

A   (Through the Interpreter)  Yes.

Q   Mr. McGinty made reference to a speech given by the new President in Butare encouraging the killings of Tutsis on April 19.

Were you aware of that speech on that date?

A   (Through the Interpreter)  Yes.

Q   Was it a notorious, famous event on that date?

A   (Through the Interpreter)  Yes, it was a notorious event.  That people had resisted to do genocide in Butare, but that event was marked as the spark of the genocide in Butare.

Q   Did that event also mark the beginning of notorious, widespread violence throughout the Butare town?

A   (Through the Interpreter)  Yes.

Q   Do you know whether Pauline Hyiramasuhuko, the owner of the hotel on Exhibit 20A, attended that rally?

A   Yes.

Q   And, finally, you mentioned -- Mr. McGinty asked you about the fact that your children traveled from Kigali to Butare when the genocide started with your father-in-law.

Do you remember those questions?

A   (Through the Interpreter)  Yes.

Q   Your father-in-law was their grandfather, right?

A   (Through the Interpreter)  Yes.

Q   Did you trust your father-in-law with the safety of his

PDF created with pdfFactory trial version www.pdffactory.com

grandchildren?

A    (Through the Interpreter)  Yes.

Q    You testified in response to Mr. McGinty that you were afraid of being killed by the Presidential Guard?

A    (Through the Interpreter)  Yes.

Q    Were you personally afraid of your father-in-law, Sindikubwabo?

A    (Through the Interpreter)  Not of him, no.

Q    Not afraid of him.

     And, finally, am I correct in understanding that when you arrived in Butare --

     MR. CAPIN:  May I approach, your Honor?

     THE COURT:  You may.

Q    -- you saw one roadblock immediately in front of Hyiramasuhuko's hotel?

A    (Through the Interpreter)  Yes.

Q    And when you left Butare, you saw that roadblock, and also a roadblock in the stretch --

A    (Through the Interpreter)  There were too -- many more roadblocks when I left Butare.

Q    And when you left Butare, there was also a roadblock along this stretch between the hotel where I'm pointing and the EER, correct?

A    (Through the Interpreter)  Yes.

Q    And it is this roadblock that is between the hotel and

the EER that consisted of logs and rocks and dirt, correct?

A    (Through the Interpreter)  It was in front of the hotel.

MR. CAPIN:  I have nothing further, your Honor.

MR. McGINTY:  Briefly.

**RECROSS-EXAMINATION**

BY MR. McGINTY

Q    Senator, when did Matthieu Ngirumpatse become head of MRND?

A    (Through the Interpreter)  In '92 after the President Habyarimana had left as the leader of the MRND.

Q    And that was a date after the letter you were shown by the government a few minutes ago?

A    (Through the Interpreter)  Pardon?  I'm sorry?

Q    And that was a date after the date on the letter that you were shown by the government a few moments ago?

THE INTERPRETER:  I'm sorry.

Q    I'm sorry.

The date on the letter that you were shown, the Sonarwa letter, was dated in 1991.

I'm sorry, 1990.

THE INTERPRETER:  I'm sorry.

Q    The letter that was shown by the government was dated in 1990, wasn't it?

A    Hm-hmm.

Q    And that was before Mr. Ngirumpatse became President of

PDF created with pdfFactory trial version www.pdffactory.com

the MRND.

A    (Through the Interpreter)  Yes.

MR. McGINTY:  I have no further questions.

THE COURT:  Thank you very much, Senator.  That concludes your testimony.

Safe travels.

(Witness excused.)

THE COURT:  Jurors, why don't we take five minutes and just stretch a little bit, and I assume we will meet the next witness.

THE CLERK:  All rise.

(Recess.)

THE CLERK:  All rise for the jury.

(Whereupon, the jury entered the courtroom.)

THE CLERK:  All rise for the Honorable Court.

Court is open.  You may be seated.

Please raise your right hand.

**MARGARET MacCALLUM, sworn**

THE CLERK:  Please be seated.

Please state your name and spell your last name for the record.

THE WITNESS:  Margaret MacCallum, spelled:  M-A-C, capital C-A-L-L-U-M.

PDF created with pdfFactory trial version www.pdffactory.com

**DIRECT EXAMINATION**

BY MR. CHAKRAVARTY

Q    Good afternoon, Ms. MacCallum.

A    Good afternoon.

Q    The entire court is aware of your desire to get back home to Mexico City, so I will try to be very quick.

Are you currently a consular officer?

