1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*UNITED STATES OF AMERICA        \*
                                 \*    CRIMINAL ACTION
            v.                   \*    No. 08-10385-RGS
\*                                \*
PRUDENCE KANTENGWA,              \*
a/k/A PRUDENTIENNE KANTENGWA    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


BEFORE THE HONORABLE RICHARD G. STEARNS
UNITED STATES DISTRICT JUDGE and a JURY
Jury Trial Day 9
May 3, 2012


APPEARANCES:

        UNITED STATES ATTORNEY'S OFFICE, (By AUSA Aloke S. Chakravarty and AUSA John A. Capin), 1 Courthouse Way, Suite 9000,  Boston, Massachusetts  02210, on behalf of the United States of America

        OFFICE OF THE FEDERAL PUBLIC DEFENDER, (By Charles McGinty, Esq., and Tamara Fisher, , Esq.), 51 Sleeper Street, Boston, Massachusetts  02210, on behalf of Defendant

        OFFICE OF THE FEDERAL PUBLIC DEFENDER, (By Bjorn Lange, Esq.), 22 Bridge Street, Concord, New Hampshire 03301, on behalf of the Defendant




                              Courtroom No. 21
                              1 Courthouse Way
                              Boston, Massachusetts 02210


                    James P. Gibbons, RPR, RMR
                       Official Court Reporter
                    1 Courthouse Way, Suite 7205
                     Boston, Massachusetts  02210
                       jmsgibbons@yahoo.com

P R O C E E D I N G S

THE CLERK:  All rise.

THE COURT:  Let me see counsel.

**(SIDEBAR CONFERENCE AS FOLLOWS:**

THE COURT:  I'm sorry for the delay, but it's the same juror, the young kid, Mr. Dooley, who's been late every morning.  And I don't know if you pay attention to the jurors, but he's not paying any attention to the case.

MR. McGINTY:  Which way does that go?

THE COURT:  I don't know if he has arrived in the building yet, but I am going to strongly --

LAW CLERK:  Terri said he just got here, Judge.

THE CLERK:  He's walking in right now.

THE COURT:  Well, think about whether we should just designate him as the alternate.

MR. McGINTY:  All right.

THE COURT:  Think about it.  I just don't think he has his heart in this enterprise.

MR. McGINTY:  While we're at sidebar, there's an issue about a couple of additional pages of transcript that we want to put in.  One of them relates to the question of the ethnicity of Ms. Kantengwa, that it was mentioned in the Rwanda Questionnaire about her being of mixed heritage.  It's her testimony about that at the asylum hearing.

The second part of it is relating to what the husband

PDF created with pdfFactory trial version www.pdffactory.com

was doing as part of the intelligence service, or both parts of that.

In one case, it's pages that the government has removed.  So in one sequence they have the page before, the page after, not that page, and not the page that follows it. So they've cropped around the two pages that we want to put in.

And the other one is the part that explains her ethnicity, so it doesn't appear to be unaddressed at the asylum hearing.  If we can just bring those up.

MR. CAPIN:  With regard to the ethnicity, the government has not argued, nor will we argue in closing, that that's a factor that the jury even needs to consider in finding her guilty.  It's not inculpatory nor exculpatory.

With regard to the husband, or testimony about why the husband might have gone to rallies, that's precisely the type of evidence you would expect the defense to present in its case in defense.

That doesn't belong in under the rule of completeness. It doesn't complete anything else that's in the transcript, so we would object.

THE COURT:  Well, if I follow you, are you offering it independently?

MR. McGINTY:  It's part of the fabric of the transcript that was presented.  I mean, when you crop out

PDF created with pdfFactory trial version www.pdffactory.com

two of the pages that surround the pages that you're putting in --

THE COURT:  I'll admit them as a defendant exhibit. In terms of the rebuttal witness --

MR. CAPIN:  No, your Honor.

THE COURT:  From my notes he testified to that yesterday, the status of the magistrate, I think.

MR. CAPIN:  That may well be, but we took to heart your --

THE COURT:  Oh, no.  I'm not trying to force you into doing anything.

MR. CAPIN:  We don't think it's necessary.

MR. CHAKRAVARTY:  We do think, though, the cross of this witness, because it is going to be different than the crosses of the others -- there's different subject matter areas -- will probably go as long as the direct has gone.

THE COURT:  Well, you can always try not to be repetitive, but, you know, I think -- that's fine, as long as we get this into their hands.

I do want to meet as soon as we finish the cross and everyone has rested to go over the jury instructions.

MR. McGINTY:  Could we fairly anticipate what the scope is going to be of the cross so we don't end up with issues about needing a sidebar?

THE COURT:  Well, no.  My rule is, if it's

PDF created with pdfFactory trial version www.pdffactory.com

relevant, it's admissible.  You can object on relevance grounds but not on the scope of what is being examined.

Okay.

**END OF SIDEBAR CONFERENCE.)**

THE COURT:  All right.  Let's bring the jury in.

(9:15 a.m.)

THE CLERK:  All rise for the jury.

(Whereupon, the jury entered the courtroom.)

THE CLERK:  All rise for this Honorable Court.

Court is open.  You may be seated.

The case before this Honorable Court carries Case No. 08-cr-10385, United States of America versus Prudence Kantengwa.

THE COURT:  Good morning, again, Counsel.

Good morning, Jurors.

What we anticipate this morning is Mr. Chakravarty thinks he has about an hour or so of cross-examination. That will then take us to the conclusion of the evidence in the case.

I will need a few minutes, so we'll take a break then -- more than a few, a half-hour or so, with the lawyers to go over the jury instructions.

We will then come back for the arguments and the charge, and the case is yours.

All right, Mr. Chakravarty.

PDF created with pdfFactory trial version www.pdffactory.com

MR. CHAKRAVARTY:  I think Mr. Lange is still on direct.

THE COURT:  I'm sorry.

Mr. Lange.

MR. LANGE:  Your Honor, for the reasons stated at sidebar, we move as defendant's exhibits the portions of the transcript with Bates Nos. 445, 447, as well as 750 and 752.

THE COURT:  All right.  Admitted as Defendant's Exhibit next in sequence.

THE CLERK:  Defendant's 31.

**(Defendant's Exhibit No. 31 received in evidence.)**

MR. LANGE:  Have a seat, Mr. Rwaka.

**THEOBALD GAKWAYA RWAKA, resumed**

**DIRECT EXAMINATION, (Cont'd.)**

BY MR. LANGE

Q   Good morning, Mr. Rwaka.

A   (Through the Interpreter)  Good morning.

Q   You understand that you're still under the oath that you took in front of the jury yesterday?

A   (Through the Interpreter)  Yes.

Q   I believe when we stopped I was asking you about Prudence Kantengwa?

A   (Through the Interpreter)  Yes.

Q   To your knowledge, after multipartyism in 1992, was Prudence a party member, a member of any political party?

PDF created with pdfFactory trial version www.pdffactory.com

A   (Through the Interpreter)  When there were a multiparty system in Rwanda, and people who became members of the political party that were established, they were registered. They were registered to those parties, and they would receive a membership card, and also badges or signs.

I have never seen Prudence with any symbol or any badges of any multiparty or any parties.

Q   So, to the best of your knowledge, she was not a member of a political party after 1991?

A   (Through the Interpreter)  I say that before 1991, that all the Rwandans were in one unique party, political party.

Q   The jury understands that.

My question is:  After 1991, to the best of your knowledge, was Prudence Kantengwa a member of any political party?

A   (Through the Interpreter)  No.

Q   When you spoke with Prudence, what were her main topics? What would she talk about most of the time?

MR. CHAKRAVARTY:  Objection.

THE COURT:  I think you asked that yesterday, Mr. Lange.

Q   Was the name of the MRND changed after 1991?

A   (Through the Interpreter)  Yes.

Q   What was the name before 1991?

A   (Through the Interpreter)  Before 1991, the MRND

PDF created with pdfFactory trial version www.pdffactory.com

symbolized or signified Movement Revolutionaire National Pour le Development, which is the National Revolutionary Movement for Development.

Q    What was --

A    (Through the Interpreter)  But after 1991 the MRND changed its name, and after it changed its name, it was called the National Revolutionary Movement for the Development and Democracy.

Q    So the full initials after 1991 would have been "MRNDD"; is that right?

A    (Through the Interpreter)  Yes.  That's how it was, but you would not pronounce the "D."  It was said -- it remained "MRND" as spoken.  But when written it was "MRNDD," and also was the stamp.  That's how it was written on the stamp, "MRNDD."

Q    Did the party logo for MRND change after 1991?

A    (Through the Interpreter)  Yes.  Total change.

Q    How so?

A    (Through the Interpreter)  The flags changed, and also on the logo on the badges changed.  There was no longer a picture of the president, because he was no longer the president of the movement, but, instead there were some other signals on the badges or the signs.

Q    Thank you.

        I want to turn now to the day that President

PDF created with pdfFactory trial version www.pdffactory.com

Juvenal Habyarimana was assassinated.

A   (Through the Interpreter)  Yes.

Q   Where were you on that day?

A   (Through the Interpreter)  I was far from home where I was working, and I was in the Cyangugu.

THE INTERPRETER:  And "Cyangugu" is spelled, C-Y-A-N-G-U-G-U.

Q   At that time did you have a wife and children?

A   (Through the Interpreter)  Yes.  I was married and father to five children.

Q   Did you and your wife and your children go into hiding?

A   (Through the Interpreter)  When we learned of the death of the President, Habyarimana, we learned that the Chief of the -- the Chief of Staff was also assassinated with him, together with the President.  And the General Director, who was also my superior, he was close to the Chief of Staff. So my first action was to approach him and present my condolences to him.  But after that, when I went to work, I could see that the other staff and also my colleagues were not at ease when I was around.

Q   Why?

A   (Through the Interpreter)  Because I was a member of the opposing party.  And before the assassination of the President, Habyarimana, I had broadcast on Radio Rwanda several critics against President Habyarimana.  So people

PDF created with pdfFactory trial version www.pdffactory.com

thought I was rejoicing of the death of the President, Habyarimana, so people would fear -- or were not at ease around me.

Q    Did you then go into hiding?

A    (Through the Interpreter)  Yes.  I went into hiding and because threats increased at that time.  So I went into my place where I was born and that's where I felt safe.

        MR. LANGE:  Madam Interpreter, I didn't understand, what increased?

        THE INTERPRETER:  "Threats."

        MR. LANGE:  "Threats."  Thank you.

Q    Do you agree that what happened over the next months was genocide?

A    (Through the Interpreter)  It's not easy to repeat the scene or the action.

        What I know is I spent three months in bushes.  I was separated from my wife and my children because I feared that if they found us together we would be killed.  But I heard that people were killed in the villages and also elsewhere.

Q    After the end of the violence in Rwanda in 1994, did you go back advocating for human rights?

A    (Through the Interpreter)  Yes.  I returned to my work, and I continued working with the human rights services.

        And in 1995 I was called to proclaim or to make a

PDF created with pdfFactory trial version www.pdffactory.com

speech -- to give orders or to speak -- about how to arrest judicially the people who were suspected.  The government was not happy, and I was imprisoned.

Q    How long were you imprisoned?

A    (Through the Interpreter)  Three months.

Q    How did you come to be released?

A    (Through the Interpreter)  When I was in prison, the association of the human rights for the one I was working for, they pressured the government.  And at that time the secretary general of the human rights, he was in Rwanda.  And he was in Rwanda investigating concerning the rights -- the human rights, and I think that's what pressured the government to release me.  And after that I went back to work.

Q   As part that work, were you involved in preparing lists of people who were suspected of being genocideare; in other words, people who were suspected of being involved in the violence in 1994?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  Overruled.

A    (Through the Interpreter)  Yes.

After 1994 I was nominated or delegated.  I was a member of Leprodo [ph].  I was nominated, and also together with other members of other associations, to assemble in the capital Kigali all information -- to gather all information

PDF created with pdfFactory trial version www.pdffactory.com

concerning those people who had had part, who were a part of the genocide, and also those who were responsible for the act of the genocide.

Q   Was there a list made?

A   (Through the Interpreter)  Yes.  We collected 2,000, between 2,000 and 3,000 list of names, and only those in the capital of Kigali.

Q   Was Athanase Munyemana's name on that list?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  There is no allegation that the defendant was involved in any genocidal act, so I am not sure this is relevant.  It may go to our understanding of the reputation of the witness, but, otherwise, I don't think it's relevant.

Q   With regard to the becoming part of the government, did you, in fact, join the government of Rwanda in the year 2000?

A   (Through the Interpreter)  Yes.  I was a member of the government from April 2000 until 2001.

Q   What was your post?

A   (Through the Interpreter)  I was the Minister of the Interior Security, Internal Affairs.

Q   As part of that, were you in charge of prisons in Rwanda?

A   (Through the Interpreter)  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Q    Did you get in trouble with the Rwandan government as the Minister of Internal Security?

          MR. CHAKRAVARTY:  Objection, your Honor.

          THE COURT:  Overruled.

A    (Through the Interpreter)  Yes, because the prisoners have no food, even though the government had committed to provide food to the prisoners, which they did not respect.

Q    Did you raise that problem at a cabinet meeting?

A    (Through the Interpreter)  My first reaction was to act personally to request the Red Cross to help while I was speaking to the other ministers of the cabinet.

Q    What was President Kagame's reaction?

          MR. CHAKRAVARTY:  Objection, your Honor.

          THE COURT:  I think we're now beyond the relevance of this trial.

Q    Did you have to flee Rwanda?

A    (Through the Interpreter)  Yes.  I am a refugee.

Q    Would it be safe for you to go back to Rwanda right now?

A    (Through the Interpreter)  For me to go back, it would be suicide, and I am not ready.

Q    And Prudence?

          MR. CHAKRAVARTY:  Objection.

          THE COURT:  Sustained.

Q    Now, you've been in the United States since when?

A    (Through the Interpreter)  Since June 2001.

PDF created with pdfFactory trial version www.pdffactory.com

Q    So you've been in the United States for over five years?

A    (Through the Interpreter)  Since in 2001, so it's maybe about ten years.

Q    So you would be eligible -- you are eligible for American citizenship?

A    (Through the Interpreter)  Yes, if I would ask.

Q    Have you asked?

A    (Through the Interpreter)  The law in America does not accept double nationality; and I have not yet taken the decision, because I believe I have to be with my fellow citizens to continue to fight for their freedom.

          MR. LANGE:  The prosecutor is going to have a lot of questions for you, but I have no more.  Thank you.

          THE COURT:  Mr. Chakravarty.

                    **CROSS-EXAMINATION**

BY MR. CHAKRAVARTY

Q    Good morning, Mr. Rwaka.

A    (Through the Interpreter)  Good morning.

Q    Mr. Rwaka, what do you do now for a living?

A    (Through the Interpreter)  Because of the situation right now, it kind of makes the situation right now, I have lost my work.  I survive by doing some job like interpreting books in Kinyarwandan and French and vice versa.

Q    So you do some interpreting?

A    (Through the Interpreter)  Yes.  I do translate for some

PDF created with pdfFactory trial version www.pdffactory.com

private people, private work.

Q   Is that what you've been doing for the last 11 years here in the United States?

A   (Through the Interpreter)  I'm sorry?

Q   Is that what you have been doing for the last 11 years in the United States?

A   (Through the Interpreter)  I told you that I lost my job, so I started doing that job because I lost my job because of the actual situation.

Q   So the job that you lost was being the Minister of the Interior in Rwanda, correct?

A   (Through the Interpreter)  I think we are misunderstanding each other.

        When I arrived here, I worked in different companies here.

Q   So that actually -- thank you for that.

        I'm trying to figure out what it is you did for work, occupation, here in the United States.  Can you please tell us?

A   (Through the Interpreter)  I worked in a company called Perfect Feet.

Q   Perfect Feet?

A   (Through the Interpreter)  Perfect Feet, and that was for two years.

        And I worked in a company called Hanson, and they

PDF created with pdfFactory trial version www.pdffactory.com

manufacture auto parts, for two years.

And I would work in other companies as well temporarily until I did not have any employment.

Q   And those jobs, were you in a management position or were you in a more labor-oriented position?

A   (Through the Interpreter)  I was just an ordinary employee, like an engine or machine operator.

Q   So a very different level of responsibility than you had back in Rwanda, correct?

A   (Through the Interpreter)  Yes.

Q   In Rwanda you were the Minister of the Interior of the entire country, correct?

A   (Through the Interpreter)  Yes.

Q   You were a leader of a political party, this PDC, correct?

A   (Through the Interpreter)  Yes.

Q   During the genocide, you were the head of a cement company, the National Cement Company, in Rwanda, correct?

A   (Through the Interpreter)  Yes.

Q   And before that for several years you were in charge of all of the magistrates and judges in the entire country, correct?

A   (Through the Interpreter)  If I was -- no.

I was responsible for the magistrate and the Ministry of Justice since 1994 until 1999.

PDF created with pdfFactory trial version www.pdffactory.com

Q   Weren't you at the Ministry of Justice from 1983 to 1992?

A   (Through the Interpreter)  I have never been a minister of justice.

Q   No.

Were you working at the ministry of justice?

A   (Through the Interpreter)  Yes.

Q   And before that you ran a tea company in Rwanda, correct?

A   (Through the Interpreter)  I think there is a mistake.

After my studies, I worked at tea companies.  And I worked also at the higher courts for six months.  And after I work for nine years at the Ministry of Justice, and then I worked for Cimerwa, C-I-M-E-R-W-A, and it was the cement company in Rwanda.

Q   So you did work at a tea company shortly after your studies?  That was my question.

A   (Through the Interpreter)  Yes.

Q   And so you were in charge of many people in the course of your professional career in Rwanda, correct?

A   (Through the Interpreter)  Yes.  I was responsible of the human resources, and also -- yes, the human resources.  I was responsible for the human resources.

Q   So by the time of 1994, you were running the state cement company, this Cimerwa, correct?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  I think we have to precise something.  I was in the Minister of Justice until 1992.  And I was sent -- in 1992 I was sent to the Cimerwa, or the company of cement, as administrative director.  But after the genocide, the whole personnel had fled, and the government asked me, or requested me, to take the cement company, to manage it, to manage it so that it could be reestablished.

Q    I'm asking you about 1994 itself.

You were the administrative director at Cimerwa, correct?

A    (Through the Interpreter)  Yes.  I was the director, general director, after July 1994.

Q    And before July 1994 you were the administrator responsible, correct?

A    (Through the Interpreter)  Yes.

Q    And Cimerwa was located in this town you described called "Cyangugu"?

A    Yes, correct.

Q    And you did you live in Cyangugu?

A    (Through the Interpreter)  Yes.

Q    And was your family there as well?

A    After I was transferred to Cyangugu, my family stayed along in Kigali, and they joined me later on in 1993.  That's when they joined me in Cyangugu.

PDF created with pdfFactory trial version www.pdffactory.com

But my residence or my house was in Kigali.  And so in Cyangugu, I would stay in the company -- I was housed in company houses.

Q   So you had company housing in Cyangugu and you had a company car as well?

A   (Through the Interpreter)  Yes.

Q   You were well known in Cyangugu?

A   (Through the Interpreter)  Yes, I think I was well known.  Because after 1983 I wanted to be congressman -- I wanted to be a congressman.  So I went into the whole prefecture of Cyangugu for campaign.  So people, I think, yes, they knew me.

Q   So you were a politician in Cyangugu?

A   (Through the Interpreter)  I was not just a politician in Cyangugu, but I was a national politician.

Q   You were a politician who was based in Cyangugu, correct?

A   (Through the Interpreter)  Yes.

Q   And you told the jury that, in fact, you were a member of this PDC, which was an opposition party after multiparties, correct?

A   (Through the Interpreter)  I think it's necessary to go in the history of the country to understand what I mean, or what I want to say.

Q   Mr. Rwaka, I'm not asking about the history of the

PDF created with pdfFactory trial version www.pdffactory.com

country.  I am asking you whether you were a member of the opposition party after the multiparty system?

A    (Through the Interpreter)  Yes, sir.

Q    Is it because you were a member of an opposition party that you didn't feel it was safe -- excuse me.  You felt it was unsafe for you to remain as a high-profile person in Cyangugu during the genocide, correct?

A    (Through the Interpreter)  Not only I feared, but also the other members of other parties feared after the assassination of the President, Habyarimana.

Q    All the opposition parties to Habyarimana and the MRND had concern after the genocide began, correct?

A    (Through the Interpreter)  Not only them leaders, but also the members were -- they feared because the opposition party thought that the opposition member of that had -- they had a part -- they were a part of the assassination of the president.

Q    Right.

So whether it was true or not, people in Rwanda associated the killing of the president with the opposition parties as helping the RPF, correct?

A    (Through the Interpreter)  I cannot say that all the members of the opposition of the MRND felt like that, but, yes, some of them thought we were responsible for the death of the president.

PDF created with pdfFactory trial version www.pdffactory.com

Q    And you were so concerned that the MRND may retaliate against you that you actually hid throughout the genocide, correct?

A    (Through the Interpreter)  I received direct threats, and also I had unanimous -- unanimous --

THE WITNESS:  Animosity.  Animosity.

Q    Are you saying "animosity"?

A    (Through the Interpreter)

THE WITNESS:  Yes.

Q    So you heard some animosity from some workers because they thought you might be targeted?

A    (Through the Interpreter)  It was not all the workers, that you would approach one, and they would be so annoyed. And you approached the other one, it would be the contrary. But, in general, they were all angry against me.

Q    So you felt it was safest for you to leave Cyangugu for the genocide because you didn't know what people might do to you, correct?

A    (Through the Interpreter)  I had to leave my place of work and go to my place of birth; and also stayed near my family, my parents, and where I could hide my family, my children and my wife, so we felt more safe over there.

Q    You actually went to a forest area, right, where nobody would come to look for you?

A    (Through the Interpreter)  I was in hiding, and I didn't

PDF created with pdfFactory trial version www.pdffactory.com

want everybody to know where I was hiding.  But my family, some members of my family knew where I was, and that's the -- they would bring me food to my hiding place.

Q   And you were concerned about the MRND that was in Cyangugu, correct?

A   (Through the Interpreter)  From what I had seen when I left the Cimerwa going towards my place of birth, I met the youth, and I met the members of the MRND and the MDR.  And before they would be cats and dogs, and they were against each other.  But at that time they were together.

Q   They were Hutu Power, right?

A   (Through the Interpreter)  And when I would go through the roadblocks, there would be Hutus and even Tutsis that belonged to the MRND.  So I did not know how those mobs formed and how it was organized, but, yes, on the roadblocks there were such people.

Q   Isn't it true that there was Interahamwe in Cyangugu that had actually attacked your cars, and you were worried they were going to attack you?

A   (Through the Interpreter)  My service car or my company car was attacked at the Cimerwa.

When armed people came and starting killing the personnel, and I was stuck and I could not enter the company, or the Cimerwa, at that time, and I could only reach my house when the armed people had left.

PDF created with pdfFactory trial version www.pdffactory.com

Q    And those armed people were the Interahamwe, correct?

A    (Through the Interpreter)  After the assassination of the President, Habyarimana, there was -- there were soldiers and militia and even strong people that were gathered together and they were what generally was called the "Interahamwe."

Q    So it is true to say that you were attacked by militia of the party in power, the MRND, and so you fled?

A    (Through the Interpreter)  Yes.

Q    And you stayed out of Cyangugu until the genocide was over in July of 1994, correct?

A    (Through the Interpreter)  The Rwanda genocide, as qualified or as described by United Nations, started, or began, in January [sic] 1994 until December of 1994.  Even in July, or after, there were action that I could describe or qualify as "genocide."

Q    Mr. Rwaka, we don't have all day.  I am going to continue to ask you "yes" or "no" questions.  And if you can answer in a "yes" or "no" fashion, I am going to ask you to answer "yes" or "no."

Can you do that for me?

A    (Through the Interpreter)  Yes.

Q    You were in hiding between May and July of 1994, and you would not go back to Cyangugu because you were afraid, correct?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  Yes.