A    I'm not currently a consular officer.  I am a foreign service officer.  I was a consular officer previously.

Q    I'm sorry.

And can you describe your prior posts.

A    I served in Nairobi from 2001 to 2003; Rome from 2003 to 2005; Washington, D.C., from 2005 to 2008; Angola from 2008 to 2010; and Mexico City from 2010 until now.

Q    And that's where you reside now?

A    That's correct.

Q    Before you became a foreign service officer, did you receive training?

A    Yes, I did.

Q    And specifically with regard to the Consular Affairs, did you receive consular training?

A    Yes.

Q    Can you describe generally what that kind of training was?

A    Consular training trains you in non-immigrant visas,

PDF created with pdfFactory trial version www.pdffactory.com

immigrant visas in American citizens' cases.  In visas specifically:  How do conduct interviews in order to determine whether somebody is eligible for a visa, and all the other procedures and processes associated with that.

Q   Are security and processing part of that training?

A   Yes.

Q   Are you familiar with the Security Advisory Opinion or the "Donkey" cable.

A   Yes.

Q   And is "Donkey" one of many animalized words which are codes for the State Department for different types of security cables?

A   Yes.

Q   I'm going to talk about your post in Nairobi.

        Was that your first posting as a foreign service officer?

A   It was.

Q   And did you perform the visa interviews, non-immigrant visa interviews, during this time?

A   Yes, I did.

Q   How busy was the visa office of consular affairs at that time?

A   We averaged about 200 non-immigrant visa interviews a day, along with other types of work, such as immigrant visas in American citizens' cases.

PDF created with pdfFactory trial version www.pdffactory.com

Q   I place in front of you Exhibits 2, 4 -- excuse me -- 2, 24 and 23.

Do you recognize those?

A   Yes.

Q   Is Exhibit 2 a series of visa applications for a Prudence Kantengwa?

A   Yes.

Q   Is Exhibit 23 a certified copy of cable traffic related to the "Donkey" cable?

A   Yes.

Q   Related to her visa?

A   Yes.

Q   And then can you describe what 24 is, which is not in evidence yet?

A   It is a Certificate of Revocation of Prudence Kantengwa's visa, with an associated cable issuing the same instruction.

MR. CHAKRAVARTY:  Your Honor, I would move in Exhibit 24.

MR. LANGE:  No objection.

THE COURT:  Twenty-four.

**(Government's Exhibit No. 24 received in evidence.)**

BY MR. CHAKRAVARTY

Q   Do you have a specific memory of Prudence Kantengwa?

A   I don't have a specific memory of meeting her or having

PDF created with pdfFactory trial version www.pdffactory.com

discussions with her, but I am familiar with the case file; and, from reading through the documents, I can understand what happened during the case, and I can recall my association with the case.

Q   What was that association?

A   I was the visa issuing officer.  The person who did the primary interview was a different consular officer, and he saw that it was -- he said the case was "okay to issue." But with Rwandans, you cannot simply issue a visa because you think they are eligible for a visa.  They have to go through the Security Advisory Opinion process, which then was subsequently done.

Once the Security Advisory Opinion process came back "clear," I issued the visa in accordance with normal procedure.

Q   As part of that Security Advisory Opinion process, are the answers to the Rwandan Questionnaire sent to Kigali and Washington?

A   Yes.

Q   Did that happen in this case?

A   Yes, it did.

Q   Now, are you familiar with that questionnaire?

A   Yes, I am.

Q   And was that a standardized requirement under State Department regulations?

A    Yes.  It was a worldwide requirement.

Q    How frequently would you use that questionnaire?

A    Fairly frequently.

We had a lot of Rwandans that were residing in Kenya as refugees, or who had moved from Rwanda at a certain point.  We also processed all immigrant visa cases for Rwanda, and, therefore, had to use it on every single immigrant visa case we processed.

So I would say at least a couple of times a month I personally dealt with such cases.

Q    And if someone answered in the affirmative to some of the questions about association on that form, how would you respond?

A    Well there were certain questions that were less -- or that were more innocuous, and there were certain questions that were definitely red flag questions that would require further exploration.  For instance, there are questions that say "If yes, please explain," such as, "If you or a family member were a member of a particular political party or organization," or, "if you were ever accused of participating in the genocide."  These questions were definite red flag questions, and if somebody answered "yes," we would need to collect as much detail as possible to send back to Washington.