Q    And when we're talking about Cyangugu, we're talking --

MR. CHAKRAVARTY:  I am showing Exhibit 7.

Q    This is the spelling of Cyangugu, correct?

A    (Through the Interpreter)  Yes.

Q    And Cyangugu is on the southwestern side of Rwanda right next to the Zairean border, correct?

A    (Through the Interpreter)  Yes.

Q    So during that time, you don't know what was happening elsewhere in the country except for what you heard from the radio or what people would tell you?

A    (Through the Interpreter).  What I did at that time, I witnessed it personally because I was there in that place.

And the other information was the information gathered after when I was gathering the information nationally.

Q    You did your own investigation of what happened in 1994, correct?

A    (Through the Interpreter)  It was not personal investigation.  It was an investigation of the full movement that had gone together called Plado [ph.] into whether investigate what had happened in Kigali.

Q    But you're here to tell this jury about what you know about the defendant and her husband, correct?

A    (Through the Interpreter).  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Q   And you were friends with them going back for several years prior to 1994, correct?

A   (Through the Interpreter)  Yes.

Q   And since you've been in the United States, since 2001, you've been friends with the defendant's family, correct?

A   (Through the Interpreter)  When I arrived here, I was received by her brother, Jean Marie Vianny Higiro, and together with the whole Rwandan community that live in New England.  And at that time, Prudence had not arrived yet.  And at that time, though, I would see her younger sister, Beatrice, and that's after -- that's when they arrived.

Q   You also mentioned Jean Marie Vianny Higiro.  He picked you up from the airport, or was he one of the first people you met here?

A   (Through the Interpreter)  I was received by an association that would receive refugees, and it was after a week that some other friends, together with Jean Marie Vianny Higiro, came to visit me.

Q   And you became good friends with the defendant, her brother, Jean Marie Vianny Higiro, and her younger sister, Beatrice Munyenyezi, correct?

A   (Through the Interpreter).  They are my acquaintances.  It's not because she is the defendant.  I am a friend of all the Rwandans that are here.

Q   And it's a very close community, the Rwandan ex-patriot

PDF created with pdfFactory trial version www.pdffactory.com

community, in the United States?

A    (Through the Interpreter)  The United States is a big country, but the Rwandan community, wherever they are in neighboring -- or close neighborhood, we gather.  We try to be together.

Q    And Higiro, Beatrice, and Prudence, are all relatively close to where you live?

A    (Through the Interpreter)  Yes.

Q    You've seen them frequently over the last seven years, correct?

A    (Through the Interpreter)  I would not say "frequently," because I could not afford to do so, because it's a busy life.  But, yes, sometimes we do see each other during some community events.

Q    Sir, you attended this lady's wedding (indicating); isn't that true?

A    (Through the Interpreter)  Yes, it's correct.

Q    Why are you resisting the notion that you're friendly with her?

        MR. LANGE:  Objection.

        MR. CHAKRAVARTY:  I will withdraw and ask another question.

        THE COURT:  All right.

Q    Mr. Rwaka, in fact, you've been politically active from the United States in Rwanda, correct?

PDF created with pdfFactory trial version www.pdffactory.com

THE INTERPRETER:  I'm sorry?

Q   You've been politically active while in the United States about Rwandan politics, correct?

A   (Through the Interpreter)  Yes.

Q   You've been doing that consistently since you left Rwanda, correct?

A   (Through the Interpreter)  No, but I express my opinion to what is happening in Rwanda.

Q   And that's one of the reasons why you think that you should get political asylum here in the United States, correct?

THE INTERPRETER:  I'm sorry?

Q   That's one of the reasons why you think you need political asylum here in the United States?

A   (Through the Interpreter)  Repeat the question, please.

Q   Is one of the reasons why you think you need political asylum here is because you continue to be politically active?

A   (Through the Interpreter)  I have received asylum status here of the United States.

Q   Because of your political activities, right?

A   (Through the Interpreter)  No, because I want -- I wanted safety.

Q   You wanted safety because you thought your political activities makes you a target, correct?

PDF created with pdfFactory trial version www.pdffactory.com

A   (Through the Interpreter)  I was in danger.  And even my other fellow citizens are also in danger.

Q   Mr. Rwaka, you told just told Mr. Lange that you were afraid to go back to Rwanda because you will be targeted, correct?

THE INTERPRETER:  "You just said to the attorney I'm sorry.  I'm tired.

(Laughter.)

THE INTERPRETER:  Thank you.

Repeat the question.

Q   You just told Mr. Lange that the reason you can't go back to Rwanda is because you fear that you will be killed; it would be suicide, you said?

A   (Through the Interpreter)  Yes.

Q   And, in fact, this isn't the first case you've testified in?

A   (Through the Interpreter)  Yes.

Q   You've traveled the world testifying in cases involving Rwandees accused of crimes, right?

A   (Through the Interpreter)  You mean in the whole world, the entire world?

Q   You've traveled to different countries in the world to testify?

A   (Through the Interpreter)  No.  I traveled in one country, Tanzania, to testify in certain cases.

PDF created with pdfFactory trial version www.pdffactory.com

Q    So you've testified in the International Criminal
Tribunal for Rwanda that's based in Arusha, Tanzania,
correct?

A    (Through the Interpreter)  That is correct.

Q    And you have also testified in the immigration
proceedings for Prudence Kantengwa, correct?

A    (Through the Interpreter)  Yes, that's correct.

Q    One of the cases that you testified in in Arusha was
that involving Matthieu Ngirumpatse, correct?

A    (Through the Interpreter)  Yes, that is correct.

Q    Mr. Ngirumpatse became the head of the MRND, correct?

A    (Through the Interpreter)  He was president of the MRND
with the word added "democracy."

Q    I asked you whether he was head of the MRND, and you
said he was the president of the MRND and then "D" again,
correct?

A    (Through the Interpreter)  Yes.

Q    But you recognize there was only one MRND party before
and after the multiparty system, correct?

A    (Through the Interpreter)  It wasn't one party.  I said
they changed the flag.  They changed signs.  Even the
mission or the purpose of the party changed, because it used
to be a unique or single party, but it became a party like
any other party.

Q    That entire answer was not responsive to my question?

PDF created with pdfFactory trial version www.pdffactory.com

MR. LANGE:  Your Honor, objection.

MR. CHAKRAVARTY:  I'm going to ask another question.

Q   Did you sit with Mr. Lange and prepare your testimony for today and yesterday?

A   (Through the Interpreter)  You mean "prepare" my testimony?

Q   Yes.

This is an important hearing.  Did you sit with Mr. Lange and talk to him about what you would say?

A   (Through the Interpreter)  Mr. Lange asked me to testify about what I know, and that's what I came to do.

Q   And he told you the questions he would be asking, correct?

A   (Through the Interpreter)  As usual.

Q   Right.  It's usual, because you've done this before, right?  You've testified before, correct?

A   (Through the Interpreter)  Hm-hmm.

Q   You've been prepared for testimony before, correct?

A   (Through the Interpreter)  No --

(Continuing in French.)

Q   Mr. Rwaka, I think you answered the question "No."

I'm going to ask another question.  If you can answer this one, then we'll move this along.

Did you prepare for your testimony when you

PDF created with pdfFactory trial version www.pdffactory.com

testified in the International Tribunal in Arusha?

A    (Through the Interpreter)  They told me the procedure that we have to respect, to give time to the interpreter or the translator, to be respectful to the judges all the time, and that's what I'm doing.

Q    Did you prepare with Mr. Lange to respect this judge and this jury's time?

A    (Through the Interpreter)  I told you that I spoke to Mr. Lange about the procedure that we use in our country, but also what I have to follow and to respect in this ongoing trial.

Q    And he told you the facts that he wanted to elicit from you, correct?

A    (Through the Interpreter)  He told me to testify about what I know and about the husband of Prudence Kantengwa.

Q    You didn't talk about the MRND at all?

A    (Through the Interpreter)  The MRND is the single party that was in the country.

Q    Mr. Rwaka, I was asking you whether you talked to Mr. Lange about the MRND.  This jury knows what the MRND is.

A    (Through the Interpreter)  Yes, I spoke with him.

Q    And you talked about the questions -- the likely questions that I would be asking, correct?

A    (Through the Interpreter)  Did you tell him the question that you would ask me?

PDF created with pdfFactory trial version www.pdffactory.com

Q    I'm asking you whether you discussed with Mr. Lange the questions that I was likely to ask you?

A    (Through the Interpreter)  Discussing with the questions that you would ask me?

How would I discuss with him the questions you would ask me when I don't even know you?

Q    So you didn't have that conversation with Mr. Lange?

A    (Through the Interpreter)  No.

Q    Did you have your entire conversation with Mr. Lange in English?

A    (Through the Interpreter)  No, I used French.

Q    Does Mr. Lange speak French?

A    (Through the Interpreter)  There was somebody who was translating.

Q    So today in the hallway you were using somebody to translate your conversations with Mr. Lange?

A    (Through the Interpreter)  You mean which hallway?  The "hallway"?

Q    The hallway in the courthouse where you were talking to Mr. Lange.

A    (Through the Interpreter)  I told you, I live here for about ten years.  If I cannot plead in English correctly, but at least I know the right words in English.

Q    And you've testified with the use of a translator in all your prior proceedings where you've testified, correct?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  Yes.

Q    And that gives you an extra opportunity to both hear my question in English as well as to hear the translation before you choose to answer it, right?

A    (Through the Interpreter)  No.

Personally, I learned law, and in my country I learned the procedure of common law.  Although there are some words that when they are said or pronounced I understand what they mean, but I'm not able to maintain or sustain the entire juridical speech in English.

Q    "Perfect Feet," were you using French?

A    (Through the Interpreter)  I don't know.  But I told you that I wasn't working in the office.  I think that work on the machine, it doesn't require to speak English.

Q    Mr. Rwaka --

A    Yes.

Q    It's your position that what happened between April 6 in 1994 and July 18 of 1994 was not the Rwandan genocide, correct?

A    (Through the Interpreter)  What are you saying?  I am not understanding very well the question.

Q    Is it your position that what happened between April 6, 1994, and July 18, 1994, that that was not a genocide?

A    (Through the Interpreter)  I think it's best not to provoke people, because I lived the genocide.  So you cannot

PDF created with pdfFactory trial version www.pdffactory.com

tell me if I believe in this because that's my life.

Q   I didn't tell you anything, sir.  I just asked you what your position was.

In fact, you don't believe that what happened during that time period was a genocide, do you?

A   (Through the Interpreter)  What happened or took place during that period, it's not -- it's not a metaphysic science that I have to believe in as if it was God.

There are actual facts that I lived through.  The genocide took place.  I lost children and friends and many people.  I don't understand why I'm being asked about my position, because it is what it is.

Q   And you do not believe that the government, along with Hutu Power and other Hutu militia, targeted Tutsis for extermination?

THE INTERPRETER:  Could you repeat the question?

MR. CHAKRAVARTY:  Sure.

Q   You do not believe that the government of Rwanda, the Hutu militia, had targeted Tutsis for extermination?

A   (Through the Interpreter)  To say that there is Hutu militia, it's one part of reality.  Because I told you that when I was leaving the Cimerwa, I met many people, Tutsi and Hutu, that had established roadblocks or barriers.

So the genocide is what I lived through myself in Buparama and what I lived through.

PDF created with pdfFactory trial version www.pdffactory.com

Q    It was a "yes" or "no" question.

Do you believe that it was a genocide?

A    Yes, yes.

Q    And do you believe it was a genocide of exterminating Tutsi?

A    (Through the Interpreter)  To extinguish the Rwandan people.

Q    So you're saying all the people were trying to kill all the other people?

A    (Through the Interpreter)  Yes.

Q    So that's your understanding of what the genocide was?

A    (Through the Interpreter)  It's not up to me to qualify what is a genocide; because it has been qualified by United Nations, and they used the word -- the term "Rwandan Genocide."

Q    Even though you don't agree that the Tutsis were targeted?

MR. LANGE:  Objection.  Asked and answered.

THE COURT:  Yes.  We've been over this, Mr. Chakravarty.

Q    So is it your position, Mr. Rwaka, that the government that was put in place, the interim government, after President Habyarimana was killed, that that government was not involved in the genocide?

MR. LANGE:  Objection.

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  Overruled.  But I think we've exhausted this, Mr. Chakravarty.

MR. CHAKRAVARTY:  I'm wrapping up, your Honor.

A   (Through the Interpreter)  Which government?

Q   The government with the President Sindikubwabo during the genocide itself.

A   (Through the Interpreter)  I told you that during that genocide, I was living it through the bush and in the forest.

Q   Sir, the question was whether you believed that that government was involved in the genocide?

MR. LANGE:  Objection.

THE COURT:  Overruled, but --

MR. CHAKRAVARTY:  Two more questions.  He's not answering the question.

THE COURT:  I think we've got the point.  But you're not going to get an answer by asking the same question over and over again.

Q   Isn't it true, Mr. Rwaka, that you've said that that Sindikubwabo government was there to help stop the genocide?

A   (Through the Interpreter)  After the death of President Habyarimana, the situation was chaos.  There was no public government of power.

The government of Sindikubwabo was like an opportunist government.  It's possible that some of the

people in his government might have done wrong in the genocide, but I wasn't in the government to be able to know.

Q   You knew that Mr. Sindikubwabo and other leaders actually gave speeches inciting the genocide?

A   (Through the Interpreter)  I know, and I am aware of the speech of Sindikubwabo that he pronounced in Butare during the genocide.  But I don't know if it was the opinion of all people who were in the government or was just his personal opinion.

Q   So let's talk about the opinions of Mr. Munyemana, your friend.

You said you would occasionally have a beer with him and you would discuss Rwanda, correct?

A   (Through the Interpreter)  Yes.

Q   And he would discuss politics with you, correct?

A   (Through the Interpreter)  It's actually I that would incite him, tell him, or to criticize the government.  But he would tell me that himself because some things are not going correctly, but he never took position.

Q   And his job at the Service De Renseignment was to make sure that people weren't criticizing the president, correct?

A   (Through the Interpreter)  I don't think so.  That the meaning of intelligence, it's not to search the criticizers of the government, it's to help the government, to make change of what is not going correctly.

PDF created with pdfFactory trial version www.pdffactory.com

Q    And when you came back to Rwanda in 1995, you were actually arrested for criticizing the then-government, correct?

A    (Through the Interpreter)  Yes.

Q    And that was the intelligence services, correct?

A    (Through the Interpreter)  It was the service of -- military intelligence services.

Q    And so when you were having conversations with Mr. Munyemana about politics, you would describe how Prudence Kantengwa would occasionally participate in the conversation, right?

A    (Through the Interpreter)  Yes.

Q    And she was exceptional in Rwanda for being one of very few lawyers, correct?

A    (Through the Interpreter)  Who?

Q    Ms. Kantengwa was one of very few lawyers in Rwanda, correct?

A    (Through the Interpreter)  No.  I don't know exactly for which year of graduation or promotion that she was; because from my own, 1978 was my promotion, there was so many other more lawyers and some training more.  I don't think she was the only best one because there were other ones prior to her.

Q    In terms of female lawyers, there was Pauline Nyiramasuhoko, right?  She was one of the few female lawyers

PDF created with pdfFactory trial version www.pdffactory.com

in Rwanda, correct?

A   (Through the Interpreter)  In my promotion, graduating year, it was in '78.  When I graduated, there were two women.

Q   So when you were --

I'll put a new question.

A   (Through the Interpreter)  And after that there were other women lawyers.

Q   I will pose a new question.

When you were in charge of registering all the lawyers in Rwanda, there were still very few lawyers in 1990, correct, female lawyers?

THE INTERPRETER:  Could you repeat the question for the interpreter, please.

Q   There were very few female lawyers in 1990?

A   (Through the Interpreter)  I told you that I left the Minister of Justice in 1992, so I don't have the statistics of lawyers and judges that followed after.

Q   All the questions that I'm asking you today, Mr. Rwaka, are you testifying based on your memory, or are you testifying based on your review of statistics or other things?

A   (Through the Interpreter)  When you asked me if I left the Minister of Justice in '92, and if you're asking me about the situation six years after regarding the number of

PDF created with pdfFactory trial version www.pdffactory.com

how many lawyers or judges, men or women, I found that it's normal for me to tell you that I don't have those statistics.

Q   You were head of the PDC, which was the Christian Democratic Party, correct?

A   (Through the Interpreter)  Yes.

Q   And eventually the "Christian" word and the name changed to "Central," correct?

A   (Through the Interpreter)  "Centrist."

Q   And that's still the same party, correct?

A   (Through the Interpreter)  Yes, it's still the same party.

Q   And the fact that it has "Christian" in the title, you were trying to appeal to Christian values throughout the country, correct?

A   (Through the Interpreter)  When we launched or formulated that party, we thought that if we got deep down in the Bible, we could find some terms that would unite most Rwandans.

Q   And you were trying to appeal to Christianity, correct?

A   (Through the Interpreter)  To use values of Christian to resolve problems of Rwanda.

Q   And that's because Rwanda is overwhelmingly a Christian country, correct?

A   (Through the Interpreter)  I don't know if Rwanda is the

PDF created with pdfFactory trial version www.pdffactory.com

most Christian country in the world, but I think that --

THE WITNESS:  The Bible, the value of the Bible, are universal.

Q   The value of the Bible is universal.  And during the genocide, it was Christians who were killing each other, correct?

A   (Through the Interpreter)  It was Rwandans that were killing each other.  So I don't know if they were Christian or not.  And among Christians, there are some that do not practice the Christianity.

Q   And in some cases, actually, church leaders actually participate in the genocide, right?

A   (Through the Interpreter)  I don't know.

Q   I'll try to go down this last line of questioning here.

I'm going to talk about some of the cases that you testified in.

You said that you testified in Arusha at the ICTR, correct?

A   (Through the Interpreter)  Yes.

Q   And you testified for the defense in Matthieu Ngirumpatse's case?

A   (Through the Interpreter)  Yes.

Q   And he was head of the MRND?

A   (Through the Interpreter)  Yes.  He was head of the MRNDD after the multipartyism, in the new --

PDF created with pdfFactory trial version www.pdffactory.com

Q    And he was your boss when he became the Minister of Justice --

THE INTERPRETER:  Excuse me?

Q    He was your boss when he became the Minister of Justice, correct?

A    (Through the Interpreter)  He was the Minister of Justice once when I was working at the Ministry of Justice myself.

Q    And that's where you had professional dealings with him, correct?

A    (Through the Interpreter)  Not only there, because we use to have many meetings of political parties, whether -- during the accord or negotiations of Arusha.

And also he was a big musician that used to sing in the church.  So he was known in many ways, or other ways. So it's not only in the Ministry of Justice that interacted with him.

Q    Okay.

You had actually attended many meetings, including MRND, after multiparty, correct?

A    (Through the Interpreter)  In the meetings of MRND, they used to invite other political parties.  Personally, I didn't go often, but some of my group of parties, we used to go often and they would tell us what had happened.

Q    Another case you testified in was that of -- you

PDF created with pdfFactory trial version www.pdffactory.com

testified for the defense in the Yussuf Munyakazi case in Arusha, correct?

A    (Through the Interpreter)  Yes.

Q    And he was charged with inciting Interahamwe, correct?

A    (Through the Interpreter)  Yes.

Q    And in both of those cases you minimized the role that the MRND played, correct?

A    (Through the Interpreter)  Played in what?

Q    In the genocide.

A    (Through the Interpreter)  I would never -- I would never minimize or reduce the genocide in any way.  I only said what I witnessed during the genocide.

Q    You were hiding during the genocide, weren't you?

A    (Through the Interpreter)  Yes.

Q    Of all the cases in Arusha, there are only about a hundred people charged with genocide-related crimes there, correct?

A    (Through the Interpreter)  I don't know the statistics of Arusha.

Q    How many cases have you testified in?

A    (Through the Interpreter)  Two.

Q    Before you testified in the Ngirumpatse case -- that was in 2010, correct?

A    (Through the Interpreter)  I think so.

Q    Before you testified there, did you prepare?

PDF created with pdfFactory trial version www.pdffactory.com

A    (Through the Interpreter)  To prepare to testify?

Q    Prepare to testify?

A    (Through the Interpreter)  Yes.

Q    Did you talk to the defendant at all?

        Did you talk to the defendant at all?

A    (Through the Interpreter)  The "defendant"?

Q    The defendant, Ms. Kantengwa (indicating)?

A    (Through the Interpreter)  But Madam Kantengwa was not accused or defendant in the case in Arusha.

Q    Did you talk to Ms. Kantengwa before you testified in Arusha?

A    (Through the Interpreter)  I talked to my friends that I would go to testify in Arusha, that I would be absent from my home.  And also Kantengwa knew that.

Q    Did you discuss with her her letter of support to Mr. Ngirumpatse that she sent to Arusha?

        MR. LANGE:  Objection.

        THE COURT:  Overruled.

        But let's see if we can wind this up, Mr. Chakravarty.

        MR. CHAKRAVARTY:  Just a couple more.

A    (Through the Interpreter)  I don't know the letter she might have wrote.  It didn't concern me and had nothing to do with my testimony.

Q    But you knew that Ms. Kantengwa had worked with Mr. Ngirumpatse at Sonarwa, correct?

PDF created with pdfFactory trial version www.pdffactory.com

A   (Through the Interpreter)  Sonarwa is a national company that used to employ so many people.  Those who worked there were not the employee of Ngirumpatse, but they were the employees of the company.

Q   Mr. Rwaka, you also testified in another Federal District Court down in the District of Columbia, correct?

A   (Through the Interpreter)  Which trial?

Q   This was the Karaki [ph.] case involving the Bwindi massacre?

A   (Through the Interpreter) Yes.

Q   And that was a case involving some Americans and Europeans who were attacked and killed well after the genocide?

THE INTERPRETER:  Could you repeat?

Q   There were some Americans and Europeans that were attacked and killed well after the genocide, correct?

A   (Through the Interpreter)  Yes.

Q   And there was a group called ALIR, A-L-I-R, that was suspected of involvement in that massacre, correct?

A   (Through the Interpreter)  I don't know.  But I think that there was a commander of the RPF that went to do those massacres, to finally involve ALIR as a terrorist movement.

Q   And ALIR was ultimately designated as a terrorist group, correct?

A   (Through the Interpreter)  I don't know.  I don't know

PDF created with pdfFactory trial version www.pdffactory.com

exactly.  I know that the intention --

Q   Okay, you don't know exactly.

A   (Through the Interpreter)  I know the intention of the RPF commander --

MR. LANGE:  Objection.

Q   There's no question for you.

MR. LANGE:  He's finishing the answer.

Q   I asked whether he knew whether ALIR was designated --

MR. CHAKRAVARTY:  I will ask another question. Obviously with the translation it's taking longer, your Honor.

Q   Do you know that ALIR changed its name to "FDLR"?

A   (Through the Interpreter)  I'm neither a member of the ALIR or the FDL.  You can ask whoever that pertains to.

Q   Do you know whether the name of "ALIR" changed to "FDLR"?

A   (Through the Interpreter)  I do not know.

Q   You testified in the defense in the case of those individuals accused of that massacre, correct?

A   (Through the Interpreter)  Yes, on the side of the defense.

Q   And you were asked to testify in the case of Beatrice Munyenyezi, correct?

A   (Through the Interpreter)  No.

Q   You were not asked to testify?

PDF created with pdfFactory trial version www.pdffactory.com

A   (Through the Interpreter)  No.

Q   So you would not be on the witness list in that case?

MR. LANGE:  Objection.

THE COURT:  Sustained.

Q   Beatrice Munyenyezi is the defendant's sister, correct?

A   (Through the Interpreter)  Yes.

Q   And she lives in New Hampshire?

A   (Through the Interpreter)  Yes.

Q   Close to you?

A   (Through the Interpreter)  Yes.

Q   And you're friends with her as well, correct?

A   (Through the Interpreter)  I think I said that, and I will not repeat it.

I'm a friend of any Rwandan, and Beatrice as well.