Q    And particularly Question 17 and 18 in the questionnaire

PDF created with pdfFactory trial version www.pdffactory.com

that you have in front of you relating to certain associations of the applicant or family members, if someone had answered "yes" to those questions, what would your response be?

A    I would definitely need to get as much detail as possible about who the family member was and what their position was in that organization or party and send that back to Washington, because Washington had to determine, through the interagency process, whether people were potentially ineligible for a visa due to association with the genocide.  And simply having a name is not enough, because there was no comprehensive list of people accused of participating in the genocide.  So they would need as much detail as possible on relevant information in order to be able to do accurate research and give an accurate opinion.

Q    In this case, looking at the questionnaire, both those answers were in the negative, so the cable went through as those answers being negative; is that fair to say?

MR. LANGE:  This is leading.

A    Yes.

MR. LANGE:  I understand that the hour is --

THE COURT:  If we're going to make 1:00, we're going to have to lead.

MR. LANGE:  I gather the law has changed then.

Q    So when the return cable that came back, which is a part

of Exhibit 2 I think as well as 23, does that indicate the State Department -- Washington's position on the issuance of the visa?

A    The "no objection" states that they have not found any reason for this person to be ineligible; and, therefore, the post is authorized to issue a visa.  It's not an instruction to issue the visa.  It's a "no objection."

Q    So you retain, as a consular officer, the discretion to issue the visa or not?

A    Yes, definitely.

Q    Now, did you have an opportunity -- or did you, rather, look at every page of that visa file when you issued this visa?

A    I had access to the full visa file.  I did not look through it in a great amount of detail, because the top page that I would have seen had Dick Wallen's "Okay to issue, send visas Donkey" instruction on it.

So basically when another officer makes that type of determination, you normally wouldn't second-guess it and look through the entire file and try to re-examine the case and redo the interview.

So that's what I did.  I looked to see those notes, saw that the "no objection" had come back, and proceeded to process the visa.

Q    If you had noticed that the answers to Questions 17 and

PDF created with pdfFactory trial version www.pdffactory.com

18 were "Yes," that the applicant was affiliated with one of those organizations, regardless of whether the visa 6 return cable came from Washington, what actions would you have taken?

A    If I had seen that the answers were "yes" as opposed to "no," as they are, that would have been a huge cause of concern to me, and I would have been worried that perhaps the cable that had gone to Washington had not been entirely accurate.  Because to get a "no objection" response, usually there's nothing that's a red flag in the file.

If you have a "yes" answer to a red flag question such as those, I would be extremely surprised to get a "no objection," as opposed to "please give more information" or "please call the applicant in for another interview," et cetera.

That kind of response would be more expected, and I would have checked more thoroughly to make sure that we had sent accurate information to the Department.

Q    Would you have done -- would you have talked to other people about the application itself?

A    Potentially we could have talked to either the Washington level or in Nairobi to other agencies to consult and get more advice.

As consular officers, we're not experts in determining whether somebody or their family members were

involved in the genocide or in any of these organizations, but we did have resources at our disposal.

Q   Are you familiar with the visa Viper meeting?

A   Yes.

Q   What was that?

A   That's a monthly meeting to discuss potential people of concern amongst different agencies.

Q   Would that meeting be the type of place where an affirmative response to those types of questions on the questionnaire would be discussed?

A   Potentially, because it's a good time to bring -- when all agencies do come together and discuss visa cases.

Q   Those are the agencies in that post, in this case Nairobi?

A   Yes.

Q   Finally, if you knew that she had actually misrepresented information on a Rwandan Questionnaire, what reaction would you take?

A   If I had known she had misrepresented herself on the application, that would have been a huge cause for concern. Anytime anyone misrepresents themself on any item on the visa application, it is a cause for concern, because an applicant's credibility is then called into question; and, therefore, their intention to go to the U.S. for their stated purpose and then return to their home country, and if

PDF created with pdfFactory trial version www.pdffactory.com

they're not going to do that, then they're not eligible for a visa.  So, therefore, particularly if you're lying about something important or misrepresenting something important, you would assume -- you would mostly likely assume that they have something to hide, and, therefore, are probably not eligible for a visa.

Q    Did you consider that Rwanda Questionnaire to be important information?

A    Definitely.  It was critical.

MR. CHAKRAVARTY:  That's all I have.

THE COURT:  Mr. Lange.

MR. LANGE:  Your Honor, it's probably not going to be long, but it might be more than five minutes.

THE COURT:  Let's try to make it five minutes.

Jurors, since this witness has further to go than any of us, I think we can give Mr. Lange a couple of minutes past 1:00.