Q   You've used this courtroom, as you used the other courtrooms, in order to say what you want to say, correct?

MR. LANGE:  Objection.

THE COURT:  Sustained.

Q   Mr. Rwaka, when you came to the United States, did you go through the refugee process and you had to provide information to the government?

A   (Through the Interpreter)  Yes.

Q   You understood the importance of candor and honesty during those proceedings, correct?

A   (Through the Interpreter)  Huh?

PDF created with pdfFactory trial version www.pdffactory.com

Q    You understood the importance of candor and honesty during that process?

A    (Through the Interpreter)  Yes.

Q    And you explained to the immigration officials why you needed to leave Rwanda?

A    (Through the Interpreter)  Yes.

Q    You were notified that persecutors are not allowed to come to the United States, correct?

A    (Through the Interpreter)  Persecuting?

Q    If someone were a persecutor, they would not be eligible to come to the United States, correct?

A    (Through the Interpreter)  A persecutor?

Q    Persecutor, to persecute.

         Someone who persecutes someone else, someone who suppresses, or incites violence, or does some other negative action on someone based on their ethnicity, their national origin, their race or other such characteristics.

A    Yes.

Q    As a human rights activist, you certainly know what a "persecutor" is, correct?

A    (Through the Interpreter)  Yes.

Q    You understood the importance of ensuring that persecutors don't find safe haven anywhere?

A    (Through the Interpreter)  I asked myself also.  I wonder if there were other people who would persecute others

PDF created with pdfFactory trial version www.pdffactory.com

and the other ones would have to keep quiet.

Q   And you understand that it's a very important process to determine whether someone is a persecutor or not?

A   (Through the Interpreter)  I don't persecute anybody.

Q   I am not accusing you of persecution.  I'm just saying, the process -- I'm asking whether you recognize, as a human rights activist, that the process is very important to determine whether somebody is a persecutor?

A   (Through the Interpreter)  It depends.  There are people that are called persecutors, but when the ones who have been persecuted and the other ones -- I would like -- I would love to have the concrete cases so I would know.

Q   So because it's complicated, honesty is extremely important, isn't it?

A   (Through the Interpreter)  Yes.

MR. CHAKRAVARTY:  Thank you.

THE COURT:  Can we be very brief, Mr. Lange?

MR. LANGE:  I hope.  I saw you look at the clock, your Honor.

**REDIRECT EXAMINATION**

BY MR. LANGE

Q   The prosecutor just asked you a question about political asylum.

Why did you need political asylum, or why did you have to come here as a refugee in 2001?

A    (Through the Interpreter)  Because I was persecuted, or escape death.

Q    By the government that was in Rwanda in 2001, is that right?

A    (Through the Interpreter)  Yes.

Q    Is that government still in power today?

A    (Through the Interpreter)  Yes.

Q    Is the head of the government Paul Kagame?

A    (Through the Interpreter)  Yes.

Q    When you arrived, your were met by Jean Vianny Higiro, Prudence's brother; is that right?

A    (Through the Interpreter)  Yes.

Q    I'm sorry.

When you arrived in the United States?

A    (Through the Interpreter)  Yes.

Q    And he was already here for the same reason that you had to come here?

A    (Through the Interpreter)  I think he was a refugee.  If he wasn't, maybe for political reasons, but I know he was a refugee.

Q    He was a moderate before the genocide, was he not, correct?

A    (Through the Interpreter)  Yes, he was moderated.  I think it was a double sword, because people who are moderate could be hurt by both sides, either side or the other side.

PDF created with pdfFactory trial version www.pdffactory.com

Q    The prosecutor asked you about coming back to the country after the genocide.  Did you leave Rwanda before 2001?

THE INTERPRETER:  Could you repeat the question, sir?

Q    Yes.

The prosecutor asked you about coming back to Rwanda after the genocide.

Did you leave Rwanda before 2001?

A    (Through the Interpreter)  No.  I never left my country before 2001.

Q    Just before you left, were you part of the government of Rwanda, sir?

A    (Through the Interpreter)  Yes.

Q    And that's why you can't go back right now?

A    (Through the Interpreter)  Yes.

Q    Nor can her brother?

A    (Through the Interpreter)  Neither, no.

MR. LANGE:  Thank you.

THE COURT:  Thank you very much, sir.  That concludes your testimony.

The defendant rests?

MR. McGINTY:  We do your Honor, subject to a stipulation that we need to clean up, yes.

THE COURT:  That's going to be offered for the

PDF created with pdfFactory trial version www.pdffactory.com

record?

MR. McGINTY:  Yes.

THE COURT:  Anything further from the government?

MR. CAPIN:  No, your Honor.

THE COURT:  All right, jurors, that concludes the evidence in the case.

We'll take a 30-minute recess, just to give me a chance to go over the jury instructions, and we'll come back for the arguments.

I think realistically we'll hear the arguments, take lunch, and then I will give you the instructions after you are comfortable and have lunch.

Counsel, take five or ten minutes and Terri will bring you back to the conference room.

THE CLERK:  All rise.

(Recess.)

**(LOBBY CONFERENCE AS FOLLOWS:**

THE COURT:  I do want to move quickly.

I've added an Appendix at the end, because normally I don't give the indictment to the jury, but with the perjury counts, you almost have to set out the indictment; otherwise, it's almost impossible to see what wording is being contested.

So with just some very small edits to some of the archaic phrasing, you will find the renumbered counts.

PDF created with pdfFactory trial version www.pdffactory.com

Actually, that was the biggest challenge, was trying to match the renumbering with the old numbering.  I think I got it right, but it's always worth a second look.

MR. McGINTY:  Is there a second copy?

THE COURT:  There's lots of copies, one for each of you.

MR. CAPIN:  Terri suggests that we put something on the docket to reflect the correspondence between the original and the new indictment and what it says on the verdict form.

THE COURT:  Well, the verdict form, I think we'll keep just One through Nine, but Terri -- and I will take this back out -- matched.  I mean, the verdict form is very simple, it's "Guilty"/"Not Guilty."

MR. CAPIN:  Do we need to file something just indicating --

THE COURT:  I'm not sure you do.  I think, unless it's unclear, I think it's all straightened out.

Now, what changed in the jury instructions, other than looking for typos and so on since last night when I posted them, is that I have added a "willfulness" instruction under perjury, since willfulness was pled as an element.  I've also added a very brief explanation.

I had already used the word "procure," as you requested.  I just didn't put "that is, to obtain" --

MR. McGINTY:  "Obtain because of the representation."

THE COURT:  Well, it's the way -- I don't know how you read it.

"And, second, that she knew the visa was procured; that is, obtained by means of a false claim or statement."

MS. FISHER:  Your Honor, they, in the jury instructions, they said, "Any false claim," and I see you have put something about "material."  But I was wondering if we could also put the word "material" in front of "fact" on page 10, "Obtain by means of a material false claim or statement," just to make it --

THE COURT:  That's fine with me.

Anything else?

MS. FISHER:  There are a list of things.

THE COURT:  We have to move very quickly.  We have a jury waiting for us.

MS. FISHER:  Regarding the perjury charges, we would ask your Honor to give the "literal truth" instruction and the "ambiguity" instruction that we've put in our proposed jury instructions.

THE COURT:  No.

MS. FISHER:  We would just ask, also, regarding Count One, the visa fraud, we filed proposed instructions on Counts One and Fifteen in April setting forth our theory

PDF created with pdfFactory trial version www.pdffactory.com

that one of the elements is that it actually has to be a counterfeited, forged document.

THE COURT:  I saw that, and I disagree with that. I agree with the Ninth Circuit.

MS. FISHER:  We would also ask for a "unanimity" instruction to be in that count.  Because there are two statements here, and we would ask that the jury be instructed that they have to be unanimous as to which one.

MR. CHAKRAVARTY:  A couple of issues we have is also the confusion on that Count One with regards to the -- it does not -- that they're pled in the disjunctive, in the sense of either of the two false statements is sufficient, and the proposed language --

THE COURT:  Okay.  I will say, "Either or both, but you must be unanimous as to which."

MR. CHAKRAVARTY:  That's fine --

MS. FISHER:  Count Two, we filed a motion asking for a "venue" instruction.

THE COURT:  Venue, though, is an issue of law.  It is not a fact for the jury.  I mean, it does say, "In the District of Massachusetts," the way it's framed, but is there any doubt --

MR. LANGE:  I thought it had to be a finding that went to the jury.  I thought that that's what the Joslin [ph.] case said.

I could be wrong.

THE COURT:  I've never given a venue instruction to the jury.  I've had lawyers move to dismiss counts because of the lack or failure --  I mean, I don't care one way or the other.

MR. LANGE:  In terms of the evidence, the evidence is the application for asylum was apparently released.  The jury could find it was done in Manchester, and the documents were then sent to St. Albans, Vermont.

THE COURT:  If that's your argument, I would throw in the towel now.

MR. CAPIN:  To be clear, I think the First Circuit law is clear -- I could be wrong about it being the First Circuit -- but so long as the alleged venue defect is manifest in the face of the indictment and they had notice prior to trial, it's waived upon impanelment.

THE COURT:  That's always been my understanding.

MS. FISHER:  Count Three, your Honor.  If you look at the indictment, Count Three is charged in a very strange way.  She committed perjury when she said she did not commit -- or she committed perjury when she said all her immigration documents were truthful because of the charges in Count One and Count Two.  That's what they've alleged.

The way this is phrased, it makes it sound like it could be any statement that happens to be false.  And so

PDF created with pdfFactory trial version www.pdffactory.com

we'd like that indictment language in there to make it clear that what they've alleged is that it's false because of a certain reason, and that reason is that she committed Count One and Count Two.

THE COURT:  Okay, that's fine.

MR. McGINTY:  Your Honor, we would object about not getting a venue instruction.

Additionally, I neglected to do so at the close of the evidence, but we'd also renew the motion --

THE COURT:  Yes, I was going to say that.

MR. McGINTY:  -- for judgment of acquittal on the grounds of the earlier-filed motion.

THE COURT:  Yes.

We'll preserve your rights on that, and, again, I will deny it depending on the jury's verdict in the case.

MS. FISHER:  Finally, your Honor -- I don't know if you're ready.

THE COURT:  Yes.

MS. FISHER:  "Materiality."  We submitted a proposed instruction asking your Honor to instruct the jury about what the scope of the asylum claim was.  We think that's important, particularly in light of the fact that there has been some questioning about the "persecutor bar." We think it's important to have the law on the "persecutor bar" in front of the jury.  It just can't be associated with

PDF created with pdfFactory trial version www.pdffactory.com

a persecutor.  You actually have to have met the standard yourself.

And so we would ask your Honor to give that instruction.  And we would object to the instruction that it has to be an objective standard, and that it doesn't matter what this particular judge did.

THE COURT:  I know it's an objective standard, so the answer is no on that.

I don't quite follow you on the first.  I mean, I didn't think there was any allegation that she had any role in persecuting anybody.  I kept saying that to the jury over and over again.

MS. FISHER:  I think the allegation is that -- consistent with our initial motions at the beginning of this case, she answered certain questions.  Those questions went to the "persecutor bar."  And it's also been our contention that there is no way at the end of the day that she would have been -- that that would have applied to her.  And so the jury has to take that into account when deciding materiality.

THE COURT:  No.  I think the question is whether she lied about her political affiliations, her husband's role --

MS. FISHER:  Those questions were all going to a specific purpose.

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  Which is why I didn't quite understand where we were going with this last witness, because we were starting to drift off into genocide denials and --

MS. FISHER:  Finally, we would ask for a "guilt by association instruction," our Proposed Instruction No. 14.

THE COURT:  With respect to which counts?

MS. FISHER:  A general instruction.

THE COURT:  That's fine.

MR. CHAKRAVARTY:  One factual thing that -- we don't want to give the defense an opportunity to get an extra closing.

With regard to the roadblock count, which is --

THE COURT:  There are two roadblock counts. They're kind of duplicative of one another.

MR. CHAKRAVARTY:  The way they're described on page 12 is that there was no roadblock outside the hotel in Butare where she stayed in April and May of 1994.  We suspect the defense will be arguing that the image shown to the jury, which is dated June 1, 1994, is the date that that's operative, and that the defendant had left that area before the roadblock.

THE COURT:  Can we say, "Where she stayed in 1994"?

MR. CHAKRAVARTY:  That's what we would ask.

MR. McGINTY:  Well, your Honor, the specific charges specify that during that time Kantengwa was at the

PDF created with pdfFactory trial version www.pdffactory.com

hotel of Pauline Nyiramasuhoko in Butare, Rwanda, from approximately mid April until the end of May 1994.

THE COURT:  I think they're trying to do this for your benefit, but if you want to back --

MR. CAPIN:  Are you reading from the indictment, Charlie?

MR. McGINTY:  I'm reading from the indictment, which is incorporated into --

THE COURT:  The indictment does say that. I know it says that because it took me forever to get that thing from Adobe into Word Perfect.

(Laughter.)

MR. CAPIN:  There's one more thing, and I suspect this goes without saying, but I say it based on the experience we had in New Hampshire on a trial which is dramatically different from this one, because that woman was, in fact, accused of genocidal acts.

Both parties brought in numerous witnesses, and in the interest of streamlining and for strategic reasons, called many fewer.  And in New Hampshire defense counsel argued: "There are witnesses down the road the government didn't call."  Totally inappropriate.  I think Mr. McGinty understands that and wouldn't do that.

THE COURT:  Mr. McGinty is too professional.

MR. McGINTY:  I am not going to do that.  I do know

that there was a prohibition against the mention of the Beatrice Munyenyezi case, and, as I recall in the cross-examination moments ago, that came out, and I was surprised by that.

MR. CHAKRAVARTY:  The case in chief.  It was very clear that the witness --

THE COURT:  I think it's best that we leave Beatrice out of any future --

MR. CAPIN:  Although it is fair, I think, for closings, the association with the family, I certainly wouldn't mention the New Hampshire trial, but his bias with regard to the family.

THE COURT:  We can avoid any -- this trial is what we want to focus on.

MR. McGINTY:  I am assuming there's not going to be any mention of Beatrice Munyenyezi; am I wrong?

MR. CAPIN:  I think it's appropriate to mention that this last witness was a friend of the defendant, her sister, Beatrice Munyenyezi, and other members of the community.

THE COURT:  In that context it's fine, but --

MR. CAPIN:  I'm not going to mention the trial --

THE COURT:  Okay.

   I'm thinking what, 40 minutes.

MR. CAPIN:  I need an hour, your Honor.  I know

PDF created with pdfFactory trial version www.pdffactory.com

it's long, but --

THE COURT:  You're going to have this poor jury --

MR. CAPIN:  I've never gone an hour.  In my head I did it --

THE COURT:  I know Mr. McGinty can easily go an hour.

(Laughter.)

MR. McGINTY:  Leave me alone.

MR. CAPIN:  I wonder if it wouldn't be advisable to give them an early lunch and start right after.

THE COURT:  We don't have the capacity to do that.

MR. CAPIN:  Fair enough.

THE COURT:  I can break up the argument.

MR. CAPIN:  I think we'd rather not do that.

I'll try to trim it.  You know, I'll talk faster.

Sorry, Jim.

THE COURT:  That's very unadvisable.

MR. CAPIN:  I was sort of joking.

THE COURT:  I think we will just have to -- would you object if we broke after the government's argument?

MR. McGINTY:  I would rather go right after.

THE COURT:  Go right after?

All right, 50 minutes, but your rebuttal is going to come out of the 50 minutes.

MR. CAPIN:  Fifty minutes for the argument in chief

PDF created with pdfFactory trial version www.pdffactory.com

and rebuttal?

THE COURT:  I think so.

I don't expect more than ten minutes for rebuttal.

MR. CAPIN:  You're saying 50 minutes for argument in chief and then --

THE COURT:  Fifty and ten.

MR. CAPIN:  Fair enough.

THE COURT:  And then up to an hour, Mr. McGinty, but try to --

MR. CAPIN:  Thank you.

THE COURT:  I know you can do this.

Let's have the jury down then, and we're ready to go.

I'll put in the suggestions.

**END OF LOBBY CONFERENCE.)**

THE CLERK:  All rise for the jury.

(Whereupon, the jury entered the courtroom.)

THE CLERK:  All rise for this Honorable Court.

Court is open.  You may be seated.

THE COURT:  All right, jurors, we've reached the point in the trial that attorneys look most forward to. This is their opportunity to argue to you the inferences they believe you should draw from the evidence that has been presented during the trial.

The way we proceed is that the government addresses you first, followed by the defendant.  The government is then

PDF created with pdfFactory trial version www.pdffactory.com

permitted to make a brief rebuttal.  The reason the government gets two bites, so to speak, at the apple is, obviously, because the government has the complete burden of proof throughout the trial.

Each side has been allocated up to an hour for their closing.  When they finish, we will take a brief break to give you a chance to stretch.  My instructions have been reduced to writing -- they're not that long -- and we will come back and do the instructions.

MR. CAPIN:  Before we start, your Honor, the parties have a stipulation concerning some corrections to the transcripts that apparently audio didn't translate.  Maybe Mr. McGinty or Mr. Lange want to read it to the jury.

MR. LANGE:  I'd be glad to read it.

"The parties stipulate that the August 24, 2006, transcripts should be corrected to read:

"ANSWER:  Even before you go to that question about the MRND, you asked me if I was a member.

"QUESTION:  Yes.

"ANSWER:  Before the parties everyone was a member of the party.  Yes, but the multiparties, you had to -- people to apply to be members.  Yes, so I was not a member, neither my husband was a member of that political party."

The parties further stipulate that the August 24, 2006, transcript should be corrected to change MRND on page 243 to

PDF created with pdfFactory trial version www.pdffactory.com

MDR.  The correction should read:

"ANSWER:  My brother was in the opposition, (indiscernible).  My brother had done his studies here and came back I think about '89 so when he came back in the country he found that the country was (indiscernible) he went to the opposition.  Because he was a member of the opposition, the MDR.  It was the political party, although MDR split in two I think in 1992."

Then we'd move for ID the portion of the transcript on the table.

THE COURT:  Very God.

**(Defendant's Exhibit C marked for identification.)**

**(Defendant's Exhibit No. D marked for identification.)**

THE COURT:  Mr. Capin, you may address the jury.

MR. CAPIN:  Thank you.

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

MR. CAPIN:  Good afternoon.

I would like to begin by echoing something Mr. Chakravarty said during our opening statements to you about eight days ago.  The U.S. is the envy of the world. Our borders are open to visitors.  They are open to immigrants.  They're open to people who want to come here to seek asylum.  And the asylum process, in particular, is something we have reason to be proud of because it provides

PDF created with pdfFactory trial version www.pdffactory.com

people coming from very dangerous places all over the world safe haven in this country, places like post-genocide Rwanda.

And the facts on the ground in places like Rwanda are very complicated, very complicated. And it's not always obvious to immigration officials whether an applicant seeking permission to get asylum here, or even to get into this country with a visa, is somebody who is eligible for that benefit.

And that is why our immigration system, as Mr. Chakravarty pointed out, in order to work, depends primarily on the candor and the honesty of people providing the information about their background, about their associations, in some cases about their party affiliation.

And that is why, as you've heard in detail during the course of this trial, both immigration authorities in the case of the asylum process, or Department of State authorities in connection with the visa process, ask very detailed questions, questions tailored to learn specific facts about an applicant's background, about the country they came from, about what they did there, what they saw there, and who they associated with in their own country.

The only way the system works is if applicants do not undermine, or, as we say in legal parlance, do not "obstruct the process" by giving false, evasive, misleading

PDF created with pdfFactory trial version www.pdffactory.com

information.  Information that prevents those people, people that you heard testify during the course of this trial, whose job it is to determine whether somebody is eligible for a visa, for asylum, or for any other benefit, preventing them from doing their jobs.

You learned that during the course of this trial information was gathered in connection with this defendant seeking to find out about her background, seeking to find out whether she was eligible for a visa, seeking to find out whether she was eligible for asylum, seeking to find out whether she was perhaps in the category of people who are barred from getting asylum because of information she may have been a persecutor in her home country.

That's what this case is about.  This case is about this defendant lying, lying to get a visa to get into this country, and then, once she was in the country, lying to get asylum -- to seek a asylum, and providing evasive information to prevent U.S. officials from figuring out how she had spent the genocide, what her party affiliation was, what her husband's party affiliation was, what her husband did for a living before and during the genocide, and what she did, or what she saw -- I should say, what she saw in Butare during those, by her own admission, at least six weeks that she spent at this hotel (indicating) in the vicinity of this roadblock (indicating).

PDF created with pdfFactory trial version www.pdffactory.com

It's a crime to enter this country by lying, and it's a crime to seek asylum by lying.  It's a crime to game the system by concealing facts that matter, material facts, facts that mattered to officials trying to determine whether you are eligible for the benefit you're seeking.  And that is precisely what this defendant did.

I would submit to you the evidence has shown that, with an impressive level of sophistication, this defendant gave exactly the answers she needed to give at exactly the time she needed to give them to get the benefit she wanted at that moment.

The first benefit she received was the visa she had gotten in Nairobi, Kenya, in 2004.  But remember before that she had already applied in Rwanda on three prior occasions to be a refugee.  And you will see -- and during the course of my closing, I'm going to point you to certain things. You will have all the exhibits, of course, but I will try to guide you through things of specific importance.

Exhibit 3 is a set of refugee applications.  And this is significant, I would submit to you, for two reasons. First of all, it shows the level of persistence by the defendant trying to get into this country and saying repeatedly that she wants to resettle in the U.S.  Despite saying repeatedly she wants to resettle in the U.S., when it comes time to apply for her visa, and she's asked

PDF created with pdfFactory trial version www.pdffactory.com

specifically:  Have you ever sought an immigration benefit?  She says, "No."

More important, though, what the refugee process taught this defendant is what matters.  She learned what matters if you want to get into this country and, in this case, seek asylum, she learned that there's certain things in ones background the one has to conceal.

So she gave one set of answers when she went wanted the visa, and she did a complete 180 and gave another set of answers when she wanted to apply for asylum.

So let's look very briefly at the first cluster -- of the first set of statements.  You saw this during Mr. Charkravarty's opening.  This is, of course, as you all recognize -- it's become an object of affection during the -- this is part of the Rwanda Questionnaire.  You also saw it as part of Exhibit 2, which is the visa application that was granted in Kenya in 2002.  And she was specifically asked -- and I'm not going to read the whole thing -- Were you or any of your immediate family members members of the Service de Renseignment, the secret police, the intelligence service?  And she said, "No."

This person who was trained as a lawyer, one of three lawyers in Rwanda, read the question and said "No."

Similarly, during the visa process, once she was asked about her party affiliation:  Were you or any of your

immediate family members members of the MRND?  Again, she said "No."

So when does the 180 come in?

The 180 comes in -- she gets a visa that allows her to enter repeatedly.  She goes back and forth to Rwanda and other parts of Africa.  And, by the way, these are in Exhibit 2.

And when it's time to apply for asylum, and I would invite you to look at Exhibit 4, which is the asylum document, when it comes time to apply for asylum, she does a complete 180.

So now instead of saying:  I don't have any member of my family who's a member of secret police, it is:  I need to come to this country.  I need asylum here because my husband was the director of the secret police.

It's no longer:  I wasn't a member of the MRND, nor was any member of my family.  Now it's:  I need to come to this country and seek asylum precisely because I was a member of the MRND.

Then in the asylum proceeding -- and you will have the transcript of the entire preceding.  You will have Exhibits 5, 6, 7, and 8, and I'm going to point you to specific pages as we go through this -- in the asylum proceeding she learns that there are certain parts of her background that may raise questions about whether she was a

PDF created with pdfFactory trial version www.pdffactory.com

persecutor.

So, like a chameleon, she changes her colors and changes her answers slightly and she goes through the process. She pretends not to know certain things that might raise red flags and, thus, may lead to additional questions by an Immigration Judge.