**CROSS-EXAMINATION**

BY MR. LANGE

Q    In exercising your judgment with regard to issuing a visa, one of the things you do is you look at the applicant's travel history; do you not?

A    That's something that I would normally look at.

Q    You look at their passport?

A    Yes.

Q    And if the passport showed a lot of international travel, that would make it perhaps less likely that they were going to not return?

A    It's something that is considered.

Q    Is a stable work history also considered?

A    That is also considered.

Q    When you made the decision to basically sign off on the visa in this case, you had not had a face-to-face contact with Prudence Kantengwa; is that right?

A    I had not at that point, no, because the person who conducted the interviews was not me.

Q    Did you ever at any point have face-to-face communication with Prudence Kantengwa?

A    I might have when she came in to pay the issuance fee, if there was an issuance fee, and pick up the visa.  I can't recall for sure.

Q    The visa was actually issued in March; was it not?

A    That sounds right.

Q    And you don't know after March just when it was that the visa might have been used.  You don't know anything about the post-issuing conduct or post-issuing use of that visa; is that right?

A    No.

Q    Is it fair to say that you had no reason to think about Prudence Kantengwa and this particular case until you ended

PDF created with pdfFactory trial version www.pdffactory.com

up talking to investigators; is that right?

A    I interviewed many people, so I didn't really have very much to think about individual cases I did among the thousands.

Q    Okay.

So in September of -- September 4 of 2008, you were in Boston, is that right, to be interviewed by the investigators in this case?

A    Yes.

Q    Where were you actually posted at that time?  Did I hear Angola?

A    September of 2008 --

Q    Yeah.

A    -- I was posted to Angola.

Q    Angola?

A    Yes.

Q    And were you here on leave, or did they call you back? How did you end up going over to the investigating office in Boston?

A    I was here on leave.

Q    Is it fair to say that this caught your attention, that they asked you to come in and speak to the Diplomatic Security Service?

A    It's part of the State Department.  I don't see what the --

PDF created with pdfFactory trial version www.pdffactory.com

Q    Were you -- did it matter to you that day that you were being interviewed by, essentially, criminal investigators?

A    I knew that I wasn't under any kind of suspicion.  It wasn't worrisome because the Diplomatic Security Service is part of the State Department.  We cooperate on things like visa cases all the time.

Q    You were given a written warning, though, before they spoke to you, right?

A    I can't remember if I received a written warning.  I was notified that they wanted to speak to me.

Q    They gave you your rights?

A    I don't remember if they did or not.

Q    There were two investigators and two prosecutors at that interview?

A    I don't remember how many people were there.

Q    Where did the interview take place?

A    Here in Boston.

Q    Where in Boston?

A    I don't recall.

Q    Was it in a secure area?

A    It was --

            THE COURT:  I'm sorry to interrupt.

        This is not relevant.  Let's ask a relevant question.

Q    Let me get to the point.

            You had -- when you came in, you had no prior

thoughts about the issuing of the visa in this case back in 2002, right?  You processed lots of visas.

A    I thought about the case when I issued it.

Q    But life had gone on, and then years later, while you were on break or while you were on leave, they call you into an investigator's office and they lay out to you that Prudence Kantengwa is suspected of fraud, right?

A    I can't remember exactly what details they gave me about the case.  They asked me questions that were relevant, but I don't remember if they shared any information about the case with me.

Q    And they wanted to know -- and they gave you this information and they said, "If you had this information, you would not have issued the visa."  That's basically what they got out of you, right?

A    If I had information that she had lied on her application, would I have issued the visa?

That's a relevant question, and the answer to that is, No, I would not have.

Q    But they told you that she was under investigation. They told you, at least in their view, she had lied and her lies had mattered.  That was clear to you; wasn't it?

A    I think what they were doing was asking me whether it would have been material or not, had I known she had lied. And my response to that was, "Yes, it was critical

PDF created with pdfFactory trial version www.pdffactory.com

information."

Q   The questionnaire that you used was a two-page questionnaire.  It wasn't a form, the Rwanda Questionnaire?

A   It was a form that we typed at post based on cable instructions from Washington.

Q   And that particular form didn't have a signature line, did it?

A   It did not have a signature line on the form.

Q   And the idea was that for every affirmative "yes," like for questions about employment of relatives by the government, as well as involvement in various groups, any kind of a yes was supposed to evoke some kind of further inquiry; is that right?