And, again, Judge Stearns will tell you, materiality is a concept we've been talk about during this trial. What matters, what is material, is what affects the government function. And one way to affect the government function is to give a false answer that shuts off a line of inquiry. That's material. If you prevent the judge from going down a path that a normal, reasonable, fair-minded judge would go down, that's material.

Now, the defendant's attorneys would have you believe -- and recall Mr. Lange's opening statement to you, the first sentence of his opening statement, he evoked a very powerful image: Picture a crowded, noisy consular office in Nairobi, Kenya, and Mr. Lange proceeded to paint a picture of an unsophisticated, almost illiterate, immigrant. He showed you parts of her personnel file. She can't even read. She can't speak English. Picture the image of somebody inept and unsophisticated. And, ladies and gentlemen, I submit to you that the evidence has shown exactly the contrary.

PDF created with pdfFactory trial version www.pdffactory.com

What do we know about this defendant?  We know she is one of approximately three female lawyers in the entire country of Rwanda during the relevant period.

Pauline Nyiramasuhoko -- who lived in this hotel, owned this hotel where this defendant spent much of the genocide -- is one of the other three-or-so female attorneys in the entire country.

You know that after law school she got this job at Sonarwa.  And despite any suggestion that the employment record suggests she was demoted -- and I invite you to look at that.  This is something akin to a meteoric rise.  She gets there.  She has this tiff with her supervisor.  Writes a letter directly to the secretary general, the top person, and, shortly thereafter, she's hired.  Look at the file.  A month after that probationary period is over, she's hired.

She's transferred to another unit where she becomes, first, assistant manager, and later a chief of section.

Now, Mr. McGinty and one of his witnesses would have you believe that that somehow was a demotion, but use your common sense.  She thrived at Sonarwa.

She lived in Kenya for six years before she applied for a visa.  Kenya is an English-speaking country.  She, herself, told the Immigration Judge, I speak English.  Look at the transcript.  Look at Exhibit 5, pages 148 and 149.  I want to give you page numbers.  You will recall that each of

PDF created with pdfFactory trial version www.pdffactory.com

those documents has two numbers on it. So whenever I give you a page number, I'm giving you the one for the natural page number. It has what we call a "Bates number" in the lower right. I'm going to give you the one in the center of the page.

So Exhibit 5, page 148 and 149, she's asked point blank: How's your English?

She says, My English is fine. My kids and I in Kenya speak primarily in English.

And what about that noisy consular office that Mr. Lange would have you picture. You heard from the person she spoke with, the person she dealt with. Was it a busy office? Of course it was. Is that relevant to whether she knowingly lied on this application?

Richard Wallen, the gentleman who lives in Colorado, who flew out to testify, who was the consular officer, who reviewed the Rwanda Questionnaire with this defendant, told you, She came in by appointment. He sat with her face to face for 15 or so minutes. They sat in a space with what he called "privacy walls."

Any suggestion that she didn't know what was going on, that this trained lawyer, who had worked for years at an insurance company, who had lived in Kenya speaking English for six years, any suggestion she didn't know what was going on, I suggest to you, is simply not supported by the

PDF created with pdfFactory trial version www.pdffactory.com

evidence.  On the contrary.  She spoke English and knew what she was doing.  She lied.

And that is the first lie that's charged in the indictment.  It's this lie (indicating), and it's this lie (indicating).  And at the end of my presentation I will turn to the actual charges in the indictment, and I'll walk you through what the specific charges are.

So that was the version of the defendant's story that was convenient at that time.  When she comes -- as I said, when she comes to seek asylum, it's an altogether different version of her story.  Now, it's:  I was MRND, and I was -- my husband was in the Service De Renseignment.

I'll ask you to recall -- in thinking about why these things matter -- to recall the testimony of Beth Payne.  Beth Payne, you recall, is the woman who testified last week.  She was the Department of State employee.  She was stationed in Kigali during the genocide -- I'm sorry.  She was stationed in Kigali after the genocide.  She was the one who actually wrote the Rwanda Questionnaire.

And she described for you the careful thought process that went into fashioning that questionnaire.  And she told you it wasn't uncommon for the Department of State, in other parts of the world, to have specific questionnaires tailored to where someone's coming from.

And you recall Dick Wallen, when he testified.  He said

the same thing.  This is a man who's been with the State Department for 30 years.  I think the example he gave was, when he was stationed in Eastern Europe during the Cold War, there was a specific Eastern Europe Questionnaire.

There was nothing unusual about this questionnaire.  In fact, it's one of the tools commonly used by the Department of State to screen out people to whom our government does not want to issue a visa, to whom our government does not want to give permission to enter this country.

Now, if I know Mr. McGinty, and I know him well, he is going to stand up in a few minutes and he is going to tell you that we had no business in 2012 trying to figure out what role, if any, Prudence Kantengwa played in the genocide.

He'll say, we can't prove that Athanase Munyemana was part of the genocidal government.

Well, ladies and gentlemen, don't be deceived and don't be distracted.  That's not what this case is about.

This case is not about whether the defendant committed acts of genocide.  It's not about whether Athanase Munyemana committed acts of genocide.  It's not about the level of involvement in MRND by either of these people.  It's not about exactly what he did in Service De Renseignment.  It's certainly -- it's certainly not about the arcane twists and turns of Rwandan politics of the 1990s.  It's not about

PDF created with pdfFactory trial version www.pdffactory.com

whether Athanase Munyemana was a nice guy when he reached out his hand to shake the hand of the journalist who his employees had just captured, beaten, and deprived of food for three days.  Whether that was an act of kindness or the act of a private cop saying, We're done with you, it's the secret police saying, We're done with you.

And it's not about what may or may not have happened to Tutsi who went through this roadblock during the genocide.

That's not what this case is about.

The question in this case, the question for you, is a far simpler case.  The question is:  Did she lie?  That's the question.

Did she lie?  And did she, in so lying, did she obstruct the integrity of the process, the integrity of the visa process, the integrity of the asylum process.  Did she lie about things that mattered?

Now, over the past -- I think it's been eight days -- you have had a crash course in two things:  A crash course in the Rwandan genocide, and a crash course on aspects of the visa and asylum processes.

Now, what did you learn about the genocide?  I'll review briefly not everything you learned from Dr. Longman, which was corroborated by the journalist who basically told you everything that Longman said was accurate.  I'm not going to review all the facts, but I am going to review some

of the key facts just to orient us.

And before I do that, I want to remind you why this is important.  It's important because it gives you the context in which you would have to understand this defendant's lies.  It's the context that was in the mind of the Department of State when it was adjudicating, deciding whether to grant her a visa, and in the mind of the Immigration Judge when she was deciding what questions to ask, what lines of inquiry were appropriate for somebody coming from post-genocide Rwanda.

Timothy Longman testified -- first witness, B.U. professor, head of the African Studies program there -- he explained -- and, again, I'm not going to go on forever.  I will give you the highlights.

He explained that, contrary to popular belief, at least in the media, the Rwandan genocide was not a spontaneous outburst of ethnic hatred.  It was a well-planned, well-orchestrated plan to seize power -- or, I should say, for the MRND to maintain power, because it was a period, he explained, where there was political turmoil.

What the MRND did in order to consolidate its power is it scapegoated the Tutsi.  Remember, there had been a civil war.  A peace agreement had been signed in '93, a year before the genocide.  And Longman explained that the MRND took advantage of the death of the president to set this

PDF created with pdfFactory trial version www.pdffactory.com

plan in motion.  The plan of scapegoating the Tutsi, consolidating power, and, in one fell swoop, getting rid of what they called the "inyenzi."  Remember that term, "inyenzi"?  It means "cockroach."  It's a common term used for the Tutsi during the genocide.

Dr. Longman explained that there was an MRND-hatched plan; that the Habyarimana regime was instrumental in drawing up lists of Tutsis, lists of moderate Hutus, lists of people to be killed during the genocide.

He explained that the name of "MRND" changed, but nothing else changed.  Don't be deceived by that.  Just the way this witness today explained that when his party's name changed, it didn't mean a thing.  MRND was MRND before the genocide.  It was MRND during the genocide.

And when the defendant said no to MRND, she didn't say -- explain, "But there's a multiparty situation.  It's a confusing question."

You'll see that in the asylum proceeding the same thing occurs.  There's no suggestion it was a different MRND. MRND was the party in power.  MRND didn't change, and Dr. Longman explained that to you.

Dr. Longman explained that, as part of fanning the flames of ethnic hatred, the MRND used RTLM Radio.  You've heard from witnesses who have told you, You could not have been in Rwanda during the genocide -- two radio stations,

remember?  One is controlled by her brother, and the other is RTLM.  You could not have been there and not known what RTLM was.

And in few minutes I will explain why that's especially relevant to your consideration about whether her lies were accidental, or knowing, or willful, whether she knew what she was doing.

You heard Dr. Longman explain that MRND maintained power in a number of ways.  One of the ways was by creating these parastatal organizations, like Sonarwa.  And the "parastatal" was a way, he explained, of giving power and money and favors to insiders in the MRND.

You learned that President Habyarimana, the President, right up until he died, and his death was what sparked the genocide, the President personally appointed Matthieu Ngirumpatse, a name you've heard many times now, as the head of Sonarwa, the man who hired the defendant right out of law school at Sonarwa.

You heard from Dr. Longman that the Service De Renseignment, the intelligence service, played an instrumental part in the genocide, that it was the secret police whose primary job was to keep track of the administration's political opponents.  It was a fundamental political organization.

You learned that the MRND, as I said, drew up lists of

people to be killed, Tutsi and moderate Hutus.

You heard that MRND had a militia branch, a youth branch called Interahamwe, which is one of the primary tools they used to effect the genocide.  Youth militia who went out during genocide, using primarily machetes and hand tools, killed countless -- well, hundreds of thousands.

You heard that other parties also had youth groups, and they participated in the genocide as well.

You've heard the event that sparked the genocide was the April 6 downing -- this is 1994 -- of the President's plane, and that when that happened, roadblocks immediately went up all over the country.

You heard that the government, the genocidal government, the MRND government, moved on about April 12, they moved from Kigali to the next big town over, which was Gitarama, that you've seen repeatedly on maps.

Roadblocks were used primarily to check people's IDs. It's primarily a pedestrian country.  You heard many witnesses, several witnesses, at least, say there were very few cars.

People had an ID that they had to have that showed if they were Twa, which is 1 percent of the population; Tutsi, which about 14 percent, and Hutu, which is about 85 percent of the population.

You heard that if you were Tutsi, getting to one of

these roadblocks meant pretty much certain death; and if you were a woman, it meant likely rape and then death.

You heard the genocide lasted 100 days. I think Dr. Longman used the term, "The most effective genocide in modern history." 700,000 to 800,000 Tutsi and moderate Hutus were killed. Countless women were raped. 100,000 to 200,000 participants, was Dr. Longman's conclusion about how many people actually directly killed or ordered killings during the genocide.

One of the focus of Dr. Longman's extensive research was in the town of Butare. This is downtown Butare, right here (indicating). You learned that he lived there before and after the genocide. And he explained what happened in Butare, again, because it provides context to what you have to consider in deciding whether this defendant lied and lied about things that mattered.

You learned about Butare. You learned it was a college town, relatively liberal. So liberal, in fact, it was the last place the genocide got to. Remember, it started on April 6. It didn't get to Butare until April 19, almost two weeks later.

You learned the MRND wasn't strong in Butare, that in order to carry out the genocide in Butare, the MRND relied on certain powerful local figures to push it forward. In fact, the interim President, Sindikubwabo, he was MRND. He

was in Butare.  He lived one kilometer, according to the Senator who testified on Friday, one kilometer from this hotel (indicating).

Who also was MRND in town?  Pauline Nyiramasuhoko, the owner of that hotel; her husband, Maurice Ntahobali, also owned that hotel; and their son, a man named Shalom Ntahobali, who, Dr. Longman explained, was the head of the local Interahamwe, the local MRND militia.

You will see that -- well, Dr. Longman described the role of the MRND in Butare and the role of the Interahamwe. And he specifically said that this roadblock was put in place on the day that Sindikubwabo came to town and gave a speech at the local stadium inciting people to kill.

I think actually, in response to one of Mr. McGinty's questions, one of the terms he used was "sweep the garbage into the street."  This was the type of dehumanizing language that was used on RTLM radio and elsewhere, "Sweep the garbage into the street."

April 19th that speech was given.  The genocide has come to town.  On April 19, Longman tells you, the roadblock goes up right there (indicating).

You heard from an eyewitness to the arrival of that roadblock.  Recall the testimony of Senator Iyamurere -- that's the only time I am going to say that name.  I have no disrespect.  I am going to call him the "Senator" from now

PDF created with pdfFactory trial version www.pdffactory.com

on because it's a tough name to say.

But recall his testimony to you.  He fled to -- he went to fetch his kids in Butare along with Sindikubwabo, ironically, his kids' granddad.  Went to Butare.  Arrived on April 12th.  The same day, when you read the transcript, that this defendant went to Butare.  Because that's also the day that the genocidal government moved to Gitarama, Athanase Munyemana delivers the defendant to Butare, and then goes back to resume his job in Gitarama.

The Senator arrives on April 18 -- I'm sorry.  He arrives on April 11.  And he says he stays at his brother-in-law's house.  And he remembers specifically that he fled there because on or about April 18 the Presidential Guard, which had been killing political opponents, and Interahamwe started pouring into Butare.  And he knew, I would suggest to you it was obvious -- he knew that the proverbial... was going to hit the fan.  He knew the genocide was coming to town.

He fled.  And the next time he goes to that area, the roadblock in question, this roadblock (indicating), is there.  But recall he also told you that when he got to town there was already a roadblock right here (indicating).

So you have an eyewitness saying "There's a roadblock when I got to town," the same day the defendant got to town.

A new roadblock went in a few days later.  And you'll

PDF created with pdfFactory trial version www.pdffactory.com

recall he went back because he left his kids at his brother-in-law's.  He went back once or twice in April and once or twice in May, and finally fetched his family at the end of May and they fled.

And he said that every time he went there there were 30 or so Interahamwe working at that new roadblock.  He described the roadblock as being made of rocks and stones and bricks, and big pieces of log, pieces of tree.

And I suggest to you that is exactly what you heard from Eric Benn, the Department of Defense analyst who came in and described this photograph (indicating), and the zoomed-in photographs on this date.

Now, there's a lot of discussion about other dates, but, ladies and gentlemen, the real usefulness of this is that it shows you what the roadblock looked like.  There's no question it was there earlier.  You heard from the Senator.  You heard from Dr. Longman.  The usefulness of that exhibit is to give you a visual image of what a roadblock looked like in Butare in April of 1994.

You'll recall, actually, on cross-examination, Mr. McGinty, just to make it perfectly clear, he put his pen right here (indicating) and walked over and he showed you, right?  So the unrefuted testimony by the one eyewitness who saw that, is that there was a roadblock right there (indicating).

PDF created with pdfFactory trial version www.pdffactory.com

There's the hotel (indicating).  Leave the door of this hotel, there's the roadblock (indicating).  And there was another one right there in front of the hotel when he got there (indicating).

That becomes relevant, as we'll discuss later, during the immigration proceeding when there's a lot of questions about that roadblock.

Most of Dr. Longman's testimony is corroborated by the defense's own witnesses.  Again, recall the former Rwandan judge, the gentleman who settled here, here in Massachusetts.  He had been a Supreme Court Judge in Rwanda.  He he lost family members in the genocide.  He fled the country during the genocide.  He said he knew that the genocide arrived in Butare on April 19, and he knew that it arrived there because it was well known.  It was a historical fact in Rwanda that on April 19 the new interim President, Sindikubwabo, gave that hate speech at the stadium, and that's when the genocide came to town.

Similarly, you heard extensively from a journalist, very brave man, you'll recall, who had been an opponent of the regime, testified about his experience during the genocide.

And he told you everything Dr. Longman told you.  He told you that Athanase Munyemana was the head of the secret police.  He told you he was answerable to the president.  He

PDF created with pdfFactory trial version www.pdffactory.com

told you it was a highly political position.  He told you the primary purpose of the secret police or the Service De Renseignment was to keep track of Habyarimana's political enemies.  He told you that, in fact, he, himself, had been kidnapped and taken to the backyard of the presidential compound, interrogated, to put it kindly, for three days.  And then when he was finally released -- he was released by Athanase Munyemana, who's holding in his hand his dossier, and he says, basically, We're done with you.

It was an inherently political position, that's why he was kidnapped.  He was kidnapped because they wanted to know, What are you doing?  Who's funding you?  What's your network?  Who are our possible opponents?

He told you about RTLM hate radio.  He's one of several witnesses who said, RTLM, whatever it was on paper, the minute it started broadcasting, it was clear it was hate radio.  It was hate radio designed to stir up ethnic hatred.

And during the genocide, it was worse.  It was radio that told people exactly where Tutsi were hiding.  It told people where to find opposition leaders.  It directed them to where these people should be killed.

That point, perhaps, was made most emphatically by, again, one of the defense witnesses.  Remember Mr. Uwimana, the gentleman who testified yesterday?  He was one of the shareholders in RTLM.  You recall -- you will see in Exhibit

PDF created with pdfFactory trial version www.pdffactory.com

26 an RTLM shareholder list.  And what RTLM, I suggest to you, was to MRND was pretty clear from the beginning.  You can tell that because the number one shareholder, Habyarimana, bought a million shares.  But certain people, even important people, in part, bought sort of entry level. Pauline Nyiramasuhoko, an MRND minister, the one MRND minister in the Habyarimana government living in Butare, she bought 5,000 shares.  The defendant bought 5,000 shares. Matthieu Ngirumpatse, the head of the MRND, bought 5,000 shares.

But what was most telling about Mr. Uwimana's testimony was what he said about what he learned as a shareholder once he started broadcasting.  He said, I was shocked.  It was obvious it was rhetorical.  In fact, we all know it is hate radio.

Remember, two radio stations in the country.  Her brother owns one of them -- I should say he runs one of them, and then RTLM starts.

And, again, the fact that that was so well known as hate radio -- and in a few minutes I will explain why that matters in trying to figure out:  What was this defendant thinking when she gave certain evasive answers to the Immigration Judge?

You heard from both Mr. Uwimana and from the journalist about parastatal organizations.  The journalist told you it

PDF created with pdfFactory trial version www.pdffactory.com

was common for people, as did Mr. Uwimana, common for people to wear badges, colors, representing their party affiliation.

These facts about genocide provide context.

So what did you learn about the immigration process, and here I'll be brief.  You learned -- because you've already heard a lot.

You heard from the young lady, the last witness, remember, last Friday, she had to catch a plane back to Mexico, Margaret Macallum?  She said that she is actually the person who authorized and issued the visa to this defendant in Nairobi, Kenya, in 2002.

She said that when she was shown the Rwanda Questionnaire with this question on it and this question on it (indicating) -- she had a specific term she used for it -- she said, and I quote, "Those were huge red flag questions."  She said they were questioned because a "yes" answer to either of those questions -- which, by the way, it says afterward, "if so explain."  A "yes" answer would have sparked any number of questions.

And you can imagine.  You know MRND?  If she had said, "yes."

"Who?

"Athanase Munyemana.

"What did he do?

"He was director.

"Was he connected to the government?  Did he stay with the government during the genocide?  Did he go to Gitarama?  Did he participate in the kidnapping and torture of people?  Did he participate in any other way in the genocide?"

Those question weren't asked because the line of inquiry got shot down right there.  Right there it got shot down with the "No."

You heard from an official from what used to be called "INS."  It's now called "CIS," Citizenship & Immigration Services.

You remember Dorothy Michaud.  Mr. Chakravarty asked her if she reviewed the entire -- or at least the portion, relevant portion, in evidence of the A-File, the Alien File.

And she told you the same considerations about:  What mattered during the visa process, mattered during the asylum process.

When an applicant lies to shut down lines of inquiry, that matters.  She told you that candor matters.  She told you that the assessment of the person's credibility matters during the asylum.

Let's take a moment just to consider the asylum process itself.  And I told you it is something we should be proud of.  It sounds like cheerleading, but when you consider the lengths that people go to -- crossing dangerous deserts,

90

coming over on rickety vessels -- to get to this country, it's something to be proud of.

They come here to seek asylum.  They come here to seek safe havens.

And the asylum process requires U.S. officials to engage in what may be the most factually complex job that anybody in our government does.  Factually complex issues like:  What happened in Rwanda in 1994?  What do we need to know about a Rwandan coming here who was there in 1994? What do we need to know in deciding whether this person coming from that place at that time is eligible for the bare privilege of political asylum; or maybe ineligible for a variety of reasons:  Because she lied before; because she wasn't candid; because's she's a persecutor.

Now, this is not an Immigration Court.  You're not doing the job that the Immigration Judge did.  You're not deciding whether, in fact, this defendant should have gotten asylum.

This is an American criminal court, and in this courtroom -- and I suspect that Judge Stearns will tell you something to this effect -- in this courtroom, we do not engage in guilt by association.  In fact, in this country and in our criminal justice system, we have a very healthy suspicion of anything that smacks of guilt by association. That's not what we're about.

PDF created with pdfFactory trial version www.pdffactory.com

But in the immigration process, association matters. It matters, and it's perfectly appropriate for the Department of State personnel and Citizenship & Immigration Services personnel to ask questions of an asylum applicant coming here about their associations.

In the case of a Rwandan applicant, it's perfectly appropriate to ask:  Were you a member of the party?  What was your affiliation?  What did your family members do? What did you do?  What did you see during the genocide?

Association matters not because they suggest that this woman participated in the genocide.  They matter in deciding whether in an Immigration Court a person seeking asylum has met her burden of showing that she is eligible; that she's testified credibly; that's she been candid.

Now, we have not tried, we have not undertaken in this proceeding, and Judge Stearns has said this to you in your presence a number of times, we have not undertaken to prove that she had a role in the genocide.  That's not what this case is about.

It's about whether she lied about things that mattered, whether she shut off lines of inquiry that would have caused a fair-minded Immigration Judge to ask further questions in deciding whether this person should get asylum or that this person, for whatever number of reasons, was barred from getting asylum.

PDF created with pdfFactory trial version www.pdffactory.com

We have not undertaken to prove to you that she would get asylum if she had told the truth. We simply don't know. We simply don't know because this defendant decided she knew better than the Immigration Judge what information that judge needed. She shut off lines of inquiry. She lied about her past, and, in that way, prevented a judge from inquiring any further.

Now, the question to you, of course, is: Did she lie and did it matter?

And as we review the specific lies she is charged with, ask yourself, based on the evidence you've heard: Would an honest answer have caused a fair and reasonable decision-maker to ask the follow-up questions, the type that I suggest here?

You know, at the visa stage: Would an honest answer have caused Richard Wallen or Margaret Macallum or anybody at the Department of State to ask the follow-up questions?

Would an honest answer about whether she was a member of MRND have caused the asylum judge to ask a follow-up question?

So what I would like to do now, is, using this, the blowup Mr. Chakravarty used during his opening, is to review with you the topics that, I suggest to you, this trial has proven beyond any reasonable doubt this defendant lied about.

PDF created with pdfFactory trial version www.pdffactory.com

So the first lie here, of course, is:  "I did not join a political party."

And the first thing I would ask you to do is to look at the defendant's own words.  Look at Exhibit 4A.  4A is the Application for Asylum, and she says -- the page numbers on this are hard to discern -- page 6, "I was a member of MRND the ruling party before the war of 1994.  I always accompanied my late husband to party public rallies."  And she says, "See attached," where she describes the husband's activity.

In this she says nothing about -- she says, Until 1994.

Remember, this is the end of the multiparty period. She says nothing about:  It's a complicated question, because, you know, there was all this intrigue and political changes in Rwanda.  She knew nothing about multipartyism. She says nothing about quitting the MRND in 1991.  She says nothing about her or her husband's role in the MRND.

What else do we know about this that shows, in fact, this is not true and, in fact, she was MRND?

We know that when fleeing Kigali -- look at Exhibit 5, pages 233 and 234 -- the last official act by Athanase Munyemana and this defendant was to burn all MRND documents.