A   Not necessarily on every question.  There's certain questions that say, "If so, explain"; and there's other questions that are simply "yes" or "no."

          MR. LANGE:  May I approach?

          THE COURT:  You may.

Q   Question 16 is answered with a "Yes"; is it not?

A   It is answered "Yes."

Q   And the question is:  "Were you or any of your immediate family members employees of the government of Rwanda prior to July 15, 1994?"

          And there is a "Yes," right.

A   There's a "Yes."  It does not have an: "If so, explain,"

PDF created with pdfFactory trial version www.pdffactory.com

like some of the other questions do.  That question does not end with "If so, explain."

Q   Do you have any connection with the Canadian equivalent of the consulate in Nairobi or the embassy in Nairobi?

A   Do I --

Q   Did you have at that time, back in 2001 when you were doing these visa applications?

A   I probably met some people who worked for the Canadian embassy at certain points, but I did not have frequent and regular contact with them.

Q   So did you have any opportunity to review the questionnaire that they used in Canada, or that the Canadian diplomatic officials used in their embassy when they were screening Rwandan citizens for visas to Canada?

A   No, I never saw that.

Q   So you don't know anything about their particular form?

A   Nothing.

Q   In any case, it's clear that the form that -- that the form that was used in these cases were a two-page form with the questions listed, an opportunity for answers, but no place for the applicant to sign, correct?

A   There is no signature line on the application -- on the questionnaire, but it's a part of the application.  We stapled it to the application.

Q   When you sent out the request -- when you sent -- the

PDF created with pdfFactory trial version www.pdffactory.com

request for a Security Advisory Opinion goes out, is it just a two-page questionnaire that went out, or was it also the visa application itself?

A    When we send it to Washington, we would send certain information from the visa application that was in the format, such as passport number and name, and then the answers to the questions verbatim.

Q    Passport, name -- the passport, the number of the passport?

A    From the cable that I'm looking at, it was the name, the type of visa they're applying for, date, and place of birth, and then it went into the questions.

Q    So the full name, of course, is required, and an accurate date of birth was required?

A    Here we have a year of birth.

Q    Just the year of birth?

A    On this particular cable.

Q    But, in any case, when someone applied for a visa, they had to give their full name, and they had to give an accurate date of birth, right?

A    Yes.

Q    And you reviewed the documents in this case, and the name and the dates of birth, they are consistent through all these various applications; are they not?  It's always Prudence Kantengwa with one particular date of birth which

PDF created with pdfFactory trial version www.pdffactory.com

does not change; isn't that right?

A    I didn't review all of the things in the file, but I'm looking at them now, and it appears to be consistent.

MR. LANGE:  Thank you.

THE COURT:  Thank you very much, Ms. MacCallum. You're finished.  Have a good trip back to Mexico City.

(Witness excused.)

THE COURT:  Thank you very much, jurors, for staying a couple of minutes longer.  You earned the weekend.

We will reconvene the usual time on Monday.  Have a great weekend, and I'll see you then.

THE CLERK:  All rise.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, I'll be coming in this weekend to give you the rulings on the documents you've given me.

Have great weekend.

MR. LANGE:  Your Honor, are you going to rule without any supplemental filing with regard to the transcripts?

MS. FISHER:  We'd like the opportunity --

THE COURT:  I'm not going to do it until Sunday.

MR. LANGE:  Plenty of time.  Thank you.

THE COURT:  Yes.  So if you file something, I will look at it.

(Proceedings adjourned.)

PDF created with pdfFactory trial version www.pdffactory.com

```
                         I N D E X

WITNESS                      DIRECT  CROSS  REDIRECT  RECROSS

AUGUSTIN IYAMURERE, resumed

   By Mr. Capin                 7              84

   By Mr. McGinty                     45              88

MARGARET MacCALLUM

   By Mr. Chakravarty        90

   By Mr. Lange                       99


                       E X H I B I T S

DEFENDANT'S                                       IN EV.

No. 27     Services du Premier Ministre             41

           document

GOVERNMENTS                                       IN EV.

No. 24     Certificate of Revocation                92
```

PDF created with pdfFactory trial version www.pdffactory.com

**C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/s/James P. Gibbons                    July 1, 2012
_____
James P. Gibbons


                    JAMES P. GIBBONS, CSR, RPR, RMR
                        Official Court Reporter
                    1 Courthouse Way, Suite 7205
                    Boston, Massachusetts 02210
                        jmsgibbons@yahoo.com

PDF created with pdfFactory trial version www.pdffactory.com