Why do that if it doesn't matter?

You learned actually today, I would submit to you, the one useful fact you learned from this witness, Mr. Rwaka, is

PDF created with pdfFactory trial version www.pdffactory.com

that at the end of the genocide, a place called Cyangugu, which is by the Zaire border -- and when you look at the transcript you will see, and in a moment I will gave you a page cite -- this is where the defendant fled at the end of the genocide.

And remember what Mr. Rwaka told you?  He said -- and he was confronted by Mr. Charkravarty with the writing, he said, Cyangugu was attacked by militia of the party in power, MRND, so I fled.

And when did he flee?

He fled in May.

When did she go to the Cyangugu?

She went by her -- there's two versions.  I submit to you, if you look at Exhibit 4A, there's a -- her interview, this is page -- it has a circled "page 2" at the bottom. That's the wrong page.

This is her interview given during the asylum application process, page 5 at the bottom, "Timeline."  Here she actually puts herself in Rwanda from "April to mid June," which, of course, would suggest that before we knew that this mattered, she had her herself there in mid June.

But, in any event, she goes to Cyangugu.  And what you learned from Mr. Rwaka is that Cyangugu was a place from which anybody in the opposition fled, and fled because the MRND Interahamwe was coming to town.  It was only safe if

PDF created with pdfFactory trial version www.pdffactory.com

you were MRND.  And that's precisely where this defendant goes.

You also know about MRND affiliations because you heard from one of her colleagues, Alphonse Kamanzi, who was the gentleman who testified he had been in the record keeping department for many years.  He's now retired.  And he told you what Dr. Longman told you, that during the -- before multipartyism it was common for people to wear insignias, party colors, a badge with Habyarimana color on it.

Dr. Longman explained that that became less common when opening for other political parties, and it was only then the radical, extreme, truly devoted MRND members who wore them.

Mr. Rutyasire told you that she wore such a badge during -- all the way leading up to the genocide.

Now, one of your jobs, Judge Stearns is going to tell you, is to assess credibility.  Look at people, how they testified, and determine whether they're believable.

So I ask you to think about Mr. Rutyasire's testimony.  Ask yourself about just the commonsense questions we ask when we're talking to someone, when we're talking to our kids about -- you know, questioning about, Why were you out so late?  You know, did their demeanor seem like they were hiding something.

In this case are the answers different or the demeanor

PDF created with pdfFactory trial version www.pdffactory.com

different on direct examination as opposed to cross-examination? Do they seem evasive? Did their testimony make sense to you? Did they have a bias or reason to testify in a particular way in favor of a particular person?

I suggest to you, if you look at all those situations, why on earth would Mr. Rutyasire come across the world to say that he saw MRND insignias on this defendant?

There is no suggestion anywhere -- on cross-examination it wasn't suggested he had any reason to make it up.

Consider the other witnesses. And I would suggest to you that the most interesting thing about today was you actually had sort of a tutorial on credibility.

Mr. Rwaka, this is a man -- think about his demeanor on direct examination. Similar question, simple answer.

What happened when Mr. Chakravarty started asking him questions? He couldn't answer a single question. I didn't see the genocide? He had trouble answering even the simple questions, a human rights advocate. It took five questions for him to understand what the term "persecutor" means. Somebody who's been here for 11 years advocating for human rights.

Curiously, on redirect examination, in response to Mr. Lange's question, he used "persecutor" in the answer.

He wouldn't admit he discussed politics with Athanase

PDF created with pdfFactory trial version www.pdffactory.com

Munyemana.  He had trouble admitting there was even a genocide.  He had trouble admitting that the MRND had any role in it.  He had trouble admitting that Sindikubwabo had anything but a marginal role in the genocide.

Bias.  You learned about his bias.  You learned about he's a friend -- he said, "A friend to all Rwandans."

Mr. Chakravarty actually had to ask him, "Why are you resisting?"

He didn't want to admit that he went to her wedding. He knows the sister, he knows the brother, he's known the family for years.

I suggest to you that all of these things you should think about in considering his credibility.  But there's one answer he gave that, I would submit to you, is the most telling.  The question from Mr. Lange:  "Do you know if Prudence Kantengwa belonged to any party?"

No -- the answer was:  "No, she never wore a badge."

That wasn't the question.

The question was, "Did she belong to a party?

"No, she never wore a badge.  She never wore any colors."

That was the question he knew you would be expecting to hear because, I submit to you, he knows that's become the topic of discussion in this courtroom.

You saw a very similar exchange from the witness

PDF created with pdfFactory trial version www.pdffactory.com

Ms. Rufyiri. This is the woman, the accountant, she only looked in her books.

She, like Mr. Rwaka, didn't seem to see anything. Remember I asked her like 15 questions about what she saw when she was fleeing Rwanda? She didn't see the genocide. They sat by a roadblock for a week, and they didn't see anything. She didn't see any Tutsi harmed. She saw nothing.

But, again, her most telling answer was when Mr. McGinty -- I think it was Mr. McGinty -- asked her -- he said: Did you ever see the defendant wearing a pin?

And she said: No, no, no. She never wore a pin with Habyarimana's face on it.

That wasn't the question. The question was: Did she wear a pin?

She knew that the answer that you needed to hear in order to believe she wasn't MRND was, Distance herself from MRND.

And finally, Mr. -- I don't have his name in my notes, but he's the gentleman who spoke -- the other Sonarwa employee who testified yesterday.

And in assessing his credibility, I'll just touch on a couple things.

First of all, he worked for her; she was his boss. And, second, looking at the personnel file, he looks at it,

PDF created with pdfFactory trial version www.pdffactory.com

and he says, Oh, yeah, these are all demotions.

I asked him:  You're saying that when she went from her trainee position, or parole period, first month on the job, to a year-and-a-half, two years later, being a chief of section, that trajectory was a demotion?

And he said, Yes.

Now, in explaining to you what you need to consider in deciding whether the defendant is guilty of perjury, I suspect the Judge will, no doubt, explain that to be guilty of perjury, the defendant has not only lied, given a false statement, but known it was false, and then willfully, meaning that she knew it was wrong when she did it.

She had to have knowingly, not by mistake, not by accident -- and, of course, you know, as we all know, in the ordinary course it's very difficult or impossible to directly prove what's on somebody's mind.  You can't look into somebody's mind and sort of know what their thought processes are.  But I suggest to you that when you deliberate, you look at what else the defendant said on these same topics, and ask yourself, as a matter of logic: Did she provide evasive answers, answers that are obviously intended to deflect attention from topics such as these?

And I think that that's -- if you conclude she did, that's an appropriate consideration for you in determining whether the false statements were knowingly false, and

PDF created with pdfFactory trial version www.pdffactory.com

whether she was doing it knowing it was wrong.

So let's turn to the next statement here:  "I am not interested in politics."

Again, we will start with her own words.

"I was a member of MRND, and I attended public rallies with my husband."

You know from Mr. Rwaka, despite his resistance, that she discussed politics with him.  You know that from the personnel file that within, I think, five months of being on the job, during her probationary period, she writes a letter to Matthieu Ngirumpatse, the very top person, the Director General of Sonarwa.  And the topic of the letter is political, it's about regional political divisions in the country.

And what she is telling him is basically that somebody brought in this magazine, this opposition magazine, Isibo, I-S-I-B-O.  But the letter is in the file, Exhibit 12. Exhibit 12 is the original Rwandan document, Exhibit 12A is the translation.

And recall that the gentleman Sixbert, whose last name I can't pronounce, the journalist, he was actually the person who established that magazine.

So let's look, with regard to these questions, what else did the defendant say that would suggest to you that these were not innocent mistakes.

PDF created with pdfFactory trial version www.pdffactory.com

I recognize that I'm running over time, and, your Honor, I apologize for that.

THE COURT:  Let's see if we can save a little bit of time for Mr. Chakravarty.

MR. CAPIN:  Thank you.

I'll try to move through this quickly.

So look carefully at the transcripts.  Exhibits 5, 6, 7, and 8 are the transcripts.  And these are some examples of other things she says in addition to the lies charged -- and I will review with you the specific lies in a moment -- the lies charged in the perjury counts.

Here are examples of other things, I would suggest to you, that are obviously evasive.  And you have to ask yourself with regard to each one of these, "If it doesn't matter, why lie about it?"

So let's take the very first one, Exhibit 6, page 215. She says she is not able to remember who hired her at Sonarwa.

Ladies and gentlemen, that is simply not credible. Matthieu Ngirumpatse is famous.  He was well known as an MRND head before he went to Sonarwa.  He became the MRND head after he left Sonarwa.  He personally hired her at her first big job out of law school.

If it doesn't matter, why lie about it?

She lies about it because she doesn't want the judge to

ask the follow-up question:  Oh, tell me about Matthieu Ngirumpatse.

And this particular passage is very telling, because in this passage there's a back and forth about Matthieu Ngirumpatse.  And in the last entry in the passage she confronts it:  "It's Matthieu Ngirumpatse, right?

"Matthieu Ngirumpatse?"  Question mark.

The line of inquiry stops right there, because, clearly, from the judge's perspective, she doesn't know who this is.

She does not remember that Ngirumpatse is the head of MRND.  Ladies and gentlemen, that simply is not plausible. That's page 222 of Exhibit 6.

She does not know how RTLM was involved in the genocide.

Now, ladies and gentlemen, you heard from numerous witnesses that it was a well-known, practically historical, fact that RTLM was the engine of the media, propaganda engine of the genocide.

But, more importantly, remember the testimony of Mr. Uwimana, who bought stock, as did she, he said, the stockholder -- remember, in Rwanda, you heard, it was only the extreme elite, very few people, who could afford to buy stock, had the luxury of buying stock.

If it doesn't matter, she claims -- she says, "I don't

PDF created with pdfFactory trial version www.pdffactory.com

know how -- she's asked:  Do you know what RTLM was?

I don't know how it was involved, I think her words were.

You know, "What happened in Rwanda," doesn't use the word "genocide,"  Refuses to use the word "genocide."

If it doesn't matter, why lie about it?

She lies about it because she knows that if she said, "Oh, yeah, RTLM.  I'm actually a shareholder," that might provoke further questions.

What do you known about it?  Who else was involved in it, et cetera.

She says -- Exhibit 7, page 420.  Look at that entire section because there's a very interesting discussion all around that.  "I went to one MRND rally."

She's being asked about her statement in the Asylum Application, that she said she went to MRND "rallies," plural, with your husband, and now you're saying "one"?

She says, Well, I went to one rally with my husband, and I took advantage of the opportunity to go visit my family.

So now, all of a sudden, she's not going to the rallies.  She's just sort of doing a drive-by and going and having tea with her family.

The next lie here is, Husband was not in a political party.  I told you, if not, why were they burning documents

PDF created with pdfFactory trial version www.pdffactory.com

before leaving town?  You heard he was the head of the most political arm of government.  You heard that he was present for the torture -- or at least he was present for the release of the journalist who the Sevice De Renseignment tortured.

You heard by the defendant's own words that he attended rallies, plural, political rallies of the MRND.  You heard that he moved to Gitarama with the genocidal government.  You know he stayed with the government.  You know that because she said it in that transcript.  And you know it because the Senator says that, "I took my government car down there, and I was relieved of it a few days later when Athanase Munyemana came and asked me for the keys because 'we need the car.'"

If there's no government functioning, as Mr. McGinty may suggest to you, and there is no Sevice De Renseignment in Gitarama, why would they need another car?

The next lie, "Husband was not in the Service."  I won't touch that.  I think enough has been said about the fact that was in the Service.

"No roadblock outside the Ilhuliro Hotel."

As I said, there's no real controversy.  Dr. Longman said it went up on April 19.  You had an eyewitness who saw, it went and saw it.  A day or so later when he went back to that intersection, saw the roadblock went up there --

PDF created with pdfFactory trial version www.pdffactory.com

(Reporter interrupts.)

MR. CAPIN:  I'm sorry.  I know I'm speaking way too fast.

And in trying to figure out why she lies, why does it matter?  Look at the portion of the transcript -- I direct your attention to Exhibit 7 -- well, I would suggest you read 488 to at least 500 or so, because there's a very interesting discussion about who Shalom is.

"Who is Shalom?"  He runs the local militia.

In her version, "Shalom is the person who takes care of the Ilhuliro Hotel.

"Who is Pauline?

"Pauline owns the hotel."

She is asked whether she knows that Pauline and Shalom are facing charges in Arusha, Tanzania, before the International Criminal Tribunal for Rwanda for what happened in Butare?  And she evades.  You will see that she evades. And that's just one of her motives to lie.  Because she knows that if she says, "Yeah, I know what Shalom and Pauline were doing, describes anything about that roadblock, she knows that the judge would naturally, any fair-minded judge, Immigration Judge or otherwise, would ask the obvious follow-up questions:  What did you see at the roadblock? Who was there?  Did she participate?  Did you invite them into the hotel?

PDF created with pdfFactory trial version www.pdffactory.com

So, very briefly, I am going to talk about the elements of the crime.

You will see the indictment has nine counts in it.  The first two counts charge visa fraud.  And the Judge is going to tell you that for visa fraud we have to prove three elements:

One, that she knowingly used or possessed a nonimmigrant visa.  Not in controversy.  There's a stipulation which was read into the record that says that she entered Boston on January 24, 2004.  She entered using a nonimmigrant visa that was issued in Nairobi on March 4, 2002.

That visa itself is a true and accurate copy of -- or part of Exhibit 4.

And there is also, as Exhibit 22, which I don't really think you need to look at, but if you are curious, it shows -- it's a record of her entry on that date.

The second thing what we have to prove is that she got the visa by means of a false statement.  You've seen the false statements:  Rwandan Questionnaire, no MRND, no Service De Renseignment.

And you have to find, in order to find her guilty beyond a reasonable doubt, which is the burden here, that the false statement on those forms mattered.

And I've told repeatedly they matter because they shut

off lines of inquiry.  They shut off lines to the Department of State in issuing that visa.  Things they obviously would have asked, questions like:  What did your husband do for the Service De Renseignment?  Was he involved in spying on political parties?  Did he join the government in Gitarama, et cetera.

Count Two also charges visa fraud.  And that asks if she's ever committed any crime for which she hadn't been arrested.

If you look at page 8 of Exhibit 4, you'll see that question, that she says "No."

This lie is one of the first lies in the asylum process.  She's asked in the Asylum Application if she's ever committed a crime.  And as a lawyer with experience, not only in the law but in the immigration process, she knows that she had, in fact, committed a crime by committing visa fraud; and she reaffirms that lie on her Asylum Application.  That is Count Two.

Counts Three through Eight charge her with perjury.

And for "perjury," the Judge is going to tell you, you have to find four things; five, depending on how you count them.

That, She made a statement under oath.  You will see and you've already heard read into the record, she was under oath.  Exhibits 5, 6, 7, and 8, are under oath at the

PDF created with pdfFactory trial version www.pdffactory.com

immigration proceeding.

She made false statements, all the statements I've discussed, that she acted knowingly and willfully, not by mistake, not by accident.  She knew they were lies, and she knew it was wrong, and that the lies mattered.

And, as I've said to you, as a lawyer, who had had at this point in the immigration proceeding nearly a decade of experience working with the U.S. immigration system as a refugee applicant, visa applicant, and, finally, as an asylum applicant, she knew that what she was doing was wrong.  And as these various evasions show, she knew that what she was doing was wrong.

And I'll turn to just a couple of these other evasions which make this point, I think, crystal clear.

With regard to whether the husband was a member of the Service De Renseignment, another very telling pattern, look at Exhibit 7, page 438.  There's a question about the Service.

There's a question about how her husband's boss was.

And she says, "A man named Augustin Iyamurere," the Senator.

And she's asked by the judge herself, "Can you spell that name for me?  Where is he now?"

And she says, "He died in Rwanda."

Now, ladies and gentlemen, unless that was a ghost

PDF created with pdfFactory trial version www.pdffactory.com

sitting on that stand a couple of days ago, you know that there is no reasonable doubt that Augustin Iyamurere is alive and well and in possession of all his faculties.

If that lie didn't matter, if it didn't matter, why lie about it?

I submit to you there's only one conclusion:  She lies because she knows that the Immigration Judge has expressed interest in who the boss was and might inquire further, might ask the Senator, who would then tell the judge what he told you.

He didn't have a chance to do that because the judge didn't have a chance to know that he was even alive.  And he would have said to that judge, I submit to you, if she had asked:  "Oh, yes.  He was MRND.  He went with the genocidal government to Gitarama."

And finally with the government roadblock, she doesn't just say, "I didn't see it."

And in those pages I described to you, that is included at page 989.  Look at that whole section, the surrounding pages, read the entire transcript.

She says she had a view of the main road where they say they had a roadblock.  It's not like it was a like big area and you had to have a big place to put the roadblock.  So she's not only saying she didn't see it, but she's describing the scene to make herself appear more credible.

PDF created with pdfFactory trial version www.pdffactory.com

Ladies and gentlemen --

THE COURT:  Mr. Capin, I think you ought to wind up.

MR. CAPIN:  If I could have one more minute, your Honor.

The final charge in the indictment is obstruction. of justice.

And for obstruction, you're going to have to ask yourself three things:  Was the judge conducting a proceeding?

Was she participating in the proceeding?

And did this defendant corruptly endeavor to impede that proceeding?

It's a very similar analysis.  Did she do anything to impeded the judge from carrying out the function of determining whether she was eligible for asylum or whether, on the contrary, she was barred from asylum?

And the question you have to ask yourself for all of these things is:  If she had given an honest answer to these questions, if she had given an honest answer to the perjury questions, what would a fair-minded judge have done?

Ask yourself, for example, with regard to the roadblock:  Would the judge not have asked, What exactly -- if she had said, Yeah, there was a roadblock -- which, ladies and gentlemen, you know there was -- would she have

PDF created with pdfFactory trial version www.pdffactory.com

asked:  What exactly did you see?  Did you participate?  Did you offer assistance?  Did you offer sustenance?  Did you invite them into the hotel?  Did you give them any aid whatsoever?

The judge didn't ask those questions, and she didn't ask those questions because this defendant was not going to risk the possibility that truthful answers would have opened up new lines of inquiry, new lines of inquiry that might have prevented her from getting the benefits she sought.

You don't have to prove, and you don't have to decide whether she would have gotten the benefit or not.  The question is:  Did she shut off lines of inquiry by saying, What roadblock; by saying, I wasn't political; by saying, My husband wasn't political; by saying, I don't know what RTLM is, by saying, The senator is dead?

She shut off the line of inquiry.  She lied about things that mattered.  She walled off her past.  She obstructed the process.

And for those reasons you should find her guilty on each and every count.

Thank you.

THE COURT:  Thank you, Mr. Capin.

Mr. McGinty.

MR. McGINTY:  Thank you.

CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

PDF created with pdfFactory trial version www.pdffactory.com

MR. McGINTY: May it please the Court.

Men and women of the jury, the government said moments ago: "Did the question about the roadblock shut off inquiry?"

Now, what would that inquiry have been? The government told you a few moments ago the inquiry would have been: Who was there? What happened at the roadblock? And since the focus would have been on her as a possible persecutor, the question would have been: Were you a participant?

If there had been further inquiry made, what Mr. Capin said is, We are not undertaking to show whether she had participated in the genocide.

In fact, Professor Longman, if you recall when he was on the stand, was asked the question whether, in connection with his investigation, the one he did in connection with Human Rights Watch, there was a single article of accusation against Prudence Kantengwa? The, answer, "None whatsoever."

When the government says -- and I'll try to quote this as carefully as I can -- "We are not undertaking to show whether she participated in the genocide" -- not "undertaking." There is no evidence. Further inquiry would not have given you that evidence because it didn't exist.

Can't we say that? Can't we say it out loud? She was not a persecutor of others, and inquiry about the roadblock, leaving someone to question whether that roadblock existed

PDF created with pdfFactory trial version www.pdffactory.com

or not for the moment, an inquiry about the roadblock would not have elicited an iota of accusation related to Prudence Kantengwa.  Can't we say it out loud?

Now, what do we know about Prudence Kantengwa?

All these lines of inquiry that have been shut down, what do we know about lines of inquiry?

We know they didn't go anywhere.  Because, as it happens, the government went over to Rwanda not once, but at least twice, spared no expense in its investigation, went to great lengths to conduct an investigation here, brought over witnesses, probed for questions of party affiliation.  All to find out about her (indicating), and was doing it during the course of the asylum hearing.

What about Prudence Kantengwa don't they know already, and what's the inquiry going to lead to?

Now, when we talk about a line of inquiry being shut off, are we talking about a fanciful line of inquiry, an imaginary one -- we could have asked these imaginary questions -- or are we asking about a line of inquiry that would have led to an answer?  Was she a persecutor of others?  Was she a genocideare?

Isn't that what the materiality is of these accusations?  And isn't it the case that when Professor Longman said, "None whatsoever," to the question that materiality fairly begs:  "What possible relevance is the

question of the roadblock as it bears on whether she was a persecutor of others?"

And Beth Payne told you that the purpose of the Rwanda Questionnaire was to identify genocideares.

Well, as she sits there, she is not one of them.

Does it makes a difference?  Yes.

Because if you ask the question, What happened here, what underlies the so-called misrepresentations, is there a "there" there?

Answer, No, there isn't.  There isn't.

There are fanciful questions, but there is no "there."

Now, there are four separate fundamental accusations of false statements that were made in the indictment.  They were spread out among the charges, but the fundamental ones are her party membership.  Was she MRND?  Was her husband MRND?  Was there a roadblock, and the Service Central in connection with the Rwanda Questionnaire.  Those are the four legs of the stool, if you want to call it that.  That's what the case rests on.  All the other things are so many atmospherics, but those are the four that are charged.

So let's go through them one by one and do it in a painstaking way, because it's important.  Let's sort the evidence and let's see what's there.

When we talk about Athanase Munyemana, we know he wasn't permitted to belong to a political party.  That

PDF created with pdfFactory trial version www.pdffactory.com

doesn't necessarily mean that he abided by it, right?  Just because as a matter of law you can't doesn't mean that you "can't."  But, as a matter of law, Alphonse Kamanzi told you he was hired in '84 as a deputy prosecutor.  As such, he was a member of the Magistracy, the Magistrate Court, in Rwanda, which in Rwanda is different from the situation in the United States where there's separation of powers.  There is a unified magistracy that's composed of magistrates, prosecutors, together.  And, as magistrates, they share restrictions on what they are able to do.  And the restriction with the advent of multiparty was all other people were given a chance to choose party membership, but as a magistrate he was not.  So, as a matter of law, he's foreclosed from being a magistrate.

But what we also learned is that Mr. Kamanzi said that he knew him as a lawyer, that he had consulted with him -- or, not "consulted" with him, but he had met him in connection with seminars and so forth, and over the years said that he had demonstrated intelligence, probity, capability.  Not once during that time did he evidence any indication of belonging to a party, the party being any party, any party whatsoever.

Interestingly, Augustin Iyamurere, a government witness concurred.  He said he wasn't a member of a political party.  So, now, as a matter of law, he can't be a member of a

PDF created with pdfFactory trial version www.pdffactory.com

party.  As a matter of fact, he can't be a member of a party.

Now, what else?

Well, in the Service Central when Augustin Iyamurere took over in '92, and he's running it under the auspices of the Prime Minister, there are commissions that Mr. Iyamurere is part of, and so is Mr. Munyemana.

And those commissions are, among other things, looking into disturbances -- that's the word that's in the report -- disturbances that occurred in Gisenyi and Ruhengeri, disturbances created by the MRND.  And these disturbances fanned out across the country, but were particularly concentrated in those two prefectures.  And as a result of those disturbances, the refusal of MRND to control what was happening, the riots that were developing, people died, homes were burned, people were displaced.

In the report, coauthored by Athanase Munyemana, there was a recommendation of prosecution for members of MRND, discipline for them.  There was a suspension of a prefect, who, in effect, is a governor of a part of Rwanda.

In other words, consequential discipline imposed by a commission by a person that government would tell you was really an MRND guy.

So, as a matter of law, he can't be party member.  As a matter of fact, can't be a party member.  By virtue of his

PDF created with pdfFactory trial version www.pdffactory.com

practice, what he did as a person working at the Service Central, was not acting as a surrogate for the MRND.

More than that, Jean de Dieu told you that his house was busted up by the Interahamwe in 1993.

So the plain fact is that if you're looking for evidence to support the count that says Athanase Munyemana was a member of the MRND, it doesn't exist.

So on the count that says that Prudence Kantengwa lied about MRND, it doesn't exist.  The government has the obligation to prove beyond a reasonable doubt.  It hasn't done it.  And, frankly, it's a conspicuous -- let's call it fact.  It's a fact.

Now, as to the question of whether Prudence herself was a member of MRND, one witness, Mr. Rutyasire, and, if you remember him, he was a Sonarwa employee.  He said that he saw Prudence Kantengwa going to rallies.

His version of what happened tended to morph over time. First, there was no description of her wearing any insignia. Second, it became that she wore a medal.  The third was that as a truck or a car with a loudspeaker would drive by and announce, We're having a party rally, Prudence Kantengwa would put on her colors and would head for the exits on a workday.

Now, we learned from, I believe it was Jean Dieu Uwimana, that rallies were held on weekends.  They're not

held during the business day.  You don't break up a business for people to disappear to go to a rally.

One more ingredient.  How do you remember the scarf? That was the thing that he remembered the very last time he talked.  And the answer was, because it struck fear in him, fear.  But not sufficient fear that that fear was tangible when the government went over and spoke to him in 2008 and said, How do know that she was a member of MRND?

Now, the interesting part of his comments were, if you tried to watch, how his testimony changed over time.

Let's go back to what Dr. Longman said that was really quite interesting, and I want to quote it because it's important to get as close as we can exactly what he said. Rwandans, and now I quote "Have a tendency culturally to tell you what they think you want to hear."  And then he said, "You have to scratch deeper to get the truth, because the first time you ask something, you frequently don't get the truth."

So with respect to Mr. Rutyasire, what did we find out? The reason he couldn't tell about the scarf and the pin the first time they met was no time was devoted to the interview.  Remember how fast the interview was?  It went like that (indicating).  Didn't have time to relate.  He had all this information, but he didn't have a chance to relate it because they didn't spend enough time with him.

PDF created with pdfFactory trial version www.pdffactory.com

Exactly the thing Longman said beware of.

They meet with him a second time.  They meet with him again, and each time the story develops.  Why?  Because he is anticipating what it is they want to hear.  And when he say "pin; pin.  When he says, "scarf; scarf.  When he says "fear";  They go, "fear."

And now we have -- now we've got a witness.  And that witness is responding to a dog whistle.  It may be subtle, but he can pick it up.

Now, what's his motivation for lying?

Who knows.

He's coming from Rwanda.  We don't know what his motivation is.

But what we do know is when your story changes like that over time -- and the warning of Longman is a warning we should pay careful attention to -- he's responding to what he thought they wanted to hear.

One last thing about him.  He learns from the defense witness list who the upcoming defense witnesses are: Ms. Charlotte, Jean Dieu.

Did you like it when he said -- when he was asked the question, "Do you know Jean de Dieu?

"A member of MRND.

Remember?  Before they even come in.

"How about Charlotte?

PDF created with pdfFactory trial version www.pdffactory.com

"Member of MRND."

Charlotte?  You mean the refugee who came from Burundi, who told you on the stand whether she was a party member? Is there any one of you that thinks there's a question about whether she was a member of any political party, let alone the MRND?

We learned that Sonarwa was run like a business and, as businesses are run, sensibly.  And a sensible way to run it is probably not to have, in a multiparty environment, have people working at the job site wearing colors of political parties, because it tends to be bad business.

It turns out that Jean de Dieu told you that about Sonarwa, but he also told you that a person wore colors at Air Rwanda where he worked previously, and the person was disciplined, was suspended.  Why?  It's bad business. Because you discourage other people from going in.

And we find out from Jean de Dieu and Charlotte, from both of them, you punched the clock at Sonarwa, when you went in, when you went out.  They were serious about the working hours.  It was a business that ran efficiently.  And Charlotte said, It was the best company.  They paid well. They were run well.

So people weren't running to party rallies and so forth.

And one last thing, and this is on -- again, because

the only witness they had with respect to her party membership was Mr. Rutyasire.

But remember one more thing, which is that Prudence Kantengwa was suspended from her job.  And when she was suspended, it was by Mr. Hazayezu, Mathieu Hazayezu.  He's the one that suspended her for three days in March of 1994.  And remember that Mr. Hazayezu was in the Commission report that Athanase Munyemana had written along with Augustin Iyamurere, talking about disturbances in Ruhengeri and Gisenyi, talking about the MRND outrages that were occurring in the western part of Rwanda.  And among the people interviewed for that report, among the people criticized in that report, was Mathieu Hazayezu, the very person that later suspended Prudence Kantengwa.

So he's a member of MRND.  Is he suspending someone who's a member of MRND, or is he retaliating against her for incompetence?  We don't know.  How about for her husband putting him in a report that specifically names him as part of a pattern of misconduct by MRND?

So when we sort through all of this and look for evidence of Prudence being a member of MRND, the plain fact is that's not proven, either.

The intelligence service.  The government keeps calling it the "secret police."  It's not exactly the translation.  The "secret police," the government uses that because it's

PDF created with pdfFactory trial version www.pdffactory.com

trying to get you -- to get a certain response from you that that's the kind of institution it is.

You learned that in 1991 a journalist, Sixbert Musangamfura, had written an article about RPF incursion into Ruhengeri in the north, and how it had taken over a prison, released the prisoners, and the Rwandan government was furious about this.  And the intelligence service came and they kidnapped him, and they drove him to Kigali and kept him there for three days.

On the third day he's brought into a room, and in the room is Athanase Munyemana.  And Athanase Munyemana has in front of him the papers that show what happened.  Why are you holding this guy?  What's it about?  And he's going through that.  And now recall that Athanase Munyemana is on detachment.  He is on loan.  He is a magistrate on loan as a lawyer functioning in the role of a lawyer to the intelligence service.

In the intelligence service he is sitting in a room, he's got the papers in front of him, he goes through the papers and he says to him, "I'm releasing you."  And then he shakes the man's hand after reviewing whether there was a sufficiency of evidence to support holding him, and he releases him.

Now, this is same person, years later is -- let me back up a second.

PDF created with pdfFactory trial version www.pdffactory.com

After this incident, within a year, there is a change in the structure of government, and the Service Central is moved over to the prime minister's office.  And as it's moved over, as I mentioned, its priorities change, and its administration changes, and the conduct of things it does change.  Witness the kind of commission that Iyamurere and Munyemana were part of regarding disturbances by MRND and not simply -- not through muscling people as they might have done in earlier times.

Now, what we learn is that Mr. Musangamfura, after the genocide, conducts an investigation, and what he's trying to learn is:  What did senior staff do during the genocide?  Had they been a participate in the genocide?  Had they themselves contributed in any respect to the genocide?

And what he found out was that Athanase Munyemana had not.  And not only did he find out that he had not -- and he asked not only people who were working at the Service Central during the time of the genocide, but he inquired around, and even went and found Augustin Iyamurere, and said to him, What do you think of the guy?  And Iyamurere recommended him for resumption of duties at the Service Central.

So what you have here is Sixbert Musangamfura, now in a senior position, part of the administration of the RPF in the post-genocide government, no hint that he was involved

PDF created with pdfFactory trial version www.pdffactory.com

in the genocide and no reason for him to have any obligation to any person who was part of the Service Central in the years before, except that he wanted a professional staff. He wanted experienced people.  He didn't want to lose the expertise that existed, so long as the person had integrity and wasn't involved in the genocide, and wasn't an extremist.

So he, based upon the recommendation of Iyamurere, was prepared to bring back Athanase Munyemana and to give him a position under Mr. Musangamfura, the very person sitting across from him years earlier having been held for three days in custody.

That's the respect that Sixbert Musangamfura had for Athanase Munyemana.

On the question of the conduct of the Service, what about that recitation tells you that the Service was an agent of the genocide?

You look at the Rwanda Questionnaire, and in the midst of it is the mention of the Service Central out of nowhere, in among some of the more serious -- "more serious" -- some of the most significant offending entities during the genocide, including the Interahamwe.

In the midst of that is Service Renseignment, the security service, out of place.  What's it doing in that questionnaire?

PDF created with pdfFactory trial version www.pdffactory.com

And when Prudence Kantengwa is filling out the form, she doesn't notice that it's even there.  Why?  Because the association of things in the questionnaire would not have alerted you to the possible presence of the entity she knew as the intelligence service in the midst of that question.

The roadblock.  I want to show you two -- I'm sorry.

I want to show you -- I didn't prepare for this.  I'm sorry.

There are two charges that relate to the roadblock, and both of them state:  The declaration of Defendant, Prudence Kantengwa, which are underscored above, as Prudence Kantengwa then and there well knew and believed were false, in that:  During the time Kantengwa was at the hotel of Pauline Hyiramasuhuko in Butare, Rwanda, between approximately mid April until the end of May 1994, the charged perjuries with respect to the roadblock.  operative dates, "from mid April until the end of May in 1994."

Now, the testimony came in two parts.  One was Professor Longman, and Professor Longman talked about how he had talked to people, and that he had gotten information about the existence of the roadblock.  He got that from interviews, from informal conversation, from living in Butare before the genocide, and knowing people in Butare, and talking to them afterwards.

He wasn't there.

PDF created with pdfFactory trial version www.pdffactory.com

And how many people told him that, under what circumstances they told him that, what kind of chatter it was, you don't know and I don't know either.

That accusation as it is served to you, it is raw, rank hearsay.  It's what other people say.  It's the reason when people say "hearsay," they go, "It's hearsay."  Why?  Because that kind of stuff is stuff that people say.  No rigor is brought to bear on that until you find out what the core truth is of that.  It's simply what other people say.

And the other person who testified was Augustin Iyamurere.  And what was so interesting about that is that he had never said that before.  So he's interviewed, and when he is interviewed, he talks about -- and there are notes that reflect that he was in Butare until the 18th, and then he went to Gisenyi.

Now, why would he have gone to Gisenyi?  You see, his father-in-law was making a speech the next day at Butare Stadium, the famous speech.

So he, the day before that says, "I left and I went to Gisenyi."  He comes in here and brings a news flash:  No, I didn't.  I stayed in Butare." In fact, I didn't move from Butare.  I lived across the street from the hotel at my brother-in-law's for a few days.  And then I went and I was basically sheltered at a place called ICA, which was over -- some blocks up and some blocks over, a distance away from

PDF created with pdfFactory trial version www.pdffactory.com

the hotel.  And I remember there was a roadblock out in front of the hotel.

And he gave it two different ways.  When he described it, when he described the roadblock -- I'm not recalling exactly which of the photographs it was that he was looking at.  What I tried to do, when he was pointing to it, was to get him to come over, and I had a pen, and I tried to identify where these were.  I think this was the one that we had worked with (indicating.)

Now, on the roadblock, he said that upon his arrival there was a roadblock that was maintained by soldiers in connection with the ESO.

So I had him indicate where that was, because that's a peculiar thing to say; because, as we talked about a short time later, the ESO is over here.  And this is not the road that's part of the entrance to the ESO.  And in his notes when he described the roadblock at the ESO, he said, "The roadblock at the gates of the ESO."  And the gates of the ESO were over here (indicating).

So the roadblock he put here (indicating) when he first arrived in Butare.

Fiction.  Fiction.  Fiction.

Then he said there was another roadblock here (indicating); and, of course, if there's a roadblock here (indicating) and a roadblock here (indicating), it doesn't

PDF created with pdfFactory trial version www.pdffactory.com

make a lot of sense.

He says that there turned out to be several roadblocks, remember?  There were like three different roadblocks.  And when the roadblocks came, they had to be assembled because they were using some big materials.  They were using stones and rocks and wood.  So this became rather a project here, if you remember, and it was in three different places.

And what's interesting was he is the son-in-law of the genocidal president.  That's who he is.  He told his story about how he was in fear of his safety, notwithstanding the protection being the son-in-law of the president.  I mean, I assume the president doesn't want his daughter's husband killed.

But his version was:  I wasn't around.  I wasn't anywhere near the genocide.  I didn't touch it.  I didn't feel it, and I didn't see it, because I wasn't involved with my father-in-law and what my father-in-law was doing.  Please understand.  That's his story.

He says, I was staying right there (indicating).  And what's interesting about "right there" is, if you look over here, right there (indicating) is where the roadblock is.

That's the head of the roadblock right there (indicating), and it's out in front of the son-in-law of the president of the genocidal government's house, right there (indicating).

PDF created with pdfFactory trial version www.pdffactory.com

And he said it was in three parts.  And when it was assembled, he said -- he first said it was April, and then he said May 30.  May 30.

What's interesting about May 30 is we know it wasn't there.  It just flat-out wasn't.

So he said it started May 30.  Actually, I think what he meant was June 1.  And this happens to be what he described.  Now, this is not outside the Ilhuliro, this building right here (indicating).  That's not outside that.  It's concentrated, at it happens, in front of his house.

And it happens after the dates that are in the charge which identify the operative period as the time between mid April and the end of May.  So we're talking about a divide, a temporal divide of consequence, with respect to this roadblock between what happened up to the end of May and what happened on June 1.  And it happenes that the United States was conducting surveillance.  It happens that we have tangible, real, not hearsay, we have real evidence about what actually happened there, and it's in front of our eyes.

Now, Mr. Benn came in, and he is the person who is the expert on this kind of surveillance and discerning what you could see from this kind of surveillance.  And what he did with respect to this photo (indicating), is he threatened his subordinates -- and I can't pull it up on the screen because it's not accessible right now, but you will see it

PDF created with pdfFactory trial version www.pdffactory.com

in evidence.  There will be a number of pointers that will point to different places along here identifying what looked to be barriers, what he could discern as possible barriers, which appear to be explain the behavior of cars that are out of lanes.  There's a slalom effect for cars to loop around.  And as they do it, he describes what appear to be the elements that explain the behavior, integrating the behavior and what appear to be these elements.  And he puts the markings down and identifies what he says appears on June 1.

Now, I asked him, "You never instructed subordinates to probe this picture here and identify structural members relating to the roadblock?"  And what was -- what was maybe troubling, I would suggest it might be troubling, if you have these photographs and you're the source of the photos and you go to school on this one and you instruct your subordinates, I see this element here (indicating).  I see this element here (indicating).  I'm watching the behavior of the cars here (indicating).  I put this together, and I can, in an empirical way with reliability say to you, there's a meaningful pattern of conduct here.  I can't tell you what the nature of the roadblock is, but I can tell you there appears to be a large number of people.  There appears to be vehicles.  They are pushed off course by what appears to be obstructions.

Never having done that with this picture, we watched

him doing something that was perhaps, as I say, troubling.

He was given a suggestion by Mr. Capin, an invitation, Can you find hints of structural members on here?

And do you remember him as a disciplined professional saying:  I don't work that way, I need to spend time and study this?

No.  He went to this and he said, Well, this "could" be.  There's a darkness here.  Well, if you chase the darknesses here (indicating), what you're going to find is they don't line up with anything that occurs here (indicating).

If you try to discern whether there's a discrete trace of something, whether it's a shadow, distortion, whatever it is, if you try to focus on that, you've lost the thing that he used to bring integrity to his findings about this photograph here (indicating).

So what he said was, "It may be that there are structural elements there.  There could be that there's this."  He always used the conditional tense to describe what might possibly be there.

But not only do we have here (indicating) -- and you can look at it closely, and I invite you to do that.  Not only do we have a picture of what appears to be a -- I don't know, I'm not an expert -- an unobstructed roadway, you have, on May 30, you have the hotel.

PDF created with pdfFactory trial version www.pdffactory.com

There's more images (indicating).  It's a little bit difficult to sort of pull out.  They're a smaller version of this (indicating).

If you look at this and you say "roadblock on May 30" -- remember what Longman said?  What he was told by the people who said there was a roadblock in the area of the Ilhuliro was that it was continuous.  Well, if it's continuity...

Then the United States flew over to take these pictures (indicating).  And there's a little hiatus here.  And that occurred on May the 30th, and this occurred on May 23.

And there's one more photograph, and you can't make out much of what's happening in this one, but it's one more.  It's not terribly useful, but this is right where you don't want the clouds to be.  That's where they are.  That's how it happens, I suppose.

What you can look at here, for what it's worth, what you're not seeing is the behavior that makes this such a dramatic picture.  Again, June 1.

You know, it's interesting.  The government says we were denied lines of inquiry by Prudence Kantengwa because she said, "No roadblock."

Well, when she said, "No roadblock," she didn't know the United States was taking pictures, didn't know about these pictures, and here you have them.

PDF created with pdfFactory trial version www.pdffactory.com

And you know what it sort of says, at least with respect to these things?  There was no roadblock.

Now, when Iyamurere was asked about the roadblocks, he wasn't asked a single thing about, "It's a roadblock.  What did you see?"

Remember how Mr. Capin grilled Charlotte:  "You were at roadblocks.  You must have seen people being dismembered and cut up and chopped up.  You must have seen terrible things."

And she said, "I tried to get away from the fire, from the shooting, because I was trying to protect my children."

And Mr. Capin said, "But you must have seen stuff."

So was the persistence of Mr. Capin with Charlotte.

What about with Mr. Iyamurere?  What was happening at that roadblock, the one right in front of your brother-in-law's?

Now, if you look at this here (indicating), and if you look at those photographs, what you don't see, if you can look down and you capture and -- everybody spoke about this, you can capture enough of a person to get a sense that this discrete image might be a person.  You can't be sure.  Just as, you know, a line or a distortion, and What's that?  Is that a shadow?  What's that there?  I can't really tell.

If you get enough of them, you can conclude it looks like there's people.  Remember he said, If they're sheep or cows they'd be the same color, but here you get the sense

PDF created with pdfFactory trial version www.pdffactory.com

that it's different?

What interesting is that nowhere on this photograph, nor on these different photographs, do you get a sense of activity at the Ilhuliro Hotel.  And you don't get any sense of anything that constitutes acts of genocide anywhere along there.  And they never asked Iyamurere anything about that.

And when the government says the question about the roadblock shut down inquiry about what Prudence Kantengwa could have known about the roadblock, well, A, the only thing that matters is whether it bears on whether she was a persecutor of others.  We're not talking about historical issues to find out whether a historian might be interested in what happens here.  It bears on her and what she did, and whether she would be barred from coming to the United States because she was a persecutor of others, not somebody else, not her brother-in-law, her.

But we don't even have an indication of anything that was happening at all around here.

So in answer to the question, "What inquiry was barred," how come when you're Iyamurere, you don't care?

And then you say, The inquiry was interfered with by Prudence Kantengwa's answer.

Now, what we know from looking at this roadblock (indicating), is that, Can you find beyond a reasonable doubt, knowing the roadblock is continuous, that's the

PDF created with pdfFactory trial version www.pdffactory.com

version you were told, and looking at these photographs, which are only United States intelligence, can you conclude beyond a reasonable doubt the existence of a roadblock at the time that's set out in that indictment between mid April and the end of May?

And, I would submit to you, you cannot.

Now, I want to talk a little bit about Prudence.

Prudence is a smart, capable person.  But one thing you learned by looking at her work records is that she had been harshly criticized, sharply criticized, for carelessness, and her skills at work were, frankly, demeaningly characterized.  One person said, "She doesn't read."  Now, that doesn't mean she can't read.  But it showed a pretty significant disrespect for her capabilities.

She was demoted.  Mr. Capin doesn't want to use that word, but you saw in the face of Jean Dieu, when he went like this (gesturing).  She was demoted, and ultimately she was suspended.

I don't mean to be unkind to her, but if you look at the letter that the government was talking about, the letter that was complaining about her supervisor, and, bear in mind, when she was working in the Juridical Department, she was a lawyer and was expected to appear in court.  She had an important job in Sonarwa.

She was then shifted to the claims department.  Do you

PDF created with pdfFactory trial version www.pdffactory.com

think that's a demotion?

In the department she was in, the head of that department answered to only one person, which was the director general.  Any complaint about that person's behavior would go to the director general.

The government suggested yesterday that perhaps a complaint would have gone to the another lawyer in the department.  That doesn't make much sense.

None of that's my point.

Look at the letter.  Look at the way she composed the letter.  For a lawyer, the composition and the narrative of the letter is an indication of what her skills would be, and the importance of evaluating it, I think, is it goes to help you to discern what she wrote when she wrote the Asylum Application.

And I would like to pull that.

The government has focused on this:  "I was a member of MRND, the ruling party before the war of 1994."  And when she writes out the asylum application, she's writing it out in longhand.  What lawyer writes things out in longhand that doesn't reflect a correct edit?

She fills this out.  You can see carelessness here (indicating).

As she's writing this, I want to point out two different things.  One of them is the reference to "ruling

party."  Now, when Longman was testifying, he used term "ruling party," and identified and expressed "ruling party" very precisely.  MRND was the ruling party before multiparty came into place.  So when he used the words "ruling party," he differentiated from the dominant party, which is how he characterized MRND in the period after multiparty.  So it was "ruling party - dominant party," the split being at the time of the multiparty.

And here is the description of the "War of 1994."  You heard evidence that Ms. Kantengwa comes from Byumba.  Byumba is in the northern part of Rwanda.  It was in the path of the RPF.  As the RPF came in, people were forced out and became internally displaced people.

Longman said many of them returned home.  The war for them didn't end.  It didn't end with Arusha because the RPF occupied their homes.

For people from Byumba, whether the war ever touched the southern part of Rwanda, it touched Byumba.  That war didn't end.

The "war of 1994," in the way that she writes that, if you think about where she's from and what she's writing about, she's talking about being a member of MRND, the ruling party, being the party that was the controlling party at the time; and it was the ruling party, which is prior to multiparty, before the war, "the war" she's talking about,

PDF created with pdfFactory trial version www.pdffactory.com

she writes, "1994."

Can you entertain the thought that for her the war wasn't 1994.  The war started October 1, 1990, in her home.

She enters the Nairobi consulate now in September of 2001.  She had applied for a visa before.  She had gone to Rwanda and had applied three times.  You learned that frequently when you apply for a visa they reject the first visa application.  That's what they do; they want to find out whether you're persistent.  Persistent isn't a red flag.  Persistent means you might actually get a visa.

So she applies for the visa.  Does it once; does it twice; does it three times.  Every single time using her name, her date of birth, the identifiers critical to determine who she is.  And then later when she applies in Nairobi, the first time she does, no one gives her the Rwanda Questionnaire.

Now, what's interesting about that is when you go to the Nairobi Embassy, or the consulate, rather, there are one hundred, two hundred people Wallen told you, waiting to be seen.  If you split up the time each of them would require, his estimate of how much time he devotes to each person, it begins to become like "wow."

But those persons who go in are met not by consulate officers, but by people who are contract employees, who work for the consular office who are Kenyan nationals, or, as

PDF created with pdfFactory trial version www.pdffactory.com

Wallen put it, they were ex-pats.  They were people living in Kenya who had come from other places and were working there.

They're the ones who give out the Rwanda Questionnaire. The Rwanda Questionnaire is remarkable for it's difference in anything that you or I have ever seen as a government form or are accustomed to filling out; Customs Declarations, IRS Forms.  There's lots of forms.  If you have a charity that you participate in, you might fill out returns, a 1099 or 1023.  The federal government is loaded with returns. Every last one of them at the top says "United States of America," and every last one of them at the end says -- this is serious -- "signed under the pains and penalties of perjury," watch what you say on this, because it's consequential.

None of that the appears on this.  And what we don't know is, when these things are handed out by the non-consular employees, what do they say to the person who's filling it out?

"Here, fill this out.  Take it seriously.  Don't take it seriously."

Nobody comes in to describe what's the protocol for these things being distributed, and am I told that this is consequential?  Am I given any way of knowing that?

Now, as I read this, Question 14:  "Were you or any of

your immediate family members have been in Rwanda since April 6?"

There's a grammatical error making the form.  Does it make the form less legitimate?  Does it affect the way a person would read the form?  Does the fact that it's copied over and over again and presented in this form, does it diminish the attention the person would pay to the form?

Question 16:  "Were you or any of your immediate family members (spouse, parents, siblings, children) employees of the government of Rwanda prior to July 15, 1994?"

The answer:  "Yes."

Wallen was asked on the stand, "Did you ask the questions from the Rwanda Questionnaire?"

And remember his answer?  It was "Yes."

When he was interviewed before, his answer was "No."

Notice how people respond to repeated interviews by juicing up, working with their testimony to make it just a little bit more responsive.

Wallen didn't say, "No."  He said, "Yes."

He comes in here and says, "Yes," and the answer is, "No."

Does it matter?

Yes, it does.

He didn't ask the question.  If you ask the question, "Who was working for the government of Rwanda," this gets

PDF created with pdfFactory trial version www.pdffactory.com

cleared up, and this whole thing doesn't get started.

Instead, 11 years later, we are here because of this.

And what's consequential about this?

Were any of your family members or you a member of MRND?

Well, the truthful answer, we know from the testimony in this trial. Athanase Munyemana was not and Prudence Kantengwa was not. It's a truthful answer.

The answer on the next one is lumping in with -- the one immediately prior to that is the one that lumps in the Service de Renseignment -- the intelligence service -- the Presidential Guard, Interahamwe, the army or the militia forces. In order words, all the bad actors in Rwanda, all of them grouped in here with an exception, and institution which, I think based on the testimony that you heard at the trial, had no business being in the Questionnaire.

So this Questionnaire is handed out and she carelessly, carelessly, says "No" to the question that relates to the Service, the intelligence service. And that answer is why we are here.

What you learned from Beth Payne is that no one answer on this form was sufficient to disqualify a person from a visa.

The charge in Count One uses the word "procure." Did the answer to the question, "No," had it been "Yes" deprive

her of the benefit of the visa?

Flipping it around, is saying "Yes" when the answer would have been "No," is it going to keep from you getting -- I'm sorry.  I'm confusing myself now.  We'll try it again.

If you say "No" to the question, does that procure the visa that you otherwise would not have gotten?  And Beth Payne's answer to that was:  No one answer would have been sufficient to disqualify a person from getting a visa.

The form doesn't use the accurate name of the MRND.  Does that matter?  Well, yeah, it does matter.  The name is missing the word "national."  Post 1991 it misses the word "national" and "development."  It doesn't accurately relate what the names are of the MRND or related as the MRNDD.

It asks about party membership.  And party membership in Rwanda pre 1991, everyone was a member of the political party.  This form can't sensibly ask that question because that question gets you no information.

The framing of this questionnaire shows an insensitivity to some issues relating to Rwanda.  They make it not a meaningful, careful, piece of work that Beth Payne told you that it was.

You know that Richard Wallen asked her nothing about the form, didn't follow-up on it, didn't ask any questions about it.

PDF created with pdfFactory trial version www.pdffactory.com

We know that the form was then sent to Washington by cable, but it was also sent to Kigali. So the questionnaire and the application for visa -- and she's approved for the visa, but for this issue of her being Rwandese.

It goes to Kigali, where, if you apply in Kigali, you don't need to complete a Rwanda Questionnaire. Why? Because they're presumptively aware of who it is that would be a genocidal suspect, and that's the objective of the Questionnaire, to identify who is a genocidal suspect.

So the process takes you through Kigali. They review the Questionnaire, and it goes to Washington; and you are run through a host of indices that indicates whether you've got a criminal record, whether you are on a wanted list, all the things that are necessary for them to clear you.

That comes back. No objection to Prudence Kantengwa getting the visa.

Now, the government says that Prudence Kantengwa had long wished to come to the United States, and all of these things were efforts to finally get here.

Well, she gets the visa in February of 2002. She doesn't come to the United States until June, and when she comes, she comes for a religious conference, and she stays from June 26 to July 3, 2002, and she goes back.

She comes back to the United States through Canada in June 2003, and she goes back.

PDF created with pdfFactory trial version www.pdffactory.com

And she comes again a third time, and the ticket is going to be evidence. The ticket that she has is a round-trip ticket. Why? Because she was going back, until she found out that the DMI, the military intelligence unit of Rwanda, was searching for her, and she made the application for asylum here.

The government's version of all of this is: This was a developed plan over the years to finally get here.

The fact of the matter is that she applied in 1995 and 1996 for refugee status. Read the file. Her husband in 1995 died. Three children. The pitiful, pitiful, letters, because she is begging, "Please, take me to the United States." She's is begging. They're pitiful, sad.

So she is trying because her life is shattered.

She left Rwanda. She went to Kenya. Didn't know what was going to happen in Kenya. Her husband is dead. Her life is destroyed. So she pitifully begs the United States, and they turn her down.

Years later when she applies in 2001 and 2002, each time she is denied. She supplements her application, and she supplements it with letters which indicate that her purpose in coming to the United States is to engage in seminars in pursuit of her work. Her work was religious work, for which she got trained in Africa, trained to be a person who was a religious conciliator, helping people with

ethnic differences.

And she is asked, invited, to come to the United States, and the letters show you this, invited to come to the United States for purposes of giving the seminars and to participate in them.

And she comes, and she goes back.  Why?  Because her life is different from what it was in '95.  She is not the poor, pitiful, sad person.  She's made a life.  She's gotten an education.  She's got a degree.  She's got a job.  She has more than that.  She's got a vocation.  She has a calling.  And she's pursuing that calling and coming to the United States for a visit to give a seminar.  That's what she was doing.

And the government's take on this is, No, it's an unbroken effort to get into the United States.

Well, once she arrived on June 26 with a visa in hand, why not then?

She didn't.

Why not the second time she came and she didn't?

So in terms of whether this was a -- whether her effort was to deceive in order to get into the United States under a false effort to immigrate here, that's not what happened, and the evidence shows that.

Now, the government has spent a lot of time talking about RTLM and about what I would call "atmospherics,"

PDF created with pdfFactory trial version www.pdffactory.com

atmospherics because it doesn't go to the core, false statements that the government has alleged.

I want to talk about RTLM for a second, because I think it's important to show how the government's advocacy is unaffected by evidence.

The evidence here was that when RTLM was created -- Alison Des Forges, in an article, parts of which were embraced by Professor Longman, said that RTLM was a station intended for the purposes of popular music and for popular conversation in Rwanda, and that a subscription price was set low enough that there could be popular subscription, popular participation, in this.

The subscription price was 5,000 Rwandan francs, approximated by Mr. Musangamfura as about $20.  Subscribed by Prudence Kantengwa, subscribed by Jean de Dieu Uwimana, subscribed by lots of ordinary people.  Subscribed by people who are part of the current RPF government now, and lots of other people who didn't know what it was going to become.

And RTLM, yes, became a virulent radio in Rwanda, but that's not what it was when it started.

Now, Mr. Musangamfura was in the media, and he saw what was happening, because as RTLM is coming online, who is it hiring?  It's hiring people he looks at and he goes, Hmm, okay, I see where this station is going.  Because the people that are being hired are people that have a certain

ideological take on things.  And he finds it disturbing because he's an opponent of the regime.  He's in the opposition.

But he watches what's happening with RTLM, and he sees the beginning, not where it's going to end up -- no one saw that -- but he began to see where it was going.

The people who subscribed to that, Jean de Dieu Uwimana, Prudence Kantengwa, had no idea where RTLM was going.

But here RTLM is used like a noose around your neck.  A way of saying, Ah-ha, RTLM, and because of RTLM, you must be an extremist, therefore, you must be MRND.  Over and over again -- it doesn't matter that the evidence suggests reliably, credibly.  That's simply not the case.

But on a regular basis that's precisely how it was presented.  People were cross-examined based on that.  And you can see how it's being used to try to paint her, as well as other answers.

Matthieu Ngirumpatse, who was the head of Sonarwa in the period when she was hired, left there, and there was another deputy director who took over afterwards.

Both of them were MRND, because the persons who led Sonarwa were all appointed by the president.  They were all MRND people.

He, Matthieu Ngirumpatse, leaves Sonarwa and he

PDF created with pdfFactory trial version www.pdffactory.com

becomes, ultimately, and we don't have the dates, he ultimately becomes head of MRND.

And with respect to Prudence Kantengwa, that means exactly what? Something more to hang around her? Because she knows him, therefore, she must be an extremist; therefore, she must be MRND; therefore convict on the count that relates to MRND.

The charges here, if you peel away all of the atmospherics, if you look at the statements, the four sequence of statements that the government claims is the core accusations here, the question here becomes, ultimately, what did she do? What did she do? Did she harm a person? Did she engage in civil rights violations? Was she part of the genocide. We know the answer to that is No. You know that any answer given didn't conceal a fact that showed that reality because there is no such reality.

The government, to prove its case, has to prove not only that something was false, which they can't do -- inadvertence isn't falsity. And the statements about MRND are true.

And there is no way, based on the evidence relating to the roadblock, that you could say that her statements about the roadblock were false.

But statements which are untrue only become significant if they are consequential, if they have a natural tendency

to affect a decision that a decision-maker is making.

The decision-maker here is the asylum judge.

What about a roadblock, when the answer to the question is that she is not demonstrably, proveably not a persecutor of others, what is the question, "Is there a roadblock" meaningful to?  What is it consequential to?  What's the "there"?  What's the thing that is concealed from discovery?  What would be peeled away when looked down?  What is the fact that you found out?  Not some fanciful fact, not:  We could have asked this.  We could have explored that.  We could have flown over.  We could have had lunch that afternoon.  We could have asked one more person.  Not that fanciful, Anything could be.  We could have done it.  We could have asked five more people.

What's the consequential fact concealed meaningful to the asylum application?

With respect to whether there was a roadblock up, once you know she didn't persecute anybody, what conceivable basis is there for a claim of materiality?  What's the natural tendency of a statement to lead to something else when you know there is no place that it goes to because you're told that the facts supporting a claim that she was a persecutor didn't even exist.

The government has to prove no only that the statements were false, but that they were material.

PDF created with pdfFactory trial version www.pdffactory.com

Unless the statements had that natural tendency, unless they were consequential, they don't matter, irrespective of whether they're true.

So as you go through the indictment, and as you evaluate the truth of the things she said, ask the materiality question:  What is the consequence?  What is the consequence?  Where would this have led?

As Mr. Capin said, The door is closed on this.  There wasn't further inquiry permitted because of the answer.  What happens if there's no further inquiry because there's no "there" there?

On Count One, on Count One, did anything on the Rwandan Questionnaire procure, actually procure?  Was it the thing that caused the issuance of the visa?

Now, I've gone on very long, and you have been very patient, and I appreciate that.

This is a case of enormous consequence.

THE COURT:  Five minutes, Mr. McGinty.

MR. McGINTY:  Pardon?

THE COURT:  Five minutes.

MR. McGINTY:  It is very daunting to appear in front of a jury and to try to argue for justice for a person.

You are the measure of that justice.  You make a decision, a consequential decision, of what happens to her.

PDF created with pdfFactory trial version www.pdffactory.com

And for a person who did nothing, not a thing, all this talk of Rwanda genocide, not one thing.

Please, review the evidence carefully, and I'd ask you to come back with verdicts of "not guilty."

Thank you very much.

THE COURT:  Thank you, Mr. McGinty.

Mr. Chakravarty, ten minutes, and no more.

MR. CHAKRAVARTY:  Thank you.

REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT.

MR. CHAKRAVARTY:  If Mr. McGinty had been a witness in this case, what he just said is pretty persuasive to you, but it's only what you heard from that witness stand, and the evidence that's coming back with you, that you have to use your common sense, the reasonable inferences from that evidence, to draw the conclusions whether the defendant committed the crimes in the indictment.

It is not the conspiracy theories or the other things that Mr. McGinty just referred to you that could have been the reason why various things happened; mysterious notes that are not in evidence, statements and motivations that witnesses may have had from the witness stand.  Those things are not evidence.  Those things are alternate explanations which Mr. McGinty is offering to you to try to explain away every single little lie that the defendant made.

When you lie about whether ever becoming aware that

PDF created with pdfFactory trial version www.pdffactory.com

RTLM was hate radio, why do you lie about that?  That's not something about what she knew when she signed up for RTLM. She's not accused of signing up for RTLM.  But when you lie to a judge, somebody whose job it is to figure out whether you're telling the truth, whether you can make a reasoned assessment as to whether somebody is entitled to an immigration benefit, when you lie to them about the very fundamental things that the judge doesn't know anything about, you shut that line of inquiry off, then she has or doesn't have the information to make the decision.

So when Mr. McGinty says, What do we know about the defendant?  We know that she's a persecutor.  That's not what this case is about, even if Mr. McGinty wishes it were.

This would be a very different trial if the defendant were charged with genocide, or if you were in asylum court determining whether she is entitled to asylum.

That's not what this case is about.

It's about whether she lied.  These are irreconcilable. They are facts.  You know she lied.

And now you know why she lied, ladies and gentlemen.

You know that's why she lied about acknowledging who her boss was at Sonarwa, Matthieu Ngirumpatse.  Does anyone in Rwanda not know who he is?  She was writing directly to him.  She was hired by him.

And, yet, when asked by an Immigration Judge, Do you

even know this person?

"Matthieu Ngirumpatse?"

You know why she lied about that.  Because he was on trial in the ICTR.  More scrutiny on her.  More scrutiny on, What else is she hiding?

Why is she lying about this roadblock, ladies and gentlemen?  She's not alleged to have done a thing at that roadblock, but Dr. Longman told you that that roadblock was one of the most notorious.  That's where her brother-in-law, the person who was taking care of her at this hotel, was engaging in his genocidal acts.

And the drama over where and when that roadblock existed, is that really legitimate?  Is that the kind of peccadillo of technicality that Mr. McGinty is relying on here, when, first, it's plain as day on the pictures?  Dr. Longman, without any doubt, told you that that roadblock was there on April 19 and April 20.

The only eyewitness to that roadblock said, Yes, it was there when I -- they were building it when I left on April 18th.  And when I got there, when I got to this intersection, when I got to this intersection, Senator Iyamurere said, there was a roadblock right here (indicating), right in front of the hotel.  And they later constructed this one here (indicating)  And, in fact, you can still see the projection right in the middle of the

PDF created with pdfFactory trial version www.pdffactory.com

road.

So you don't have to rely just on Eric Benn's expert eye telling you, Yes, I wish I had more time to look at this thing, but, given the constraints, I see that, I see these structures, all consistent with the roadblock as it appeared on June 1. But the defendant herself, in her asylum application, she said that she was there until mid June.

And why do I mention all that?

Because what the case is about is her lies. It's about lying to an Immigration Judge and saying, There was no roadblock there. She didn't say, Well, there may have been one after I was there. I heard there was one.

She didn't get into the kind of nuanced explanations that she started to get into regarding her political affiliations. She said, There was no roadblock there. In fact, when you read the transcript, you'll see, "I let my kids go out there and play."

Gratuitous extra facts to distract the judge.

And that's what Mr. McGinty was doing here, trying to distract you from whether she told the truth, whether she was evasive, and whether she was trying to deflect inquiry into things that might impact whether she gets the benefit that she was looking for.

Lying about MRND. You don't have to rely just on a disinterested witness who saw her wearing a badge.

PDF created with pdfFactory trial version www.pdffactory.com

Her own words are crystal clear, "I was a member of MRND to the war of 1994."

And then in the asylum proceedings before the judge, she pretended that that statement did not even exist.  What I meant to say was that there was a multiparty system.  I was a member before then but not after.

Ladies and gentlemen, it's the type of evasion that is at the core of why that process, which is designed to carefully filter out all of the equities by trained professionals, by people who have to assess her credibility, why she corrupted that process.

That's what this case has always been about.  It's what I told you it was about eight days ago.  It's what the evidence has shown over all this time.  That's why we brought in witness after witness, not to explain how horrible the genocide was, not to explain how she or her husband may have been involved, but to show that, when she was lying about the little obvious things, there was a purpose to it.  It was to evade.  It was to obstruct those proceedings.

That's what is impermissible in the immigration process.  That's why the U.S. Government has brought her here.  It's not a measure of her character.  It's not a measure of whether she is an extremist or sympathetic to the genocide or any of that business.  It's about cold, hard

PDF created with pdfFactory trial version www.pdffactory.com

facts and the reasonable inferences that you can draw therefrom.

So when we talk about RTLM, when we talk about Matthieu Ngirumpatse, when we talk about how obvious it was that the Service de Renseignment was the secret police in this country, which is something less than the democracy that we have here, those things matter, because those things were the lines of inquiry that she wanted to shield.

She wanted to portray herself very much as Mr. McGinty has tried to portray her to you:  A committed Christian missionary who was here, maybe a little naive, maybe a little apologetic as to the circumstances that brought her here, she's just looking for an end.

While all that is well and good, if you don't pervert the process, if you just tell the truth -- it was the truth that she feared.  It was the truth that led -- that was the reason why she lied, because it was the truth that was going to open every one of those lines of inquiry that she wanted to keep closed.

And it's the truth that you are going to be asked to find here, and the truth is simply, Did she lie or did she not:  First, when she came in on that fraudulently obtained visa back on January 29 of 2004; second, when, after being here and having all the luxury in the world, spending as much time as she needed to fill out that asylum application,

PDF created with pdfFactory trial version www.pdffactory.com

she very carefully chose her words, "I was member of the MRND."  Of course she was.  She need to claim political asylum.  She needed to show how political she was.  She needed to prove that she was going to be persecuted.  Of course that's what she meant by she was a member of MRND.  That was her basis of relief.

But when she was in front of the judge having to explain that, she retreated from that.  She made it very clear, No, I meant I may have gone to a rally once with my husband, and I was really just going to visit my family.

Mr. McGinty said very clearly, when stories change over time, you do have to suspect whether they're telling the truth.  And the only person's story that's changed over time that you have heard over the course of the last eight days is the defendant's.

That's what we're asking you to find her guilty of.  That's perjury.  That's obstruction.  That's visa fraud, and we ask you to return a "guilty" verdict.

THE COURT:  Thank you, Mr. Chakravarty.

All right, jurors, we're about to reach my part in the final phase of the case before your deliberations begin.  Unfortunately, my part is a little less dramatic than what the lawyers have been able to present.

So why don't we take a 20-minute break to prepare yourself for what's coming, and then we'll proceed with the

PDF created with pdfFactory trial version www.pdffactory.com

jury instructions.

THE CLERK:  All rise.

(Recess.)

THE CLERK:  All rise for the jury.

(Whereupon, the jury entered the courtroom.)

THE CLERK:  All rise for this Honorable Court.
Court is open.  You may be seated.

THE COURT:  Jurors, as I promised, I have reduced these instructions verbatim to writing, so you will have the to consult during your deliberations.  You're welcome to keep notes, if you'd like, but I do not think it will be necessary, in that you will have the transcript.

CHARGE TO THE JURY

THE COURT:  Now that you have heard the evidence in the case and the closing arguments of the lawyers, the time has come for me to instruct you on the law.  These instructions will be in four parts: first, some instructions on the general rules that define the duties of the jury in a criminal case; second, a brief review of what is and what is not evidence in a criminal trial, together with some guidelines that may assist you in evaluating the evidence that has been presented; third, I will give instructions defining the elements, or components, of the crimes charged; and, finally, I will explain the rules that will guide the conduct of your deliberations.

PDF created with pdfFactory trial version www.pdffactory.com

In defining the duties of the jury, let me first remind you of the general rules. It is your duty to find the facts from all of the evidence in the case.  To the facts as you find them you must apply the law as I will explain it to you, and you must follow the applicable law as I will define it, whether you personally agree with the wisdom of the law or not.  You must do your duty as jurors regardless of any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case based solely on the evidence that is before you.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important.  And you must not read into these instructions, or into anything that I may have said or done during the course of the trial, any suggestion from me as to the verdict you should return.  That is a matter entirely up to you.  Even if I were to have an opinion as to what your verdict should be, my opinion would be utterly irrelevant. The verdict is yours, and yours alone, to render as the sole judges of the facts.

Now, at the beginning of the case, I explained some important rules that govern criminal trials.  I will restate them for you now in more detail.  There are three basic rules.

The first rule is that a defendant is presumed innocent

PDF created with pdfFactory trial version www.pdffactory.com

unless and until proved guilty, and this presumption alone is sufficient to acquit her.  The indictment brought by the United States against Ms. Kantengwa is an accusation, and only that; it is not proof of anything at all.  A defendant is innocent in the eyes of the law, unless and until you, as the jury, decide, unanimously, that the government has proved her guilt beyond a reasonable doubt.  A corollary of the presumption of innocence is the rule that a person is to be judged solely on the basis of her own conduct.  A person is never to be convicted simply because she associated with or knew persons who themselves might have committed crimes. Our law does not permit a finding of guilt by association.

That brings me to the second rule.  In a criminal case, the burden of proving guilt is on the government.  It carries that burden throughout the trial.  A defendant never has the burden of proving her innocence.  The right of the defendant to put the government to its proof is one of the most fundamental guarantees of our Constitution. Ms. Kantengwa has elected to exercise her constitutional right not to testify, and no negative inference may be drawn from her decision.  I stress that you may not speculate about why Ms. Kantengwa did not testify, or even discuss that fact in your deliberations.  Again, the burden rests on the government and the government alone to prove Ms. Kantengwa's guilt beyond a reasonable doubt.

PDF created with pdfFactory trial version www.pdffactory.com

Now, what is proof "beyond a reasonable doubt"?  The term is often used, and is probably pretty well understood intuitively, although it is not easily defined.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, or proof to a mathematical certainty, for almost everything in our common experience is open to some possible or imaginary doubt.  It does, however, mean that the evidence must exclude any reasonable doubt as to the defendant's guilt.

A reasonable doubt may arise not only from the evidence produced but also from the lack of relevant evidence.  Reasonable doubt exists when, after weighing and considering all of the evidence in the case, using your reason and common sense, you cannot say that you have a firm and settled conviction that a charge is true.

A defendant is never to be convicted on suspicion or conjecture.  If, for example, you were to view the evidence in the case as reasonably permitting either of two conclusions - one that Ms. Kantengwa is guilty of a crime charged, the other that she is not guilty of the offense - then it follows that you would be required to find her not guilty.

It is not enough for the government to establish a probability, even a strong probability, that a defendant is more likely guilty than not.  That is not enough.  Proof

PDF created with pdfFactory trial version www.pdffactory.com

beyond a reasonable doubt must be proof of such a convincing character that you can, consistent with your oath as jurors, conscientiously base your verdict upon it.  If you so find as to a charge against Ms. Kantengwa, you will return a verdict of "guilty" on that charg.  If, on the other hand, you think there is a real possibility that Ms. Kantengwa is not guilty of the charge under consideration, you must give her the benefit of that doubt, and find her "not guilty."

Next, I want to review with you what is meant by evidence in the context of a criminal trial.

Evidence is produced at a criminal trial in one of three ways.

First, through the sworn testimony of witnesses, both on direct and cross-examination.

Second, through physical objects, or exhibits, usually identified by a witness, and admitted as such during the trial.

Third, by stipulation, or agreement between the parties that certain facts are true and need not be independently proven as such at trial. An example is the agreement of the attorneys as to the authenticity of certain documents that were admitted in evidence.

Certain things, however, are not evidence and are not to be treated as such in your deliberations.

Arguments and statements by lawyers, as I have

PDF created with pdfFactory trial version www.pdffactory.com

cautioned, are not evidence.  What the lawyers have said over the course of the trial you may find helpful, or even persuasive, in reaching a verdict, but the facts are to be determined from your own evaluation of the testimony of the witnesses, the exhibits, and any reasonable factual inferences you choose to draw from the evidence that has been admitted.

Questions to witnesses are not evidence.  They can only be considered in the sense that they give context or meaning to a witness's answer.

Objections to questions are not evidence.  Attorneys, as I explained at the outset of the trial, have a duty to their clients to object when they believe that a question is improper under the rules of evidence.  You should not be influenced by the fact that an objection was made or by the way I ruled on it.  If I sustained the objection, you should ignore the lawyer's question, and any assertion of fact that the question might have contained.  If the objection was overruled, you should treat the question and the witness's answer like any other.

Anything that you may have seen or heard outside the courtroom during the course of the trial, of course, is not evidence.  You must decide the case based solely on the evidence that was offered and received in open court.

If you have kept notes, as, I think, most of you have,

remember that your notes are not evidence.  They are only an aid to be used during the deliberations to refresh your recollection of the testimony that was offered during the trial.

Now, regardless of the way in which evidence is presented, you will recall that it comes in one of two forms, either as direct or as so-called circumstantial evidence.

"Direct evidence" is direct proof of a fact, usually offered through the testimony of a person who claims to have been an eyewitness to an event or a participant in a conversation.

"Circumstantial evidence," on the other hand, is proof of a fact, or a set of facts, from which you could infer or conclude that another fact is true, even though you have no direct evidence of that fact.

An appropriate example might be his, given the season: If you were to awake in the morning and, even though the day had dawned bright and clear, see puddles of water on the street, you might draw the inference that it rained during the night, even though your sleep had been uninterrupted. In other words, the fact of rain is an inference that can be drawn from the presence of water on a street.  An inference may be drawn, however, only if it is reasonable and logical, and not if it is speculative or based on conjecture.  If,

PDF created with pdfFactory trial version www.pdffactory.com

for example, you observed puddles of water on your street, but not on any other street in your neighborhood, other facts, like a broken water main, or if you live in the suburbs, a neighbor's malfunctioning sprinkler system, might explain the presence of water.  In deciding whether to draw an inference, you must look at and consider all of the facts in the case in the light of reason, common sense, and your own life experience.

Neither type of evidence, direct or circumstantial, is considered superior or inferior to the other.  Both types of evidence may be considered in reaching your verdict and may be given whatever weight you, as the finders of fact, deem that evidence to be worth.

Most evidence received at trial is offered through the testimony of witnesses.  As the jury, you are the sole judges of the credibility of these witnesses.  If there are inconsistencies in the testimony, it is your function to resolve any conflicts and to decide where the truth lies.

You may choose to believe everything that a witness said, or only part of it, or none of it.  If you do not believe a witness's testimony that something happened, that, of course, is not evidence that it did not happen.  It simply means that you must put aside that testimony and look elsewhere for credible evidence before deciding where the truth lies.

PDF created with pdfFactory trial version www.pdffactory.com

Often it may not be so much what a witness says, but how he or she says it that might give you a clue whether or not to accept his or her version of an event as believable. You may consider a witness's character, his or her demeanor on the witness stand, his or her frankness or lack of frankness in testifying, whether the witness was contradicted by anything that he or she said before the trial, and whether the testimony appears reasonable or unreasonable, probable or improbable, in light of all the other evidence in the case. You may take into account how good an opportunity the witness had to observe the facts about which he or she testified, his or her mental and physical state at the time the observations were made, the degree of intelligence the witness shows, and whether his or her memory seems accurate.

You may consider a witness's motive for testifying, whether he or she displays any bias in doing so, and whether as a result he or she has an interest in the outcome of the case. Now, simply because a witness has an interest in the outcome of the case does not mean that the witness is not trying to tell you the truth as he or she recalls it or believes it to have been. But a witness's interest in the case is a factor that you may consider along with everything else. You may also consider the fact that a witness may be perfectly sincere in his or her account of an event and

PDF created with pdfFactory trial version www.pdffactory.com

simply be mistaken as to the truth.

As a rule a witness is not permitted to offer an opinion about the facts to which he testifies, unless it concerns a matter falling within our common everyday experience. An exception is made for those who are asked to testify as "experts," as was Professor Longman and Mr. Benn. These are witnesses, who, by education and experience, have acquired specialized knowledge in some art, science, or calling. These witnesses are permitted to give opinions about matters falling within their particular expertise, and they may also give reasons for their opinions. This type of testimony is allowed in the belief that the knowledge of certain experts is so specialized that the facts which they have mastered are beyond the collective knowledge of the court and the jury.

However, the credibility of the testimony of an expert witness is judged like that of any other witness. Simply because the law allows a witness to give an opinion does not mean that you must accept that opinion. If you decide that the opinion of an expert witness is not based on sufficient education or experience, or if you conclude that the reasons given for the opinion are not convincing or are outweighed by other evidence in the case, you may disregard the opinion altogether.

Now, With these preliminary instructions in mind, let

PDF created with pdfFactory trial version www.pdffactory.com

me turn to the offenses with which Ms. Kantengwa is charged in the Indictment.  They are respectively: fraudulent use of a visa; perjury, and obstruction of justice.  Ms. Kantengwa has pled not guilty to each of these charges.  As I explained when a defendant pleads not guilty, the government is put to the obligation of proving each material component of every crime charged.  We commonly call these components the "elements" of the crime.  The government has the burden of establishing each element of an offense by proof beyond a reasonable doubt.

Now an indictment typically charges that an offense was committed "on or about" a given date or dates, rather than "on" a certain date.  It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date in reasonable proximity to the date alleged.  Where an indictment, as here, charges multiple crimes, each is set out separately in what are called "counts."  The indictment in this case is comprised of separate counts, some nine in number, and I will describe each specie of the offense as it appears in the indictment.

In Counts 1 and 2 of the indictment, Ms. Kantengwa is charged with violations of the Visa Fraud Statute.

With respect to these two counts, that is, 1 and 2, and the perjury counts, 3 through 8, I've either placed them directly in the text of the instructions I'm giving or I

PDF created with pdfFactory trial version www.pdffactory.com

have added, in the case of the perjury counts, for reasons I'll explain in a minute, I've added them in their full text as an appendix at the back of the instructions.  I'm not going to read those to you, but they're going to be available to you.  In fact, you're going to find them, I think, very helpful in terms of your deliberations.  But you're going to have them, again, set out, and they'll appear in the instructions at pages 18, and 26 as an appendix.

Count 1 of the indictment reads as follows:  On or about January 29, 2004, in the District of Massachusetts and elsewhere, the defendant, Ms. Kantengwa, did knowingly utter, use, and possess a document prescribed by statute and regulation for entry into and as evidence of authorized stay in the United States, that is, a Non-Immigrant Visa, by which the defendant entered the United States at Boston, Massachusetts, knowing it to have been falsely made and procured by means of false claims and statements, and to have been otherwise obtained by fraud and unlawfully obtained; said visa was thus procured and obtained in that the defendant did provide false information as to material facts in the Application to obtain said Non-Immigrant Visa Application and Rwandan Questionnaire (that was submitted as part of said Application), as follows:

In response to a question that asked "Were you or any

immediate family members (spouse, parents, siblings, children) ever a member of the Armed Forces of Rwanda (FAR), the army or militia force, the Gendarmerie, police Communal, Service de Renseignment, Presidential Guard, Interahamwe, PALIR, or ALIR?  If so, please explain," the defendant responded by writing "No."

As the defendant then and there well knew, the statements set forth above were false, in that in that the Defendant's husband was a member of the Service de Renseignment, in fact, he served as the Director.

In response to questions that asked:  "Were you or any of your immediate family members (spouse, parents, siblings, children) ever members of a political party, particularly CDR (Coalition Pour la Defense de la Republique) or MRND (Mouvement Revolutionaire pour le Developpement), organization (civil society), or association in Rwanda?  If so, explain."  The defendant responded by writing "No."

As the defendant then and there well knew, the statements set forth above were false, in that both the Defendant and her husband had been members of the MRND.

That's Count 1 of the indictment.

In order for the defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:

First, that Ms. Kantengwa knowingly used or possessed a

PDF created with pdfFactory trial version www.pdffactory.com

nonimmigrant visa; and second, that she knew that the visa was procured, that is, obtained by means of a material false claim or statement. An act is done "knowingly" if a defendant is aware of what she is doing and is not acting out of ignorance, mistake, or accident.

A statement is "false" if it was untrue when made, and known at the time to be untrue by the person making it.

A statement is "material" if it has a natural tendency to influence or to be capable of influencing the function of the government agency to which it was addressed. I will say more about materiality shortly.

These definitions, as I've given them to you, will apply to each offense that I describe of which they are an element.

You will note that this count, Count 1 of the indictment, sets out two separate statements; that is, two "No" answers that were given to questions asked on the Questionnaire, the statements that the government contends were materially false. It is sufficient for a finding of guilt on this count if you find that at least one of the statements to have been materially false, but you must be unanimous as to which.

Count 2 of the Indictment reads, and it follows the same structure as Count 1, that on or about March 8, 2004, in the District of Massachusetts, the defendant, did

PDF created with pdfFactory trial version www.pdffactory.com

knowingly make under oath, and did knowingly subscribe as true under penalty of perjury, a false statement with respect to a material fact in an application and document required by the immigration laws and regulations prescribed thereunder, that is, a Form I-589, Application for Asylum and Withholding Removal, by which the defendant applied to remain in the United States and avoid removal, and did knowingly present such application and document which contained a false statement, to wit:

In response to a question that asked: "Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?"  The Defendant responded by putting an "X" in the box indicating "No."

As the defendant then and there well knew, the statement set forth above was false, in that, as set forth in Count One, the Defendant had previously committed a crime in the United States by uttering, using and possessing a document prescribed by statute and regulation for entry into and as evidence of authorized stay in the United States, that is, a nonimmigrant visa, knowing it to have been falsely made and procured by means of false claims and statements, and to have been otherwise obtained by fraud and unlawfully obtained.

PDF created with pdfFactory trial version www.pdffactory.com

That's Count 2.

I realize there's some preciosity in these counts, but this is the way they're set out in the statutes.

To find Ms. Kantengwa guilty of this crime, you must be convinced that the government has proven each of the following things beyond a reasonable doubt:  First, that Ms. Kantengwa knowingly made a material false statement under pains and penalties of perjury;

Second, that she made the statement voluntarily and intentionally; and,

Third, that she made the statement in an immigration form, Form I-589, Application for Asylum and Withholding Removal.

The indictment charges Ms. Kantengwa in Counts 3 - 8 with violating Section 1623 of Title 18.  Section 1623 is a criminal statute that makes it an offense for any person to knowingly make a false material declaration in a statement made under oath or signed under penalties of perjury in connection with any proceeding before any court of the United States.  In order to find Ms. Kantengwa guilty of this offense, that is, perjury, you must be satisfied beyond a reasonable doubt of the following four elements with respect to each count:

First, that Ms. Kantengwa made a statement or declaration under oath or under penalties of perjury in

PDF created with pdfFactory trial version www.pdffactory.com

connection with a proceeding before a court of the United States;

Second, that Ms. Kantengwa made a false statement;

Third, that she acted knowingly and willfully; and,

Fourth, that the statement was material to the proceeding being conducted by the court.

Let me summarize the statements specified in the separate counts of the indictment as perjurious.  They are: Count 3, that Ms. Kantengwa lied in swearing that the statements in her immigration documents, as set out in Counts 1 and 2, were truthful;

Count 4, that she was not interested in political matters and did not subscribe to the views of any Rwandan political party after 1991;

Count 5, that her husband had not belonged to any political party;

Count 6, that her husband was not a member of a political group in 1994;

Count 7, that there was no roadblock outside the hotel in Butare where she stayed in April and May of 1994; and.

Count 8, that if there had been a roadblock in front of the hotel, she would have seen it.

The precise wording of each question and answer is very important; consequently I have attached, as I've explained, to these instructions the exact language set out in each of

PDF created with pdfFactory trial version www.pdffactory.com

the perjury counts of the Indictment for you to consult during your deliberations, and, again, there is an Appendix at the back of the instructions themselves.

As for the first element of perjury, you must find beyond a reasonable doubt that Ms. Kantengwa made a statement either under oath or under pains and penalty of perjury. In other words, you must find beyond a reasonable doubt that Ms. Kantengwa testified before the Immigration Court after having sworn an oath to tell the truth, a matter that is not in dispute.

With respect to the second element, you must find beyond a reasonable doubt that the statements at issue were false as charged in the Indictment. For a statement to be perjurious, it must not only be false; its maker must also have known that it was false when made. In other words, the government must prove beyond a reasonable doubt that Ms. Kantengwa knowingly told a falsehood. The statement must also be made willfully, that is, made with bad purpose and the intent to violate the law.

Your decision whether Ms. Kantengwa acted knowingly and willfully in making any statement you find to be false involves a decision about her state of mind at the time the statement was made. It is ordinarily impossible to directly prove the operation of a defendant's mind. You obviously cannot look into a person's mind to see her thought

PDF created with pdfFactory trial version www.pdffactory.com

processes.  But a consideration of all the facts and circumstances shown by the evidence and the exhibits in the case may enable you to infer with a reasonable degree of accuracy what the defendant's state of mind was when the statements at issue were made.  In other words circumstantial evidence may assist you in determining her state of mind.

With respect to the final element of perjury, you must find beyond a reasonable doubt that the false statement under consideration was material to the proceeding in connection with which the statement was made.  A statement is "material," again, if it had a natural tendency to influence the tribunal before which it was made, in this case the Immigration Court hearing Ms. Kantengwa's asylum claim.  Materiality is demonstrated if a truthful statement could aid a court's inquiry, or if a false statement could hinder it.

The statement need not have actually influenced the court, and need not have been related to the primary subject matter of the proceeding in order to be material.  Rather, the statement may be material if it pertained to any proper subject matter of the court's inquiry, including the issue of credibility.  The government need not prove that the false or misleading information would have resulted in a denial of Ms. Kantengwa's asylum claim, but rather that the

PDF created with pdfFactory trial version www.pdffactory.com

disclosure of the fact would have likely influenced the Immigration Court's actions in some material way.

Materiality is measured by an objective standard.  The question is not whether the Immigration Judge subjectively considered the false statements to be material, but whether the statements themselves had a natural tendency or potential to influence the Court.

Ms. Kantengwa, finally, is charged in Count 9 of the Indictment with obstruction of justice in violation of Section 1503 of Title 18.  This is a criminal statute that, among other things, makes it an offense to corruptly influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice.

In order to prove Ms. Kantengwa guilty of obstruction of justice, the government must prove each of the following elements beyond a reasonable doubt:  First, that the Immigration Court Judge was conducting a proceeding;

Second, that Ms. Kantengwa participated in that proceeding; and.

Third, that she did corruptly obstruct or impede, or endeavor to obstruct or impede the proceeding itself.

The obstruction of justice law is intended to protect the justice system from corrupt interference.  It is aimed at a variety of means by which the orderly and due process of the administration of justice might be impeded, thwarted,

PDF created with pdfFactory trial version www.pdffactory.com

or corrupted.  The sweep of the statute extends to any corrupt endeavor or effort to interfere with the Immigration Judge's function in discharging her duties.

The key word in the statute is "endeavor."  As used in this statute, "endeavor" means to make any effort or to do any act, however contrived, again, to obstruct, impede, or interfere with a court proceeding.  It is this endeavor that is the gist of the crime.

Success of the endeavor is not an element of the crime. Any effort, whether successful or not, that is made for the purpose, again, of corrupting, obstructing, or impeding the proceeding is a violation of this law.

The word "corruptly" as used in the statute means having the improper motive or purpose of obstructing justice.  In the context of this case, to act corruptly is to act with the intent to secure an unlawful advantage or benefit; or to engage in any activity that seeks to thwart the efforts to faithfully execute the immigration laws.

Now let me say a few words about your deliberations.

It is your duty to discuss the case with your fellow jurors for the purpose of reaching agreement if you can do so.  Each of you must decide the case for yourself, but should do so only after considering all of the evidence, after listening to the views of your fellow jurors, and after discussing the case fully with the other jurors.  This

PDF created with pdfFactory trial version www.pdffactory.com

trial has been reasonably brief, but, as you can imagine, it has taken a genuine effort by all involved to prepare and present.  There is no reason to think that it could have been better tried -- in fact, it was tried very ably by both sides -- or that another jury would be better qualified than you to render a verdict.  It is important, therefore, that you reach a verdict if you can do so conscientiously.  You should not hesitate to reconsider your own opinions from time to time and to change them if you become convinced that they are wrong.  However, do not surrender an honest conviction as to the weight and effect of the evidence simply for the expedience of arriving at a verdict.

The Your verdict must be unanimous as to whether Ms. Kantengwa is guilty or not guilty of each charge that is being submitted to you for a verdict.  You may not draw any inference, favorable or unfavorable to the government, from the fact that any other person was not named as a defendant or is not on trial before you in this case.  Similarly, you are not to consider whether Ms. Kantengwa might be guilty of some other crime that the government for whatever reason has chosen not to prosecute.  Your task is to determine whether the government has proved beyond a reasonable doubt that Ms. Kantengwa committed the crimes that are alleged.

The matter of sentencing should also not be a factor in your deliberations.  Sentencing is the sole responsibility

PDF created with pdfFactory trial version www.pdffactory.com

of the Court.

Remember that your verdict must be based solely on the evidence in the case and the law as I have explained it to you and not on anything else.

And finally, as I have instructed, bear in mind that the government has the burden of proof and that you must be convinced of a defendant's guilt beyond a reasonable doubt to return a guilty verdict.  If you find this burden has not been met, then you must return a verdict or verdicts of not guilty.

It is important that you not communicate with anyone outside the jury room about your deliberations or about anything touching this case until you, in fact, reach your verdict.  There is one exception to this rule.  If it becomes necessary during your deliberations to communicate with me, you may send a note through the court officer, signed by the person who I appoint as your foreperson.  No member of the jury should ever attempt to communicate with the Court except by means of this signed writing.

As explained there two times during the course of the case that I am required to meet with the attorneys.  This is one them, and this should be brief, but it's just so they can point out any ommisions I might have made or places I might have misspoke during the instructions.

**(SIDEBAR CONFERENCE AS FOLLOWS:**

THE COURT:  I'm going to consider the -- there were the two issues that I did not adopt that you advanced and I preserved.  So you don't have to go on at any great length here.

MS. FISHER:  In that case, your Honor, I'm just going to address the materiality instruction.

THE COURT:  Okay.

MS. FISHER:  We object to the language that "the statement need not have been related to the primary subject matter of the proceeding in order to be material."

We object to the language, That the disclosure of the fact would have likely influenced the Immigration Court's action in some way, instead of the language in Kungys, which is "Predictably capable of affecting."

And we object to the language that "Materiality is measured by an objective standard.  The question is not whether the Immigration Judge subjectively considered the false statements to be material."

One other thing I forgot to mention in our prior is we had proposed something which was also in the government's instructions, which is the manner of proof, the "two witness" rule, which was our Proposed Jury Instruction No. 11.

"The testimony of one witness is not sufficient."

THE COURT:  I'll add that.

PDF created with pdfFactory trial version www.pdffactory.com

MR. McGINTY:  Your Honor, on materiality, the First Circuit is quite clear that there has to be some centrality about the facts that are to be considered by the Immigration Judge, so the -- or the structure of the process that the Immigration Judges are required to adhear to when they reach their rulings.  Those, too, should be part of the materiality instruction.

THE COURT:  We discussed that in the conference.

MR. CAPIN:  Nothing, your Honor.

THE COURT:  I said "two witnesses."

Give me what you have.  I don't want to freelance on that.

MR. CHAKRAVARTY:  The only issue we might have with the language on the "two witness" rule is not the giving of it, but that the defendant's own statements can constitute one of the witnesses, some evidence that can be corroborated by a second witness.

THE COURT:  Okay.

I thought you were all good.

Mr. McGinty, I knew you were good, but that was astounding.  That was one of the best closings --

MR. LANGE:  Your Honor, have we preserved the Rule 29?

THE COURT:  Yes.  We did that.

MR. LANGE:  Thank you.

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  On last thing.

Just because I always appoint No. 1.  She seems fine.  She'll be the foreperson.

MR. LANGE:  The young man, we agree.  He slept.

MR. CAPIN:  We agree with that.

**END OF SIDEBAR CONFERENCE.)**

THE COURT:  Okay.

There is one thing I inadvertently skipped over.  It will be in the instructions, which you will have in the book that will be with you tomorrow.  This is going back to perjury, and proof of perjury.

The rule in federal court is that one witness alone, that is, one witness is not sufficient to support a finding that a statement was false.  There have to be two witnesses, at lease.  One of them, of course, would be the defendant making the statement herself, but it has to be corroborated by at least one other evidence for you to find beyond a reasonable doubt that the testimony was false.

Does that capture --

MS. FISHER:  Yes, your Honor.

THE COURT:  All right, jurors, at this point, we are going to appoint a foreperson and, by tradition, Juror No. 1, Ms. Xxxxxx, do you mind --

JURY FOREPERSON:  No.

THE COURT:  -- taking on that role?

PDF created with pdfFactory trial version www.pdffactory.com

Obviously, you'll be the moderator of the jurors' discussions.  Your primary role is to ensure that every juror has a full and fair chance to be heard on every material issue by his or her fellow jurors.

When you reach your verdict, I'll ask you to complete and ensure the accuracy of the verdict slip.  It's very simple.  It's a check list.  Count One:  Guilty or Not Guilty.  Count Two:  Guilty or Not Guilty, and you have to match them against the instructions as you go through the verdict itself.

That said, I am going to ask Danni to play the role of Vanna White.

(Laughter.)

THE COURT:  She is going to pool -- we do it by letter, because all I have is a Scrabble set.  So the alternate will be.

LAW CLERK:  G.

THE COURT:  Mr. Xxxxxx, I don't know if this comes as good news to you, but you have been selected as the alternate juror.  We'll need to know how to get in touch with you if we need you.  I don't think it will be necessary, but should any of the deliberating jurors be unable to continue, we have to have a means -- I think we have a phone number for you -- to get ahold of you at a moment's notice.

PDF created with pdfFactory trial version www.pdffactory.com

All right. With the exception of Mr. Xxxxxx, I am going to suggest then that the deliberating jury return to the jury room. It's been a long, long day. I assume you're going to want to go home and come back tomorrow. I would just just go up, organize yourselves. I assume we will start at nine. That seems to be a good time for everyone.

Again, we will provide lunch for you tomorrow.

So we will look forward to seeing you tomorrow morning, and when you come in again, all of the exhibits and the instruction book will be sitting waiting for so you will them for your deliberations.

All right. The deliberating jury may retire, and, again, just get yourself organized and feel free to go. You don't have to report back to the courtroom.

Ms. Xxxxxxx, make sure that no deliberations begin tomorrow morning until everyone is there. I think you will all be there, but good luck in that sense.

Counsel, you'll go over the exhibits with Terri and make sure we know how to get ahold of you if we need you.

(Whereupon, the jury left the courtroom.)

THE COURT: I assume you don't need your supplement back? I am just going -- I know I have a copy of it, but to make sure while it's on my mind, and I'll do it now.

MS. FISHER: That's fine. Thank you.

(Whereupon the Court left the bench.)

PDF created with pdfFactory trial version www.pdffactory.com

(Pause in proceedings.)

          MR. CAPIN:  The parties are satisfied the exhibits are in order.

          MR. McGINTY:  Agreed.

        (Proceedings adjourned.)

                            I N D E X

WITNESS                        DIRECT   CROSS   REDIRECT

THEOBALD GAKWAYA RWAKA, resumed

  By Mr. McGinty                 6                49

  By Mr. Chakravarty                    14

                      E X H I B I T S

DEFENDANT'S                                          IN EV.

No. 31      Documents                                  6

COURT EXHIBITS

C           Portion of 8/24/06 transcript            65

D           Stipulation                              65

PDF created with pdfFactory trial version www.pdffactory.com

187

---

**C E R T I F I C A T E**

 

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                     March 7, 2013

_____
James P. Gibbons


JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jmsgibbons@yahoo.com

---

PDF created with pdfFactory trial version www.pdffactory.com